**No. 26-4388**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

Z.A., *a minor, by and through their parent*, A.A., *et al.*,
*Plaintiffs-Appellees*,

v.

TODD BLANCHE, *Acting Attorney General, in his official capacity*; UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California

**BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
*Assistant Attorney General*

JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

PERTINENT STATUTES .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 3

A. Factual Background .......... 3

B. Prior Proceedings .......... 7

SUMMARY OF ARGUMENT .......... 11

STANDARD OF REVIEW .......... 14

ARGUMENT .......... 15

I. The Injunction Is Indefensible .......... 15

A. Plaintiffs Chose the Wrong Procedural Vehicle and the Wrong Court .......... 15

B. The District Court Grossly Misapplied Substantive Due Process Principles. .......... 28

II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction .......... 40

CONCLUSION .......... 42

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 27

*Am. Acad. of Pediatrics v. Uthmeier*,
2026 WL 1971202 (7th Cir. July 8, 2026) .......... 21, 40

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .......... 22, 23, 24

*Becker v. Kroll*,
494 F.3d 904 (10th Cir. 2007) .......... 33

*Blair v. United States*,
250 U.S. 273 (1919) .......... 29, 36, 39

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......... 18

*Brown v. United States*,
359 U.S. 41 (1959) .......... 17

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) .......... 40

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) .......... 42

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) .......... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 27

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) .......... 13, 33, 34, 35

*Cobbledick v. United States*,
309 U.S. 323 (1940) .......... 17, 41

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992) .......... 28

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026) .......... 40

*Dobbs v. Jackson Women's Health Org*,
597 U.S. 215 (2022) .......... 30, 31, 32, 33

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
441 U.S. 221 (1979) .......... 19

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) .......... 22

*Hancock v. Cnty. of Rensselaer*,
882 F.3d 58 (2d Cir. 2018) .......... 37

*Hilao v. Est. of Marcos*,
95 F.3d 848 (9th Cir. 1996) .......... 22

*In re Grand Jury Proceedings*,
801 F.2d 1164 (9th Cir. 1986) .......... 9, 12, 28, 29, 35, 37, 38

*In re Grand Jury Subpoena No. 16-03-217*,
875 F.3d 1179 (9th Cir. 2017) .......... 14, 39, 41

*In re Pantojas*,
628 F.2d 701 (1st Cir. 1980) .......... 17

*In re Sealed Case*,
794 F.2d 749 (D.C. Cir. 1986) .......... 41

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .......... 35, 42

*Kachatryan v. Blinken*,
4 F.4th 841 (9th Cir. 2021) .......... 31

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .......... 33

*Levine v. United States*,
362 U.S. 610 (1960) .......... 17

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................................ 40

*NASA v. Nelson*,
562 U.S. 134 (2011) .......................................................................................... 31

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ...................................................................................... 26

*New York Times Co. v. Gonzales*,
382 F. Supp. 2d 457 (S.D.N.Y. 2005)................................................................ 25

*New York Times Co. v. Gonzales*,
459 F.3d 160 (2d Cir. 2006)............................................................................... 25

*Norbert v. City & Cnty. of San Francisco*,
10 F.4th 918 (9th Cir. 2021) .............................................................................. 14

*Raich v. Gonzales*,
500 F.3d 850 (9th Cir. 2007) ............................................................................. 32

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ...............................................................28, 31, 32

*Samia v. United States*,
599 U.S. 635 (2023) .......................................................................................... 41

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ........................................................................... 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................................................... 27

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..............................................................................24, 25, 40

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) ..................................................................9, 30, 37

*United States v. (Under Seal)*,
714 F.2d 347 (4th Cir. 1983) ............................................................................. 17

*United States v. Beaufils*,
160 F.4th 1147 (11th Cir. 2025)......................................................................... 35

*United States v. Calandra*,
414 U.S. 338 (1974) ....................................12, 16, 20, 21, 29, 41

*United States v. Dionisio*,
410 U.S. 1 (1973) ....................................21, 29, 39

*United States v. Hayes*,
794 F.2d 1348 (9th Cir. 1986) .................................... 35

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) .................................... 14

*United States v. R. Enters., Inc.*,
498 U.S. 293 (1991) ....................................18, 20, 21, 30, 31, 34

*United States v. Skrmetti*,
605 U.S. 495 (2025) .................................... 4, 33

*United States v. Williams*,
504 U.S. 36 (1992) .................................... 18, 37

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) .................................... 5

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. And Gulf Coast Dist. of the ILA; AFL-CIO*,
751 F.2d 721 (5th Cir. 1985) .................................... 41

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .................................... 13, 31

*Whalen v. Roe*,
429 U.S. 589 (1977) .................................... 38

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................... 15, 39

*World Pro. Ass'n for Transgender Health v. FTC*,
No. 26-cv-532, 2026 WL 1999008 (D.D.C. July 10, 2026) .................................... 21

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .................................... 23

**Statutes**

5 U.S.C. § 552a ........ 38

5 U.S.C. § 552a(i) ........ 38

18 U.S.C. § 1035 ........ 5

18 U.S.C. § 1347 ........ 5

18 U.S.C. § 3237(a) ........ 36

18 U.S.C. § 3282(a) ........ 41

18 U.S.C. § 3486 ........ 6, 27

21 U.S.C. § 352(f) ........ 5

**Rules**

Fed. R. App. P. 4(a)(1)(B) ........ 3

Fed. R. Civ. P. 45(d)(3) ........ 19

Fed. R. Crim. P. 6 ........ 16

Fed. R. Crim. P. 6(e) ........ 7

Fed. R. Crim. P. 6(e)(2)(E) ........ 18

Fed. R. Crim. P. 6(e)(2)(F) ........ 18

Fed. R. Crim. P. 6(e)(3)(B) ........ 39

Fed. R. Crim. P. 6(e)(3)(E) ........ 19, 24

Fed. R. Crim. P. 6(e)(3)(F) ........ 19, 24

Fed. R. Crim. P. 6(e)(7) ........ 38

Fed. R. Crim. P. 17 ........ 16, 29, 38

Fed. R. Crim. P. 17(a) ........ 17, 18

Fed. R. Crim. P. 17(c)(2) ........ 17

**Regulations**

21 C.F.R. § 208.128 .......... 5

45 C.F.R. § 164.520 .......... 37

## INTRODUCTION

Plaintiffs are several minor patients of Lucile Packard Children's Hospital at Stanford (LPCH) and their parents. They assert that a grand jury in the Northern District of Texas issued a subpoena to LPCH seeking communications with pharmaceutical companies regarding cross-sex hormones and puberty blockers, internal communications regarding billing practices for certain treatments, medical and billing records, and other related documents.

Consistent with grand jury secrecy rules, the government cannot disclose the existence or nature of any grand jury subpoenas, but the government publicly disclosed last year that it is investigating matters including whether healthcare providers have committed healthcare billing fraud or made unlawful false statements, and whether manufacturers and distributors of puberty blockers and cross-sex hormones violated the Food, Drug, and Cosmetic Act (FDCA) by distributing drugs intending that they be used off-label. Pursuant to that investigation, three hospitals have thus far agreed to pay substantial penalties to resolve potential liability for allegations that they submitted false bills to secure insurance coverage for sex-rejecting procedures on minors.

Rather than moving to quash or otherwise seeking relief in the Northern District of Texas, Plaintiffs asked a district court in the Northern District of California to enjoin the government from seeking or obtaining patient records in response to any present or future subpoenas. The district court granted this motion and extended

its relief by provisionally certifying a class of patients who received gender-related medical interventions from LPCH as minors.

That order is an unprecedented arrogation of authority that this Court should promptly correct. Just as the Northern District of Texas cannot superintend grand juries in the Northern District of California, so the Northern District of California cannot superintend grand juries in the Northern District of Texas. The basic principles governing grand jury proceedings dictate that if Plaintiffs seek to challenge a subpoena, they must seek to quash before the issuing court. By the same token, a district court cannot invade Executive Branch prerogatives by telling the Executive Branch which offenses or entities it may investigate. Orders like the one entered here have no historical precedent, would create law-free zones where private actors may violate the law with impunity, and irreparably harm the government and the public's interests in enforcing laws protecting the public and the public fisc. Even beyond those threshold considerations, on the merits, the district court's novel expansion of substantive due process is contrary to circuit precedent and erroneous on its own terms.

The preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject matter jurisdiction under 28 U.S.C. § 1331. ER-113. On July 2, 2026, the district court entered a preliminary injunction. ER-3-45. On July 9, 2026, the government filed a timely notice of appeal. ER-161-

64; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether the district court exceeded its constitutional and equitable authority by enjoining a grand jury subpoena purportedly issued by the Northern District of Texas.

2. Whether Plaintiffs may bypass the Federal Rules of Criminal Procedure and challenge a federal grand jury subpoena in a collateral civil action outside the issuing court.

3. Whether Plaintiffs are likely to establish a novel and expansive Fifth Amendment substantive-due-process right to prevent compliance with a grand jury subpoena for medical records directed to a third party.

## STATEMENT OF THE CASE

### A. Factual Background

For over a year, the Department of Justice has been investigating potential violations of federal law in connection with the provision of certain prescription drugs to minors with gender dysphoria. These include prescription drugs that suppress the production of sex hormones to delay puberty (common referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the

child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. *See United States v. Skrmetti*, 605 U.S. 495, 503-04 (2025) (describing use of these drugs). Although these drugs are approved by the Food and Drug Administration (FDA) for some uses, the FDA has not determined that any of these drugs are safe or effective for treating gender dysphoria or approved them for such use or any other psychiatric disorder.

The use of these drugs in the treatment of gender dysphoria in minors is highly controversial—the subject of "fierce scientific and policy debates." *Skrmetti*, 605 U.S. at 525. As the Supreme Court recently explained, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors," and "more than 20 States have enacted laws banning the provision of sex transition treatments to minors." *Id.* at 504-05. The United States Department of Health and Human Services (HHS) has likewise found, after reviewing the available evidence, that these interventions in minors are associated with serious potential harms—including infertility and sterility, impaired bone density development, cardiovascular and metabolic disease, and psychiatric conditions. Admiral Brian Christine, Assistant Sec'y for Health, U.S. HHS, *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025), https://perma.cc/ZH22-R5GH (HHS Statement). In sum, "[c]urrent evidence does not support claims that puberty blockers, cross-sex

hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria." *Id.* at 3.

Although federal law does not prohibit doctors from prescribing drugs for off-label purposes, various federal statutes prohibit defrauding or obtaining money by false pretenses from programs like Medicare or Medicaid or from private health care benefit programs. *See, e.g.*, 18 U.S.C. §§ 1035, 1347. For example, a physician may violate the False Claims Act by submitting claims for reimbursement that contain misleading "payment" or "other [billing] codes." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 189-90 (2016). And the FDCA extensively regulates pharmaceutical companies. For example, drug manufacturers and distributors can violate the FDCA by shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently evidenced by promoting the drugs for off-label uses. 21 U.S.C. § 352(f); 21 C.F.R. § 208.128.

In April 2025, then-Attorney General Bondi directed the Department to prioritize investigations of "medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilation." Memorandum from the Att'y Gen., Off. of the Att'y Gen., for Select Component Heads 4 (Apr. 22, 2025), https://perma.cc/N345-R8QL (Bondi Memo). The Bondi Memo directed the Department to "undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making" "false claims about the on- or off-label use of puberty

blockers, sex hormones," and similar drugs. *Id.* It separately directed the Department to prioritize investigations under the False Claims Act "of false claims submitted to federal health care programs for any non-covered services" related to gender-related medical interventions in minors. *Id.*

In June 2025, Assistant Attorney General for the Civil Division Brett Shumate issued a memorandum directing his staff to "prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with" the Bondi Memo. Memorandum from Brett A. Shumate, Assistant Att'y Gen., U.S. Dep't of Just., to Civ. Div. Emps. 2-3 (June 11, 2025), https://perma.cc/AMR2-U7W3 (Shumate Memo).

In connection with its public investigation, the government has issued various administrative subpoenas under 18 U.S.C. § 3486 (a provision of the Health Insurance Portability and Accountability Act), including one since-withdrawn administrative subpoena to LPCH. The Department has thus far announced resolutions of criminal liability with three hospitals for allegations that they submitted false bills to obtain insurance coverage for gender-related medical interventions for minors.[1]

[1] Press Release, U.S. Dep't of Justice (August 5, 2026), https://perma.cc/D4MX-8TD8; Press Release, U.S. Dep't of Justice (June 5, 2026), https://perma.cc/7MPN-4AQK; Press Release, U.S. Dep't of Justice (May 15, 2026), https://perma.cc/S4NQ-X6FN.

### B. Prior Proceedings

Plaintiffs are patients and former patients who received gender-related treatments at LPCH while they were minors, along with several of their parents, proceeding pseudonymously. ER-114-15. According to Plaintiffs and LPCH's public filings, a grand jury subpoena bearing the seal of the Northern District of Texas commanded LPCH to produce documents before a federal grand jury in Fort Worth. ER-98-109. The asserted subpoena purportedly required production by June 10, 2026, and sought communications with pharmaceutical companies regarding cross-sex hormones and puberty blockers, internal communications regarding billing practices for certain treatments, medical and billing records, and other related documents. ER-102-04.

Plaintiffs conceded that "the nature of any alleged criminal conduct under investigation" in connection with the asserted grand jury subpoena "is unknown." ER-72. Due to grand-jury secrecy requirements, the government may not confirm or deny the existence or contents of a subpoena or the nature of any grand jury investigation. *See* Fed. R. Crim. P. 6(e).

On May 27, Plaintiffs filed this lawsuit in the Northern District of California and moved for a temporary restraining order. Dkt.1. But "[r]ather than sue any government official or move to quash the subpoena in the district where it was issued," the original complaint named only LPCH and alleged that its compliance with the asserted grand jury subpoena would violate Plaintiffs' Fourth and Fifth

Amendment rights. ER-145. On June 6, the district court denied the motion because Plaintiffs had failed to establish that LPCH should be treated as a state actor. ER-145-60.

On June 8, Plaintiffs filed the operative amended complaint, adding the Department and Acting Attorney General as defendants and asserting claims under the First and Fifth Amendments. ER-110-139. That day, or as the district later put it, "[j]ust hours before the original return date on [asserted] the grand jury subpoena," Plaintiffs sought a temporary restraining order to prevent the Department from "obtain[ing] their identifying information and [personal health information] in response to Grand Jury Subpoenas" allegedly issued to LPCH and other California hospitals. ER-59. Plaintiffs also sought provisional certification of a class of "individuals who received any medical treatment for gender dysphoria" at a "healthcare institution located in the State of California" while they were minors, and a subclass of those individuals treated "at [LPCH]." ER-124.

That same day, the district court entered a text order "prohibiting DOJ and Packard from taking further action to enforce or comply with the subpoena in order to preserve [its] jurisdiction." ER-13. The district court later heard argument, and the parties agreed to treat the temporary restraining order briefing as briefing on a preliminary injunction.

On July 2, the court granted Plaintiffs' motions in substantial part. ER-3-45. The court provisionally certified the LPCH subclass and entered a preliminary

injunction, concluding that Plaintiffs would likely succeed on their Fifth Amendment claim against the Department. The court first rejected the Department's threshold argument that Federal Rule of Criminal Procedure 17 requires challenges to grand jury process to be presented to the supervising court through a motion to quash. ER-26-33. The court acknowledged that it is "quite likely that Rule 17 would preclude" Plaintiffs from moving to quash the asserted subpoena outside the Northern District of Texas. ER-27. It nevertheless concluded that Plaintiffs could pursue an equitable action in California because they characterized their suit as challenging a "broader campaign" to obtain their information, rather than seeking only formal quashal of a particular subpoena. *Id.*

The district court next held that Plaintiffs were likely to succeed on their Fifth amendment informational-privacy claim. ER-33-42. The court distinguished this Court's decision in *In re Grand Jury Proceedings*, 801 F.2d 1164, 1169 (9th Cir. 1986), which rejected a constitutional privacy challenge to a grand jury subpoena for patient and prescription records, reasoning that Plaintiffs asserted a narrower right concerning "information of a particularly sensitive and intimate nature." ER-35. It then applied the five-factor balancing framework from *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004), and concluded that Plaintiffs' interest in the confidentiality of their medical information outweighed any possible government investigative interests. In reaching that conclusion, the court acknowledged that "grand jury secrecy restricted DOJ's ability to explain the relevance of the requested

patient records for purposes of opposing preliminary injunctive relief." ER-39. It nevertheless reasoned that the Department could, "moving forward," seek authorization from the supervising court to make an in camera submission in the California proceeding. ER-39.

Based on the public record before it, the court concluded that LPCH's patient records have "no obvious relevance" and "no apparent nexus" to an investigation or potential indictment in Texas. ER-39, ER-41. It thus found "little to no possibility" that the requested patient information would be relevant to a grand jury investigation in Texas and so characterized the Department's need as "at most, minimal." ER-41-42. Having found a likelihood of success on Plaintiffs' informational-privacy theory, the court did not reach their First Amendment claim. Finally, the court determined that the remaining equitable factors weighed in favor of an injunction. ER-44-45.

The resulting injunction prohibits the Department and all persons acting in concert with them from "requesting, receiving, producing, transmitting, disclosing, or otherwise obtaining" any records or information that:

- identify provision class members as having sought or received gender-related care
- disclose the clinical indications, diagnoses, assessments, or other sensitive health information underlying such care
- describe the care provided to provisional class members, including consultations or patient intakes
- relate to informed consent or parent or guardian authorization for such care

ER-45.

The government timely appealed and moved for a stay pending appeal. The district court denied the government's stay motion on July 31, 2026. As of August 7, this Court has not acted on the government's motion for a stay pending appeal.

## SUMMARY OF ARGUMENT

The district court's unprecedented injunction is both legally and equitably indefensible and should accordingly be reversed.

**I.A.** At the outset, Plaintiffs chose the wrong procedural vehicle and the wrong court. A federal grand jury is an arm of the court in which it sits, and the Federal Rules of Criminal Procedure therefore assign responsibility for supervising and enforcing grand jury subpoenas to the issuing court. Rule 17 thus requires Plaintiffs' objections to the asserted grand jury subpoena to be raised through a prompt motion to quash before the court supervising the grand jury. Respecting that allocation of authority is critical because grand jury investigations are secret, nationwide in scope, and vulnerable to disruption and delay. A non-supervising court lacks both the investigative context and the authority needed to assess another court's grand jury process, while the government cannot freely disclose the investigative details necessary to defend that process in collateral litigation. Allowing such challenges would delay grand jury investigations and the enforcement of federal criminal law, invite conflicting rulings, and permit precisely the sort of "litigious

interference with grand jury proceedings" that the Supreme Court has consistently rejected. *United States v. Calandra*, 414 U.S. 338, 350 (1974).

Plaintiffs cannot evade Rule 17 by recasting quashal as an injunction against the government's receipt of subpoenaed evidence. Courts may not invoke equity to circumvent a remedial framework established by federal law, particularly where the prescribed mechanism provides the plaintiff with an avenue for judicial review and collateral adjudication would be unworkable. Nor do district courts possess freewheeling equitable authority to enjoin grand jury process supervised and enforced by a coordinate federal court. Such injunctions lack any historical pedigree and thus exceed the bounds of federal court's equitable power. The district court's attempt to justify its order as addressing a broader investigative "campaign" only magnifies the intrusive nature of the court's unprecedented injunction. Plaintiffs cannot end-run Rule 17 by packaging an impermissible challenge to an existing grand jury subpoena together with objections to hypothetical future process.

**B.** In any event, the asserted grand jury subpoena does not raise any constitutional concern, let alone one that could justify the preliminary injunction issued below. Substantive due process does not imbue third parties with a right to prevent their medical records from being used in a grand jury investigation. That theory is incompatible with a functioning grand jury system, in which federal prosecutors frequently must seek and handle highly sensitive evidence. And it is foreclosed by this Court's decision in *In re Grand Jury Proceedings*, 801 F.2d 1164, 1167

(9th Cir. 1986), which rejected a materially similar constitutional privacy challenge to a grand jury subpoena for patient and prescription records. Plaintiffs' asserted substantive due process right of privacy in medical records as against grand jury process directed at a third party is not "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation omitted); indeed, Plaintiffs identify no court that endorsed such a novel and expansive theory of substantive due process before the decision below.

Even if such a right existed, the district court's substantive due process analysis was independently erroneous. The routine use of grand jury subpoenas to obtain sensitive evidence in a criminal investigation bears no resemblance to the extreme official misconduct necessary to establish a substantive due process violation. And the court could not perform the required "exact analysis of circumstances," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998), including because Plaintiffs admitted that the nature of the investigation was unknown and grand jury secrecy restricted the government's ability to disclose an investigative theory or supporting facts. For related and independent reasons, the district court's analysis of the privacy balance was plainly erroneous too. Medical records maintained by third parties are routinely disclosed for law-enforcement purposes, and grand jury secrecy provides substantial protection for the privacy interests of patients. The district court erroneously discounted the government and the public's compelling interest in investigating

possible violations of federal law because of its mistaken view that the records were almost certainly irrelevant.

**II.** The equities also decisively favor the government. The injunction indefinitely prevents the government from obtaining an entire category of relevant evidence through any grand jury or other lawful process—regardless of the offense under investigation, the strength of the evidence, or the necessity for the records. That intrusion irreparably harms the government and the public's "compelling interest in the grand jury's investigation into possible violations of federal law." *In re Grand Jury Subpoena No. 16-03-217*, 875 F.3d 1179, 1191 (9th Cir. 2017). Plaintiffs' asserted privacy interests, by contrast, would be substantially protected by grand jury secrecy and other legal safeguards.

## STANDARD OF REVIEW

This Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (quotation marks omitted). A "district court abuses its discretion when it makes an error of law" or "rests its decision on clearly erroneous findings of fact." *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc) (citation omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. The Injunction Is Indefensible

Plaintiffs are unlikely to succeed on their challenge to grand jury process that they assert was issued by the Northern District of Texas. District courts have no equitable authority to interfere with a sister federal court's grand jury process, and Plaintiffs lack an equitable cause of action to seek such unprecedented and intrusive relief. Even apart from those threshold defects, the notion that substantive due process principles can limit compliance with an otherwise lawful grand jury subpoena is foreign to our constitutional tradition and foreclosed by on-point circuit precedent.

#### A. Plaintiffs chose the wrong procedural vehicle and the wrong court.

At the threshold, Plaintiffs lack a cause of action to seek an injunction that functions as quashal of an asserted grand jury subpoena, and the district court had no equitable power to interfere with any grand jury process issued under the authority of a federal court in Texas. Neither Plaintiffs nor the district court pointed to *any* prior case in which one federal court has purported to interfere with a grand jury investigation supervised by another federal district court. And that is no surprise: even aside from the absence of any historical tradition allowing such equitable interference with another court's process, the Federal Rules of Criminal Procedure

establish a unified and comprehensive framework governing the issuance, enforcement, and challenge of grand jury subpoenas. *See* Fed. R. Crim. P. 17; *see also id.* R. 6. Under that framework and consistent with centuries of settled practice, Plaintiffs' challenge belongs before the court supervising the grand jury, through a motion to quash or modify the subpoena.

Plaintiffs may not bypass that framework through collateral civil litigation in which they recast quashal as an injunction against the government's receipt of subpoenaed evidence. Nor may district courts assert freewheeling equitable authority to disable grand jury process issued by a sister federal court that exercises supervision and enforcement jurisdiction over such subpoenas. The novel procedure approved by the district court would create a procedural morass in which grand juries across the country could be paralyzed by litigation brought in multiple jurisdictions across the country—jurisdictions that lack visibility into the grand jury's investigation and have no means to compel the production of secret grand-jury information that would enable them to conduct any coherent analysis of a challenge to such a subpoena. Given the constitutional role and responsibility of the grand jury, the Supreme Court has consistently "reaffirmed [its] disinclination to allow litigious interference with grand jury proceedings." *Calandra*, 414 U.S. at 350. Plaintiffs' choice to sue in the wrong court and through the wrong procedural vehicle means their claim has no chance of success.

**1.** A federal grand jury "is an arm of the court" in which it sits. *Levine v. United States*, 362 U.S. 610, 617 (1960). "The Constitution itself makes the grand jury a part of the judicial process," and it serves "under general instructions from the court to which it is attached and to which, from time to time, it reports its findings." *Id.* (quoting *Cobbledick v. United States*, 309 U.S. 323, 327 (1940)). Indeed, as "an appendage of the court," a grand jury is "powerless to perform its investigative function without the court's aid"—it cannot "itself" compel evidence or testimony. *Brown v. United States,* 359 U.S. 41, 49 (1959). Rather, it is the supervising "court's process which summons the witness to attend and give testimony, and it is the court which must compel a witness to testify if, after appearing, he refuses to do so." *Id.*

The corollary is that "[t]he power to quash a subpoena exists in the district court of the district where the grand jury sits by reason of its inherent authority to prevent misuse of its own process." *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir. 1983); *see also, e.g.*, *In re Pantojas*, 628 F.2d 701, 705 (1st Cir. 1980) ("The practical responsibility for controlling grand jury excesses lies with the district court, on which the grand jury must rely for subpoena and contempt procedures."). Consistent with that principle, the Federal Rules of Criminal Procedure expressly channel objections to grand jury process to the issuing court. A grand jury subpoena must "state the court's name" and "include the seal of the court." Fed. R. Crim. P. 17(a). And "[o]n motion made promptly, *the court* may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* R. 17(c)(2) (emphasis

added). In context, "the court" with exclusive authority to quash or modify grand jury process is the court named on the subpoena—the same court that supervises the grand jury and exercises authority over its proceedings, including deciding any requests for disclosure under Rule 6(e). *See id.* R. 6(e)(2)(E), (F) ("A petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened.").

That allocation of authority reflects long-settled practice. The Supreme Court has repeatedly explained that "[g]rand juries are subject to judicial control and subpoenas to motions to quash." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972). Although a "grand jury subpoena issued through normal channels" is presumed reasonable in light of the grand jury's broad investigative authority, *United States v. R. Enters., Inc.*, 498 U.S. 293, 298-301 (1991), the supervising "court will refuse to lend its assistance when the compulsion the grand jury seeks would override rights accorded by the Constitution," *United States v. Williams*, 504 U.S. 36, 48 (1992). And, as explained, Rule 17 requires that such objections be presented to the court responsible for the investigation—not to any far-flung district in which the subpoena recipient, the documents, or persons mentioned in those documents happen to be located.

**2.** The district court's contrary approach is completely unworkable. Apart from intruding upon the issuing court's supervisory authority, permitting a separate federal district court to entertain collateral challenges to a subpoena issued by a grand jury sitting in another district would delay and disrupt the orderly administration of

federal criminal investigations and unnecessarily risk inconsistent rulings among federal courts. Because Rule 17(e) authorizes nationwide service, permitting collateral challenges in any district in which an interested person happens to be located would permit different courts—without access to the same information or responsibility for the grand jury's investigation—to issue conflicting rulings about the same grand jury proceeding. Rule 17 avoids that disorder and delay by channeling disputes to the one court responsible for the investigation. The contrast with Civil Rule 45 confirms the point: whereas Civil Rule 45 expressly assigns certain subpoena disputes to "the court for the district where compliance is required," Fed. R. Civ. P. 45(d)(3), Criminal Rule 17 contains no comparable provision contemplating collateral review in the district where documents are located.

The historic tradition of grand jury secrecy, now enshrined in Rule 6(e), makes that channeling a "practical necessity." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 221, 225 (1979). Rule 6(e) generally prohibits government attorneys from disclosing matters occurring before the grand jury without authorization from the supervising court. *See* Fed. R. Crim. P. 6(e)(3)(E)(i), (F). And "the policies underlying" grand jury secrecy also "dictate that the grand jury's supervisory court participate in reviewing such [disclosure] requests, as it is in the best position to determine the continuing need for grand jury secrecy." *Douglas Oil*, 441 U.S. at 225. On the other hand, a non-supervising court lacks the information needed to evaluate a subpoena's relevance, the government's need, or delay's consequences. It is

effectively asked to restrain an investigation whose relevant details and scope neither the plaintiffs nor the court know—and which the government cannot freely reveal. By contrast, the supervising court does not face that disability; it may evaluate objections against the full investigative context and even authorize appropriate disclosures to the objecting party. *See R. Enters.*, 498 U.S. at 302.

Even if Rule 6(e) were no obstacle, "[r]equiring the Government to explain in too much detail the particular reasons underlying a subpoena" in a collateral proceeding "threatens to compromise 'the indispensable secrecy of grand jury proceedings.'" *Id.* at 299 (citation omitted). The district court believed that concern could be addressed by requiring the government to obtain permission from the supervising court to provide an in camera submission. ER-39 (citing *R. Enters.*, 498 U.S. at 301-02). But that merely underscores why the challenge belongs before the supervising court. *R. Enterprises* approved in camera review *by the court supervising the grand jury* as a means of screening a Rule 17 motion before revealing investigative information to the challenger. 498 U.S. at 302. It did not contemplate that the government must interrupt an investigation, petition the supervising court for leave to export secret information, and then hope such permission is granted before it can even begin to defend the same subpoena before a different court unfamiliar with the investigation or consequences of delay.

More broadly, the Supreme Court has repeatedly "reaffirmed [its] disinclination to allow litigious interference with grand jury proceedings." *Calandra*, 414 U.S. at 350.

It has declined to adopt "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters.*, 498 U.S. at 298-99 (quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973)). Yet the "probable result" of subjecting a single grand jury investigation to emergency litigation across multiple districts "would be protracted interruption of grand jury proceedings," which "would unduly interfere with the effective and expeditious discharge of the grand jury's duties." *Calandra*, 414 U.S. at 434, 349-50. This explains why the Criminal Rules expressly route challenges to grand jury process to the issuing court, which "will be able to craft appropriate procedures that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays." *R. Enters.*, 498 U.S. at 302.

Given those compelling interests (and the Supreme Court's unusually clear guidance in this area), it is unsurprising that plaintiffs have identified *no* injunctions barring compliance with an out-of-district grand jury subpoena or investigation, prior to last month. Indeed, other courts have continued to properly reject efforts to collaterally attack and intrude on lawful investigations or enforcement actions in other districts. *See Am. Acad. of Pediatrics v. Uthmeier*, 2026 WL 1971202 (7th Cir. July 8, 2026) (en banc) (staying injunction against state enforcement action regarding groups that advocate for gender-related medical interventions for minors); *World Pro. Ass'n for*

*Transgender Health v. FTC*, No. 26-cv-532, 2026 WL 1999008 (D.D.C. July 10, 2026) (denying anti-suit injunction against enforcement action).

**3.** Though even the district court agreed that "Rule 17 would [likely] preclude" Plaintiffs from moving to quash a grand jury subpoena outside the issuing district, ER-27-28, it reasoned that Plaintiffs nonetheless had an equitable workaround, relying on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). But *Armstrong* itself explains why Plaintiffs cannot "circumvent" Rule 17 by "invoking [a court's] equitable powers." 575 U.S. at 328; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012) (remedial scheme channels claims to that scheme, precluding district court jurisdiction, "even though they are constitutional claims for equitable relief"). In *Armstrong,* Medicaid providers sought to enjoin state officials from setting reimbursement rates that allegedly violated the Medicaid Act. The Supreme Court held that providers had no cause of action in equity, explaining that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327. The Medicaid Act implicitly foreclosed equitable enforcement because Congress had provided a specific enforcement mechanism (authorizing the Secretary of HHS to withhold federal funds) and because equitable enforcement would be "judicially unadministrable." *Id.* at 328.

The same principles foreclose Plaintiffs' attempt to evade Rule 17. "[T]he Federal Rules have the force of statute," *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996), and Rule 17 "express[ly] provi[des]," *Armstrong,* 575 U.S. at 328, a

mechanism for obtaining relief from extant grand jury process: a prompt motion to quash presented to the supervising court. Indeed, the Supreme Court's more recent "cases have stressed that if Congress has created 'an alternative remedial structure,' then '*that alone*' precludes the creation of a cause of action." *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1891 (2026) (emphasis in original) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)). That reasoning applies with particular force here, where, unlike *Armstrong*, the prescribed procedure affords Plaintiffs themselves a chance to seek relief from a federal court. And as the district court acknowledged, Rule 17 is a "broad mechanism" that would permit Plaintiffs to object "based on, among other reasons, a subpoena's indefiniteness or lack of relevance, the burdensome nature of compliance, statutory or common-law privileges, or the Constitution." ER-29.

In any event, even if Rule 17's remedy were not alone sufficient to foreclose a duplicative equitable cause of action, "it does so when combined with the judicially unadministrable nature" of collateral challenges to grand jury process. *Armstrong*, 575 U.S. at 328. As explained already, the defining features of grand jury investigations (including secrecy, centralized supervision, and nationwide service of process) make collateral adjudication incompatible with a functional grand jury system. The district court even appeared to recognize these issues, elsewhere acknowledging that grand jury secrecy "restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief." ER-39. That was of course the inevitable consequence of attempting to adjudicate an eleventh-hour

challenge to another federal court's grand jury process. Yet the district court proceeded to assess the subpoena's relevance without the investigative context necessary to do so—and then treated the resulting gaps in the record as grounds to obstruct the asserted grand jury investigation. ER-40-42. The district court's supposition that "moving forward grand jury secrecy should not tie DOJ's hands," ER-39, misses the point in multiple respects. For one, it is up to a grand jury's supervising court—not the Department—to determine whether to authorize the disclosure of any information about a grand jury's proceedings, to what extent such disclosure may occur, and whether any conditions should be attached to that disclosure. *See* Fed. R. Crim. P. 6(e)(3)(E), (F). And even if such authorization were granted on terms that would permit the Department to collaterally litigate the validity of the subpoena, in the meantime, there would be extended interruption of the grand jury's investigation, with no informed determination about the consequences or appropriateness of such delay. This case vividly illustrates why Congress could not possibly have intended to allow litigants to "circumvent" Rule 17 simply "by invoking [a court's] equitable powers." *Armstrong*, 575 U.S. at 328.

Nor is there any equitable history or tradition recognizing freestanding constitutional causes of action to enjoin grand jury process. Again, prior to last month, no other federal court appears to have entertained a request for a coercive injunction aimed at a coordinate federal court's grand jury process. This is not surprising. A federal court's equity power "is not freewheeling." *Trump v. CASA, Inc.*,

606 U.S. 831, 841 (2025). Federal equitable remedies must remain within "the bounds of a federal court's equitable authority under the Judiciary Act," *id.* at 847, which include "only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception," *id.* Relief lacking a "historical pedigree"—like the district court's novel injunction—falls outside those bounds. *Id.*

*New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006), does not support the district court's injunction. There, the Second Circuit considered a newspaper's request for a declaratory judgment that its phone records in the possession of third parties should be shielded from any grand jury subpoenas in connection with a specific incident based on common-law or First Amendment privilege. *Id.* at 162. The district court had entered a declaratory judgment for the newspaper, emphasizing that the declaratory judgment the newspaper sought was not "tantamount to a permanent injunction." *New York Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 480 (S.D.N.Y. 2005). Given that posture, the only threshold issues the Second Circuit considered were specific to declaratory judgments. *Times*, 459 F.3d at 166-67. Nothing in *Times* endorses an *injunction* against a grand jury subpoena that Plaintiffs here allege has *already* issued from another district court. *See id.* at 167 (emphasizing that it was "unknown whether subpoenas have been issued" and that "a motion to quash is not available if the subpoena has not been issued"). Indeed, even the district court acknowledged that *Times* was "not directly on point." ER-30.

**4.** The district court reasoned that because Plaintiffs challenged a "broader campaign" to obtain their information, a Rule 17 motion would not provide complete relief against hypothetical future process. ER-27-28. That does not solve Plaintiffs' Rule 17 problem, and it instead introduces new problems.

A plaintiff cannot end-run Rule 17 by packaging an impermissible request for relief from grand jury process together with a request for relief from other previously issued or hypothetical future process. If an order forbidding Action A is foreclosed, that limit cannot be evaded simply by entering an order forbidding "Action A or Action B." *See, e.g.*, *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660-61 (2025) (staying injunction in part); *see id.* at 2661-62 (Barrett, J., concurring) (plaintiffs may not "end-run" channeling regime "simply by packaging" legally distinct claims together). Whether or not the district court's order also interfered with other investigative steps, it undoubtedly sought to functionally quash a grand jury subpoena. ER-28 (acknowledging requested remedy would "prevent DOJ's enforcement of a grand jury subpoena in another district"). That was, after all, the goal: despite Plaintiffs' gamesmanship in waiting to seek emergency relief until "just hours" before the asserted return date, the district court nonetheless hurried to enter an ex parte "order prohibiting DOJ and Packard from taking further action to enforce or comply with the subpoena." ER-13.

Further, Plaintiffs lack standing to challenge hypothetical future subpoenas because they provide no evidence that the government will imminently seek to obtain

their information through future subpoenas. To establish standing, a plaintiff must allege a "threatened injury" that is "certainly impending," and "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Yet the district court's analysis, like the amended complaint, identified only one concrete and imminent injury: LPCH's "near-certain disclosure" of Plaintiffs' records in response to the asserted grand jury subpoena. ER-42; *see* ER-113 (alleging "imminent" injury because "[t]he subpoenas . . . have a return date no later than June 10, 2026"). Absent standing to challenge anything other than the asserted grand jury subpoena, there is no Article III dispute to justify the balance of the injunction. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing … for each form of relief that they seek.").

Even if Plaintiffs somehow had standing to challenge all future process, such a remedy is, if anything, even more unprecedented and unjustified than an order targeting a single alleged grand jury subpoena. Plaintiffs also cannot possibly show on the merits that every conceivable future attempt by the government to obtain patient records would be unlawful. The privacy balancing Plaintiffs invoke is inherently fact-specific and cannot be conducted in advance, and hypothetical future investigations may be subject to their own frameworks for motions to quash. *E.g.*, 18 U.S.C. § 3486.

In the end, Plaintiffs sought and obtained an order that functions just like quashal of a sister federal court's grand jury process. *Cf. Abbott v. Perez*, 585 U.S. 579,

595 (2018) (functional assessment of remedy to prevent judicial "manipulation"). The government is likely to show that the district court exceeded its authority.

### B. The District Court Grossly Misapplied Substantive Due Process Principles.

Even aside from this threshold defect, Plaintiffs' Fifth Amendment theory depends on a second unprecedented proposition: that a right to informational privacy permits third parties to control evidence sought by an otherwise lawful grand jury subpoena. That is wrong on first principles and under circuit precedent. *See In re Grand Jury Proceedings*, 801 F.2d at 1167. Even if this were an open question, the district court's analysis is erroneous on its own terms.

**1.** "Substantive due process protects individuals from state action that interferes with fundamental rights." *Regino v. Staley*, 133 F.4th 951, 959-60 (9th Cir. 2025). Courts must "exercise the utmost care whenever . . . asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). But this Court need not break any new ground here. Plaintiffs assert a constitutional right to prevent a federal grand jury from obtaining medical records held by third parties, and this Court has already rejected that theory in materially identical circumstances. *In re Grand Jury Proceedings* concerned a grand jury investigation into "illegal dispensation of anabolic steroids, androgenic hormones and other such drugs" by a physician believed to treat "many professional athletes." 801 F.2d at 1166. The physician was held in contempt for resisting a grand jury subpoena for patient and prescription

records on the ground that disclosure would violate "his patients . . . constitutional right to privacy in the records sought by the subpoena." *Id.* at 1167. This Court rejected that argument and affirmed, explaining that "[t]here is no general right to privacy before the grand jury," and, in any event, "a person possesses no reasonable expectation that his medical history will remain completely confidential." *Id.* at 1169.

That decision controls here. It also accords with the Supreme Court's holding that a witness "of course" has "no right of privacy before the grand jury." *Calandra*, 414 U.S. at 353. The "historically grounded obligation of every person to appear and give his evidence before the grand jury" is "'a part of the necessary contribution of the individual to the welfare of the public'" and "'necessary to the administration of justice.'" *Dionisio*, 410 U.S. at 9-10 (quoting *Blair v. United States*, 250 U.S. 273, 281 (1919)). Thus, absent a "recognized privilege," "every man owes his testimony," and a grand jury is entitled even to "responses [that] might prove embarrassing or result in an unwelcome disclosure of … personal affairs." *Calandra*, 414 U.S. at 353.

That tradition follows from the nature of grand jury proceedings. As this Court has reasoned, "[s]uch proceedings are secret," and "the information sought by the subpoena or any other information presented to the grand jury may be disclosed only to the extent authorized by law." *In re Grand Jury Proceedings*, 801 F.2d at 1169. Thus, "when the grand jury seeks the production of personal or confidential information, grand jury secrecy affords substantial protection for the [individual's] privacy and dignity interests." Fed. R. Crim. P. 17 advisory committee's note to 2008

amendment (explaining why judicial approval and victim notification requirements applicable to third-party subpoenas directed at crime victims do not apply to grand jury subpoenas). On the other hand, subjecting grand jury subpoenas to a "multifactor" balancing test would impermissibly (and predictably) "invite procedural delays and detours while courts evaluate the relevancy and admissibility of documents sought by a particular subpoena." *R. Enters.*, 498 U.S. at 298. That approach, particularly when undertaken by a non-supervising court, would improperly "compromise the indispensable secrecy of grand jury proceedings" by "[r]equiring the government to explain in too much detail the particular reasons underlying a subpoena." *Id.* at 299. It is all for the good that this Court's precedents foreclose a theory of substantive due process that would empower a non-supervising court to balance away a federal grand jury's demand for medical records held by third parties.

**2.** Against these precedents, the district court nonetheless held that Plaintiffs established a new "due-process right to the privacy of information of a particularly sensitive and intimate nature" protecting their "identifying information coupled with details of their medical history." ER-35. Although this Court has recognized a constitutional interest in avoiding certain unauthorized disclosures of highly personal information, *see, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), no court appears to have applied informational-privacy principles to limit compliance with a grand jury subpoena. Even assuming that some "informational

privacy" interest "of constitutional significance" exists, *NASA v. Nelson*, 562 U.S. 134, 146-47 (2011), courts may not recognize new applications of substantive due process by describing the asserted liberty interest "at a high level of generality," such as a generalized interest in "privacy," "autonomy," or bodily integrity. *Dobbs*, 597 U.S. at 254-57. Instead, a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" and "[w]ith that careful description in mind," prove that "the asserted interest is 'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it were] sacrificed." *Regino*, 133 F.4th at 960 (second alteration in original) (first quoting *Glucksberg*, 521 U.S. at 721; then quoting *Kachatryan v. Blinken*, 4 F.4th 841, 858 (9th Cir. 2021)). This inquiry requires "a careful analysis of the history of the right at issue." *Dobbs*, 597 U.S. at 238.

For example, in *Glucksberg*, the Supreme Court surveyed more than 700 years of "the Anglo-American common-law tradition," including Blackstone's Commentaries, laws of "the early American Colonies," state statutes, state court decisions, and multiple treatises. 521 U.S. at 711-12. Similarly, in *Dobbs*, the Supreme Court considered "eminent common-law authorities (Blackstone, Coke, Hale, and the like)," "English cases dating all the way back to the 13th century," "[m]anuals for justices of the peace printed in the Colonies in the 18th century," early colonial cases, and state statutes. 597 U.S. at 242-49. "Historical inquiries of this nature are essential whenever [courts] are asked to recognize a new component of the 'liberty' protected

by the Due Process Clause because the term 'liberty' alone provides little guidance." *Id.* at 239. When courts "ignore[] the appropriate limits imposed by respect for the teachings of history," courts "fall[] into . . . freewheeling judicial policymaking." *Id.* at 240 (alteration and quotation marks omitted).

The district court engaged in nothing like the requisite analysis in announcing a new fundamental "right to the privacy of information of a particularly sensitive and intimate nature—here, identifying information coupled with details of their medical history, including their receipt of politically controversial care." ER-35. This "careful statement does not narrowly and accurately reflect the right that [Plaintiffs] seek[] to vindicate." *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007). "To formulate the asserted fundamental right," the Court "must consult 'both the scope of the challenged [government action] and the nature of [the plaintiffs'] allegations.'" *Regino*, 133 F.4th at 964 (quoting *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015)). And "[c]onspicuously missing from [Plaintiffs'] asserted fundamental right is its centerpiece," *Raich*, 500 F.3d at 864—that Plaintiffs seek a right to privacy as *against grand jury process directed at a third party*.

Neither Plaintiffs nor the district court identify any history or tradition supporting a fundamental right to informational privacy against asserted grand jury process directed at third parties. Just like the parties who failed to establish a fundamental right to abortion in *Dobbs*, Plaintiffs and the district court identified "no state constitutional provision, no statute, no judicial decision, no learned treatise"

recognizing the purported right. 597 U.S. at 251. And given that federal prosecutors constantly obtain and handle intensely private information in the context of grand jury investigations (such as when investigating crimes involving sexual violence or child exploitation), any deeply-rooted privacy rights against grand jury subpoenas would have long since emerged. That alone should be dispositive of Plaintiffs' claim. At a minimum, the novelty of Plaintiffs' claim strongly suggests that they are unlikely to prevail on the merits. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) ("[S]eek[ing] to extend the constitutional guarantees to new territory . . . suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing."), *aff'd sub. nom.*, *United States v. Skrmetti*, 605 U.S. 495 (2025).

**3.** Even if Plaintiffs' proposed novel fundamental right exists, the district court further erred in concluding that the alleged issuance of a grand jury subpoena would amount to an abuse of power that "shocks the conscience" so as to support a due process claim. *Lewis*, 523 U.S. at 846; *see id.* at 847 n.8. This uniquely demanding standard can be met "in only the most extreme circumstances" and thus "typically involv[es] some violation of physical liberty or personal physical integrity." *Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007); *see also Lewis*, 523 U.S. at 849 ("conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). The routine use of grand jury subpoenas to obtain sensitive evidence in criminal investigations bears

no resemblance to the extreme abuses that satisfy this standard. Indeed, that prosecutors frequently seek sensitive evidence through grand jury process is strong evidence that their alleged use is not conscience shocking (and that third parties have no fundamental right to veto such process).

In any event, the Supreme Court "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850. That requirement reflects the context-dependent nature of the inquiry: conduct that "shocks in one environment may not be so patently egregious in another." *Id.* The district court ignored that rule. Again, the court recognized that the government's Rule 6(e) obligations "restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief." ER-39. And, significantly, Plaintiffs conceded that "the nature of any alleged criminal conduct under investigation is unknown." ER-72.

Those acknowledgements necessarily foreclose the "exact analysis of circumstances" *Lewis* requires, which further underscores why these sorts of collateral attacks on alleged grand jury subpoenas are not judicially administrable. In an ordinary Rule 17 proceeding, Plaintiffs would bear the burden of showing that "there is no reasonable possibility" that the requested records would produce information relevant to the investigation. *R. Enters.*, 498 U.S. at 301 (court erred by "plac[ing] an initial burden on the Government"). But Plaintiffs could not possibly meet that burden here. The district court's solution—requiring the government to disclose an

investigative theory and identify facts establishing venue, when any facts would be subject to Rule 6(e)'s secrecy rule, then faulting the government because "[n]othing in the record" supplied those details, ER-41—both impermissibly inverted the burden of proof and treated grand jury secrecy protections as license to obstruct an alleged grand jury investigation. And in any event, even a successful showing that a subpoena would be properly quashed under Rule 17 would not suffice to show an "abuse of power" that is "conscience shocking." *Lewis*, 523 U.S. at 849-50.

In any event, the district court's uninformed assessments about the likelihood that a grand jury subpoena might produce relevant evidence suffered from obvious flaws. *First*, the district court asserted that patient records have "no discernible relevance to any federal healthcare offense or other fraudulent billing or insurance-claim practices," ER-40, and that the government therefore lacked a legitimate interest. That was plainly incorrect, even if it could substitute for an "exact analysis": the government frequently uses patient medical and billing records—often in large quantities—to investigate, charge, and prove healthcare-related crimes. *See, e.g.*, *In re Grand Jury Proceedings*, 801 F.2d at 1166 (affirming contempt order for failure to produce patient charts and explaining that "hormones are regulated . . . under the [FDCA]"); *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986) ("over 10,000 patient files"); *United States v. Beaufils*, 160 F.4th 1147, 1154-57, 1161, 1163-66 (11th Cir. 2025) (hundreds of medical records, to prosecute healthcare fraud, false statements related to health care matters, and aggravated identity theft); *In re Subpoena*

*Duces Tecum*, 228 F.3d 341, 345, 350 (4th Cir. 2000) ("more than 15,000 patient files," to investigate "any of 13 federal statutory offenses"). Indeed, such records are often the central piece of evidence in healthcare-related prosecutions.

*Second*, the district court reasoned that even if patient records were relevant to "some chargeable offense," LPCH's records "have no apparent nexus to the Northern District of Texas." ER-40-41. That reasoning is flawed several times over. Initially, a grand jury may investigate out-of-district conduct and obtain out-of-district evidence to determine "whether the facts show a case within their jurisdiction," *Blair*, 250 U.S. at 283—which is precisely why Rule 17 authorizes nationwide service of process. Moreover, because a continuing offense may be "inquired of and prosecuted" in any district where it was begun, continued, or completed, 18 U.S.C. § 3237(a), conspiracies and other multijurisdictional crimes frequently support venue in multiple districts. The district court therefore erred by demanding the government establish a venue nexus before permitting a grand jury to obtain the evidence needed to determine whether such a nexus exists.[2] Together or separately, these errors leave little doubt that the district court failed to perform the "exact analysis" *Lewis* demands.

[2] The district court's analysis on this score is also difficult to reconcile with its later conclusion that—with respect to the "likelihood of California residents being targeted with criminal investigations in Texas" by state officials—"such prosecutions are indeed possible." ER-38.

**4.** Even if Plaintiffs had established a fundamental right against grand jury process issued to third parties, and even if the district court had attempted an exact analysis, no ad hoc interest balancing is required to conclude that Plaintiffs' informational privacy claim fails. Insofar as a grand jury's receipt of evidence implicates constitutionally protected privacy interests, such "a breach of privacy takes a form [that] courts"—including this one—"have previously approved," *Hancock v. Cnty. of Rensselaer*, 882 F.3d 58, 66 (2d Cir. 2018). *See In re Grand Jury Proceedings,* 801 F.2d at 1169.

In any event, Plaintiffs' claim also fails under the balancing framework this Court has applied (outside the grand jury context) when evaluating constitutional challenges to the government's collection of personal information. *See Tucson Woman's Clinic*, 379 F.3d at 551. The first factor (the type of information) does not favor Plaintiffs merely because the records are medical. Such records were created and are maintained by third parties, and they are routinely disclosed to others—including to the government for law-enforcement purposes—as LPCH's own privacy notice makes clear. ER-46-57; *see id.* at 52 (notifying patients of numerous situations in which patients' protected health information may be disclosed, including "in response to a court or administrative order," "a subpoena [or] legally enforceable discovery request," or "to law enforcement"); *see* 45 C.F.R. § 164.520 (requiring such notices). As explained, prosecutions of healthcare crimes frequently depend on review and use of these records, and "disclosures of private medical information to doctors, to

hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice," *Whalen v. Roe*, 429 U.S. 589, 602 (1977).

The second and third factors (potential harm from disclosure and adequacy of safeguards) likewise do not favor Plaintiffs. As discussed already, "grand jury secrecy affords substantial protection for the [individual's] privacy and dignity interests." Fed. R. Crim. P. 17 advisory committee's note to 2008 amendment; *see In re Grand Jury Proceedings*, 801 F.2d at 1169. Other statutes likewise strictly limit the government's use and disclosure of information, including the Privacy Act, 5 U.S.C. § 552a. And government personnel can face strict penalties for violating these privacy protections. *See id.* § 552a(i); Fed. R. Crim. P. 6(e)(7) (knowing violation punishable by contempt of court).

The district court's analysis of these factors was clearly and offensively erroneous. The court baselessly assumed that the federal prosecutors who would have access to Plaintiffs' records hold a "clear hostility to . . . the existence of transgender people," which it characterized as "an obvious harm." ER-37. The court then speculated that the Department might disclose Plaintiffs' information under Rule 6(e)(3)(A)(ii)—which does not require permission of a court—"to a large number of Texas officials," which "might lead to [child abuse] investigations of [Plaintiffs'] families" by state officials. ER-37-38. But there is no reason to believe that patients of LPCH or their parents would be subject to the State of Texas's jurisdiction, as even the district court seemed to acknowledge. In any event, that speculation simply

misreads the governing grand jury secrecy rule, which provides that "A person to whom information is disclosed under Rule 6(e)(3)(A)(ii) may use that information only to assist an attorney for the government in performing that attorney's duty to enforce *federal* criminal law," Fed. R. Crim. P. 6(e)(3)(B) (emphasis added), not potential violations of state law. Moreover, a federal prosecutor who discloses such information "must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule." *Id.*

Last, the remaining two factors (need for access and public policy) decisively favor the government. It is established beyond debate that the government and the public have a "compelling interest in the grand jury's investigation into possible violations of federal law." *In re Grand Jury Subpoena No. 16-03-217*, 875 F.3d at 1191. Again, the "historically grounded obligation of every person to appear and give his evidence before the grand jury" is '"necessary to the administration of justice."' *Dionisio*, 410 U.S. at 9-10 (quoting *Blair*, 250 U.S. at 281 (1919)). The district court's contrary view turned on its conclusion that patient records are "almost certainly irrelevant to the Texas grand jury investigation," which fails for the reasons already explained. ER-38-42; *see supra* at 35-36.

## II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction.

The injunction should also be vacated because the remaining equitable factors decisively favor the government. The preliminary injunction irreparably harms the government and the public by directly and indefinitely prohibiting the government from obtaining relevant evidence through any grand jury process (or any other process) to investigate any crime—no matter how strong the evidence of wrongdoing, how necessary the information, or whether the subject of the investigation is a pharmaceutical company, hospital, or otherwise. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers); *Uthmeier*, 2026 WL 1971202.

That harm is compounded in this context. By "prevent[ing] the Government from enforcing its policies against nonparties," the injunction "transgresses the separation of powers by 'effectively establish[ing] the district court as the supervisor'" of the investigation. *Dickinson v. Trump*, 174 F.4th 634, 648-49 (9th Cir. 2026) (first quoting *CASA*, 606 U.S. at 859; then quoting *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th Cir. 2026)). And because the district court lacks equitable authority to enjoin grand jury process allegedly issued by a sister federal court, "the Government is likely to suffer irreparable harm from the [court's] entry of [an] injunction[] that likely exceed[s] the [court's] authority." *CASA*, 606 U.S. at 860.

These harms cannot be repaired by a favorable later judgment. In this context, indefinite delay concretely and irreversibly harms the government and the public's

"compelling interest in the grand jury's investigation into possible violations of federal law." *In re Grand Jury Subpoena*, No. 16-03-217, 875 F.3d at 1191; *accord, e.g.*, *In re Sealed Case*, 794 F.2d 749, 751 n.3 (D.C. Cir. 1986) (per curiam) (recognizing "weighty public interest in the orderly functioning of grand juries and the judicial process"); *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (emphasizing "society's compelling interest in finding, convicting, and punishing those who violate the law").

In the meantime, personnel depart, records are lost or destroyed, statutes of limitations run, and witnesses' memories fade. *See, e.g.*, 18 U.S.C. § 3282(a) (default five-year statute of limitations for federal crimes). And a grand jury is itself a temporary investigative body. *See Cobbledick*, 309 U.S. at 327 ("The duration of its life, frequently short, is limited by statute."). It is thus "no less important to safeguard against undue interruption the inquiry instituted by a grand jury than to protect from delay the progress of the trial after an indictment." *Id.* Indeed, "'protracted interruption of grand jury proceedings'" "might be fatal to the enforcement of the criminal law." *Calandra*, 414 U.S. at 350. Vacating the injunction will both alleviate those harms and reinforce "the principle of comity" between "courts of coordinate jurisdiction and equal rank." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. And Gulf Coast Dist. of the ILA; AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985).

On the other side of the balance, Plaintiffs' asserted privacy interests do not outweigh those interests. For the reasons explained already, to the extent Plaintiffs retain privacy interests in records held by hospitals in this context, grand jury secrecy

provides substantial protection for Plaintiffs' privacy interests. More fundamentally, the government's interest in finding, convicting, and punishing those violate the law far "outweighs the privacy rights of those whose [medical] records" are sought via subpoena. *In re Subpoena Duces Tecum*, 228 F.3d at 351). And any records disclosed to the government in the interim could be returned if Plaintiffs were to ultimately prevail on appeal. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13-15 (1992). No principle of law or equity supports an injunction that indefinitely prohibits the Department from seeking or receiving any entire category of relevant evidence.

## CONCLUSION

For these reasons, the district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
BRANTLEY MAYERS
S/ JOHN BAILEY
JOHN BAILEY
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*

August 2026

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ John Bailey*
JOHN BAILEY

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,156 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ John Bailey*
JOHN BAILEY