**No. 26-4388**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

Z.A., *a minor, by and through their parent*, A.A., *et al.*,
*Plaintiffs-Appellees*,

v.

TODD BLANCHE, *Acting Attorney General, in his official capacity*; UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California

**EXCERPTS OF RECORD**
**VOLUME 1 OF 1**

BRETT A. SHUMATE
*Assistant Attorney General*
JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*

## TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Opinion and Order (Dkt. 93) (July 2, 2026) ........ ER-3
LPCH Privacy Notice (Dkt. 79-1) (June 17, 2026) ........ ER-46
Motion for Temporary Restraining Order (Dkt. 46) (June 8, 2026) ........ ER-58
Memorandum in Support of TRO (Dkt. 46-2) (June 8, 2026) ........ ER-62
Errata to First Amended Complaint (Dkt. 44) (June 8, 2026) ........ ER-95
First Amended Complaint (Dkt. 41) (June 8, 2026) ........ ER-110
Order Denying Temporary Restraining Order (Dkt. 40) (June 6, 2026) ........ ER-145
Notice of Appeal (Dkt. 94) (July 9, 2026) ........ ER-161
District Court Docket Sheet ........ ER-165

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Z.A., et al.,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General, et al.,

Defendants.

Case No. 26-cv-04998-PCP

**ORDER RE: MOTIONS FOR PROVISIONAL CLASS CERTIFICATION AND PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 42, 45, 46

For over a year, the Department of Justice has been on a mission to "end" gender-affirming care for minors experiencing symptoms of gender dysphoria. One means to achieve that purpose has been to investigate providers of such care for evidence of purported fraud and violations of federal healthcare laws. As part of its campaign, DOJ has repeatedly sought to obtain private information about minor patients who have received gender-affirming care, including those who received care at the Lucile Packard Children's Hospital at Stanford. In July 2025, DOJ issued an administrative subpoena seeking, among other records, documents that would identify all minor patients who had received certain forms of gender-affirming care at Packard and disclose sensitive information about their clinical indications and diagnoses. Although Packard produced other records in response to the administrative subpoena, it did not produce the identifying patient data requested by DOJ, and other hospitals around the country successfully quashed substantially identical administrative subpoenas on the ground that DOJ lacked any legitimate interest in minor patients' sensitive health information.

After finding limited success in gaining access to transgender minors' medical records through the administrative subpoena process, DOJ adopted a new tactic in May 2026: issuing grand jury subpoenas to Packard and other providers of gender-affirming care. Though Packard is

located in California and the other hospital known to have received such a subpoena is located in New York, DOJ issued both grand jury subpoenas under the seal of the Northern District of Texas.

The plaintiffs in this action either received gender-affirming care at Packard or are the parents of minors who received such care. They claim that DOJ's receipt of the patient records it seeks in the grand jury subpoena would violate their or their children's rights under the First, Fourth, and Fifth Amendments. To protect their private health information, plaintiffs now move for a temporary restraining order that would enjoin DOJ and Acting Attorney General Todd Blanche from obtaining their medical records. Plaintiffs seek such relief on behalf of both a putative class of individuals who received gender-affirming care as minors at any healthcare institution in California and a subclass of individuals who received such care at Packard.

In opposing plaintiffs' motion, DOJ does not meaningfully defend the propriety of its demand for patients' sensitive health information. Instead, DOJ contends that because it now seeks plaintiffs' medical records through issuance of a grand jury subpoena rather than through an administrative subpoena, plaintiffs' sole recourse is to file a motion to quash the subpoena in the issuing court pursuant to Federal Rule of Criminal Procedure 17. For the reasons that follow, the Court concludes, for purposes of plaintiffs' motion, that Rule 17 likely does not preclude plaintiffs from pursuing an action in this Court to enjoin the federal officials' ongoing efforts to procure their private medical information. And because plaintiffs have demonstrated a likelihood of success on their claim that DOJ's efforts, if successful, would infringe upon their constitutional privacy rights, the Court provisionally certifies a class of patients who received gender-affirming care at Packard and grants plaintiffs' request for preliminary injunctive relief as to that class.[1] Because the record does not establish that patients who received gender-affirming care at other Californian hospitals face a similar risk of injury, the Court denies plaintiffs' motions to the extent they seek provisional certification of a statewide class and statewide injunctive relief.

**BACKGROUND**

More than a million Americans "identify as transgender, meaning that their gender identity

[1] Given that plaintiffs' motion for a temporary restraining order has been fully briefed and argued by all parties, it is effectively a motion for a preliminary injunction, and the Court treats it as such.

does not align with their … sex" assigned at birth. *United States v. Skrmetti*, 605 U.S. 495, 501–02 (2025). Many transgender Americans "suffer from gender dysphoria, a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and … sex" assigned at birth. *Id.* at 502–03. "Left untreated, gender dysphoria may result in severe physical and psychological harms." *Id.* at 503. Common treatments for gender dysphoria include hormone therapy (i.e., "the use of hormones to induce the development of physical characteristics" consistent with a person's gender identity) and puberty blockers (i.e., treatments "designed to delay the development of physical sex characteristics" in younger transgender individuals). *Id.* at 503–04. These and related treatments for gender dysphoria are often referred to as "gender-affirming care."

Although "the generally accepted medical practice is to treat people who suffer from gender dysphoria with necessary, safe, and effective gender-affirming medical care," *Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024) (citation modified), *vacated on other grounds*, No. 24-449, 2026 WL 1871306 (U.S. June 30, 2026), recent years have seen "rising debates regarding the relative risks and benefits of such treatments" for minors. *Skrmetti*, 605 U.S. at 504. In *Skrmetti*, the Supreme Court held that the responsibility for resolving those debates falls on state legislatures. That is because the Constitution "afford[s] States 'wide discretion to pass legislation in areas where there is medical … uncertainty,'' which the Supreme Court held includes the use of "puberty blockers and hormones … for minors." *Id.* at 524. Exercising that discretion, many states have prohibited the provision of gender-affirming medical care to minors. *See id.* at 504. California has not. To the contrary, "gender-affirming health care services[] and gender-affirming mental health care services … are rights secured by the Constitution and laws of California[,]" and "[i]nterference with these rights … is against the public policy of California." Cal. Civ. Code § 1798.301. And California, like at least fifteen other states, has "taken steps to safeguard access to transgender healthcare" for both adults and minors, "exercising [its] sovereign judgment that such safeguards promote public health and wellbeing."[2]

[2] *See* Brief of Amici Curiae States in Support of Plaintiffs' Motion for a Temporary Restraining



United States District Court
Northern District of California

Despite the Supreme Court "underscor[ing] the need for legislative flexibility in this area," *id.*, its counterparts in the Executive Branch have displayed significant antipathy for the choice of some state legislatures not to ban gender-affirming care for minors. On January 28, 2025, the President issued an executive order that expressly aimed to "end" gender-transition-related medical care for minors, which the order labelled "a stain on our Nation's history."[3] The executive order stated that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."[4] The order included specific directives to DOJ to "prioritize investigations" of providers of gender-affirming care.[5] As the White House explained in an official statement, the "intended effect" of the President's executive order was to "prevent[]" children from receiving gender-affirming care and to pressure "[h]ospitals around the country … to downsize or eliminate their … 'gender-affirming care' programs[.]"[6]

Three months later, then-Attorney General Pamela Bondi issued a memorandum announcing various measures to combat the rise in youth "transgenderism" and to abate the provision of gender-affirming medical care to transgender minors, which the memorandum described as "radical gender experimentation."[7] One of those measures directed DOJ's Civil

---

Order, Dkt. No. 70, at 4–6 (documenting protections for transgender healthcare in California).

[3] Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (2025).

[4] *Id.*

[5] *Id.* at 8772.

[6] *President Trump is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/ [https://perma.cc/DD9Z-WU7Q]. Plaintiffs cite this and other press releases, memoranda, and online articles in their amended complaint, motion for provisional class certification, and renewed motion for a temporary restraining order. Defendants have not objected to the Court's consideration thereof. The Court therefore exercises its discretion to consider such materials in resolving the instant motions. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024) (holding that district courts "may give even inadmissible evidence some weight" in resolving motions for preliminary relief); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (holding that "the 'evidentiary proof' a plaintiff must submit in support of class certification … need not be admissible evidence").

[7] Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," at 1, 3–6 (Apr. 22, 2025),

Division to investigate "any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about … puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition,'" or by "promot[ing] … off-label uses of hormones."[8] The memorandum also instructed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation," including the prescription of puberty blockers for a purportedly "illegitimate reason" like "gender dysphoria."[9] And the memorandum announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners" providing gender-affirming care.[10]

Over the past year, the DOJ has followed the Attorney General's instructions with gusto. On June 11, 2025, the Civil Division issued a memorandum announcing that it would "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's] directives."[11] Soon thereafter, DOJ issued more than 20 administrative subpoenas to medical centers providing gender-affirming care for minors pursuant to 18 U.S.C. § 3486(a)(1)(A)(i)(I), which authorizes subpoenas in aid of investigations of federal healthcare offenses.[12] The press release announcing

https://www.justice.gov/ag/media/1402396/dl [https://perma.cc/DHR7-436A].

[8] *Id.* at 4. The Court notes that while "drug manufacturers are prohibited from promoting off-label uses in marketing a drug," the FDCA "does not prohibit doctors from prescribing drugs for off-label uses." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063, 2026 WL 33398, at *1 (D. Colo. Jan. 5, 2026) (first quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 127 (2d Cir. 2010); and then quoting *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 5 (1st Cir. 2019)). Amicus the American Academy of Pediatrics explains that "off-label prescriptions for drugs are a common feature of modern medical practice and are, at times, the standard of care," including in the context of gender-affirming care for adolescents. Brief of Amicus Curiae American Academy of Pediatrics in Support of Plaintiffs' Motion for a Temporary Restraining Order, Dkt. No. 73, at 3, 6.

[9] *Id.* at 4.

[10] *Id.* at 5.

[11] Memorandum from Assistant Attorney General Brett A. Shumate, "Civil Division Enforcement Priorities," at 2 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl [https://perma.cc/5LPR-Y74L].

[12] *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 569–70 (E.D. Pa. 2025); *see also In*

the subpoenas stated that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by [DOJ]."[13] The administrative subpoenas sought, among other records, documents that would "identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy" by the targeted hospitals, as well as documents relating to such patients' "clinical indications" and "diagnoses."[14] Just a few weeks after DOJ served the administrative subpoenas, the White House issued a statement touting the President's success in "end[ing] the barbaric, pseudoscientific practice" of gender-affirming care for minors, listing 20 medical centers that had terminated or significantly curtailed their provision of such care based on executive-branch pressure.[15]

But not every provider of gender-affirming care folded. Many of the hospitals targeted by DOJ's administrative subpoenas moved to quash, arguing that DOJ's sweeping demands for patient records lacked any legitimate investigative purpose. At least eight district courts across the country agreed.[16] While recognizing that DOJ's investigatory authority is broad, several courts

*re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007, 2026 WL 1392565, at *1 (D.R.I. May 14, 2026); *In re Children's Nat'l Hosp.*, No. 1:25-CV-03780, 2026 WL 160792, at *3 (D. Md. Jan. 21, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 233 (D. Mass. 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1298 (W.D. Wash. 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041, 2025 WL 3562151, at *2 (W.D. Wash. Sept. 3, 2025); Declaration of David S. Schumacher, Dkt. No. 31-1 ¶ 2.

[13] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, U.S. DEP'T OF JUST.: OFF. OF PUB. AFFS. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical [https://perma.cc/P7L9-5MQD].

[14] *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *4 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 571; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *2; *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1.

[15] *President Trump Promised to End Child Sexual Mutilation – and He Delivered*, THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/ [https://perma.cc/54DN-4EA9].

[16] *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *6–8; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *6–8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 236–39; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1302–04; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578–87; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025

concluded that DOJ had failed to articulate any basis for investigating the hospitals for violations of federal healthcare laws.[17] Even assuming DOJ had some basis for investigating the hospitals, many courts reasoned, it was "utterly unclear" how such sensitive and identifying patient records related to the hospitals' purportedly unlawful conduct.[18] The lack of connection between DOJ's stated goals and the patient records it demanded led several courts to conclude that DOJ's "true purpose" was "to interfere with [states'] right to protect [gender-affirming care] within [their] borders, to harass and intimidate [hospitals] to stop providing such care, and to dissuade patients from seeking such care."[19] Three courts also determined that disclosure of the sensitive medical records sought by the subpoenas would violate patients' constitutional right to privacy.[20]

Packard, which operates a gender-affirming care clinic, was one of the medical centers that received such an administrative subpoena.[21] Like the administrative subpoenas issued to other hospitals, the "[s]ubpoena issued to Packard included requests for records of all minor patients that received [gender-affirming care]" at the hospital.[22] After receiving the subpoena in July 2025, Packard produced certain non-patient records to DOJ.[23] Packard did not, however, produce any

---

WL 3562151, at *9–13; *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069, 2025 WL 3724705, at *1–3 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *3–7.

[17] *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *6–7; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237–38; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *8–9; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7.

[18] *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see also QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578–83; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4–5.

[19] *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239; *see also In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1303–04; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *10–12; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *3–7; *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069, 2026 WL 570419, at *2 (W.D. Pa. Mar. 2, 2026).

[20] *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8–10; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 588–606.

[21] Schumacher Declaration, Dkt. No. 31-1 ¶ 2.

[22] *Id.*

[23] *Id.* ¶ 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

patient records after receiving the subpoena. Instead, Packard spent the next nine months negotiating with DOJ over the possibility of "anonymiz[ing] the patient records" and preparing those anonymized records for production.[24] Before Packard disclosed any anonymized patient records, however, DOJ informed Packard on May 6, 2026 that it was withdrawing the administrative subpoena.[25]

The next day, DOJ served on Packard a grand jury subpoena similar in scope to the withdrawn administrative subpoena.[26] Although it demanded records from an entity located in California, the grand jury subpoena was issued under the seal of the Northern District of Texas.[27] The subpoena requests a wide range of documents from Packard, including records concerning minor patients who received medical care between January 1, 2020 and May 5, 2026 "for the purpose of … affirming [their] asserted gender identity," i.e., gender-affirming care.[28] (The subpoena refers to this care as "Sex-Rejecting Procedures.") Specifically, the grand jury subpoena demands:

> Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures[;] …
>
> [D]ocuments relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers and hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each [such] patient … from initial consultation to the most recent treatment provided[; and]
>
> All documents relating to informed consent, patient intake, and parent or guardian authorization for [such] minor patients….[29]

The return date on the subpoena was June 10, 2026.[30]

---

[24] *Id.* ¶ 4.

[25] *Id.* ¶ 6.

[26] *Id.*; Subpoena to Lucile Packard Children's Hospital to Testify Before Grand Jury (May 6, 2026) ("Grand Jury Subpoena"), Dkt. No. 31-2, at 2–8.

[27] Schumacher Declaration, Dkt. No. 31-1 ¶ 6; *see also* Grand Jury Subpoena, Dkt. No. 31-2, at 2.

[28] Grand Jury Subpoena, Dkt. No. 31-2, at 6–8.

[29] *Id.* at 7–8.

[30] *Id.* at 2; Schumacher Declaration, Dkt. No. 31-1 ¶ 6.

Packard is not the only hospital outside Texas that DOJ has targeted from that state. In April, DOJ sought (and received) an order from the Northern District of Texas compelling Rhode Island Hospital to disclose the patient records of transgender minors in response to an administrative subpoena.[31] And on the same day DOJ issued the grand jury subpoena at issue in this case, it issued a nearly identical subpoena to NYU Langone Hospitals in New York.[32] Nothing on the face of the grand jury subpoena served on Packard suggests any nexus to Texas—for example, the requested records are not limited to care provided to patients from Texas. But as the Texas judge presiding over certain matters relating to DOJ's subpoenas has explained, DOJ is "a frequent forum shopper."[33] In the related matters involving subpoenas issued to Rhode Island Hospital and NYU Langone, courts have found that DOJ is engaged "in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from [those courts'] review, in favor of a distant forum that DOJ deems friendly to its political positions." *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; *see also* Transcript of Teleconference Decision at 8, *Coe v. Blanche*, No. 26-cv-4641 (S.D.N.Y. June 24, 2026), Dkt. No 89 at 11 ("[T]his Court will not blind itself to [the] reality … of DOJ's efforts … to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.").

Hoping to challenge the disclosure of their medical records in the district where both they and the records reside, plaintiffs filed suit in this Court on May 27, 2026. Their original complaint asserted claims only against Packard, arguing that Packard was a government actor whose disclosure of patient records would violate plaintiffs' rights under the Fourth and Fifth

---

[31] *See In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026), Dkt. No. 2.

[32] *See* Subpoena to NYU Langone Hospitals to Testify Before Grand Jury (May 6, 2026), Dkt. No. 1, at 25–36.

[33] The Federalist Society, *Opening Remarks from Judge Reed O'Connor [2024 TX Chapters Conference]*, at 7:46–7:53 (YouTube, Oct. 22, 2024), https://www.youtube.com/watch?v=HMTt9pxWBhA [https://perma.cc/GR7A-H6N8]

Amendments. Concurrent with the original complaint, plaintiffs filed a motion for a temporary restraining order (TRO) asking the Court to enjoin Packard from producing their identifying information and medical records to DOJ. The Court denied the motion, concluding on the available record that Packard could not be deemed a government actor.

Plaintiffs then filed an amended complaint, adding DOJ and Acting Attorney General Todd Blanche as defendants. The amended complaint alleges that DOJ is waging a "campaign to end pediatric transgender medical care" that "every major medical association recognizes as necessary care for transgender minors when medically indicated." According to the amended complaint, DOJ's investigations of hospitals and demands for patient data are part and parcel of that broader campaign, serving to intimidate hospitals and minor patients into abandoning lawful gender-affirming care. And plaintiffs contend that DOJ will "us[e] every weapon at its disposal" to achieve its ends. In plaintiffs' view, just as DOJ shifted to grand jury subpoenas when its administrative subpoenas were quashed, DOJ will adopt new tactics should its grand jury subpoenas fail. Plaintiffs claim that DOJ's efforts to procure their sensitive health information violate their rights to informational privacy, bodily autonomy, and equal protection of the laws in violation of the Fifth Amendment; amount to an unreasonable search and seizure in violation of the Fourth Amendment; and chill both their and their medical providers' speech in violation of the First Amendment. Plaintiffs seek relief on behalf of a putative class of all individuals who received gender-affirming care as minors at a healthcare institution in California from January 2020 to May 2026 and on behalf of a putative subclass of individuals who received such care at Packard during the same period.

On the same day they filed their amended complaint, and just hours before the original return date on the grand jury subpoena issued to Packard, plaintiffs filed a renewed motion for a temporary restraining order to enjoin DOJ from requesting, receiving, or otherwise obtaining the sensitive health information demanded by the grand jury subpoena issued to Packard. In support of that motion, plaintiffs sought provisional certification of both the statewide class and Packard subclass.

United States District Court
Northern District of California

Given the short time between the filing of the renewed motion for a TRO and the original return date, and because disclosure of the plaintiffs' records could moot their claims, the Court issued an order prohibiting DOJ and Packard from taking further action to enforce or comply with the subpoena in order to preserve the Court's jurisdiction pending a status conference the following day. Twelve hours later, the Court held the status conference and the parties agreed to maintain the status quo pending full briefing and hearing on plaintiffs' renewed TRO motion. The parties subsequently filed a stipulation to that effect. The Court heard argument on the motion on June 24, 2026. At the hearing, the parties expressed their preference that the Court treat plaintiffs' motion for a TRO as one for a preliminary injunction and, to that end, stipulated to maintain the status quo for an additional week.

## ANALYSIS

### I. Plaintiffs' motion to proceed via pseudonym is granted.

Plaintiffs have moved to proceed in this action via pseudonym. Neither Packard nor the DOJ defendants oppose that request. For the reasons explained in the Court's prior order denying plaintiffs' first motion for a temporary restraining order, the Court concludes that this is "the unusual case when nondisclosure of [plaintiffs'] identit[ies] is necessary to protect [them] from harassment," and that plaintiffs' "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing [plaintiffs'] identit[ies]." Dkt. No. 40 at 8 (first quoting *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000); and then quoting *Doe v. UNUM Life Ins. Co. of Am.*, 164 F. Supp. 3d 1140, 1144 (N.D. Cal. 2016)). Accordingly, plaintiffs' unopposed motion to proceed via pseudonym is GRANTED.

### II. Plaintiffs' motion for provisional class certification is granted in part and denied in part.

For the purpose of pursuing preliminary relief, plaintiffs ask the Court to provisionally certify the following class and subclass:

> ***Statewide Class:*** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics,

for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in the State of California, including Lucile Salter Packard Children's Hospital at Stanford.

> ***Packard Subclass:*** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at Lucile Salter Packard Children's Hospital at Stanford.

Under Rule 23, plaintiffs seeking to certify a class must first show that they satisfy four "prerequisites":

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];
>
> (2) there are questions of law or fact common to the class ["commonality"];
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, plaintiffs must also demonstrate that they satisfy at least one requirement of Rule 23(b). *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here, plaintiffs seek provisional certification under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In the alternative, plaintiffs seek provisional certification under Rule 23(b)(1)A), which applies where "prosecuting separate actions by … individual class members would create a risk of … inconsistent or varying adjudications … that would establish incompatible standards of conduct for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(A).

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure

that the[se] requirements are satisfied," and "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (first quoting *Olean*, 31 F. 4th at 664; and then quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). "A district court can certify a provisional class for purposes of a preliminary injunction." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025) (citation modified). The term "'provisional' … signal[s] that the certification will dissolve if the injunction does" but does "*not* … suggest [the Court] undertook less than a full Rule 23 analysis." *Mercado v. Noem*, No. 25-cv-6568, 2025 WL 2658779, at *17 (S.D.N.Y. Sept. 17, 2025) (citation modified).

For the reasons explained below, plaintiffs have not demonstrated that the proposed statewide class shares common questions of law or fact or that plaintiffs are typical of individuals in the proposed statewide class. But plaintiffs' proposed Packard subclass satisfies the requirements of Rule 23(a) and Rule 23(b)(2). The Court therefore provisionally certifies a class limited to individuals who received care at Packard, to be represented by plaintiffs B.B. and G.G. and plaintiffs' counsel.

### A. Rule 23(a)

#### 1. Numerosity

Plaintiffs have demonstrated that both the proposed statewide class and the Packard subclass are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determining whether joinder is impracticable "requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Ninth Circuit has held that a proposed class is sufficiently numerous where joinder of all class members "would impose very substantial logistical burdens." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). And "[n]umerosity is presumed where the plaintiff class contains forty or more members." *Willis v. Koning & Assocs.*, No. 21-CV-00819, 2023 WL 2541327, at *2 (N.D. Cal. Mar. 15, 2023).

The proposed class and subclass are sufficiently numerous. The proposed statewide class

consists of all individuals who received a wide range of gender-affirming medical treatments at any institution in California over a period of more than six years. That number is presumably large in number—indeed, plaintiffs have submitted evidence suggesting that 3,000 minor patients were receiving gender-affirming care from Children's Hospital Los Angeles when that hospital shuttered its clinic for transgender youth in 2025.[34] The proposed Packard subclass similarly consists of all individuals who received gender-affirming care at Packard over a period of more than six years. Though the record does not contain data on the precise number of such patients, Packard's counsel has attested that the records DOJ has demanded for those patients number in the "tens of thousands," suggesting that the proposed subclass significantly exceeds 40 members.[35] Both the proposed class and subclass thus presumptively satisfy the numerosity requirement. *See Willis*, 2023 WL 2541327, at *2.

Even if the proposed class and subclass were not presumptively numerous, joinder of their membership "would impose very substantial logistical burdens." *A.B.*, 30 F.4th at 837. That is because "[t]he potential harm to transgender children if their identities are exposed can be severe." *Int'l Partners for Ethical Care Inc. v. Inslee*, No. 3:23-CV-05736, 2023 WL 7017765, at *1 (W.D. Wash. Oct. 25, 2023). While plaintiffs are willing to risk exposing their identities as transgender youth in order to seek redress for DOJ's allegedly unconstitutional conduct, many other individuals may be unable to do so due to their reasonable fear of retaliation and harassment. *See id.* Courts are "more likely to find impracticability of joinder if fear or retaliation or prejudice could deter individual class members from bringing suit." 5 Moore's Federal Practice § 23.22. And "[w]here, as here, the class seeks only prospective injunctive and declaratory relief, the practical value of joining *each* of the … class members as a formal party is slim to non-existent." *A.B.*, 30 F.4th at 837. The Court concludes that this minimal practical benefit "is plainly outweighed by the substantial logistical burdens that [joinder] would entail." *Id.*

---

[34] Ana B. Ibarra, "Feds drop efforts to get trans patients' records from LA children's hospital," CAL MATTERS (Jan. 24, 2026), https://calmatters.org/health/2026/01/childrens-hospital-transgender-patients-california/ [https://perma.cc/AU9R-L6NH].

[35] Shumacher Declaration, Dkt. No. 31-1 ¶ 7.



United States District Court
Northern District of California

Accordingly, the Court finds that both the proposed statewide class and the proposed Packard subclass satisfy Rule 23(a)'s numerosity requirement.

**2. Commonality and Typicality**

"Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024) (citation modified). In other words, commonality exists where "the evidence establishes that a common question is capable of class-wide resolution." *Noohi*, 146 F.4th at 863. "To satisfy commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation modified) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

Typicality requires that representative claims be "reasonably coextensive with those of absent class members," but not that they "be substantially identical." *Parsons v. Ryan*, 754 F,3d 657, 685 (9th Cir. 2014). "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Small*, 122 F.4th at 1201–02. "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* at 1202.

In the context of Rule 23(b)(2) classes, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 564 U.S. at 349 n.2. The Court therefore analyzes them together and finds that plaintiffs have demonstrated commonality and typicality only with respect to the Packard subclass.

**a. Plaintiffs have not established commonality or typicality as to the proposed statewide class.**

Plaintiffs argue that the proposed statewide class shares common questions because "[p]laintiffs and proposed class members are subject to the same challenged course of conduct: DOJ's demand for patient-identifying information … concerning transgender minors and young



United States District Court
Northern District of California

adults who received transgender medical care" in California during the relevant period. In plaintiffs' view, every class member's claim requires the Court to answer questions like "[w]hether DOJ's demand for class members' identifying information … violates the right to informational privacy" and "[w]hether grand jury secrecy, anonymization, or other asserted safeguards are adequate to protect class members' rights."

The problem with this argument is that it assumes, without evidence, that DOJ is seeking to obtain medical records from every provider of gender-affirming care to minors in California. DOJ has certainly stated its intent to investigate many such providers. But the available record suggests that, in practice, DOJ served administrative subpoenas on approximately 20 providers across the country.[36] Plaintiffs do not represent that this number represents all or most providers of gender-affirming care in the United States. And although plaintiffs allege that "at least ten hospitals in California" could be targeted by DOJ, the evidence before the Court identifies only two California hospitals that have received DOJ subpoenas: Packard and Children's Hospital Los Angeles. The latter appears to no longer be under pressure to disclose patient records: After Children's Hospital Los Angeles received an administrative subpoena in 2025, several patients and their families moved to quash, and DOJ entered into a settlement agreement withdrawing its request for any individually identifying patient information from the hospital.[37] Even assuming that other California hospitals have received administrative or grand jury subpoenas from DOJ, there is no way to know whether or not those hospitals have already disclosed the patient records DOJ demands—if they have, any attempt to prevent DOJ's acquisition of their patients' private health information may be too late. *See Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014). For all these reasons, the preliminary record before the Court does not support plaintiffs' assertion that every California hospital providing gender-affirming care to minors is

[36] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, *supra* note 13.

[37] *See* Ana B. Ibarra, "Feds drop efforts to get trans patients' records from LA children's hospital," CAL MATTERS (Jan. 24, 2026), https://calmatters.org/health/2026/01/childrens-hospital-transgender-patients-california/ [https://perma.cc/AU9R-L6NH]; Settlement Agreement, *In re Children's Hospital of Los Angeles Subpoena*, No. 25-CV-11183 (Jan. 22, 2026), Dkt. No. 25-1 at 3–5.

subject to DOJ's demands for identifying patient records. Because that is the sole basis for plaintiffs' argument that common questions undergird the proposed statewide class's claims, they have not established commonality with respect to that proposed class.

Plaintiffs' typicality arguments as to the statewide class fail for similar reasons. Plaintiffs B.B. and G.G. propose to represent the class. B.B. and G.G. sue on behalf of their minor children who received gender-affirming care at Packard.[38] Given the lack of evidence that DOJ is seeking identifying patient records about transgender minors from hospitals other than Packard, the Court cannot conclude that members of the proposed statewide class who received care at other hospitals "have been injured by the same course of conduct" as B.B. and G.G. or that "the action is based on conduct which is not unique to" plaintiffs who received care at Packard. *Small*, 122 F.4th at 1202.[39]

The recent decision of a court in the Southern District of New York in *Coe v. Blanche* is not to the contrary. *See* No. 26-CV-4641, 2026 WL 1815507 (S.D.N.Y. June 24, 2026). As already discussed, on the same day DOJ served a grand jury subpoena on Packard, it served a nearly identical grand jury subpoena on NYU Langone Hospitals in New York City. Based on that subpoena, the patient-plaintiffs in *Coe* filed a putative class action against DOJ, Acting Attorney General Blanche, and Langone to enjoin the disclosure of their private health information to the government. The New York court granted provisional certification of a class of patients who received gender-affirming care at any healthcare institution located in New York City, not just Langone. *See id.* at *1. But in *Coe*, plaintiffs presented evidence that at least one hospital in New York City other than Langone was subject to an active DOJ subpoena demanding transgender minors' identifying patient records. *See* Reply Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order and Provisional Class Certification at 2, *Coe*, No. 26-CV-4641 (citing news reporting confirming "that Mount Sinai Health System received a subpoena"). And

---

[38] Declaration of B.B., Dkt. No. 45-7 ¶¶ 1–2; Declaration of G.G., Dkt. No. 45-8 ¶¶ 1–2.

[39] Of course, to the extent plaintiffs subsequently procure evidence that DOJ is seeking the medical records of minors who received care at institutions other than Packard, they may seek relief on their behalf at that time.



United States District Court
Northern District of California

the proposed class representatives included patients who received care at that other hospital in addition to patients at Langone. *See* Memorandum of Law in Support of Plaintiffs' Motion for Provisional Class Certification at 13, *Coe*, No. 26-CV-4641. In other words, the record in *Coe* supported a finding that DOJ's challenged course of conduct would injure putative class members at multiple hospitals in New York City and that the proposed class representatives' interests aligned with putative class members regardless of where those members received gender-affirming care. The record here does not support a similar determination.

**b. Plaintiffs have established commonality and typicality as to the proposed Packard subclass.**

Unlike with the California class, plaintiffs have demonstrated that members of the proposed Packard subclass share common questions and that B.B. and G.G.'s claims are typical of the subclass's claims. DOJ has not argued otherwise.

As to typicality, Packard has confirmed that DOJ is demanding patient data for every member of the proposed subclass pursuant to a grand jury subpoena and that DOJ previously did so through an administrative subpoena.[40] All members of the proposed subclass, including B.B. and G.G.'s children, thus face injury as "a result of a course of conduct that is not unique to any of them," that is, DOJ's demand for Packard's patient records. *Parsons*, 754 F.3d at 685. That shared injury "follows from the course of conduct at the center of the class claims." *Id.* B.B. and G.G.'s claims are therefore typical of the proposed Packard subclass's claims.

As to commonality, the claims of each of the proposed subclass members turn on a common question concerning the nature and strength of DOJ's interest in procuring subclass members' private health information. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (informational privacy), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (equal protection); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (substantive due

[40] *See* Shumacher Declaration, Dkt. No. 31-1 ¶¶ 2, 6; *see also* Grand Jury Subpoena, Dkt. No. 31-2, at 7–8.



United States District Court
Northern District of California

process); *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016 (9th Cir. 2007) (unreasonable search and seizure); *cf. Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (analyzing the government's motive in action challenging its investigation of physicians for communicating certain messages to patients). The record strongly suggests that DOJ's interest in each proposed subclass member's information is exactly the same. DOJ did not differentiate among Packard patients when twice demanding their data in its subpoenas, nor has it attempted to do so before this Court. And at least as to the informational-privacy claim, many of the factors bearing on the strength of DOJ's interest in the information—like "the type of information requested" and "the adequacy of safeguards to prevent [subsequent] unauthorized disclosure" by DOJ, *Tucson Woman's Clinic*, 379 F.3d at 551—cannot logically vary across subclass members.

The proposed Packard subclass therefore independently satisfies the requirements of Rule 23(a)(2) and (3).

**3. Adequacy**

Plaintiffs have established that they "will fairly and adequately protect the interests of the" proposed Packard subclass. Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

As to the proposed class counsel, plaintiffs assert that counsel has no conflicts with the interests of the class and is competent to vigorously prosecute the action on behalf of the class.[41]

[41] *See* Declaration of Caleb Hayes-Deats, Dkt. No. 45-2 ¶¶ 4–18 (describing qualifications and commitment of Lowell & Associates PLLC); Declaration of Josh Rovenger, Dkt. No. 45-3 ¶¶ 2–17 (describing qualifications and commitment of GLBTQ Legal Advocates & Defenders); Declaration of Kara Janssen, Dkt. No. 45-4 ¶¶ 2–7 (describing qualifications and commitment of Rosen Bien Galvan & Grunfeld LLP); Declaration of Shannon P. Minter, Dkt. No. 45-5 ¶¶ 2–27 (describing qualifications and commitment of the National Center for LGBTQ Rights).

DOJ does not argue otherwise.

As to the proposed class representatives, plaintiffs B.B. and G.G. assert claims in this action on behalf of their minor children Z.B. and Z.G.[42] Both B.B. and G.G. attested that their children received gender-affirming care at Packard during the relevant period, i.e., that their children are members of the Packard subclass.[43] B.B. and G.G. also represent that their interests in preventing Packard's disclosure of sensitive medical information without patients' consent fully aligns with the interests of the subclass and that they will vigorously prosecute this action on behalf of the class.[44]

DOJ argues that B.B. and G.G. are inadequate class representatives because they are proceeding pseudonymously. To be sure, some courts in this circuit have suggested that "where … plaintiff[s] seek[] to assert class damages claims … class members will … have a right to know the identity of their representative[s] in th[e] litigation." *Doe v. NFL Enters., LLC*, No. 17-CV-00496, 2017 WL 697420, at *2 (N.D. Cal. Feb. 22, 2017); *see also I.L. v. Six Flags Ent. Corp.*, No. 23-CV-01769, 2025 WL 2300009, at *5 (E.D. Cal. Aug. 8, 2025). That makes sense: In damages actions, "[p]utative class members have an interest in … assess[ing] whether the representatives adequately represent them and whether they wish to participate in the action[.]" *Barbara v. Trump*, 790 F. Supp. 3d 80, 96 (D.N.H. 2025) (citation modified)), *aff'd*, No. 25-365, 2026 WL 1870543 (U.S. June 30, 2026). But in a Rule 23(b)(2) class seeking only prospective relief, "the putative class members have no way to opt in or out of the class, and thus less need for information about class representatives." *Id.*

Further, where pseudonymous plaintiffs "seek declaratory and injunctive relief applicable to the entire class," rather than "[i]ndividual damages …, there is little, if any, possibility of conflicting interests between [the pseudonymous plaintiffs] and members of the class … that would preclude [the pseudonymous plaintiffs] from making decisions that benefit the entire class."

---

[42] B.B. Decl., Dkt. No. 45-7 ¶ 1; G.G. Decl., Dkt. No. 45-8 ¶ 1.

[43] B.B. Decl., Dkt. No. 45-7 ¶ 2; G.G. Decl., Dkt. No. 45-8 ¶ 2.

[44] B.B. Decl., Dkt. No. 45-7 ¶ 16; G.G. Decl., Dkt. No. 45-8 ¶ 17.

*Does 1-10 v. Univ. of Washington*, 326 F.R.D. 669, 682–83 (W.D. Wash. 2018); *see also Barbara*, 790 F. Supp. 3d at 96. DOJ attempts to manufacture a conflict here by hypothesizing that some members of the Packard subclass might not oppose DOJ's collection of their identifying medical records. This is no conflict at all—the relief plaintiffs seek would not prevent individual class members from disclosing their health information to DOJ or authorizing Packard to do the same.

Nor would pseudonymous representation vitiate the public interest, as "[i]n putative class actions raising constitutional challenges, the public interest is not being able to identify any one [p]laintiff, but in being able to follow the case to determine how the constitutional issues are resolved." *Doe v. City of Apple Valley*, No. 20-CV-499, 2020 WL 1061442, at *3 (D. Minn. Mar. 5, 2020). By contrast, "a rule that class representatives must be publicly identified"—even where the Court has determined that pseudonymity is otherwise warranted based on stigma and potential harassment—"would likely discourage individuals from stepping forward and seeking redress for their injury. That is antithetical to the purpose of the class action" and contrary to the public interest. *Id.* Unsurprisingly, other courts in this circuit have certified classes represented by pseudonymous plaintiffs under Rule 23(b)(2). *See, e.g.*, *Doe v. Mindgeek USA Inc.*, 702 F. Supp. 3d 937, 954 (C.D. Cal. 2023); *Does 1-10*, 326 F.R.D. at 685.

The Court concludes that B.B. and G.G. are adequate representatives and that plaintiffs' counsel is adequate counsel for the proposed Packard subclass. Accordingly, the proposed Packard class and its proposed representatives satisfy the Rule 23(a) prerequisites.

**B. Rule 23(b)(2)**

Plaintiffs also satisfy the requirements of Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360; *see also id.* ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation modified). "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is the case here. The



United States District Court
Northern District of California

provisional Packard class seeks to enjoin DOJ from taking further action to request or obtain Packard patient data. DOJ has not drawn any distinctions between the patients whose medical records it seeks, and all of those records have been subject to the same administrative and grand jury subpoenas. Nor has DOJ otherwise attempted to argue that Packard patients lack a shared injury. It contends only that certification of the proposed statewide class would be improper because a statewide remedy would be "readily divisible," as patients of a particular hospital "would get nothing" from an order prohibiting DOJ's pursuit of patient data from other hospitals. That argument obviously does not apply to the proposed Packard subclass, every member of which received gender-affirming care at the same institution.

Accordingly, plaintiffs have established that they satisfy all the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(2) with respect to the Packard subclass. The Court provisionally certifies the Packard subclass (the "provisional class") for the purposes of plaintiffs' motion for a preliminary injunction. Plaintiffs B.B. and G.G. shall represent the provisional class. Because the Court certifies the provisional class under Rule 23(b)(2), it need not address plaintiffs' alternative request for certification under Rule 23(b)(1)(A).

United States District Court
Northern District of California

**III. Plaintiffs' motion for a preliminary injunction is granted in part and denied in part.**

Plaintiffs request a temporary restraining order that would prohibit DOJ from requesting, receiving, or otherwise obtaining certain identifying and private patient information from California hospitals that provided gender-affirming care to minors within the past six years. The standard for issuing a temporary restraining order is largely identical to the standard for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Plaintiffs seeking either form of relief must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a [temporary restraining order or] preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are

satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Youth 71Five Ministries v. Williams*, 160 F.4th 964, 977 (9th Cir. 2025) (citation modified).

Although the substantive standards for both motions are similar, the timeframe for a temporary restraining order is different. While a preliminary injunction remains in effect pending final resolution of the litigation, "a TRO 'should be restricted to ... preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)). And "temporary restraining orders, in contrast to preliminary injunctions, are not appealable." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002).

Although plaintiffs originally moved for a temporary restraining order, defendants received notice and an opportunity to respond to the motion, both in writing and orally at the hearing. All parties have therefore agreed that the Court should treat plaintiffs' motion as one for a preliminary injunction. The Court agrees and so converts the motion.

Because the Court denies plaintiffs' motion for provisional certification of the proposed statewide class, the Court denies plaintiffs' request for statewide injunctive relief. *See Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1176 (N.D. Cal. 2020), *aff'd sub nom. Yeomans v. World Fin. Grp. Ins. Agency, LLC.*, No. 20-16937, 2021 WL 5356537 (9th Cir. Nov. 17, 2021). But because plaintiffs have satisfied each of the *Winter* factors with respect to the provisional Packard class, the Court grants preliminary injunctive relief to that provisional class.

**A. Plaintiffs have raised at least serious questions as to the ultimate success of their informational-privacy claim under the Fifth Amendment.**

Although plaintiffs' complaint asserts several constitutional claims against all defendants, their motion for a preliminary injunction seeks relief only from DOJ and Acting Attorney General Blanche based on their informational-privacy claim under the Fifth Amendment and free-speech

United States District Court
Northern District of California

claim under the First Amendment. DOJ contests both the procedural propriety of this action and the merits of plaintiffs' claims. On the available record, the Court finds that plaintiffs have raised at least "serious questions" as to DOJ's argument that their chosen procedural vehicle is improper and have demonstrated a likelihood of success on their informational-privacy claim. The Court therefore need not address plaintiffs' First Amendment claim.

**1. Plaintiffs have shown serious questions, and possibly a likelihood of success, as to the availability of the relief they seek.**

DOJ contends that, regardless of the merits of plaintiffs' constitutional claims, their assertion of those claims here is improper for four reasons.

***First,*** DOJ insists that sovereign immunity bars plaintiffs' claims. But in § 702 of the Administrative Procedure Act, Congress expressly waived sovereign immunity as to any "action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer … acted … in an official capacity or under color of legal authority." 5 U.S.C. § 702. This waiver is "not limited to suits involving an 'agency action' as defined under the APA." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). The waiver squarely applies to plaintiffs' claims for injunctive relief against DOJ (an "agency") and Acting Attorney General Blanche (an "officer"). *See* 5 U.S.C. § 701(b)(1) (defining "agency" as "each authority of the Government of the United States"); *see* 5 U.S.C. § 2104 (defining "officer" to include any individual "engaged in the performance of a Federal function under authority of law or an Executive act").

***Second,*** DOJ argues that plaintiffs have no private right of action to assert their constitutional claims. It is true that plaintiffs may lack a *statutory* cause of action, but that is not dispositive. The Supreme Court "ha[s] long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 110 (1902)). "The ability to sue to enjoin unconstitutional actions by … federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* (citation modified). Plaintiffs thus seek the sort of "equitable relief that is traditionally available to enforce federal



United States District Court
Northern District of California

law." *Id.* at 329.

***Third,*** DOJ contends that any equitable cause of action that might have been available to plaintiffs has been displaced by Federal Rule of Criminal Procedure 17, which governs subpoenas in federal criminal actions. This issue is closer than the first two. As the Supreme Court explained in *Armstrong*, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 327. Because "the Federal Rules have the force of statute," *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996), it follows that a federal rule of criminal procedure could displace an equitable cause of action. But a traditional equitable remedy remains available unless "Congress has demonstrated an 'intent to foreclose' that form of relief." There is good reason to doubt that Rule 17 precludes the equitable relief plaintiffs seek.

Rule 17 provides that a subpoena in the federal criminal context, whether issued as part of a grand jury investigation or after a prosecution is underway, "must state the court's name" and "include the seal of the court." Fed. R. Crim. P. 17(a). The rule also creates a procedure for challenging a subpoena: "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). So the rule contemplates that the court hearing a motion to quash will be the same court whose name and seal appear on the subpoena—that is, the court for the district from which the subpoena issued.

It is quite likely that Rule 17 would preclude plaintiffs from filing a motion to quash a grand jury subpoena issued by DOJ in a district other than the one from which the subpoena issued. In interpreting a similar (but since-altered) provision in Rule 17's civil analog, the Ninth Circuit held that only "the issuing court … has the authority to consider motions to quash or modify" and affirmed a district court's decision denying review of a motion to quash on that basis. *S.E.C. v. CMKM Diamonds, Inc.*, 656 F.3d 829, 832 (9th Cir. 2011).

But plaintiffs do not seek to quash a particular grand jury subpoena. Rather, plaintiffs challenge DOJ's broader campaign to procure provisional class members' private health information, which began a year ago when DOJ issued an administrative subpoena to Packard. Both plaintiffs' amended complaint and their motion for a preliminary injunction ask the Court to

United States District Court
Northern District of California

enjoin DOJ from "obtaining" that information by any means. Because the grand jury subpoena is DOJ's latest gambit to obtain plaintiffs' information, plaintiffs' requested relief would of course impact DOJ's ability to enforce the subpoena. As plaintiffs' counsel explained at the hearing, however, their requested remedy would not invalidate the subpoena itself, which would remain in place. Nor is plaintiffs' requested remedy a mere proxy for a motion to quash. Given DOJ's persistence in pursuing transgender minors' patient data, there is little reason to think that the grand jury subpoena will be DOJ's last such effort. A motion to quash could not enjoin those new efforts; equitable relief can. So plaintiffs seek equitable relief to avoid playing "a game of whack-a-mole" in which they must constantly uncover and counter DOJ's ever-shifting tactics. Teleconference Decision at 7, *Coe*, No. 26-cv-4641, Dkt. No 89 at 10.

The question, then, is whether Rule 17's quashal provision embodies an intent to foreclose equitable remedies in one district that would incidentally prevent DOJ's enforcement of a grand jury subpoena in another district. A conclusive answer must await fuller briefing on a non-expedited schedule. At this early stage, however, the Court concludes that Rule 17 likely does not foreclose such remedies.

*Armstrong* guides the Court's analysis. There, the Supreme Court addressed whether certain provisions of the Medicaid Act foreclosed equitable relief seeking to compel Idaho's compliance with § 30(A) of that statute. *See* 575 U.S. at 323–24, 327–29. The Supreme Court reasoned that "[t]wo aspects of § 30(A) establish Congress's intent to foreclose equitable relief." *Id.* at 328 (citation modified). "First, the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements … is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* (citing 42 U.S.C. § 1396c). The *Armstrong* Court cautioned, however, that "[t]he provision for the … enforcement [of Medicaid's requirements] by withholding funds might not, *by itself*, preclude the availability of equitable relief." 575 U.S. at 328. Instead, equitable relief was unavailable because the statute contained another indicum of Congress's intent to foreclose such relief: "the judicially unadministrable nature of § 30(A)'s text," which is broad, unspecific, and complex. "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes … that Congress wanted to make

the agency remedy that it provided exclusive[.]" *Id.* (citation modified); *see also id.* at 329 ("The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, … shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts.").

Like the Medicaid Act in *Armstrong*, Rule 17 provides only one remedy for an unlawful subpoena: a motion to quash or modify in the court for the district from which the subpoena issued. *See* Fed. R. Crim. P 17(c)(2). But Rule 17's remedy is far less tailored to a specific violation of federal law than the statutory remedy at issue in *Armstrong*. That remedy (the withholding Medicaid funds) was directed to a discrete statutory violation: a state's failure to comply with the requirements for state medical-assistance plans under 42 U.S.C. § 1396a. *See* 575 U.S. at 328; 42 U.S.C. § 1396c. It was this "express provision of one method of enforcing a [particular] substantive rule" that, the Court reasoned, "suggests that Congress intended to preclude others." *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Rule 17, by contrast, provides a broad mechanism to challenge any federal criminal subpoena—whether issued in aid of a grand jury investigation or trial—as "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Such challenges may be based on, among other reasons, a subpoena's indefiniteness or lack of relevance, the burdensome nature of compliance, statutory or common-law privileges, or the Constitution. *See United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991); *Branzburg v. Hayes*, 408 U.S. 665, 688, 708 (1972). Because the remedy provided by Rule 17 lacks a close relationship to any particular substantive rule of federal law, it is less suggestive of a congressional intent to preclude equitable relief for violations thereof than the narrowly tailored remedy considered in *Armstrong*.

Even if Rule 17's quashal mechanism were analogous to the Medicaid Act's remedial provision, it likely would "not, *by itself*, preclude the availability of equitable relief" here. *Armstrong*, 575 U.S. at 328; *see also Sierra Club*, 929 F.3d at 699 (explaining that the APA's provision of a "general mechanism by which to challenge final agency action" does not foreclose direct constitutional claims challenging the same agency action). That is because, unlike the Medicaid Act, Rule 17 contains no other indicia of an intent to foreclose constitutional claims for

equitable relief that would incidentally affect enforcement of a subpoena. DOJ points to a provision in Rule 6 requiring grand jury secrecy. *See* Fed. R. Crim. P. 6(e). Because that provision limits DOJ's ability to disclose details about a grand jury investigation, DOJ argues that reviewing the legitimacy of its reasons for issuing a grand jury subpoena in another district is impractical and suggests an intent to foreclose such review. That may be a plausible interpretation, but it is undercut by an exception allowing DOJ to petition to disclose "a grand-jury matter … in connection with a judicial proceeding[.]" Fed. R. Crim. P. 6(e)(3)(E)(i). Though such a petition "must be filed in the district where the grand jury convened," the rule expressly contemplates that it may "arise[] out of a judicial proceeding in another district." Fed. R. Crim. P. 6(e)(3)(F), (G). Rule 6 thus acknowledges that a court in one district may have good cause to review at least some matters related to grand jury proceedings in another district. Absent some other indicia of an intent to foreclose equitable remedies affecting enforcement of criminal subpoenas, the Court cannot conclude that Rule 17 precludes plaintiffs' claims.

This conclusion is bolstered by *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 165–67 (2d Cir. 2006). In *Gonzales*, the Second Circuit held that a plaintiff could use a declaratory action in one district to collaterally challenge DOJ's attempt to obtain the plaintiff's confidential information by issuing a grand jury subpoena to a third party under the seal of another district. *See id.* at 167. Critical to the Second Circuit's reasoning was that a motion to quash under Rule 17 might not afford the plaintiff complete relief, whether because the subpoenas had yet to issue or because the recipients had already complied. *See id.* at 167. While not directly on point, *Gonzales* at least stands for the proposition that Rule 17 does not foreclose all other relief affecting DOJ's enforcement of a grand jury subpoena where quashal is unlikely to fully remedy the alleged constitutional harms. That is the case here. As discussed above, and as the court in *Coe* explained, "[t]he filing of a Rule 17(c) motion to quash the [grand jury] subpoena in the Northern District of Texas would not have any effect on other grand jury or civil administrative subpoenas seeking the same information from [Packard] … [T]he government may simply switch their strategy and go after plaintiffs' private information under the guise of a different investigation." Transcript of Teleconference Decision at 17, *Coe*, No. 26-cv-4641, Dkt. No 89 at 20.

The Court does not suggest that this issue is open and shut, nor need it be at this stage. For present purposes, it suffices that plaintiffs have raised serious questions as to the availability of equitable relief that overlaps with (but does not duplicate) the relief available under Rule 17.

***Fourth,*** DOJ argues that even if the Court has discretion to review plaintiffs' claims for equitable relief, it should decline to do so based on comity and separation-of-powers concerns. Neither rationale is convincing.

"The purpose of the comity principle" is "to avoid placing an unnecessary burden on the federal judiciary" (i.e., to avoid duplicative litigation) "and to avoid the embarrassment of conflicting judgments." *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979), *overruled in part on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Plaintiffs' claims are not duplicative of any potential proceedings in the Northern District of Texas because they challenge a broader campaign of conduct than could be challenged through a motion to quash in that district. Nor will plaintiffs' requested relief result in conflicting judgments or "enjoin[] an action underway in a sister court." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless Shoesource, Inc.*, No. 11-CV-1892, 2012 WL 3277222, at *8 (N.D. Cal. Aug. 9, 2012). A grand jury subpoena issues without judicial review, *see* Fed. R. Crim. P. 17(a), and nothing in the record suggests that any court in Texas has reviewed or approved the scope of the grand jury subpoena issued to Packard. In any event, plaintiffs' requested injunction does not invalidate, quash, or otherwise operate on a particular subpoena—it enjoins DOJ from acting to obtain plaintiffs' information by whatever means.

DOJ also argues that granting injunctive relief "would raise serious separation-of-powers concerns because it would effectively restrain a lawful Executive Branch criminal investigation through collateral civil process." But plaintiffs' requested injunction does not terminate DOJ's criminal investigation in the Northern District of Texas. It narrowly prevents DOJ from obtaining private health information that, as the Court explains below, has no apparent relevance to any crime indictable in Texas. DOJ remains otherwise free to proceed with its investigation, including by obtaining other records from Packard that do not disclose individual patients' private information. Nor does the injunction restrain "lawful" conduct. The very reason for the injunction



United States District Court
Northern District of California

is that DOJ's challenged conduct is likely *not* lawful. It is well settled that federal courts may exercise their equitable authority to enjoin likely unconstitutional actions by executive-branch actors. *See In re Clean Water Act Rulemaking*, 60 F.4th 583, 594 (9th Cir. 2023).

DOJ's protestations about comity and separation-of-powers principles are unavailing for an additional reason: Any risk of conflicting court orders or interference with criminal investigations has been manufactured by DOJ itself. DOJ issued an administrative subpoena to Packard in July 2025, and that subpoena would be subject to challenge by plaintiffs in this district. The administrative subpoena was never quashed. Instead, Packard produced responsive non-patient records and, by May 2026, was actively "explor[ing] the possibility" of producing "anonymized patient records," which "DOJ had indicated it would accept … in the first instance."[45] Despite being poised to get everything it could reasonably need, DOJ abruptly withdrew the administrative subpoena on May 6, 2026, and replaced it the very next day with a grand jury subpoena of nearly identical scope, issued under the seal of the Northern District of Texas.[46] That tactical shift came in the wake of a series of court losses in which DOJ's administrative subpoenas demanding other hospitals' patient records were quashed for lack of a legitimate purpose.[47] The unavoidable conclusion is that DOJ issued its grand jury subpoena to avoid another loss and force Packard and its patients to pursue any challenge to DOJ's demands in a forum that DOJ deems friendlier. This is hardly DOJ's first such ploy. *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; Transcript of Teleconference Decision at 8, *Coe*, No. 26-cv-4641, Dkt. No 89 at 11. DOJ cannot reasonably invoke comity and the separation of powers as cover for its forum shopping. Plaintiffs received care in this district from a hospital in this district, and unless Rule 17 forbids it, they may seek protection for the resulting medical records in this district.

In sum, most of DOJ's procedural arguments likely fail. As to the question of whether Rule

---

[45] Schumacher Decl., Dkt. No. 31-1, ¶¶ 2–4.

[46] *Id.* ¶ 6.

[47] *See supra* note 16.

United States District Court
Northern District of California

17 forecloses equitable relief here, plaintiffs have at least raised serious questions. The Court therefore turns to the merits.

**2. Plaintiffs are likely to succeed on the merits of their informational-privacy claim.**

Plaintiffs claim that DOJ's attempts to obtain their private health information violates their constitutional right to informational privacy. The Ninth Circuit has long "recognized [this] right" as "stemming from an individual's interest in avoiding disclosure of personal matters." *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024) (citation modified); *see also Tucson Woman's Clinic*, 379 F.3d at 551–52. And the Supreme Court has for decades assumed, without conclusively deciding, that such a right exists. *See Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 (2011) (citing *Whalen v. Rose*, 429 U.S. 589, 599 (1977)). As asserted against federal actors, the right arises under the Fifth Amendment. *See id.* at 147 n.10 (noting that the right is rooted in "due process").

Not all compelled disclosures implicate the right to informational privacy—only "certain, highly sensitive information" triggers constitutional protections. *Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021). But DOJ does not dispute that the information at issue here is highly sensitive. That is for good reason: The information includes detailed and identifying medical records as well as social security numbers, two categories of information that the Ninth Circuit has suggested implicate informational-privacy rights. *See Tucson Woman's Clinic*, 379 F.3d at 552–53; *Doe v. Bonta*, 101 F.4th at 637–38; *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999).

That plaintiffs have a constitutional interest in preventing disclosure of the information does not end the inquiry. The right to informational privacy "is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Doe v. Bonta*, 975 F.3d at 768 (quoting *Crawford*, 194 F.3d at 958). "[T]o determine whether the governmental interest in obtaining information outweighs the individual's privacy interest," the Court must balance five factors:

> (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need

> for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Tucson Woman's Clinic*, 379 F.3d at 551. Taken together, these factors show that the provisional class's privacy interests likely outweigh DOJ's interest in obtaining class members' sensitive health information.

**a. The Type of Information Requested**

The type of information requested by DOJ is highly sensitive because it includes both personally identifying information about minor patients (e.g., names, dates of birth, and social-security numbers) and detailed information about their medical histories (e.g., the gender-affirming care they received, the clinical assessments and diagnoses underlying that care, and their consent to or parental authorization for such care). *See id.* at 552–553 (reasoning that "broad" requests for "patient identifying information such as names and full medical histories" generated a heightened privacy interest). Such detailed medical information is all the more sensitive because it identifies provisional class members as having received care that is subject to intense political controversy, that the federal government has professed a desire to "end,"[48] and that state authorities in Texas have suggested could from the basis for child-abuse prosecutions against patients' parents.[49]

DOJ suggests that provisional class members have no reasonable expectation that their personal health information will remain private because Packard's privacy notice states that such information may be disclosed to law enforcement and HIPAA's implementing regulations authorize such disclosures "[i]n compliance with … [a] grand jury subpoena." *See* 45 C.F.R. § 164.512(f)(1)(ii). But the privacy notice indicates that such disclosures will occur only "when certain conditions are met,"[50] and the cited regulation provides that disclosure will be "limited by

---

[48] Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (2025).

[49] *AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, ATT'Y GEN. OF TEX (Feb. 21, 2022), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-declares-so-called-sex-change-procedures-children-and-prescription-puberty-blockers-be [https://perma.cc/Z67Z-A5RR].

[50] Stanford Medicine Notice of Privacy Practices, Dkt. No. 79-1, at 7.



United States District Court
Northern District of California

the relevant requirements" for a grand jury subpoena. *See id.* Thus, they suggest that patients' personal health information will not be disclosed absent a showing of possible relevance to the purported law-enforcement purpose and an attendant government interest in the information. A reasonable patient reading this language could very well maintain an expectation of privacy where their personal health information is minimally relevant to DOJ's professed law-enforcement purpose. In fact, at least three parent-plaintiffs *did* maintain such an expectation, attesting that they "never consented to [Packard] disclosing [their children's] patient-identifying medical records to the government."[51]

DOJ next argues that whatever constitutional interest provisional class members may have in their sensitive health information evaporates in the face of a grand jury subpoena because "[t]here is no general right to privacy before the grand jury." *In re Grand Jury Proceedings*, 801 F.2d 1164, 1169 (9th Cir. 1986); *see also United States v. Calandra*, 414 U.S. 338, 353 (1974) ("Ordinarily, of course, a witness has no right of privacy before the grand jury."). But plaintiffs do not assert a "general right of privacy." They invoke a narrow due-process right to the privacy of information of a particularly sensitive and intimate nature—here, identifying information coupled with details of their medical history, including their receipt of politically controversial care.

While an individual subject to a grand jury subpoena "may not decline to answer on the grounds that his responses might prove embarrassing or result in an unwelcome disclosure of his personal affairs," the Supreme Court has acknowledged that "some recognized privilege[s] of confidentiality" under the Constitution apply in the grand jury context. *Calandra*, 414 U.S. at 353. In *Calandra*, the Supreme Court suggested that a grand jury subpoena that effected an "independent governmental invasion of one's … papers[] or effects," rather than "the usual abridgment of personal privacy common to all grand jury questioning," might contravene the Fourth Amendment. *Id.* at 354. That was not the case in *Calandra* because the subpoena at issue asked questions based on a prior unreasonable search but did not itself demand documents without probable cause. The subpoena therefore "work[ed] no new Fourth Amendment wrong." *Id.* By

---

[51] G.G. Decl., Dkt. No. 45-8 ¶ 7; B.B. Decl., Dkt. No. 45-7 ¶ 7; Declaration of A.G., Dkt. No. 45-6 ¶ 5.

contrast, DOJ's demand for provisional class members' sensitive health information would effect a new and distinct harm to class members' constitutionally protected privacy interests. DOJ's use of a grand jury subpoena does not obviate the extreme sensitivity of that information or the provisional class's privacy interests therein. *Cf. Hale v. Henkel*, 201 U.S. 43, 76 (1906) (holding that a grand jury subpoena contravened the Fourth Amendment because its demand for documents was "far too sweeping in its terms to be regarded as reasonable"), *overruled on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964)).

**b. The Potential Harm from, and Adequacy of Safeguards to Prevent, Unauthorized Disclosure**

Plaintiffs have also established potential harm from Packard's non-consensual disclosure of their private health information to DOJ. As DOJ notes, cases considering informational-privacy claims usually focus on the risk that government actors will misuse or publicly disclose sensitive information after the government has obtained it, rather than harm stemming from the government's initial acquisition of the information. *See, e.g.*, *Endy v. County of Los Angeles*, 975 F.3d 757, 769 (9th Cir. 2020). Still, the right to informational privacy "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789–90 (9th Cir. 2002). "Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information." *Tucson Woman's Clinic*, 379 F.3d at 551–52.

DOJ contends that there is no realistic potential for harm here because the requirement of grand jury secrecy will prevent the widespread dissemination of provisional class members' sensitive health information within the government. Even assuming that DOJ will not use means other than a grand jury subpoena to seek class members' information, the Court disagrees that the requirements of grand jury secrecy eliminate the risk of harm for two reasons.

First, the DOJ attorneys who assuredly will have access to provisional class members' information are those investigating Packard and other providers of gender-affirming care. In other



United States District Court
Northern District of California

words, the information will be accessible to the drivers of what courts around the country have found to be a bad-faith campaign to intimidate hospitals into halting the lawful provision of gender-affirming care. *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238–39; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *12; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7; *In re 2025 UPMC Subpoena*, 2026 WL 570419, at *2. It is of little solace to transgender minors that the only officials with access to their medical records are those working to terminate gender-affirming care based on clear hostility to "transgenderism" (i.e., the existence of transgender people).[52] And regardless of identity or animus, the disclosure of children's private health information to officials who expressly intend to deprive them of medical care that their families, doctors, and the California legislature deem necessary and appropriate is an obvious harm.

Second, Rule 6(e) expressly authorizes disclosure of grand jury materials to "any" state official whom DOJ unilaterally deems "necessary to assist in performing [DOJ]'s duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(A)(ii). So grand jury secrecy would not prevent disclosure of provisional class members' health information to a large number of Texas officials. In her memorandum instructing DOJ to begin investigating providers of gender-affirming care, then-Attorney General Bondi stated that she would "partner with state attorneys general," and DOJ has since collaborated with the Texas Attorney General in at least one criminal investigation of a hospital providing gender-affirming care,[53] making such disclosure more likely. The provision of provisional class members' health information to Texas officials would not be merely

---

[52] Memorandum from Attorney General Pamela Bondi, *supra* note 7, at 1; *see also Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, U.S. DEP'T OF JUST.: OFF. OF PUB. AFFS. (May 15, 2026), https://www.justice.gov/opa/pr/justice-department-secures-landmark-resolution-end-pediatric-gender-affirming-care-and [https://perma.cc/9DG7-4UJD] (quoting defendant Blanche as stating that "[t]he Justice Department will use every weapon at its disposal to end … so-called 'gender-affirming care' for children").

[53] Memorandum from Attorney General Pamela Bondi, *supra* note 7, at 5; *Justice Department Secures Landmark Resolution*, *supra* note 52.



United States District Court
Northern District of California

embarrassing. Because the Texas Attorney General has suggested that the parents of transgender minors who receive gender-affirming care should be investigated for child abuse,[54] several plaintiff-parents understandably fear that the disclosure of their children's information to DOJ might lead to investigations of their families.[55] The Court might in other cases have questioned the likelihood of California residents being targeted with criminal investigations in Texas, but the circumstances of this action suggest that such prosecutions are indeed possible.

Grand jury secrecy may, of course, mitigate the potential for harm from the unauthorized disclosure of provisional class members' private health information to DOJ. But for the reasons above, a potential for harm remains.

**c. The Degree of Need for Access**

Although DOJ previously sought the information at issue here through an administrative subpoena, it now does so through a grand jury subpoena issued under the seal of the Northern District of Texas. Because DOJ has identified no other purpose for its pursuit of the information, the extent of DOJ's legitimate need for access is coextensive with the grand jury's interest in the information.

"It is axiomatic that the grand jury sits … to assess whether there is adequate basis for bringing a criminal charge." *United States v. Williams*, 504 U.S. 36, 51 (1992); *see also United States v. Wiseman*, 991 F.2d 804 (9th Cir. 1993), *as amended on denial of reh'g* (Nov. 24, 1993). As DOJ argues, the grand jury enjoys wide-ranging investigatory authority. *See R. Enters.*, 498 U.S. at 297. But because it wields that authority to the ultimate end of determining whether to indict, "[t]he investigatory powers of the grand jury are … not unlimited." *Id.* at 299. DOJ's internal guidance reflects this, explaining that "[t]he grand jury's power, although expansive, is limited by its function toward possible return of an indictment." U.S. Dep't of Just., Just. Manual § 9-11.120 (2018) (citing *Costello v. United States*, 350 U.S. 359, 362 (1956)). Accordingly, when DOJ issues a subpoena in furtherance of a grand jury investigation, there must be at least a

---

[54] *AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, *supra* note 49.

[55] A.G. Decl., Dkt. No. 45-6 ¶ 6; B.B. Decl., Dkt. No. 45-7 ¶ 12; G.G. Decl., Dkt. No. 45-8 ¶ 11.

"reasonable possibility that the category of materials [DOJ] seeks will produce information relevant to the general subject of the grand jury's investigation," i.e., to the existence of a basis for an indictment. *R. Enters.*, 498 U.S. at 301. Because the sensitive patient information demanded by DOJ has no obvious relevance to an indictment in the Northern District of Texas, DOJ likely lacks a meaningful need for access to such information.

DOJ insists that the Court cannot fairly probe the grand jury subpoena's potential relevance to an investigation in Texas because grand jury secrecy requirements prevent DOJ from explaining the nature of that investigation. That is not quite true. It is within DOJ's authority to petition the Texas court for authorization to disclose grand jury matters in connection with this proceeding. *See* Fed. R. Crim. P. 6(e)(3)(E)(i). Should it receive such authorization, DOJ may of course request that this Court review any materials *in camera* as needed to preserve grand jury secrecy. *Cf. R. Enters.*, 498 U.S. at 301–02. Thus, moving forward, grand jury secrecy should not tie DOJ's hands. And while the general rule of grand jury secrecy restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief, the record is clear enough for the Court to conclude that, even with greater explanation, DOJ likely could not show any reasonable possibility that the subpoena is relevant to a valid grand jury investigation designed to return indictments out of the Northern District of Texas.

As an initial matter, it is difficult to conceive of a potential criminal offense for which an investigation "would require … identifying and sensitive medical information for an entire class of people for a six-year period." Teleconference Decision at 22, *Coe*, No. 26-cv-4641, Dkt. No 89 at 25. But the Court need not guess at the criminal conduct the grand jury is investigating. The grand jury subpoena to Packard mirrors the scope of the administrative subpoenas DOJ previously issued to Packard and to other hospitals pursuant to its authority under 18 U.S.C. § 3486(a)(1)(A)(i)(I) to investigate "federal healthcare offenses," like violations of the Food, Drug, and Cosmetic Act (FDCA). *See, e.g.*, *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *4; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 569 n.57. DOJ issued the grand jury subpoena the day after it withdrew the




United States District Court
Northern District of California

substantively identical administrative subpoena it had served on Packard, so it is hardly a logical leap to conclude that the subpoenas concern the same potential FDCA violations. And DOJ has repeatedly stated that it intends to investigate providers of gender-affirming care for misbranding and fraudulent billing in violation of the FDCA and, relatedly, for fraudulent insurance claims in violation of the False Claim Act.[56]

Some of the non-patient records DOJ demands from Packard, which neither Packard nor plaintiffs seek to protect, may be relevant to such FDCA and False Claims Act violations. But the requests challenged here concern "child-patients' identities and highly sensitive medical information … reflect[ing] individualized clinical care and deeply personal medical disclosures," including "psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578. As other courts have ably explained, that information has no discernible relevance to any federal healthcare offense or other fraudulent billing or insurance-claim practices. *Id.*; *see also In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see also QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4–5. The Court agrees with, and adopts, these other courts' analysis.

Even if the sensitive patient information DOJ demands is possibly relevant to the existence of some chargeable offense, the record before the Court evinces virtually no chance that the information is relevant to an offense chargeable in the Northern District of Texas. As discussed above, the grand jury's ultimate purpose is to decide whether to return an indictment. And an indictment must allege facts that would sustain venue in the district of prosecution. *See United States v. Ghanem*, 993 F.3d 1113, 1120 (9th Cir. 2021). For that reason, DOJ's internal guidance instructs that "[a] case should not be presented to a grand jury in a district unless venue for the offense lies in that district." U.S. Dep't of Just., Just. Manual § 9-11.121 (2018). The proper venue

[56] *See, e.g.*, Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," *supra* note 7, at 4; Memorandum from Assistant Attorney General Brett A. Shumate, *supra* note 11, at 2; *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, *supra* note 52.



United States District Court
Northern District of California

in a federal criminal action is generally the district "where the crime was committed," which is "the place of the crime's conduct elements—the acts that the prosecution must prove to secure a conviction." *Abouammo v. United States*, No. 25-5146, 2026 WL 1686084, at *4 (U.S. June 11, 2026) (citation modified). The appropriate scope of a grand jury investigation will thus usually be limited to potential criminal conduct in the district in which the grand jury sits unless the investigation concerns potential multi-district offenses. For there to be a reasonable possibility that the material demanded by a grand jury subpoena is relevant to the grand jury's investigation, then, the material must ordinarily have some connection to potential in-district conduct. In *R. Enterprises*, for example, the Supreme Court upheld a grand jury subpoena issued from the Eastern District of Virginia to a group of New York companies that had shipped sexually explicit materials into Virginia. 498 U.S. at 295. Yet the patient records demanded by the grand jury subpoena issued to Packard have no apparent nexus to the Northern District of Texas—DOJ is demanding information about patients who received care in California from an institution that is located in California and has no documented connection to Texas. Nothing in the record suggests that such records relate to a potential multi-district offense that might allow prosecution in Texas for criminal conduct occurring in California. *See id.*

DOJ resists this conclusion by pointing to Rule 17's provision authorizing service of criminal subpoenas "at any place within the United States." Fed. R. Crim. P. 17(e). That provision simply acknowledges that individuals outside a particular district may nevertheless possess evidence of potential relevance to criminal conduct within the district. It does not suggest that grand jury subpoenas may demand records absent a reasonable possibility of relevance to crimes chargeable in the district where the grand jury sits (i.e., to in-district conduct). And the text of Rule 17's nationwide-service provision suggests that it relates primarily to subpoenas compelling out-of-district witnesses to testify, rather than grand jury demands for out-of-district records. *See id.* (referring specifically to a "subpoena requiring a witness to attend a hearing or trial").

The record before the Court thus establishes that there is little to no possibility that the patient information DOJ demands will be of any relevance to the grand jury investigation in Texas. Because that is DOJ's only present basis for asserting an interest in the information, its

"degree of need for access" to the information is, at most, minimal.

**d. The Public Interest**

Finally, the Court must consider "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Tucson Woman's Clinic*, 379 F.3d at 551. DOJ again gestures to the general public policy against unduly burdening grand jury investigations. *See R. Enters.*, 498 U.S. at 298. But the Supreme Court has made clear that this policy does not authorize "fishing expeditions" or demands for records for which there is not a reasonable possibility of relevance to the existence of an indictable offense. *See id.* at 299–301. So the policy does not favor DOJ's access to the patient information at issue in this case.

On balance, the provisional class members' individual interests in maintaining the privacy of their highly sensitive medical information—the disclosure of which carries a risk of harm—likely outweighs DOJ's negligible interest in obtaining such information, which is almost certainly irrelevant to the Texas grand jury investigation. *See Tucson Woman's Clinic*, 379 F.3d at 551. Assuming the viability of their equitable cause of action, plaintiffs are therefore likely to succeed on the merits of their Fifth Amendment informational-privacy claim.

**B. The provisional Packard class will likely suffer irreparable harm absent an injunction.**

Members of the provisional Packard class will likely suffer immediate and irreparable harm without preliminary injunctive relief. "[W]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" once plaintiffs have established a likely constitutional violation. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) ("[I]t follows inexorably from [the] conclusion that the government's [conduct is] likely unconstitutional … that [p]laintiffs have also carried their burden as to irreparable harm.").

In any event, plaintiffs have established that provisional class members will suffer irreparable harm absent an injunction due to the near-certain disclosure of their "personal medical information," which is "among the most sensitive information that could be collected about a person." *Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501, 2025 WL 2052302, at *15 (N.D. Cal.

United States District Court
Northern District of California

July 22, 2025) (citation modified) (quoting *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023)). As amicus the American Academy of Pediatrics explains, and as several parent-plaintiffs' declarations bear out, such disclosure would negatively impact minor patients' healthcare because "[a]dolescents will discuss fewer topics overall, and fewer confidential topics, with the their health care professionals if they cannot be assured that clinicians' discussion with them and their family members will be kept confidential."[57] Some "may not seek care at all."[58] The disclosure of such information would also 'out' provisional class members as transgender to a federal government that for more than a year has "sought to identify, to demonize, and ultimately to eradicate an entire population of transgender people." Transcript of Teleconference Decision at 5, *Coe*, No. 26-cv-4641, Dkt. No 89 at 8. Such disclosure and the attendant loss of privacy, chilling of doctor-patient communications, and risk of governmental harassment cannot be undone. *Cf. In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) ("Secrecy is a one-way street: Once information is published, it cannot be made secret again.").

DOJ argues that the provisional class faces no risk of irreparable harm for the same reasons DOJ argues that plaintiffs' informational-privacy claim fails. That is, DOJ suggests that plaintiffs cannot reasonably expect privacy because Packard's current privacy notice states that the hospital may disclose personal health information for law-enforcement purposes, and DOJ insists that grand jury secrecy requirements will adequately protect class members' privacy interests. The Court rejects these arguments for the reasons noted above.

---

[57] Brief of Amicus Curiae American Academy of Pediatrics in Support of Plaintiffs' Motion for a Temporary Restraining Order, Dkt. No. 73, at 9 (citing Amy Lewis Gilbert et al., *Clinical Conversations About Health: The Impact of Confidentiality in Preventive Adolescent Care*, 55 J. ADOLESCENT HEALTH. 672, 672–77 (2014); *see also* A.G. Decl., Dkt. No. 45-6 ¶ 7 ("Disclosure would discourage my family from seeking for my child in the future."); B.B. Decl., Dkt. No. 45-7 ¶ 13 ("Disclosure would ruin our trust in the medical system."); G.G. Decl., Dkt. No. 45-8 ¶ 13 ("Disclosure would affect our family's willingness to seek care and share sensitive information in the future … If [Packard] turns over our information, it would be incredibly difficult to return there, but equally difficult to find providers anywhere in the United States who are as competent and whom my daughter would trust.").

[58] *Id.* (citing Richard J. Chung et al., *Confidentiality in the Care of Adolescents: Technical Report*, 153 PEDIATRICS e2024066327 (2024), at 4).

**C. The balance of equities and public interest tip sharply in plaintiffs' favor.**

The final two *Winter* factors—the balance of the equities and public interest—merge because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tip sharply in plaintiffs' favor. "Because public interest concerns are implicated when a constitutional right has been violated, all citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042. In contrast to the irreparable harm faced by the provisional Packard class and the strong public interest in preventing those likely unconstitutional harms, DOJ has not established that preliminary injunctive relief would injure it in any meaningful way. As a general matter, the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice" implicating "constitutional concerns"), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018). And as the Court has already explained, DOJ lacks any discernibly legitimate interest in reviewing private and identifying medical information about the provisional class. To the extent that DOJ and the grand jury in Texas have legitimate reasons for investigating Packard for its provision of gender-affirming care—which is doubtful—plaintiffs' requested injunction does nothing to prevent DOJ from seeking other records that might actually be relevant to that investigation. Indeed, Packard's counsel has attested that Packard already produced other records to DOJ in response to the administrative subpoena.[59] And even if DOJ has a particular need for identifying health information about individual members of the provisional class, DOJ's conduct suggests that the need is not urgent: DOJ took no action to compel disclosure of such information for nine months after first serving Packard with its administrative subpoena.[60]

Plaintiffs have raised serious questions, and potentially a likelihood of success, as to DOJ's argument that they lack an equitable cause of action and have established a likelihood of success

[59] *See* Schumacher Decl., Dkt. No. 31-1 ¶ 3.

[60] *Id.* ¶¶ 2–4.



United States District Court
Northern District of California

on their informational-privacy claim, a likelihood of irreparable harm, and that the balance of equities and public interest tip sharply in their favor. Preliminary injunctive relief is therefore appropriate as to the provisional Packard class.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion to proceed via pseudonym (Dkt. No. 42) is GRANTED. Plaintiffs' motions for provisional class certification (Dkt. No. 45) and for a preliminary injunction (Dkt. No. 46) are GRANTED in part and DENIED in part.

DOJ and Acting Attorney General Blanche, and all persons acting in concert with or on behalf of such defendants, are hereby ENJOINED from requesting, receiving, producing, transmitting, disclosing, or otherwise obtaining any records, documents, or information that (1) identify members of the provisional class as having sought or received gender-affirming care (or "Sex-Rejecting Procedures"); (2) disclose the clinical indications, diagnoses, assessments, or other sensitive health information underlying the provision of such care to members of the provisional class; (3) describe the gender-affirming care (or "Sex-Rejecting Procedures") provided to members of the provisional class or any consultations or patient intakes related to such care; or (4) relate to the provision of informed consent and parent or guardian authorization for provisional class members' receipt of gender-affirming care (or "Sex-Rejecting Procedures"). Absent a further order from this Court, the injunction shall remain in effect during the pendency of these proceedings.

**IT IS SO ORDERED.**

Dated: July 2, 2026



P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

# Exhibit A

**STANFORD MEDICINE**

**NOTICE OF PRIVACY PRACTICES**

*Effective Date: February 16, 2026*

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

**OUR PLEDGE REGARDING YOUR HEALTH INFORMATION**

Stanford Medicine is committed to protecting the privacy of health information we create or receive about you. Health information that identifies you ("protected health information," or "health information") includes your medical record and other information relating to your care or payment for care.

We are required by law to:

• Make sure that your health information is kept private (with certain exceptions);

• Provide you with this Notice of our legal duties and privacy practices with respect to health information about you; and

• Follow the terms of the Notice currently in effect.

**WHO DOES THIS NOTICE APPLY TO?**

This Notice describes the privacy practices of the following entities of Stanford Medicine including: Stanford Health Care, Lucile Salter Packard Children's Hospital at Stanford, Stanford Health Care Tri-Valley, University Healthcare Alliance (Stanford Medicine Partners), Packard Children's Health Alliance, the Stanford Blood Center, and health care professionals, employees, volunteers, trainees, students, and workforce members of the entities listed above and any affiliated entities when they provide services to you at any site or location of such entities.

Within this Notice, a reference to "Stanford Medicine" and "we," "us" and "our" is defined to include all of the entities and their workforce members listed above.

**HOW WE MAY USE AND DISCLOSE HEALTH INFORMATION ABOUT YOU**

The following sections describe different ways that we typically use and disclose your health information:

**FOR TREATMENT**

We may use health information to provide you with medical treatment or services. We may use and share health information about you with physicians, residents, nurses, technicians, medical students, or other Stanford Medicine personnel involved in your care. For example, a provider treating you for a condition may need to know what medications you are taking to assess risks related to drug interactions. Different departments of Stanford Medicine may also share health information about you to coordinate the services you need, such as pharmacy, lab work and x-rays.

We may also disclose your health information to providers not affiliated with Stanford Medicine to facilitate care or treatment they provide you. For example, we may disclose your health information to your personal physician for care coordination purposes. In addition, we may provide access to your health information to affiliated entities and locations, such as affiliated provider groups for care coordination purposes.

**FOR PAYMENT**

We may use and disclose your health information to bill and receive payment for health care services that we or others provide to you. This includes uses and disclosures to submit health information and receive payment from your health insurer, HMO, or other party that pays for some or all of your health care (payor) or to verify that your payor will pay for your health care. We may also tell your payor about a treatment you are going to receive to determine whether your payor will cover the treatment. For certain services, if your permission is needed to release health information to obtain payment, you will be asked for permission.

**FOR HEALTH CARE OPERATIONS**

We may use and disclose health information for health care operations. This includes functions necessary to run Stanford Medicine or assure that all patients receive quality care and includes many support functions such as appointment or procedure scheduling. We may also share your information with affiliated health care providers so that they may jointly perform certain business operations along with Stanford Medicine. We may combine health information about many of our patients to decide, for example, what additional services Stanford Medicine should offer, what services are not needed, and whether certain new treatments are effective. We may share information with doctors, residents, nurses, technicians, medical students, clerks and other personnel for quality assurance and educational purposes. We may also compare the health information we have with information from other health care organizations to see where we can improve the care and services we offer.

**OTHER WAYS WE SHARE YOUR HEALTH INFORMATION**

We are permitted or required by law to share your health information in other ways – usually in ways that help the public, such as public health and research. We have to meet many conditions in the law before we share your information for these reasons.

**BUSINESS ASSOCIATES**

Stanford Medicine contracts with outside entities, called business associates, that perform business services for us, such as billing companies, management consultants, quality assurance reviewers, accountants, or attorneys. In certain circumstances, we may need to share your health information with a business associate so it can perform a service on our behalf. We will have a written contract in place with the business associate requiring protection of the privacy and security of your health information.

**APPOINTMENT REMINDERS AND OTHER COMMUNICATION**

We may use and disclose health information to contact you as a reminder that you have an appointment for care at Stanford Medicine or to provide other informational messaging for routine purposes (e.g., flu shot availability), which may include general information about your care such as appointment location,

department, date and time, unless you notify us otherwise. We will communicate with you using the information (such as telephone number and email address) that you provide.

**HEALTH INFORMATION EXCHANGES**

Electronic exchange of health information helps ensure better care and coordination of care. Stanford Medicine may participate in one or more health information exchanges (HIE) that allow outside providers who need information to treat you to access your health information through a secure health information exchange. We currently participate in the HIEs listed here: www.epic.com/CareEverywhere/.

If you do not want Stanford Medicine to share your information in an HIE, you may opt out by completing the opt-out form located here and submitting it to the Health Information Management Services (HIMS) department listed on the form. For questions, please contact HIMS at the contact info located at the end of this Notice and in the form. Stanford Medicine will agree with your opt-out request as needed to comply with the laws that apply to us. Opting out stops Stanford Medicine from sharing your information with other health care providers through the HIE; it does not stop other health care providers from sharing your information with Stanford Medicine, and it does not stop a health care provider that already received your information from keeping it. To stop other health care providers from sharing your information with Stanford Medicine, you must contact those providers directly. If you opt out, you may choose to resume participation by submitting a written request to HIMS.

**TREATMENT ALTERNATIVES**

We may use and disclose health information to tell you about or recommend possible treatment options or alternatives that may be of interest to you.

**HEALTH-RELATED BENEFITS AND SERVICES**

We may use and disclose health information to tell you about health-related benefits or services that may be of interest to you.

**HOSPITAL DIRECTORY AND RELIGIOUS AFFILIATION**

We may include your name and your location (but not specific health information) in the hospital Patient Directory while you are receiving inpatient care. We make this information available so that individuals who ask for you by name can contact or visit you. You have the right to opt out of the patient directory. We may also provide information about your religious affiliation to members of the clergy employed in our Spiritual Care Services Office, unless you specifically request that we not do so.

**INDIVIDUALS INVOLVED IN YOUR CARE**

We may release health information about you to a family member or friend who is involved in your medical care. We may also give information to someone who helps pay for your care. Unless there is a specific written request made to and agreed to by the Office of Compliance and Privacy from you, we may also notify a family member, personal representative or another person responsible for your care about your location and general condition. This does not apply to patients receiving treatment for certain conditions, such as substance/alcohol abuse.

**DISASTER RELIEF EFFORTS**

We may disclose health information about you to an organization assisting in a disaster relief effort (such as the Red Cross) so that others can be notified about your condition, status and location.

**FUNDRAISING ACTIVITIES**

Consistent with applicable state and federal laws, we may provide limited information such as your contact information, provider name, and dates of care to the Lucile Packard Foundation for Children's Health or the Stanford University Office of Medical Development to conduct fundraising activities for the advancement of care and research on behalf of the Medical Center. You may opt out of receiving fundraising information by contacting:

**Lucile Packard Foundation for Children's Health**

400 Hamilton Avenue, Suite 340

Palo Alto, CA 94301

(650) 461-9800

**Stanford University Office of Medical Center Development**

485 Broadway, 4th Floor, MC5470

Redwood City, CA 94063

(650) 725-2504

**RESEARCH**

As part of an academic medical center, Stanford Medicine has an active research program. For example, research is ongoing to advance care, to evaluate investigational procedures to treat conditions, to compare the health of patients who have received one medication with those who have received another medication for the same condition, and to learn from medical record studies. We generally ask for your written authorization before using your health information or sharing it with others to conduct research. Under limited circumstances, we may use and disclose your health information without your authorization. In most of these latter situations, we must comply with law and obtain approval through an independent review process to ensure that research conducted without your authorization poses minimal risk to your privacy. Researchers may also contact you to see if you are interested in or eligible to participate in a study. They may only contact you if they have approval to do so under a special review process.

**TO PREVENT A SERIOUS THREAT TO HEALTH OR SAFETY**

We may use and disclose certain information about you when necessary to prevent a serious threat to your health and safety or the health and safety of others. However, any such disclosure will only be to someone able to prevent or respond to the threat, such as law enforcement, or a potential victim. For example, we may need to disclose information to law enforcement when a patient reveals participation in a violent crime.

**WORKERS' COMPENSATION**

We may release health information about you for workers' compensation or similar programs as allowed or required by law. These programs provide benefits for work-related injuries or illness.

**PUBLIC HEALTH ACTIVITIES**

We may disclose health information about you for public health activities. These activities include, but are not limited to the following:

• To prevent or control disease (such as cancer and tuberculosis), injury or disability;

• To report births and deaths;

• To report suspected abuse, neglect, or domestic violence

• To report reactions or surveillance related to medications or problems with products;

• To notify you of the recall, repair, or replacement of products you may be using;

• To notify a person who may have been exposed to a disease or may be at risk for contracting or spreading a disease or condition;

• To report all inpatient admissions, emergency department visits and same-day surgeries to California's Office of Statewide Health Planning and Development; and

- To notify appropriate state registries, such as the Northern California Cancer Center or the California Emergency Medical Services Authority, when you seek treatment at Stanford Medicine for certain diseases or conditions. To provide limited information to your employer for legally required reporting of an employee's serious injury or death that occurs in the workplace.

- To provide limited information to your employer for legally required reporting related to medical surveillance of the workplace or work-related illness or injury, including infections disease prevention and control.

**HEALTH OVERSIGHT ACTIVITIES**

We may disclose health information to a health oversight agency, such as the California Department of Public Health or the Center for Medicare and Medicaid Services, for activities authorized by law. These oversight activities include audits, investigations, inspections, and licensure. These activities are

necessary for the government to monitor the health care system, government programs, and compliance with civil rights laws.

**LAWSUITS AND DISPUTES**

If you are involved in a lawsuit or a dispute, we may disclose health information about you in response to a court or administrative order. We may also disclose health information about you in response to a subpoena, legally enforceable discovery request, or other lawful process by someone else involved in the dispute.

**LAW ENFORCEMENT**

As allowed or required by law, when certain conditions are met, we may release your health information to law enforcement.

**CORONERS, MEDICAL EXAMINERS AND FUNERAL DIRECTORS**

We may release health information to a coroner, medical examiner, or funeral director when an individual dies. This may be necessary to identify a deceased person or determine the cause of death.

**ORGAN AND TISSUE DONATION**

If you are an organ donor, we may release health information to organizations that handle organ, eye, or tissue procurement or transplantation, as necessary to facilitate organ or tissue donation.

**MILITARY AND VETERANS**

If you are a member of the armed forces, we may release health information about you as required by military command authorities. We may also release health information about foreign military personnel to the appropriate foreign military authority.

**NATIONAL SECURITY AND INTELLIGENCE ACTIVITIES**

Upon receipt of a request, we may release health information to authorized federal officials for intelligence, counterintelligence, and other national security activities authorized by law.

**INMATES**

If you are an inmate of a correctional institution or under the custody of a law enforcement official, we may release health information about you to the relevant correctional institution or law enforcement official. This release may be necessary for the institution to provide you with health care; to protect your health and safety or the health and safety of others; or for the safety and security of the correctional institution.

**AS REQUIRED BY LAW**

We may also use or disclose health information about you when required to do so by federal, state or local laws not specifically mentioned in this Notice. For example, we may disclose health information as part of a lawful request in a government investigation.

**SUBSTANCE USE DISORDER RECORDS**

If we create, receive, or maintain any information about you from a substance use disorder (SUD) treatment program that is covered by 42 CFR Part 2 ("Part 2 program"), these records receive additional privacy protections, in addition to existing state and federal patient privacy protections.

We may use or share your Part 2 program records, (1) if the law requires us to do so (e.g., medical emergencies or court orders/subpoenas) or (2) when we receive your written consent (for purposes of treatment, payment, or health care operations, as described in this notice and as permitted by law).

We may only use or share your Part 2 Program records in a civil, administrative, criminal, or legislative proceeding against you with a court order, or similar legal mandate compelling the disclosure, or with your written consent.

**OTHER USES AND DISCLOSURES OF HEALTH INFORMATION**

Special laws apply to certain kinds of health information considered particularly private or sensitive to a patient. This sensitive information includes psychotherapy notes, sexually transmitted diseases, mental health records, and HIV/AIDS information. When required by law, we will not share this type of information without your written permission. In certain circumstances, a minor's health information may receive additional protection.

**SITUATIONS THAT REQUIRE YOUR AUTHORIZATION**

For uses and disclosures not generally described above, we must obtain your authorization. For example, the following uses and disclosures will be made only with your authorization:

- Uses and disclosures for marketing purposes;
- Uses and disclosures that constitute the sale of PHI;
- Most uses and disclosures of psychotherapy notes; and
- Other uses and disclosures not described in this Notice

If you provide us with authorization to use or disclose health information about you, you may revoke that authorization, in writing, at any time. If you revoke your authorization, we will no longer use or disclose health information about you for the activities covered by the authorization, except if we have already acted in reliance on your permission. We are unable to take back any disclosures we have already made with your authorization, and we are required to retain records of health information.

**YOUR RIGHTS REGARDING YOUR HEALTH INFORMATION**

You have the following rights regarding health information we maintain about you:

**RIGHT TO INSPECT AND COPY**

You have the right to inspect and obtain a paper or electronic copy of health information that may be used to make decisions about your care, with certain exceptions. Usually, this includes medical and billing

records, but may not include some mental health information. We reserve the right to charge a reasonable, cost-based fee to cover the cost of providing your health information records to you. You may also request that a copy of your health information be released to a third party of your choosing. Your request must be made in writing and submitted to the Health Information Management Services (HIMS) Department listed at the end of this section.

**RIGHT TO ASK FOR A CORRECTION**

If you believe that health information Stanford Medicine has on file about you is incorrect or incomplete, you may ask us to change or add more information to complete your record. Your request must be in writing to the HIMS Department listed at the end of this section. In addition, you must provide a reason that supports your request. Stanford Medicine can only amend information that we created or that was created on our behalf. If your health information is accurate and complete, or if the information was not created by Stanford Medicine, we may deny your request to amend. If we deny your request, we will reply to you in writing with our reasons for doing so.

Even if we deny your request to amend, you have the right to submit a written addendum to HIMS Department. Addendums may not exceed 250 words for each item or statement in your record you believe is incomplete or incorrect.

**RIGHT TO AN ACCOUNTING OF DISCLOSURES**

You have the right to request an "accounting of disclosures" which is a list describing how we have shared your health information with outside parties. This accounting is a list of the disclosures we made of your health information for purposes other than treatment, payment, health care operations, and certain other purposes consistent with law. You may request an accounting of disclosures for up to six years before the date of your request. If you request an accounting more than once during a twelve-month period, we may charge you a reasonable fee. Your request must be in writing to the HIMS Department listed at the end of this section.

**RIGHT TO REQUEST RESTRICTIONS**

You have the right to request restrictions on certain uses or disclosures of your health information. For example, you may request that your name not appear in the hospital Patient Directory while you are here as an inpatient. Requests for restrictions must be in writing to the HIMS Department listed at the end of this section. In most cases, we are not required to agree to your requested restriction. However, if we do agree, we will comply with your request unless the information is needed to provide you with emergency treatment or comply with the law. If we do not agree to your request, we will reply to you in writing with the reason.

We are legally required to accept certain requests not to disclose health information to your health plan for payment or health care operations purposes as long as you have paid out- of-pocket and in full in advance of the particular service included in your request. If the service or item is part of a set of related services, and you wish to restrict disclosures for the set of services, then you must pay in full for the related

services. It is important to make the request and pay before receiving the care so that we can work to fully accommodate your request. We will comply with your request unless otherwise required by law.

**RIGHT TO REQUEST CONFIDENTIAL COMMUNICATIONS**

You have the right to request that we communicate with you about your health information or medical matters in a certain way or at a certain location. For example, you can ask that we only contact you at work, rather than at your home. We will not ask you the reason for your request. We will work to accommodate all reasonable requests. Your request must be in writing to the HIMS Department listed at the end of this section and specify how and where you wish to be contacted.

**RIGHT TO BE NOTIFIED OF A BREACH**

Stanford Medicine is committed to safeguarding your health information and proactively works to prevent health information breaches from occurring. If a breach of unsecured health information occurs, we will notify you in accordance with applicable state and federal laws.

**RIGHT TO A COPY OF THIS NOTICE**

You have the right to a copy of this Notice. It is available in registration areas and by clicking the link "Patient Privacy" on the bottom of our internet home page.

**HEALTH INFORMATION MANAGEMENT SERVICES (HIMS) DEPARTMENT CONTACT INFORMATION:**

To obtain more information about how to request a copy of your health information or to exercise your rights as contained in this notice, please contact:

**Stanford Health Care**

*In Person Location and Mailing Address:*

Health Information Management Services

450 Broadway, PAV-C, Room C14, MC5200

Redwood City, CA 94063

Phone: (650) 723-5721; Fax: (650) 725-9821

**<u>Stanford Medicine Partners</u>**

Health Information Management Services

Stanford Medicine Partners

7999 Gateway Blvd., Suite 200

Newark, CA 94560

Telephone #: 510-974-8224 Fax: 510-974-8222

**Lucile Salter Packard Children's Hospital at Stanford / Packard Children's Health Alliance**

*<u>In Person Location & Mailing Address</u>*:

Health Information Management Services

Stanford Medicine Children's Health

4700 Bohannon Drive, MC5900

Menlo Park, CA 94025

Phone: (650) 497-8334; Fax: (650) 725-8496

**Stanford Health Care Tri-Valley**

*<u>In Person Location and Mailing Address</u>:*

Health Information Management Services

1111 E. Stanley Blvd, Building D

Livermore, CA 94550

Phone: (925) 373-8019; Fax: (925) 373-4126

**<u>COMPLAINTS</u>**

If you believe your privacy rights have been violated, you may file a written complaint with our Office of Compliance and Privacy via email at PrivacyOfficer@stanfordhealthcare.org, by telephone at 650-724-2572, or by mail at Office of Compliance and Privacy, 300 Pasteur Drive MC 5780 Stanford, CA 94305.

You may also file a written complaint with the Director, Office for Civil Rights of the U.S. Department of Health and Human Services. Upon request, our Office of Compliance and Privacy will provide you with the current address for the Director. We will not retaliate against you for filing a complaint.

**CHANGES TO THIS NOTICE**

We reserve the right to change our privacy practices and update this Notice accordingly. The changes will apply to all health information we already have about you as well as any information we receive in the future. We post copies of the current Notice in our facilities and on our Internet sites and copies are available at registration areas. If the Notice is significantly changed, we will post the new Notice in our registration areas and provide it to you upon request. The Notice contains the effective date on the first page.

**QUESTIONS ABOUT OUR PRIVACY PRACTICES**

Stanford Medicine values the privacy of your health information as an important part of the care we provide to you. If you have questions about this Notice or our privacy practices, please contact the Office of Compliance and Privacy by telephone at 650-724-2572, by email at PrivacyOfficer@stanfordhealthcare.org, or by mail at Office of Compliance and Privacy, 300 Pasteur Drive MC 5780 Stanford, CA 94305.

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email: sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
kjanssen@rbgg.com

ABBE DAVID LOWELL (*pro hac vice*)
CALEB HAYES-DEATS (*pro hac vice*)
SCHUYLER STANDLEY (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
Sstandley@lowerllandassociates.com

JOSHUA ROVENGER (*pro hac vice*)
DONOVAN BENDANA (*pro hac vice*)
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email: jrovenger@gladlaw.org
dbendana@gladlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; F.F.; and Z.G., a minor, by and through their parents, G.G. and A.G., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; and LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation,

Defendant.

Case No. 5:26-cv-04998

**PLAINTIFFS' EX PARTE NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

**PROPOSED CLASS ACTION**

Assigned to: Hon. P. Casey Pitts

Plaintiffs Z.A., Z.B., Z.C., Z.D., Z.E., F.F., Z.G., G.G., and A.G. (collectively, "Plaintiffs") respectfully submit this Ex Parte Notice of Plaintiffs' Motion for a Temporary Restraining Order ("TRO"). Plaintiffs seek emergency relief enjoining Defendants U.S. Department of Justice and Acting Attorney General Todd Blanche (together, "DOJ") and all persons acting in concert with DOJ or on their behalf, from requesting, receiving, producing, transmitting, disclosing, or otherwise obtaining any records, documents, or information responsive to specifications 12-14 of the Grand Jury Subpoenas issued to Defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH") or any substantially similar subpoena issued to any California health care provider, or otherwise obtaining Plaintiffs' identifying information or protected health information in violation of rights secured by the U.S. Constitution. This Motion is made on the grounds that Plaintiffs and the proposed class face immediate and irreparable harm if DOJ obtains their identifying information and PHI in response to Grand Jury Subpoenas issued by DOJ to LPCH and, on information and belief, other healthcare entities in California.

On information and belief, the return date for the Grand Jury Subpoenas is no later than June 10, 2026. Unless this Court acts before that date, Plaintiffs' and the proposed class's constitutionally protected medical records will be irreversibly disclosed to federal prosecutors, permanently destroying their privacy and speech interests and rendering any subsequent relief meaningless.

This Motion is based on the accompanying Amended Complaint for Declaratory and Injunctive Relief; the accompanying Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause; the accompanying Proposed Order to Show Cause and Temporary Restraining Order; the Motion for Provisional Class Certification; the accompanying supporting declarations; as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this Motion is heard by the Court.

A TRO is warranted because: (1) Plaintiffs and the proposed class members are likely to succeed on the merits of their constitutional claims under the First and Fifth Amendments; (2) Plaintiffs and the proposed class members will suffer irreparable harm absent immediate relief,

Case: 26-4388, 08/07/2026, DktEntry: 13.1, Page 60 of 187

as the disclosure of their identifying information and PHI would permanently and irrevocably destroy their privacy and speech interests; (3) the balance of equities and the public interest tips sharply in Plaintiffs' and the proposed class members' favor, as DOJ would suffer no cognizable harm from a brief delay in producing the specific patient-identifying records at issue; and (4) an injunction is in the public interest because it is always in the public interest to prevent the violation of a party's constitutional rights.

Plaintiffs have made diligent efforts to provide notice to Defendants' counsel of this Motion, as set forth in the accompanying declaration of Caleb Hayes-Deats filed in support of this Motion.

Plaintiffs additionally request that the Court exercise its discretion to waive the security under Federal Rule of Civil Procedure 65(c). *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("Despite the seemingly mandatory language, 'Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). Here, "it is unlikely that the government will incur any significant cost and requiring a bond 'would have a negative impact on plaintiff[s'] constitutional rights, as well as the constitutional rights of other members of the public.'" *Teroganesyan v. Noem*, No. 26-cv-00124, 2026 WL 246014, at *4 (C.D. Cal. Jan. 26, 2026) (quoting *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996)).

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a Temporary Restraining Order enjoining DOJ and all persons acting in concert with DOJ or on their behalf from requesting, receiving, producing, transmitting, disclosing, or otherwise obtaining any records, documents, or information responsive to specifications 12-14 of the Grand Jury Subpoenas issued to LPCH or any substantially similar subpoena issued to any California health care provider, or otherwise obtaining Plaintiffs' identifying information or protected health information in violation of rights secured by the U.S. Constitution.
2. Issue an Order to Show Cause why a preliminary injunction should not be entered on the same terms;

3. Waive the security requirement under Fed. R. Civ. P. 65(c);
4. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: June 8, 2026

*/s/ Caleb Hayes-Deats*

Caleb Hayes-Deats

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email: sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
kjanssen@rbgg.com

ABBE DAVID LOWELL (*pro hac vice*)
CALEB HAYES-DEATS (*pro hac vice*)
SCHUYLER STANDLEY (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
Sstandley@lowellandassociates.com

JOSHUA ROVENGER (*pro hac vice*)
DONOVAN BENDANA (*pro hac vice*)
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email: jrovenger@gladlaw.org
dbendana@gladlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; F.F.; and Z.G., a minor, by and through their parents, G.G. and A.G., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; and LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation,

Defendants.

Case No. 5:26-cv-04998-PCP

**PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**PROPOSED CLASS ACTION**

Assigned to: Hon. P. Casey Pitts

**RELIEF REQUESTED BY JUNE 9, 2026, AT 5:00PM**

Trial Date: None Set

## TABLE OF CONTENTS

INTRODUCTION ........................................ 1

STATEMENT OF FACTS ........................................ 2

I. The Trump Administration Attempts to End Pediatric Transgender Medical Care ............ 2

II. DOJ Issues 20 Substantively Identical HIPAA Subpoenas Seeking the Same PHI ............ 3

III. DOJ Pivots To Grand Jury Subpoenas Seeking the Same PHI ........................................ 4

IV. Procedural History ........................................ 5

LEGAL STANDARD ........................................ 6

ARGUMENT ........................................ 7

I. THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED RELIEF ........................................ 7

A. Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Defendants. ........ 7

B. This Court May Adjudicate Plaintiffs' Constitutional Challenge to Compliance with an Out-of-District Grand Jury Subpoena. ........................................ 7

C. The Grand Jury Context Does Not Foreclose Constitutional Challenge. ...................... 10

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S DEMAND FOR THEIR IDENTIFYING INFORMATION AND PHI WOULD VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY .................................. 11

A. The Information Requested Is Highly Sensitive........................................ 12

B. Nonconsensual Disclosure Would Cause Grave Harm. ........................................ 13

C. No Adequate Safeguards Against Unauthorized Disclosure or Misuse......................... 15

D. No Demonstrated Need for Plaintiffs' Identities or PHI ........................................ 17

E. No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies Disclosure of Plaintiffs' Identifying Information and PHI. ........................................ 19

III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S REQUESTS FOR THEIR INFORMATION VIOLATE THE FIRST AMENDMENT ........................................ 21

IV. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION .................................. 23

V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 7

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 22

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
340 F.3d 810 (9th Cir. 2003) .......... 7

*Coe v. Blanche*,
No. 1:26-cv-4641 (S.D.N.Y. Jun. 10, 2026) .......... 25

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) .......... 21

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021) .......... 14

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .......... 12

*Doe v. Bonta*,
101 F.4th 633 (9th Cir. 2024) .......... 11, 13

*Doe v. Garland*,
17 F.4th 941 (9th Cir. 2021) .......... 11, 13

*Dow Jones & Co. v. Harrods Ltd.*,
346 F.3d 357 (2d Cir. 2003) .......... 9

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 7

*Endy v. Cnty. of Los Angeles*,
975 F.3d 757 (9th Cir. 2020) .......... 11, 12

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 7, 21, 22

*Hale v. Henkel*,
201 U.S. 43 (1906) .......... 10

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .......... 3

*In re Admin. Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025) .......... 3

*In re CNH Subpoena, No. 25-cv-03780-JRR,*
2026 WL 160792 (D. Md. Jan. 21, 2026) ........ *passim*

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ........ 11, 13

*In re Grand Jury Proceeding*,
721 F.2d 1221 (9th Cir. 1983) ........ 10

*In re Grand Jury Subpoena, JK-15-029*,
828 F.3d 1083 (9th Cir. 2016) ........ 10

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
No. 26-mc-12 (JEB), 2026 WL 710202 (D.D.C. Mar. 13, 2026) ........ 10

*In re Horn*,
976 F.2d 1314 (9th Cir. 1992) ........ 20

*In re Sealed Case*,
141 F.3d 337 (D.C. Cir. 1998) ........ 8

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ........ 3, 11, 13

*In re Subpoena No. 25-1431-014*,
810 F. Supp. 3d 555 (E.D. Pa. 2025) ........ *passim*

*In re Subpoena*, No. 1:26-mc-0007,
2026 WL 1392565 (D.R.I. May 14, 2026) ........ 3, 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 7

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........ 7, 23, 25

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ........ 21

*N.Y. Times Co. v. Gonzales*,
459 F.3d 160 (2d Cir. 2006) ........ 8, 9

*Nw. Mem'l Hosp. v. Ashcroft*,
362 F.3d 923 (7th Cir. 2004) ........ 11, 15, 19, 22

*Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*,
No. 03-cv-4872, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004) ........ 15

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*,
122 F.4th 825 (9th Cir. 2024) ........ 21, 23

*Planned Parenthood v. Lawall*,
307 F.3d 783 (9th Cir. 2002) .......... 12

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) .......... 13

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
807 F. Supp. 3d 1295 (W.D. Wash. 2025) .......... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 23

*Sammartano v. First Judicial Dist. Ct.*,
303 F.3d 959 (9th Cir. 2002) .......... 25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001). .......... 6

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 7

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) .......... *passim*

*United States v. Calandra*,
414 U.S. 338 (1974) .......... 10

*United States v. Comey*,
809 F. Supp. 3d 396 (E.D. Va. 2025) .......... 16

*United States v. Powell*,
379 U.S. 48 (1964) .......... 10

*United States v. R. Enterprises, Inc.*,
498 U.S. 292 (1991) .......... 10

*United States v. Star*,
470 F.2d 1214 (9th Cir. 1972) .......... 10

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .......... 23

*Whalen v. Roe*,
429 U.S. 589 (1977) .......... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 6

Case: 26-4388, 08/07/2026, DktEntry: 13.1, (68 of 187)

**Statutes**

28 U.S.C. § 1331 .......... 7
28 U.S.C. § 1651 .......... 7
28 U.S.C. §§ 2201-2202 .......... 7

**Other Authorities**

Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28. 2025) .......... 2

**Rules**

Fed. R. Civ. P. 45 .......... 8
Fed. R. Crim. P. 6 .......... 16

**Regulations**

45 C.F.R. § 164.502 .......... 19
45 C.F.R. § 164.512 .......... 19

## INTRODUCTION

Plaintiffs and proposed class members are minors, young adults, and their parents who are being harassed by the U.S. Department of Justice ("DOJ") as a result of medical care they received, care that the State of California regards as medically necessary, but to which the DOJ has repeatedly declared its opposition. DOJ has served substantially identical administrative subpoenas on providers across the country. All such subpoenas seek deeply personal protected health information ("PHI") including: (1) documents identifying each minor patient who received transgender healthcare, (2) documents relating to indications, diagnoses, or assessments that formed the basis for that care, and (3) informed consents and parental authorizations signed in connection with that care. Courts have held that those subpoenas serve no legitimate investigative need, impermissibly intrude on patients' privacy, and were designed for no purpose other than to intimidate and harass hospitals, patients, and providers. As these subpoenas failed, DOJ has now issued grand jury subpoenas—seeking substantially the same information—to Defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH"), and on information and belief, to other hospitals providing pediatric transgender healthcare in California.

Plaintiffs bring this action to prevent DOJ from obtaining their PHI, and that of other, similarly situated patients, in violation of the First and Fifth Amendments. The Fifth Amendment bars DOJ from obtaining Plaintiffs' sensitive PHI without any legitimate interest in doing so. The PHI sought has no relation to any investigative need, as courts have repeatedly found. It is being sought to harass. That harassment also violates the First Amendment, which bars DOJ from using a subpoena to chill protected speech and association by requiring disclosure of records reflecting medical and mental health consultations on subjects DOJ dislikes. Plaintiffs respectfully move this Court *ex parte* for a temporary restraining order maintaining the *status quo* by temporarily barring DOJ from seeking their PHI while these issues are fully litigated. Because the subpoenas to LPCH and other hospitals demand compliance by June 10, 2026, immediate relief is necessary.

This Court previously denied a request for injunctive relief against LPCH "without prejudice to the filing of a renewed motion for a preliminary injunction in the event of materially changed facts or further development of the record." ECF 40 at 16. The Court did not "doubt the

Case: 26-4388, 08/07/2026, DktEntry: 13.1 (70 of 187)

strength of plaintiffs' constitutional interest in the preservation of their privacy or the gravity of harm that might result from unauthorized disclosure of their medical information (or their inability to access medically indicated care going forward)." *Id.* at 15. But it held that the "sparse record" before it did not support a finding that LPCH, the sole Defendant at the time, could be deemed a "government actor" for purposes of Plaintiffs' constitutional claims. *Id.* at 14-15. Plaintiffs' amendment of their complaint to add DOJ and the Acting Attorney General as Defendants is a material change for purposes of the Court's analysis. The same constitutional interests are at stake. The same harm is threatened. And now, DOJ is indisputably a state actor the Court can enjoin from violating Plaintiffs' and the proposed class's constitutional rights.

## STATEMENT OF FACTS

### I. The Trump Administration Attempts to End Pediatric Transgender Medical Care

The Trump Administration has pledged to end pediatric transgender medical care. On January 28, 2025, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28. 2025). Within days, the White House announced that the order was "already having its intended effect," listing hospitals that had paused or ended treatment.[1] DOJ promptly took action to effectuate the President's mandate. In April 2025, the Attorney General issued a memorandum, "Preventing the Mutilation of American Children," directing U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warning DOJ would "hold accountable those who mutilate [our children] under the guise of care."[2]

[1] President Trump Is Delivering on His Commitment to Protect Our Kids, The White House (Feb. 3, 2025), https://www.whitehouse.gov/releases/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.
[2] Memorandum for Select Component Heads: Preventing the Mutilation of American Children at 3, 5, U.S. Off. Of the Att'y Gen. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (DOJ April 2025 Memorandum).

## II. DOJ Issues 20 Substantively Identical HIPAA Subpoenas Seeking the Same PHI

The Administration initially pursued only civil investigations in its campaign to compel providers to stop offering and patients to stop seeking medically necessary transgender healthcare. On June 11, 2025, DOJ served more than 20 "substantively identical" administrative subpoenas under 18 U.S.C. § 3486 "to doctors and clinics involved in performing transgender medical procedures on children."[3] Six weeks later, the White House declared victory.[4] But federal district courts around the country swiftly halted many of DOJ's improper PHI demands, quashing the administrative subpoenas seeking patients' identifying information and PHI. *In re CNH Subpoena, No. 25-cv-03780-JRR,* 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (quashing subpoena for improper purpose); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025) (quashing Boston Children's Hospital subpoena as issued for an improper purpose and "virtually unlimited in scope"); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578-81, 588-607 (E.D. Pa. 2025) (striking requests to Children's Hospital of Philadelphia ("CHOP") seeking patients' identities and medical data as beyond statutory authority and outweighed by minors' privacy interests); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (rejecting enforcement based on "DOJ's threadbare justification" and "strong evidence" of "improper purpose"); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2-3 (W.D. Pa. Dec. 24, 2025) (granting patient movants' request for relief); *In re Subpoena*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026) (quashing subpoena and

[3] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Off. of Pub. Affs., U.S. Dep't of Just. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical. *See also In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3 n.12 (D. Md. Jan. 21, 2026) (*In re CNH Subpoena*), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026). *See also* Email from Ross Goldstein, U.S. Dep't of Just., to Eve Hill (Nov. 14, 2025), Mot. to Quash Ex. W, *In re CNH Subpoena*, No. 1:25-cv-03780 (D. Md. Nov. 17, 2025) (ECF 1-38).

[4] President Trump Promised to End Child Sexual Mutilation—and He Delivered, The White House (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

collecting decisions finding improper purpose).

These decisions did not rest on technical defects unique to any one subpoena recipient. They found DOJ had issued the subpoenas for an "improper purpose," namely, seeking to "end the very practice it claims to be merely investigating." *QueerDoc*, 807 F. Supp. 3d at 1303-04. They identified the same core defects: DOJ's asserted investigative rationale—*i.e.*, potential violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") and healthcare fraud statutes—is disconnected from its demands for children's intimate medical, psychological, and family information; and the subpoenas appear designed to advance the Administration's stated objective of ending transgender medical care. *See In re Subpoena Duces Tecum No. 25-1431-016*, 2026 WL 1102159, at *2 (noting "seven recent decisions" reached similar conclusions).

## III. DOJ Pivots To Grand Jury Subpoenas Seeking the Same PHI

DOJ responded to these unfavorable court decisions by accelerating its improper efforts to obtain PHI and pivoting to criminal grand jury proceedings in the Northern District of Texas. After losing repeatedly in court after court, DOJ "out of the blue" withdrew the administrative subpoenas and replaced them with "substantially similar" grand jury subpoenas. ECF 31-1 ¶6. While the nature of any alleged criminal conduct under investigation is unknown, a statement issued by NYU Langone Hospitals ("Langone") in New York City disclosed that on May 7, 2026, it "was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas."[5] The statement included a copy of the subpoena.[6] On June 3, LPCH disclosed that it had received a grand jury subpoena that is almost identical to NYU Langone's. On June 5, Mt. Sinai Hospital revealed that it, too, had received a grand jury subpoena calling for patient PHI.[7] So similar are the grand jury subpoenas received by LPCH and NYU Langone that both contain the *same* typo, a reference to "45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3),"

[5] Information for NYU Langone Health Patients, NYU Langone Health, https://nyulangone.org/public-notices/TYHPsubpoena (last visited May 26, 2026).
[6] Grand Jury Subpoena to NYU Langone Health (May 7, 2026), https://nyulangone.org/files/nyu-gj-subpoena.pdf.
[7] *See* Joseph Goldstein, *Trump Administration Investigating Gender Treatments at Mount Sinai*, N.Y. Times (June 5, 2026), https://www.nytimes.com/2026/06/05/nyregion/trump-administration-investigating-gender-treatments-at-mount-sinai.html.

with no closing parenthesis after "1." *Compare* ECF 31-2 at 9, *with* ECF 1 at 32.

The grand jury subpoenas issued to LPCH and, on information and belief, other providers in California, seek patient identifying information and PHI that is substantially similar to the information sought by the administrative subpoenas previously quashed by multiple district courts as lacking any proper investigative purpose. Specifically, the following demands from the LPCH grand jury subpoena directly seek identifying information and PHI:

- Subpoena specification 12 seeks "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."
- Subpoena specification 13 seeks, for each patient so identified, "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided."
- Subpoena specification 14 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

The grand jury subpoenas issued to LPCH, and, on information and belief, other providers in California, define "Sex-Rejecting Procedures" covered by the subpoenas to include:

> any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures.

The subpoenas demand information about every patient who received the such care at LPCH and, on information and belief, other hospitals in California.

## IV. Procedural History

On May 27, 2026, six individual patients and five parents filed this lawsuit, naming only LPCH as a Defendant. The individual plaintiffs moved for a temporary restraining order barring LPCH from producing their PHI to DOJ because such disclosure would violate their right to informational privacy under the Fifth Amendment, constitute an unreasonable search and seizure

in violation of the Fourth Amendment, and deny them equal protection of the law. The Court did not "doubt the strength of plaintiffs' constitutional interest in the preservation of their privacy or the gravity of harm that might result from unauthorized disclosure of their medical information (or their inability to access medically indicated care going forward)." ECF 40 at 15. But it held that the "sparse record" before it did not support a finding that LPCH, the sole Defendant at the time, could be deemed a "government actor" for purposes of Plaintiffs' constitutional claims. *Id.* at 14-15. While the Court acknowledged that DOJ threats could result in private actors such as LPCH being deemed to act on behalf of the government, and further that "DOJ has threatened providers of gender-affirming care with criminal investigation," it concluded that it needed proof of a "direct tie between DOJ's threats of prosecution and LPCH's disclosure of patient records." ECF 40 at 13-15. The "record before the Court" was undeveloped and did not have evidence of such a tie. *Id.*

On June 8, the 11 individual plaintiffs who filed the first complaint, plus 3 additional plaintiffs, filed an amended complaint that added DOJ as a Defendant, asserted claims under the First Amendment in addition to the Fourth and Fifth Amendments, and sought relief on behalf of not just the individual plaintiffs, but also other similarly situated patients and parents whose information has been sought from LPCH or other California hospitals. Plaintiffs now seek a temporary restraining order barring DOJ from obtaining proposed class members' PHI through the grand jury subpoenas served on LPCH and, on information and belief, other California hospitals, or through any other means that violate the First and Fifth Amendments of the Constitution.

## LEGAL STANDARD

The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, these factors operate on a sliding scale; interim relief may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's]

Case: 26-4388, 08/07/2026, DktEntry: 18.1, Page 75 of 187

favor.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). The threatened deprivation of constitutional rights constitutes irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## ARGUMENT

### I. THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED RELIEF

#### A. Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Defendants.

Plaintiffs readily satisfy Article III's requirements of injury in fact, causation, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury is the certain and imminent disclosure of Plaintiffs' identifying information and constitutionally protected health information to DOJ, which will occur, on information and belief, no later than June 10. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (imminence satisfied where threatened injury is "'certainly impending'"). Moreover, the issuance of the subpoena and the threatened disclosure of patient identities and communications has created a chilling effect on Plaintiffs' and their providers' protected speech, violating Plaintiffs' First Amendment rights. *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). These injuries are fully redressable by an injunction preventing DOJ from obtaining such records.

#### B. This Court May Adjudicate Plaintiffs' Constitutional Challenge to Compliance with an Out-of-District Grand Jury Subpoena.

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and authority to issue equitable relief under the All Writs Act (28 U.S.C. § 1651) and the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202). It has personal jurisdiction over DOJ, which operates within this District. The fact that at least one grand jury subpoena has issued from the Northern District of Texas does not divest this Court of authority to protect the constitutional rights of patients whose records are held within its jurisdiction and who reside within this State.

The Second Circuit's decision in *New York Times Co. v. Gonzales*, confirms that a third party whose own constitutional or privilege interests are threatened by a grand jury subpoena

seeking records held by someone else may bring a civil action for declaratory relief. 459 F.3d 160, 165-67 (2d Cir. 2006). There, the Times sued the United States and the Attorney General in the Southern District of New York, seeking a declaration that reporters' privileges barred enforcement of grand jury subpoenas seeking reporters' telephone records from third-party telephone providers. The Second Circuit held that the district court did not abuse its discretion by exercising jurisdiction over that declaratory judgment action, even though it concerned a grand jury proceeding in another district. *Id.* Although the Second Circuit ultimately rejected the privilege claim on the merits, it held jurisdiction was proper. *See id.* at 165-67, 174.

For the same reasons, this Court has jurisdiction to consider Plaintiffs' constitutional challenges to production of their medical records. Like the New York Times in *Gonzales,* Plaintiffs are not parties to the grand jury proceeding. As in *Gonzales,* the potential subpoenas would be directed to third parties, *i.e.*, LPCH and other providers located in California. And as in *Gonzales,* they have filed an action seeking relief in the district where they reside and where the information at issue was created. *Gonzales* confirms that it is appropriate for the Court to consider Plaintiffs' challenges on the merits notwithstanding the pendency of the Texas grand jury proceeding.

The Court's prior decision cited *Gonzales* as "authority suggesting that a plaintiff may challenge a grand jury subpoena in the plaintiff's home district instead of moving to quash the subpoena in the district where it was issued (although that case involved a threatened subpoena rather than an already-issued one)." ECF 40 at 15-16 n.32. But it noted that other precedent appears to hold that "[o]nly the issuing court has the power to act on its subpoenas." *Id.* (quoting *In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998)). *In re Sealed Case*, however, concerned the issuance of a civil subpoena and relied on a textual analysis of an old version of Federal Rule of Civil Procedure 45.[8] 141 F.3d at 341 (quoting Fed. R. Civ. P. 45(c)(3)(A) (1998)). It considered

[8] Notably, Rule 45 was amended in 2013 to transfer jurisdiction over a motion to quash from the "issuing court" to the "court for the district where compliance is required," *i.e.*, a court "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c); *see also* Fed. R. Civ. P. 45(d)(3). Thus, the current version of Rule 45 explicitly permits non-issuing courts where the subpoena recipient resides to quash or modify subpoenas. It permits transfer of a motion to quash by the "court where compliance is required" to the "issuing court" only "if the person subject to the subpoena consents or if the court finds

only the rights of the law firm that received the civil subpoena, and not third parties whose personal information any production might contain. *Id.* at 339. Its analysis does not control here. *Gonzales* squarely addressed the rights of interested parties who did not receive a subpoena and holds that a motion to quash is not Plaintiffs' exclusive remedy. Applying the test that governs declaratory judgment actions, *see Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003), the Second Circuit held that a motion to quash "would not offer the Times the same relief as a declaratory action," because such a motion "is not available if the subpoena has not been issued," as it was unknown whether the third-party recipients had been served "or not, and if so, whether [they] ha[d] already complied," and because it was "unclear whether, when a subpoena has been issued to a third party and the third party has complied, a motion to quash is still a viable path to a remedy." *Gonzales*, 459 F.3d at 167.

That *Gonzales* "involved a threatened subpoena rather than an already-issued one," ECF 40 at 15-16 n.32, does not distinguish this case. The five-factor test still favors allowing Plaintiffs to proceed with a declaratory judgment action. First, a declaration of Plaintiffs' and the proposed class's rights will "serve a useful purpose in clarifying or settling the legal issues," which concern Plaintiffs' constitutional rights. *Gonzales*, 459 F.3d at 167. Second, a declaratory judgment action offers Plaintiffs and the proposed class "relief from uncertainty," because the threat to PHI transcends any single subpoena. *Id.* And because Plaintiffs seek relief that is broader than any specific subpoena, the declaratory judgment action is not merely "procedural fencing," but instead provides a "more effective remedy" for protecting their constitutional rights. *Id.* Because this case does not involve a "state or foreign court," the last factor is "inapplicable on its face." *Id.*

Plaintiffs seek not merely to prevent enforcement of the grand jury subpoena to LPCH, but also to prevent DOJ from obtaining the same information by other means that would violate proposed class members' First and Fifth Amendment rights. Plaintiffs reside in this District,

exceptional circumstances." Fed. R. Civ. P. 45(f). These changes to Rule 45 recognize that subpoena recipients, and others impacted by subpoenas, face significant burdens where required to challenge subpoenas issued far from where they live. Fed. R. Civ. P. 45, cmt. to 2013 Amendments ("The prime concern should be avoiding burdens on local nonparties subject to subpoenas.").

sought care in this District, and entrusted hospitals in this District to protect their privacy. DOJ's violation of the proposed class members' rights, whether through the subpoena or by other investigative means, would occur in this District, where the proposed class members live and their information is stored. This Court has jurisdiction to declare proposed class members' rights under 28 U.S.C. § 2201 and to protect those rights from infringement. *See* pp. 7-8, *supra*. The fact that protecting class members' rights from violation has implications for an existing subpoena in no way deprives this Court of the jurisdiction it would otherwise have under the Constitution and the Declaratory Judgment Act.

**C. The Grand Jury Context Does Not Foreclose Constitutional Challenge.**

The Supreme Court has long recognized that grand jury subpoenas are presumptively reasonable and that grand juries are vested with broad investigative authority. *See generally United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297-301 (1991). But it is equally well established that a grand jury subpoena may not compel production of records or testimony in violation of an individual's constitutional rights. *See, e.g.*, *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088 (9th Cir. 2016) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). "[W]here a grand jury's subpoena . . . would *itself* violate the privacy interests protected by the Fourth Amendment, '[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)).

To be sure, in ordinary grand-jury proceedings, "[n]o affidavit of relevance and need must be introduced" and that "legitimate purpose may be derived from the fact that the subpoena is necessary to a legitimate pursuit and the presumption that the government obeys the law." *In re Grand Jury Proceeding*, 721 F.2d 1221, 1223 (9th Cir. 1983). But where an improper purpose appears on the face of a grand jury subpoena, a "unanimous chorus" of courts of appeals, including the Ninth Circuit, "agrees that courts may quash." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. 26-mc-12 (JEB), 2026 WL 710202, at *5 (D.D.C. Mar. 13, 2026) (citing *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972)); *see United States v. Powell*, 379 U.S. 48, 58 (1964) (summons issued for "improper purpose, such as to harass," is an "abuse"). Plaintiffs do not ask this Court to supervise routine grand-jury relevance. They seek only to

prevent an imminent disclosure of their own constitutionally protected medical records in response to requests from DOJ that multiple courts have rejected in the context of substantially similar administrative subpoenas. Multiple federal district courts have quashed those subpoenas—many concluding that DOJ had "issued the subpoena[s] first and searched for a justification second." *QueerDoc*, 807 F. Supp. 3d at 1303. DOJ's response was not to articulate a legitimate investigative need for Plaintiffs' identifying medical records, but to repackage materially similar demands as grand jury subpoenas issued from a forum with no apparent connection to LPCH, proposed class members, or their care. That pattern is strong evidence that judicial review is necessary before Plaintiffs' constitutional rights are extinguished. *See In re Subpoena No. 25-1431-016*, 2025 WL 3562151, at *13. Constitutional privacy limits apply regardless of the procedural vehicle used to compel disclosure. *See, e.g.*, *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929-31 (7th Cir. 2004) (quashing trial subpoena for patient records on patient-privacy grounds). If anything, DOJ's willingness to shift from one procedural mechanism to another underscores why the proposed class requires broad injunctive relief that bars DOJ from obtaining PHI by any means that would violate Plaintiffs' rights.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S DEMAND FOR THEIR IDENTIFYING INFORMATION AND PHI WOULD VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY

"[F]ederal constitutional law recognizes a 'right to informational privacy' stemming from 'the individual interest in avoiding disclosure of personal matters.'" *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020) (quoting *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999)); *see also Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024). The Supreme Court first recognized that interest in *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977).[9]

The Ninth Circuit has expressly recognized the right to informational privacy and has applied it to compelled disclosures of medical information by health care providers. *See Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551-

[9] The Supreme Court did not reject "the right to shield information from disclosure" in *Dobbs v. Jackson Women's Health Organization*, but instead found that *Roe v. Wade* had "conflated" it with a "very different" "right to make . . . important personal decisions." 597 U.S. 215, 273 (2022).

53 (9th Cir. 2004), *overruled in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Endy*, 975 F.3d at 768. The Ninth Circuit's decision in *Tucson Woman's Clinic* is most instructive. There, Arizona enacted a statutory and regulatory scheme requiring providers of abortion health care to permit "warrantless, unbounded inspections of their offices" by employees of the Department of Health Services and to provide access to patients' unredacted medical records. 379 F.3d at 537. The state also required providers to submit "ultrasound prints with patient identifying information on them to a private contractor" for review. *Id.* at 553. The Ninth Circuit affirmed summary judgment for the providers on their patients' informational-privacy claim. *Id*. DOJ's demand for patient medical records pursuant to the grand jury subpoena here, and broader efforts to obtain the same information by other means, violates Plaintiffs' right to informational privacy for the same reasons set forth in *Tucson Woman's Clinic.*

The Ninth Circuit balances several factors "to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest," namely: "(1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.* (citing *Planned Parenthood v. Lawall*, 307 F.3d 783, 790 (9th Cir. 2002)). Each factor weighs against disclosure here.

**A. The Information Requested Is Highly Sensitive.**

The first factor weighs heavily against disclosure because the information sought by the subpoena "is extremely broad, and includes patient identifying information such as names and full medical histories." *Id.* at 552. The grand jury subpoena seeks information "sufficient to identify" each LPCH patient who received transgender medical care, and for each such patient, all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for" that care. ECF 31-2 at 7-8. The records demanded for each proposed class member are among the most sensitive categories of personal information,[10] essentially requiring disclosure of each

[10] *See, e.g.*, ECF 3-5 ¶ 4 ("We had very personal conversations with Stanford providers about

Case: 26-4388, 08/07/2026, DktEntry: 18.1, (81 of 187)

class member's complete medical file as it relates to transgender medical care. The Ninth Circuit has repeatedly held that such medical records are "'highly sensitive' personal information" protected by the right to privacy. *Doe*, 101 F.4th at 637 (quoting *Garland*, 17 F.4th at 947).

These privacy interests are especially strong because the records at issue concern minors' medical care. Courts reviewing materially identical government subpoenas have recognized that demands for children's identities and confidential medical records trigger heightened privacy concerns. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 594 (holding that DOJ's demands for children's identities and clinical records implicated "intensely personal and sensitive medical information warranting the highest level of protection"); *In re CNH Subpoena*, 2026 WL 160792, at *8. This factor strongly favors Plaintiffs and the proposed class.

**B. Nonconsensual Disclosure Would Cause Grave Harm.**

The second factor also weighs decisively against disclosure, as "[t]he potential for harm in any subsequent non-consensual disclosure is obviously tremendous[.]" *Tucson Woman's Clinic*, 379 F.3d at 552. That concern is especially acute where, as here, disclosure would reveal information that is stigmatizing or likely to expose a person to discrimination, harassment, or violence. *See Crawford*, 194 F.3d at 960 (disclosure of HIV status or sexual orientation can "lead directly to injury, embarrassment or stigma"); *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999) (recognizing constitutional privacy interest in transgender status).

The potential for harm is not speculative. Disclosure would expose proposed class members and their families to the risk of harassment, discrimination, damage to educational and employment opportunities, loss of access to health care, government targeting, family separation, and prosecution.[11] Disclosure would also involuntarily reveal proposed class members'

---

fertility, sexuality, mental health, depression, the long-term impacts of medical treatment, and other matters that my daughter would not want disclosed to anyone outside of her care team.").

[11] *See, e.g.*, ECF 3-4 ¶ 10 ("I fear that the government wants to prosecute providers, and possibly even parents, for seeking care that is in the best interests of transgender children. My greatest fear is that the government could try to take my child away from me because I supported his care."); ECF 3-6 ¶ 12 ("Disclosure would make me fear for my family's safety. I am scared of death threats, harassment of my child, and professional consequences for me, including being fired from my job."); ECF 3-8 ¶ 12 ("Disclosure would affect both my son's physical safety and mental health. I am scared for him being outed when he has not chosen to be, especially because he is

transgender status and their receipt of transgender medical care to federal law-enforcement officials. For several Plaintiffs, that information is not publicly known.[12] Involuntary disclosure of a minor's transgender status is itself a serious harm, exposing the child "to stigma, bullying, fear, and violence." *D.T. v. Christ*, 552 F. Supp. 3d 888, 897 & n.8 (D. Ariz. 2021).

That risk is magnified by the context in which DOJ has sought these records. The President has declared that pediatric transgender medical care "must end," and the Attorney General has characterized that care as "mutilation" and a "warped ideology." The Administration's widely publicized campaign, across multiple agencies, to denigrate, investigate, and deter providers from offering and patients from seeking transgender medical care gives rise to a realistic concern that Plaintiffs' information will be broadly disseminated within the government and used for purposes unrelated to any legitimate investigation. Courts reviewing materially identical HIPAA subpoenas have credited the same concern. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 599-600. In this environment, compelled disclosure of Plaintiffs' identities and medical records would expose them and their families to the harms the informational-privacy doctrine exists to prevent.

Disclosure would also harm the doctor-patient relationship.[13] The records at issue were generated in a relationship of trust between patients, parents, physicians, and mental-health providers. Compelled disclosure would breach that relationship and undermine the very conditions that permit accurate diagnosis, effective treatment, and candid disclosure of sensitive information. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 600-01 ("Patients and families who

entering high school. His whole life would change if his medical records were disclosed."); ECF 3-9 ¶ 13 ("Disclosure of my records would cause severe emotional harm.").

[12] *See, e.g.*, ECF 3-6 ¶ 5 ("My child has come out to only a couple of people. They are not publicly telling people that they are transgender."); ECF 3-7 ¶ 4 ("My son prefers not to talk about the fact that he is transgender. His friends and many of the people he interacts with do not know that he is transgender."); ECF 3-8 ¶ 5 ("My son is not publicly out as transgender. His school, friends, and community do not know that he is transgender. He is also a very private person generally.").

[13] *See, e.g.,* ECF 3-4 ¶ 11 ("Disclosure would affect our family's willingness to seek care and share sensitive information in the future . . . If Stanford turns over our information, we would never go back there, and it would be incredibly difficult to find providers who are as competent and whom my son would trust."); ECF 3-5 ¶ 5 ("Privacy was essential to my daughter's ability to process what she was experiencing and to speak candidly with providers. She would not have been willing to speak openly with Stanford providers if she knew that information could be disclosed outside the medical-care setting."); ECF 3-7 ¶ 5 ("It was important that my son felt Stanford was a safe place and that the providers were there to help him. Privacy was important to his ability to participate in care.").

believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.]”). If DOJ obtains records relating to the transgender medical care proposed class members’ received, then proposed class members will reasonably fear that information disclosed in confidence to health care providers can later be turned over to law enforcement. Courts have repeatedly recognized that such fear chills access to care and undermines candor in treatment. *See, e.g.*, *Nw. Mem. Hosp*, 362 F.3d at 929 (cautioning that hospital “will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment” if it fails to “shield the medical records of its abortion patients from disclosure”); *Planned Parenthood Fed’n of Am., Inc. v. Ashcroft*, No. 03-cv-4872, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004) (“[P]otential for injury to the relationship between patient and provider is significant ....”).

### C. No Adequate Safeguards Against Unauthorized Disclosure or Misuse

The third factor—the adequacy of safeguards to prevent unauthorized disclosure—also weighs strongly against disclosure. As in *Tucson Woman’s Clinic*, there are no adequate protections “against release of information to government employees who have no need for the information.” 379 F.3d at 552. “Even if a law adequately protects against public disclosure of a patient’s private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information.” *Id.* at 551-52. The subpoena itself offers no safeguards or guarantees concerning the use of Plaintiffs’ identities or private medical records, no information concerning the investigatory purpose for which the government is seeking the records or to whom they may be disclosed, no details on which government employees will have access to these records, and no assurances that these records will not be used to harass or intimidate Plaintiffs or others who have received transgender health care.

Federal Rule of Criminal Procedure 6(e) does not cure the problem. Although Rule 6(e) establishes some constraints on public disclosure of grand jury information, it contains exceptions permitting disclosure to “an attorney for the government for use in performing that attorney’s duty,” disclosure to federal or state government personnel “that an attorney for the government

considers necessary to assist in performing that attorney's duty to enforce federal criminal law," and disclosure to another federal grand jury. Fed. R. Crim. P. 6(e)(3)(A)(i), (ii); 6(e)(3)(C). Those exceptions do not meaningfully limit intra-governmental dissemination or prevent use of Plaintiffs' information for purposes far removed from any lawful need for their medical records.

These limitations do not prohibit the government from using information obtained from a grand jury subpoena against patients in other criminal proceedings, or against patients' parents, a group of people whom the government has, in no uncertain terms, accused of child abuse, despite overwhelming evidence that what these parents are doing—supporting their transgender children in lawfully obtaining essential medical care—leads to positive outcomes for these youth. Indeed, DOJ announced its intention to partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners, and the Attorney General directed all U.S. Attorneys to investigate all suspected cases of transgender medical treatment and to prosecute all offenses to the fullest extent possible.[14] *See In re. Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 603 (applying analogous factor to similar requests and concluding that DOJ "offers nothing to mitigate a concern for these children and their families given these pronouncements"). Such information sharing is particularly concerning to any parent who sought lawful, medically recommended care for their transgender child that is now being falsely characterized as abuse.

Recent history also shows a disregard by DOJ for the standards that have traditionally governed grand jury practice. *See United States v. Comey*, 809 F. Supp. 3d 396, 414 (E.D. Va. 2025) (ordering release of grand jury materials after "an FBI agent and a prosecutor" "potentially

---

[14] *See* Memorandum for Select Component Heads re Preventing the Mutilation of American Children, Off. Att'y Gen. at 3-4, 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (directing all U.S. Attorneys to investigate and prosecute all suspected providers of "gender-affirming care," directing other components of DOJ to investigate FCA and FDCA claims based on same, and announcing partnership with state attorneys general to support state-level prosecution of these providers); Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Dep't of Just., Off. of Pub. Affs. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (stating that medical professionals and organizations who provide this care "in the service of a warped ideology will be held accountable by this Department of Justice").

undermine[d] the integrity of the grand jury proceeding").[15] Thus, even if grand jury secrecy could provide adequate protection in some context, the Court should not entrust it to do so here. The third factor strongly favors Plaintiffs.

**D. No Demonstrated Need for Plaintiffs' Identities or PHI**

The fourth factor—the government's degree of need for access—likewise weighs strongly against disclosure. As in *Tucson Woman's Clinic*, "[w]eighing even further against the medical record access is the fact that there is little, if any, need for much of this information, such as the names and addresses of patients." *Id.* at 552. The subpoena offers no indication of the purpose for which Plaintiffs' information is being demanded. It does not state why Plaintiffs' medical records are relevant to any investigation that may be underway, let alone offer any explanation as to why that investigation could not be conducted without that information. This mismatch between the information sought and any legitimate investigative need is fatal under the Ninth Circuit's balancing test. In decisions quashing substantively similar DOJ administrative subpoenas seeking transgender patients' private medical records, numerous district courts have found that DOJ failed to establish any legitimate purpose or need for seeking the identities of transgender patients and the most intimate details of their medical histories and treatment. *See In re CNH Subpoena*, 2026 WL 160792, at *8 ("If the Government is pursuing FDCA violations, it is utterly unclear to this court why the Government demands production of adolescent patient records."); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 605 ("Nothing in the present record establishes a need . . . for the patient-identifying clinical files . . . .").

The Eastern District of Pennsylvania's analysis of substantively identical patient-data requests is especially instructive. The court distinguished between requests for billing data,

[15] *See also* Sara Tenenbaum & Todd Feurer, *All charges dismissed against "Broadview Six," defense says grand jury transcript revealed "gross misconduct,"* CBS News (May 22, 2026), https://perma.cc/4JPF-TM6D (prosecutors dismissed charges after the revelation of myriad abuses of the grand jury system, including "improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room"); Benjamin S. Weiss, *DOJ may have disclosed secret grand jury material to Congress, violated judicial gag order in Trump classified documents case*, Courthouse News Service (Mar. 25, 2026), https://perma.cc/9N69-BNKD (reporting that, on March 13, 2026, DOJ produced information to the House Committee on the Judiciary that contained grand jury material).

insurance-claim submissions, coding guidance, communications with insurers, and manufacturer-related materials—which could plausibly relate to the commercial conduct DOJ invoked—and requests for child-patient identities, psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents. The latter materials, the court held, "reflect individualized clinical care and deeply personal medical disclosures" and "do not speak to how products were labeled, marketed, introduced into interstate commerce, or billed to health care benefit plans." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578. The same distinction controls here because Subpoena Specifications 12 through 14 seek the same patient-identifying categories the court in the CHOP case found disconnected from DOJ's stated FDCA and fraud theories. The District of Maryland agreed: "The Government seeks to investigate how the Hospital treats its patients," but "the FDCA regulates commerce, not patient care." *In re CNH Subpoena*, 2026 WL 160792, at *8.

DOJ's own conduct in the administrative subpoena context reinforces the conclusion that patient-identifying information is unnecessary for any legitimate investigation. On May 6, 2026, DOJ dismissed its appeal of the Eastern District of Pennsylvania's order striking Requests 11-13 in the substantively identical subpoena to Children's Hospital of Philadelphia. Br. in Supp. of Mot. to Confirm Jurisdiction at 4, *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. May 6, 2026) (ECF 47-1). That dismissal confirms what multiple courts have independently concluded: DOJ can pursue any genuine FDCA or fraud investigation without obtaining children's identities or medical files. If DOJ does not need this information to investigate CHOP, it cannot demonstrate any greater need for the information as it relates to LPCH and other hospitals in California.

Moreover, even if the subpoena did not on its face require production of unredacted medical records, redaction of certain items such as names and addresses could not avert the realistic risk of reidentification of Plaintiffs and disclosure of their intimate medical details.[16] In a

[16] *See, e.g.,* ECF 3-4 ¶ 12 ("I do not believe removing names or obvious identifiers would protect my child's privacy. Details such as his age, dates of care, treatment history, providers, diagnosis, family circumstances, and location of care could still identify him."); ECF 3-8 ¶ 14 ("I do not believe removing names or obvious identifiers would protect my child's privacy. With advanced technology and the details contained in medical records, I believe it would be easy to identify my son and our family.").

closely analogous context, the Seventh Circuit affirmed an order quashing a DOJ subpoena for redacted abortion records. *See Nw. Mem'l Hosp.*, 362 F.3d at 929-31. The court emphasized that in a highly charged social environment, acquaintances or "skillful 'Googlers'" can "put two and two together," that granular clinical narratives or descriptions contained in redacted medical records can effectively reidentify patients, and that compelled disclosures erode patients' trust in medical providers and discourage them from seeking needed care. *Id.* That rationale applies with added force to DOJ given the many investigative techniques it has at its disposal. DOJ is not limited to skillful Googling, and can instead serve subpoenas on other entities or compare redacted patient documents to information it has from other databases, such as claims submitted to Medicaid and other federal health programs.

Finally, DOJ seeks the information at issue, which has no legitimate connection to any criminal investigation, for the "improper purpose" of seeking to "end the very practice it claims to be merely investigating." *QueerDoc*, 807 F. Supp. 3d at 1303-04. Current federal directives expressly target transgender health care, describe it as "mutilation," direct government-wide action, and call for coordinated investigations and information sharing with state authorities. This antagonistic environment magnifies every factor identified by the court in *Northwestern Memorial*: the concrete risk of reidentification despite redaction; the dignitary injury from disclosure of intimate details; the severe chilling effect on access to care; and the undermining of institutional trust. In short, DOJ's receipt of even so-called "de-identified" or redacted records would endanger privacy and safety and chill minors' access to medically necessary care. The fourth factor favors Plaintiffs.

### E. No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies Disclosure of Plaintiffs' Identifying Information and PHI.

The fifth factor—whether an express statutory mandate, articulated public policy, or other recognizable public interest militates toward access—also weighs against disclosure. The primary statutory mandate at issue, HIPAA, ordinarily prohibits medical providers from disclosing PHI. 45 C.F.R. § 164.502(a). While HIPAA ordinarily contains an exception for grand jury subpoenas, 45 C.F.R. § 164.512(f)(1)(ii)(B), an "invalid" grand jury subpoena "may not be used for any

purpose," *In re Horn*, 976 F.2d 1314, 1319 (9th Cir. 1992), including to establish an exception to HIPAA. HIPAA's mandate thus weighs against disclosure here.

The subpoena does not reveal how disclosure of Plaintiffs' identifying information and PHI promotes any identifiable public interest. To the contrary, the record indicates that DOJ is using the grand jury subpoena to obtain the same patient-identifying records that multiple courts have already held it was not entitled to obtain through materially similar administrative subpoenas. Even if the government could show some legitimate purpose for its investigation generally, nothing in the subpoena indicates how disclosure of Plaintiffs' identities and PHI "promotes this need." *Tucson Woman's Clinic*, 379 F.3d at 553. Under *Tucson Woman's Clinic*, a generalized invocation of a public interest in law enforcement cannot automatically override constitutional privacy rights in highly sensitive medical records. If it could, the balancing test would have no force in the very cases where it matters most. The government must identify a concrete and particularized interest in the specific information sought. It has not done so.

The articulated public policy surrounding the subpoena cuts the other way. The Administration has publicly declared that pediatric transgender medical care "must end," described this care in stigmatizing and inflammatory terms, and directed DOJ to use federal enforcement tools to end it. In related subpoena litigation, courts have repeatedly found that DOJ's demands for transgender minors' identifying information and PHI were tied to an improper effort to target this care rather than any legitimate need for children's medical files. *See QueerDoc*, 807 F. Supp. 3d at 1304 ("[T]he subpoena serves to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct."); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("[T]he Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare."); *In re 2025 Admin. Subpoena to R.I. Hosp.*, 2026 WL 1392565 , at *8 ("The Administration has publicly characterized gender-affirming care for minors as abuse, directed the DOJ to bring its practice to an end, and celebrated when hospitals curtailed such programs as a result of this subpoena campaign.").

The public interest favors protecting minors' medical privacy, preserving the

confidentiality of the doctor-patient relationship, preventing misuse of law-enforcement authority to expose stigmatized medical information, and ensuring that patients and families can seek lawful medical care without fear that their most intimate records will be turned over to the federal government. The fifth factor strongly favors Plaintiffs.

In sum, an assessment of the *Tucson Woman's Clinic* factors shows that LPCH's disclosure of Plaintiffs' identifying information and PHI would violate Plaintiffs' informational privacy rights. Plaintiffs are likely to succeed on this claim. At a minimum, Plaintiffs raise serious questions going to the merits, warranting preliminary relief to prevent disclosure while this action proceeds.

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S REQUESTS FOR THEIR INFORMATION VIOLATE THE FIRST AMENDMENT

"Throughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018). But free and open communication between medical providers, patients, and their families is protected by the First Amendment. *Id.* "Physicians must be able to speak frankly and openly to patients." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) (upholding a permanent injunction of government investigations into doctors recommending medical marijuana). For this reason, the Ninth Circuit has long recognized the First Amendment's protection of communications between doctors and providers and their patients, particularly where the government discriminates based on viewpoint. *See id.* at 673; *see also Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (finding likelihood of success and affirming preliminary injunction where law "forbids expression of a particular viewpoint" in doctor-patient communications).

The Supreme Court has recently held that subpoenas can infringe First Amendment rights. *Davenport*, 146 S. Ct. at 1125. In *Davenport*, the New Jersey Attorney General subpoenaed information about a nonprofit's donors to investigate whether the organization had "misled" them. *Id.* at 1120. The Supreme Court held that the issuance of the subpoena "established a present injury to [the recipient's] First Amendment associational rights" for purposes of Article III

standing. *Id.* at 1124. Because the recipient's "prospective partners would be hesitant to risk the revelation of their personal information through government investigation," the subpoena discouraged "people from associating with groups" and also encouraged "groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." *Id.* at 1125.

The grand jury subpoena here will encourage members of the proposed class to "cease or modify protected First Amendment" communications with their doctors, both at LPCH and at any other healthcare provider. *Davenport*, 146 S. Ct. at 1125. Courts have recognized that "[p]atients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.]" *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 600-01; *see also Nw. Mem. Hosp*, 362 F.3d at 929 (cautioning that hospital "will lose the confidence of its patients" if it fails to "shield the medical records of its abortion patients from disclosure"). The individual Plaintiffs have submitted declarations stating that they "would not have been willing to speak openly with LPCH providers if [they] knew that information could be disclosed outside the medical-care setting." B.B. Decl. dated June 8, 2026 ("B.B. Decl.") ¶ 5.[17]

The grand jury subpoenas will additionally deprive Plaintiffs and the proposed class of their right to receive the candid guidance from their providers in California-based hospitals that does not align with DOJ's beliefs regarding transgender healthcare. It is well-established that the First Amendment protects good-faith medical and scientific disagreement. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1022-23, 1029 (2026). Where the government has taken action to limit a provider's ability to communicate a certain perspective or provide information on certain care, such actions are subject to strict scrutiny. *See id.* Here, the subpoenas seek vast troves of information on any individual who "underwent Sex-Rejecting Procedures." The definition of "Sex Rejecting Procedures" includes medical and clinical interventions, as well as clinical services that are "functionally integral to, preparatory for, or undertaken in furtherance of" those interventions. The subpoena thus seeks records concerning even purely preliminary discussions, intakes, or

[17] *See also* ECF 3-7 ¶ 5 ("It was important that my son felt Stanford was a safe place and that the providers were there to help him. Privacy was important to his ability to participate in care.").

evaluations. Knowing that their speech in such encounters regarding gender-related care will be scrutinized, doctors will limit their communications with their patients on these topics. This, in turn, will deprive Plaintiffs and the proposed class of their right to receive these communications. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both.").

The First Amendment harm is particularly acute here because the grand jury subpoena to LPCH discriminates based on "viewpoint." *Planned Parenthood*, 122 F.4th at 844. The subpoena's definition of "Sex Rejecting Procedures" includes medical procedures only when they have the "purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." ECF 31-2 at 6. Whether communications fall within the subpoena's scope thus depends on whether the minor "assert[s]" a "gender identity" that differs from their "biological sex." The subpoena is clear that an "intervention is considered a Sex-Rejecting Procedure based on its intended purpose." *Id.* Two identical prescriptions can be treated differently under the subpoena based entirely on the patient's and the doctor's viewpoint about potential differences between gender and sex. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Because the grand jury subpoena discriminates based on viewpoint and will chill protected communications, Plaintiffs are likely to succeed on their First Amendment claims.

## IV. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The irreparable harm standard is satisfied as to each Plaintiff, and the proposed class. The Ninth Circuit has held that the threatened deprivation of constitutional rights, for even minimal periods of time, "unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002 (quoting *Elrod*, 427 U.S. at 373). That rule applies here because Plaintiffs have shown, at a minimum, serious questions that DOJ's receipt of their PHI would violate their constitutional rights. In any event, the harm to proposed class members from disclosure is independently irreparable on its own terms. Once DOJ obtains the records from any source, proposed class

Case: 26-4388, 06/07/2026, DktEntry: 18.1, Page 92 of 187

members' privacy interest in the information the records contain is permanently and irrevocably destroyed. The federal government will possess records of the most intimate details of each class member's medical history—including the diagnoses and clinical assessments that supported each member's care; the specific treatments received; and the results of that care—obtained without notice or any opportunity for proposed class members to object on grounds of privilege or constitutional protection. No damages award can restore the confidentiality of that information.

The harm is also imminent. The return date for the grand jury subpoena issued to LPCH is June 10, 2026. On information and belief, other California hospitals may have the same return date. Without a TRO issued before that date, the constitutional harm will be complete as to proposed class members and the Court will no longer have any effective means of providing the relief sought in this litigation. The imminence of the constitutional harm is not speculative—it will occur within this District on a specific known date absent judicial intervention.

The pendency of the grand jury proceeding in the Northern District of Texas heightens, rather than diminishes, the need for emergency relief here. Plaintiffs' records, providers, and treatment relationships are in this District, and Defendants are subject to this Court's personal jurisdiction. LPCH's production of Plaintiffs' private medical records would occur from California. Plaintiffs have no records, residence, treatment relationship, or other connection to Texas that would make it reasonable to require them to seek relief there on the eve of disclosure. This Court is the forum with the most direct connection to Plaintiffs and the threatened injury.

## V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF

The balance of equities tips sharply in favor of granting preliminary relief to preserve the status quo and prevent an irreparable infringement of Plaintiffs' constitutional rights. Denial of relief would result in the permanent and irreversible destruction of Plaintiffs' privacy interest in their identifying information and PHI. This is a harm that, once inflicted, cannot be undone regardless of how this litigation ultimately resolves. DOJ, in contrast, would suffer no cognizable harm from interim relief. The government has no cognizable interest in obtaining Plaintiffs' records by unconstitutional means. If the subpoena is constitutionally permissible, contrary to

what at least eight federal district court decisions have found, then the government suffers nothing but a temporary delay in reviewing Plaintiffs' records, one small part of an investigation that the government's public statements confirm has gone on for nearly 12 months and involve its attempt to obtain the records of every patient treated by more than 20 doctors and clinics around the country. In a similar proceeding in the Southern District of New York relating to the grand jury subpoena served on NYU Langone, DOJ agreed not to require any New York City hospital to "produce or disclose any material covered by the lawsuit (i.e., identifying and sensitive health information) . . . before June 24, 2026." *Coe v. Blanche*, No. 1:26-cv-4641, ECF 21 at 1 (S.D.N.Y.). The time period covered by that agreement, 14 days after the subpoena's return date, is exactly what would be covered by the TRO requested here.

The public interest also strongly favors relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). The public interest here is amplified by the scope of the threatened constitutional violation. The government's simultaneous targeting of multiple transgender individuals who reside in this District—and many more proposed class members across California—highlights the public importance of ensuring that any investigation is conducted through constitutionally valid methods. If this Court denies preliminary relief, the government's improper effort to deter pediatric transgender medical care will proceed unchecked. The privacy of multiple residents of this District will be permanently compromised, and the chilling effect on transgender individuals' willingness to seek medically necessary care will be felt across the community. This Court's intervention to ensure constitutional compliance before widespread harm is inflicted is squarely in the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order barring DOJ from obtaining proposed class members' PHI in violation of their constitutional rights for fourteen days, and that it further issue an order to show cause why a preliminary injunction should not issue before the temporary restraining order expires.

DATED: June 8, 2026

Respectfully submitted,

*/s/ Caleb Hayes-Deats*

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email:
sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

CALEB HAYES-DEATS*
ABBE DAVID LOWELL*
SCHUYLER STANDLEY*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
CHayes-Deats@lowellandassociates.com
ALowellpublicoutreach@lowellandassociates.com
SStandley@lowellandassociates.com

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:
ggrunfeld@rbgg.com
kjanssen@rbgg.com

JOSHUA ROVENGER*
DONOVAN BENDANA*
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email:
jrovenger@gladlaw.org
dbendana@gladlaw.org

Attorneys for Plaintiffs
*motion for admission *pro hac vice* granted

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email: sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
kjanssen@rbgg.com

ABBE DAVID LOWELL (*pro hac vice*)
CALEB HAYES-DEATS (*pro hac vice*)
SCHUYLER STANDLEY (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
Sstandley@lowerllandassociates.com

JOSHUA ROVENGER (*pro hac vice*)
DONOVAN BENDANA (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email: jrovenger@gladlaw.org
dbendana@gladlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; F.F.; and Z.G., a minor, by and through their parents, G.G. and A.G., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; and LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation,

Defendants.

Case No. 5:26-cv-04998-PCP

**NOTICE OF ERRATA TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

Assigned to: Hon. P. Casey Pitts

Trial Date: None Set

**NOTICE OF ERRATA**

Plaintiffs respectfully submit this notice of errata to correct an error in the First Amended Complaint filed on June 8, 2026, as Docket No. 41. Due to an administrative error, Plaintiffs inadvertently omitted Exhibit A to the First Amended Complaint. Plaintiffs respectfully request that this document be attached to the First Amended Complaint, Docket No. 41.

DATED: June 8, 2026

Respectfully submitted,

NATIONAL CENTER FOR LGBTQ RIGHTS
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
ROSEN BIEN GALVAN & GRUNFELD LLP
LOWELL & ASSOCIATES PLLC

By: */s/ Kara Janssen*
Kara Janssen

Attorneys for Plaintiffs

# Exhibit A

.AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

## Northern District of Texas

TO:
Lucile Salter Packard Childrens Hospital at St

Attn: Custodian of Records

700 Welch Road
Suite 200
Palo Alto, CA 94304

**SUBPOENA TO TESTIFY BEFORE GRAND JURY**

SUBPOENA FOR:
☐ PERSON ☑ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| 501 W 10th St.<br>Fort Worth, TX 76102-6882 | Grand Jury Room |
| | DATE AND TIME<br>6/10/2026 9:00 am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

PLEASE SEE ATTACHMENT

☐ *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| Karen Mitchell<br>(By) Deputy Clerk | 5/6/2026 |

| This subpoena is issued on application of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY<br>Ethan Womble<br>Assistant United States Attorney<br>801 Cherry St., Suite 1700<br>Fort Worth, TX 76102-6882<br>(817) 252-5200 |
|---|---|

* If not applicable, enter "none".

AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

## RETURN OF SERVICE (1)

| | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | |
| SERVED BY (PRINT NAME) | | TITLE |

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | 0.00 |

## DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________
DATE

______________________
SIGNATURE OF SERVER

______________________
ADDRESS OF SERVER

## ADDITIONAL INFORMATION

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".



Print Save As...

# ATTACHMENT A

**ATTACHMENT TO THE GRAND JURY SUBPOENA ISSUED TO**

Lucile Salter Packard Children's Hospital at Stanford
700 Welch Road
Suite 200
Palo Alto, CA 94304

## I. DEFINITIONS

1. "You," "Your Company," and "the Company" means:

   a. Lucile Salter Packard Children's Hospital at Stanford, a California nonprofit corporation, whose principal place of business is located at 700 Welch Road, Palo Alto, California, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Pediatric and Adolescent Gender Clinic; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

   b. Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes,

telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. "Relevant Time Period" means **January 1, 2020, through May 5, 2026**. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7. "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any

records or logs reflecting the time, date, participants, and content of such communications.

9. "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics. This includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. DOCUMENTS TO BE PRODUCED

For the Relevant Time Period, please provide in electronic format:

1. Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) those who held authority to perform or order Sex-Rejecting Procedures; (b) those who conducted clinical evaluations related to Sex-Rejecting Procedures; (c) those who engaged in billing or coding activities related to Sex-Rejecting Procedures; and (d) any individual within such person's supervisory or reporting chain.

2. All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving Sex-Rejecting Procedures.

3. All documents that show or relate to any use of diagnosis codes for minors undergoing Sex-Rejecting Procedures other than codes specifically identifying

transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, vocal disorders, medication management, etc.).

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for Sex-Rejecting Procedures.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for Sex-Rejecting Procedures, including any inquiries, denials, or appeals related to claims for such procedures or treatment.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for Sex-Rejecting Procedures.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in Sex-Rejecting Procedures for minors.

8. All documents relating to communications between any pharmaceutical manufacturer of puberty blockers or hormones and any of the individuals identified in response to specification 1, *supra*, regardless of whether the document or communication is facially related to Sex-Rejecting Procedures for minors.

9. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for use in or associated with Sex-Rejecting Procedures or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

10. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for Sex-Rejecting Procedures or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

11. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

12. Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures.

13. For each such patient identified in Subpoena specification 12, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided

to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided.

14. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones.

15. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety and effectiveness of Sex-Rejecting Procedures for treatment of gender dysphoria, including the use of puberty blockers or hormones.

16. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to Sex-Rejecting Procedures.

17. All communications with the World Professional Association for Transgender Health ("WPATH") or any of its members relating to Sex-Rejecting Procedures, including but not limited to communications regarding the safety and efficacy or Sex-Rejecting Procedures, the Standards of Care 8, and billing guidance for Sex-Rejecting Procedures

## III. FORM OF PRODUCTION

We request materials responsive to the above be made available in electronic format. Please forward the documents directly to the individual listed below on or before the return date of this subpoena:

**Special Agent Bradley Cooper**
**FDA Office of Criminal Investigations**
**Kansas City Field Office**
**(913) 396-2129**
**bradley.cooper@fda.hhs.gov**

## HIPAA STATEMENT

The U.S. Department of Justice (the "DOJ") is familiar with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations providing guidance in the application of that statute.

The DOJ has considered the predicate requirements of 45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3) and represents that

- The information requested in this grand jury subpoena attachment is relevant and material to a legitimate law enforcement inquiry;
- The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and
- De-identified information could not reasonably be used in its stead.

The documents and records requested in this grand jury subpoena attachment requires you to produce are sought by the DOJ in its capacity as a health oversight agency, and this information is necessary to further health oversight activities. *See* 45 C.F.R. §§ 164.512(d) and 164.501. The information sought is the minimum necessary to accomplish the intended purpose of the subpoena. *See* 45 C.F.R. § 164.502(b)(1).

## PRIVILEGE LOG

This grand jury subpoena is not intended to call for the production of any material that is subject to a valid claim of attorney-client or other privilege recognized by the federal courts of the United States. To the extent you or some other party may seek to assert a claim of privilege, work product protection, or other legal claim to preclude production of material called for in this subpoena, a privilege log must be produced. Such a privilege log shall set forth:

a. each document by date, transmittal detail (if any);
b. type of document;
c. author(s) and location (e.g., name of company, firm etc.);
d. recipient(s) and location (e.g., name of company, firm etc.);
e. general subject matter;
f. number of pages;
g. paragraph of the subpoena to which the document is responsive;
h. indicated or known circulation, including the names and titles of all persons to whom the document, or a copy thereof, or any part thereof, was shown; and
i. the privilege asserted with respect to each such document in sufficient detail to facilitate a determination by a reviewing party or court to assess the validity of the claim of privilege.

Failure to produce such a log with sufficient detail to allow a reviewing party or court to assess whether such a claim is valid may result in waiver of any such claim.

**NOTICE REGARDING LIABILITY FOR OBSTRUCTION OF JUSTICE**

- **18 U.S.C. § 1001 in relevant part provides –**

  (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

  > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
  > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
  > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

  shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

- **18 U.S.C. § 1503 in relevant part provides –**

  (a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

- **18 U.S.C. § 1512 in relevant part provides –**

  (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

. . .

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

- **18 U.S.C. § 1519 provides –**

  Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

- **18 U.S.C. § 1623(a) in relevant part provides –**

  (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS**
**PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

Pursuant to Federal Rules of Evidence 803(6) and 902(11) regarding certified domestic records of regularly conducted activity, I hereby certify:

1. I am employed by ________________________________________ ("the Business") and my official title is ______________________. I am a person designated by the Business as a custodian of records with the authority to make this certificate.

2. I state that each of the records attached hereto is the original record, or a true duplicate of the original record, in the custody of the Business, and that I am the custodian of the attached records, consisting of _____ total pages.

3. I further certify that all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters.

4. I further certify that that all records attached to this certificate were kept in the course of the regularly conducted activity of the Business.

5. I further certify that it is the regular practice of the Business to make and retain each record attached to this certificate.

6. I further state that this certificate is intended to satisfy the requirements of Rule 902(11) of the FEDERAL RULES OF EVIDENCE.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Date: __________________

_____________________________
Signature

_____________________________
Print Name

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email: sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
kjanssen@rbgg.com

ABBE DAVID LOWELL (*pro hac vice*)
CALEB HAYES-DEATS (*pro hac vice*)
SCHUYLER STANDLEY (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
Sstandley@lowerllandassociates.com

JOSHUA ROVENGER (*pro hac vice*)
DONOVAN BENDANA (*pro hac vice*)
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email: jrovenger@gladlaw.org
dbendana@gladlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; F.F.; and Z.G., a minor, by and through their parents, G.G. and A.G., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; and LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation;,

Defendants.

Case No. 5:26-cv-04998-PCP

**FIRST AMENDED COMPLAINT**

**CLASS ACTION**

Assigned to: Hon. P. Casey Pitts

Trial Date: None Set

## INTRODUCTION

1. The federal government has pledged to shut down essential medical care for transgender minors. Days into office, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared it is not U.S. policy to "fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care.

2. As part of this campaign to end pediatric transgender medical care, the Department of Justice ("DOJ") has spent the last year using "every weapon at its disposal" to end pediatric transgender healthcare,[1] including the initiation of a sprawling, nationwide investigation into providers, hospitals pharmaceutical companies, and other entities supporting this essential care.[2]

3. Beginning in June 2025, DOJ served "substantively identical" civil administrative subpoenas under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA subpoenas") on healthcare providers across the country demanding the identities and protected health information ("PHI") of every transgender patient who received care. *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3-4 & n.12 (D. Md. Jan. 21, 2026), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026).

4. District courts across the country have condemned these identical HIPAA subpoenas demanding patient identities and PHI. *See, e.g.*, *id.* at *9 (stating that a HIPAA subpoena to Children's National Hospital "is an overreach untethered to any lawful purpose no matter who seeks protection from the court," that "[t]he Government has made

---

[1] *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, Department of Justice (May 15, 2026), https://www.justice.gov/opa/pr/justice-department-secures-landmark-resolution-end-pediatric-gender-affirming-care-and.

[2] Brett Schumate, *Civil Division Enforcement Priorities*, Department of Justice (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

improper use of a § 3486 administrative subpoena to out Movants for receiving, and their Hospital for providing, healthcare the Executive characterizes as a 'stain on our Nation's history,'" that "[t]he Subpoena bears no credible connection to an investigation of any statutory violation by the Hospital" and that it "appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated.").

5. Faced with rejection of its improper HIPAA subpoenas from courts across the country, DOJ decided to sidestep those orders by convening a grand jury investigation. It has served grand jury subpoenas on several of the same medical providers previously issued HIPAA subpoenas.

6. These subpoenas seek the same identifying information and PHI previously requested in the administrative subpoenas that have been quashed as lacking any proper investigative purpose. But simply re-labeling a HIPAA subpoena as a grand jury subpoena cannot transform an improper investigative purpose into a proper one. DOJ's improper effort to use the grand jury process to obtain identities and PHI of Plaintiffs—and the similarly situated members of the proposed class—violates their rights under the First, Fourth, and Fifth Amendments.

7. Plaintiffs and proposed class members are transgender minors and young adults who are receiving or have received pediatric transgender medical care in California, including individuals who received care in this District at the Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic. Defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH"), which operates the clinic, is one of the institutions that has received a federal grand jury subpoena seeking identifying information and PHI for transgender minors and young adults to whom it provided care.

8. On information and belief, DOJ has also issued grand jury subpoenas to other providers of pediatric transgender medical care in California.

9. Disclosure of Plaintiffs' and proposed class members' private information in response to blatantly unconstitutional and invalid grand jury subpoenas, even considering the government's coercive actions, would render those providers a tool of federal law

Case: 26-4388, 08/07/2026, DktEntry: 13.1, 113 of 187

enforcement and a participant in the federal government's campaign to unconstitutionally obtain Plaintiffs' and proposed class members' private information, which is protected by the First, Fourth, and Fifth Amendments.

10. Government seizure of Plaintiffs' and proposed class members' identities and PHI would violate their rights under the First, Fourth and Fifth Amendments, regardless of whether that seizure is accomplished directly by government officials searching their homes and doctors' offices or is instead effectuated by employing their medical providers as agents of the federal government.

11. The threatened violation of Plaintiffs' and proposed class members' constitutional rights is imminent. The subpoenas to California providers, on information and belief, have a return date no later than June 10, 2026. The Court should act quickly to exercise its jurisdiction to enjoin DOJ from violating Plaintiffs' and proposed class members' constitutional liberties by seizing their private medical records.

12. At bottom, the Administration is engaged in an effort to widely obtain the identities and PHI of transgender youth and young adults by targeting the medical providers who deliver that care. The government seeks to employ providers as its agents in disclosing to government officials the identities and private medical records of every individual transgender child and adolescent they treat. The records the government seeks pertain to medical care that is and was lawful where provided. And, it is also care that every major medical association recognizes as necessary care for transgender minors when medically indicated. These unlawful efforts should be halted.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

14. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court has authority to grant declaratory relief, injunctive relief, and other relief under both the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Court's equitable powers.

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (c)(2), and (e)(1), as one defendant, Defendant LPCH, is an entity with the capacity to sue and be sued in its common name that is subject to the personal jurisdiction of this Court with respect to this action.

16. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## DIVISIONAL ASSIGNMENT

17. Assignment to the San Jose Division of this Court is proper because this action arises in the County of Santa Clara.

## PARTIES

**Plaintiffs**

18. Z.A. is a 17-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2022 to the present and is proceeding in this case through parent A.A.

19. Z.B. is a 17-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2024 to 2025, has since received similar healthcare at a different California healthcare provider, and is proceeding in this case through parent B.B.

20. Z.C. is a 15-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2024 to the present and is proceeding in this case through parent C.C.

21. Z.D. is a 10-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2021 to the present and is proceeding in this case through parent D.D.

22. Z.E. is a 14-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2023 to the present and is proceeding in this case through parent E.E.

23. F.F. is a 19-year-old transgender woman who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2023 to 2025.

24. Z.G. is a 13-year-old transgender minor who currently receives gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic and is proceeding in this case through parents G.G and A.G.

**Defendants**

25. Defendant Todd Blanche is Acting Attorney General of the United States. He is sued in his official capacity. Attorney General Blanche is responsible for all aspects of the operation and management of the U.S. Department of Justice ("DOJ"), including implementing and fulfilling DOJ's duties under the U.S. Constitution and statutory law. As such, Attorney General Blache supervises and directs the administration and operation of the United States Attorneys' Offices. See 28 C.F.R. § 0.5.

26. Defendant DOJ is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501. DOJ has several divisions, including the Civil and Criminal Divisions. DOJ also directs and oversees United States Attorneys' Offices, including the U.S. Attorney's Office for the Northern Districts of Texas and California.

27. Defendants DOJ and Acting Attorney General Blache are collectively referred to as "DOJ" or the "DOJ Defendants."

28. Defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH") is a California nonprofit public benefit corporation with its principal place of business in Palo Alto, California. On information and belief, LPCH owns and operates the Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic.

29. LPCH has received a Subpoena to Testify Before Grand Jury issued by the United States District Court for the Northern District of Texas demanding that LPCH produce documents disclosing the identities and protected health information ("PHI") of Plaintiffs and every other transgender patient to whom it provided such care— including "documents sufficient to identify each patient," diagnoses, parent/guardian information,

and informed consent materials for minors.

## FACTUAL ALLEGATIONS

30. The Trump Administration has pledged to end pediatric transgender medical care. On January 28, 2025, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared it is not U.S. policy to "fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3. 2025). Within days, the White House announced that the order was "already having its intended effect," listing hospitals that had paused or ended treatment.[3]

### I. DOJ Targets Pediatric Transgender Healthcare With Improper Subpoenas.

31. The United States Department of Justice ("DOJ") promptly took action. In April 2025, the Attorney General issued a memorandum, "Preventing the Mutilation of American Children," directing U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warning DOJ would "hold accountable those who mutilate [our children] under the guise of care."[4]

32. On June 11, 2025, the Civil Division ordered components to "prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing such care to minors.[5] The Civil Division, also known as the Enforcement and Affirmative Litigation Branch, under the leadership of Brett Shumate,

---

[3] President Trump Is Delivering on His Commitment to Protect Our Kids, The White House (Feb. 3, 2025), https://www.whitehouse.gov/releases/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

[4] Memorandum for Select Component Heads: Preventing the Mutilation of American Children at 3, 5, U.S. Off. Of the Att'y Gen. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (DOJ April 2025 Memorandum).

[5] Memorandum: Civil Division Enforcement Priorities at 2, U.S. Off. of the Assistant Att'y Gen. (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

retains supervisory authority regarding criminal and civil investigations of pediatric transgender healthcare.[6]

33. The Administration initially pursued only civil remedies in its campaign to compel providers to stop offering this medically necessary care. On July 9, 2025, DOJ served more than 20 "substantively identical" HIPAA subpoenas under 18 U.S.C. § 3486 "to doctors and clinics involved in performing transgender medical procedures on children."[7] Several weeks later, the White House declared victory.[8]

34. Federal district courts around the country swiftly responded to DOJ's improper PHI demands. Nearly every court to consider DOJ's HIPAA subpoenas seeking patients' identifying information and PHI concluded that they are impermissible and must be quashed. *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (quashing subpoena for its improper purpose), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025) (quashing Boston Children's Hospital subpoena as issued for an improper purpose and "virtually unlimited in scope"), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025) (quashing subpoena for improper purpose because DOJ "issued the subpoena first and searched for a justification second"), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578-81, 588-607 (E.D. Pa. 2025) (striking requests to Children's Hospital of Philadelphia ("CHOP") seeking patients' identities and medical data as beyond statutory

---

[6] Ben Penn, *DOJ Rethinks Reorganization Tied to Gender-Affirming Care Probes*, Bloomberg Law (Sept. 22, 2025), https://news.bloomberglaw.com/us-law-week/doj-rethinks-reorganization-tied-to-gender-affirming-care-probes.

[7] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, Off. of Pub. Affs., U.S. Dep't of Just.. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[8] *President Trump Promised to End Child Sexual Mutilation—and He Delivered*, The White House (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

authority and outweighed by minors' privacy interests); *In re Subpoena No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (rejecting enforcement of Seattle Children's Hospital subpoena based on "DOJ's threadbare justification …, and strong evidence suggesting that the subpoena was issued for an improper purpose"), *motion to alter or amend judgment denied*, 2026 WL 1102159 (W.D. Wash. Apr. 23, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2-*3 (W.D. Pa. Dec. 24, 2025) (holding subpoena "tramples the Commonwealth of Pennsylvania's power to police, and legislate, matters of medical care"), *appeal docketed*, No. 26-1401 (3d Cir. Feb. 20, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, Misc. No. 25-mc-00063, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) (report and recommendation) (concluding Children's Hospital Colorado subpoena was a "smokescreen" for ending transgender care); *In re Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026) (quashing Rhode Island Hospital subpoena and collecting other decisions finding improper purpose), *appeal docketed*, No. 26-1568 (1st Cir. May 18, 2026).

35. One hospital in California, Children's Hospital of Los Angeles, moved to quash the HIPAA subpoena, but voluntarily dismissed the action after entering into a settlement agreement with DOJ. *See* No. 25-cv-11183-MWC-JDE, ECF No. 25-1 (C.D. Cal. Jan. 22, 2026). Under the terms of that agreement, DOJ averred that it was "not currently aware of information that would support the federal prosecution of parents or guardians who have sought and consented to receiving gender-related care for their children at Children's Hospital of Los Angeles." *Id.* at *2. The parties agreed to redacted medical records under the requirements of the HIPAA Privacy Rule, 45 C.F.R. § 164.514(b)(2)(i), and DOJ withdrew requests seeking patient identifying information, patient medical records, and records related to parental authorization and consent. *Id.* This agreement does not appear to apply to new subpoenas issued by a grand jury. *Id.* at *5.

36. Some hospitals decided to negotiate their productions, rather than move to

Case: 26-4388, 08/07/2026, DktEntry: 13.1, (119 of 187)

quash. One such hospital, Rhode Island Hospital ("RIH"), was in the midst of months of ongoing negotiations with DOJ when, in late April 2026, DOJ filed a civil enforcement petition against Rhode Island Hospital in the Northern District of Texas, asserting that its investigation was "being carried out in the Northern District of Texas." Gov't Pet. to Enforce at 2, *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026). Within hours—and without notice to any affected patient—the Texas district court granted the petition. Order, *id.* (N.D. Tex. Apr. 30, 2026) (ECF 2).

37. As revealed in this case, LPCH similarly negotiated, rather than moving to quash, the HIPAA subpoena it received in July 2025. Between August 2025 and May 2026, LPCH initiated a comprehensive search for responsive information and produced records in response to certain requests in the HIPAA subpoena. While LPCH did not produce any patient records, it was engaging in negotiations with DOJ regarding anonymization of those records and exploring the possibility of conducting those redactions. DOJ had indicated that it would accept anonymized records in the first instance. LPCH was exploring the possibility of this anonymization when, on May 6, 2026, the DOJ informed counsel for LPCH via email that DOJ was withdrawing LPCH's HIPAA subpoena "[e]ffective immediately."

38. On information and belief, DOJ Defendants initiated the investigation in the Northern District of Texas to ensure a favorable forum to enforce HIPAA subpoenas. When asked by the court in Rhode Island to explain the origins of the Texas investigations, "counsel for DOJ represented that the investigation began in Washington D.C. but could not specify when it transferred this investigation to the Northern District of Texas." *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, No. 1:26-mc-0007, 2026 WL 1392565, at *3 (D.R.I. May 14, 2026).

## II. DOJ Swaps Improper HIPAA Subpoenas for Grand Jury Subpoenas

39. In late April or early May 2026, DOJ opened a criminal grand jury investigation in the Northern District of Texas.

40. The nature of any alleged criminal conduct under investigation is unknown,

but on information and belief, it is substantively similar or the same as the investigation underlying the HIPAA subpoenas.

41. On May 6, 2026, the U.S. Attorney's Office in the Northern District of Texas issued grand jury subpoenas to several hospitals.

42. NYU Langone Hospitals in New York City ("Langone") was the first institution to disclose that it received a subpoena. It stated that it "was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas."[9] The statement included a copy of the subpoena.

43. On June 3, 2026, LPCH disclosed that it had received a substantively identical subpoena on May 7, 2026, a day after the abrupt rescinding of the HIPAA subpoena. A copy of the LPCH subpoena is attached to this Complaint as **Exhibit A**.

44. On June 5, Mt. Sinai Hospital revealed that it, too, had received a grand jury subpoena calling for patient PHI.[10]

45. On information and belief, other healthcare providers who provided pediatric transgender medical care in California received substantively identical grand jury subpoenas.

46. The grand jury subpoenas issued to LPCH, and on information and belief, other California healthcare providers, are hereinafter referred to as the "Grand Jury Subpoenas."

47. The Grand Jury Subpoenas seek patient identifying information and PHI that is substantially similar to the information sought by the HIPAA subpoenas previously quashed by multiple district courts as lacking any proper investigative purpose. Specifically, the following demands from the LPCH subpoena directly seek identifying information and PHI:

---

[9] *Information for NYU Langone Health Patients,* NYU Langone Health, https://nyulangone.org/public-notices/TYHPsubpoena.

[10] *See* Joseph Goldstein, *Trump Administration Investigating Gender Treatments at Mount Sinai*, N.Y. Times (June 5, 2026), https://www.nytimes.com/2026/06/05/nyregion/trump-administration-investigating-gender-treatments-at-mount-sinai.html.

- Subpoena specification 12 seeks "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."
- Subpoena specification 13 seeks, for each patient so identified, "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided."
- Subpoena specification 14 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

48. The Grand Jury Subpoenas define "Sex-Rejecting Procedures" covered by the subpoenas to include "any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures."

49. The Grand Jury Subpoenas include a three-page "Notice Regarding Liability for Obstruction of Justice" detailing potential criminal liability these institutions may face in connection with their response to the subpoenas.

50. On information and belief, the Grand Jury Subpoenas are substantively identical to those issued across the United States. The grand jury subpoenas received by LPCH and NYU Langone are so similar that both contain the *same* typo, a reference to "45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3)," with no closing parenthesis after "1." *Compare* ECF 31-2 at 9, *with* ECF 1 at 32. (That citation in fact refers to HIPAA regulations concerning administrative subpoenas, rather than grand jury subpoenas, suggesting it was incorporated from the HIPAA subpoenas courts have invalidated. *See* 45 C.F.R., §§ 64.512(f)(1)(ii)(B)-(C).

**III. Disclosure of This Information Is Harmful to Plaintiffs.**

51. The information sought by the Grand Jury Subpoenas is among the most sensitive information a medical provider can possess. Plaintiffs' and proposed class members' records contain patient-identifying information; information revealing Plaintiffs' and proposed class members' transgender status; diagnoses and assessments; information concerning puberty, physical development, fertility, sexuality, mental health, family dynamics, school experiences, and treatment decisions; records of communications with physicians, mental health professionals, nurses, and other providers; and records concerning parental consent and family decision-making. Those records concern children and adolescents who disclosed intimate information to medical providers and mental-health professionals for the purpose of receiving health care, with the understanding that such information would remain confidential and would not be disclosed to the federal government.

52. Plaintiffs and proposed class members reasonably relied on their expectation of privacy and confidentiality within the doctor-patient relationship when seeking care from their providers. Plaintiffs and proposed class members disclosed information to providers solely for the purpose of receiving medical care, and they did so with the expectation that their information would be used for treatment and shared only with providers involved in their care.

53. Plaintiffs and proposed class members and their parents did not consent to

their providers' disclosure of their patient-identifying medical records to the federal government, and their providers did not provide them with notice or an opportunity to be heard before the government obtained those records. Disclosure would seriously damage Plaintiffs' and proposed class members' trust in providers and in the medical system, chill their willingness to seek necessary care, and deter them and other patients from speaking candidly with providers about sensitive medical, mental health, and other information necessary for diagnosis and treatment.

54. Disclosure would also expose Plaintiffs and proposed class members to serious and irreparable harm. Several minor Plaintiffs are not publicly known to be transgender, and disclosure of their records would risk involuntarily outing them to the government and potentially to others. The risk of harm is especially acute because the records concern minors; reveal stigmatizing and highly personal information about gender identity, medical treatment, mental health, puberty, sexuality, and family decision-making; and are sought in the context of a federal campaign that has publicly characterized the medical care Plaintiffs and proposed class members received as "mutilation," "child abuse," and a "warped ideology." Plaintiffs and proposed class members fear harassment, discrimination, family separation or prosecution, damage to education and employment opportunities, loss of access to care, and physical and emotional harm. Redaction of obvious identifiers would not eliminate these risks because the details contained in Plaintiffs' and proposed class members' medical records—including age, dates and location of care, treatment history, providers, diagnoses, family circumstances, school information, employment information, and other contextual details—could still identify them and their families.

55. By using its criminal investigation authority to compel LPCH and other California healthcare providers to produce Plaintiffs' and class members' constitutionally-protected identifying information and PHI, and by raising the specter of obstruction of justice charges should they fail to comply to DOJ's satisfaction, DOJ is attempting to conscript private, third-party intermediaries— LPCH and other health care providers—as

its agents in violating the constitutional and statutory rights of Plaintiffs and proposed class members. There is no legitimate constitutional or investigatory purpose for disclosure of the identifying information and PHI sought by the Grand Jury Subpoenas. The Court should issue appropriate declaratory relief that disclosure to DOJ would violate Plaintiffs and putative class members' rights and promptly enjoin DOJ from obtaining, and LPCH from producing, Plaintiffs' private information.

## CLASS ALLEGATIONS

56. Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

57. **Class Definition.** The proposed Class under Federal Rule of Civil Procedure 23(b)(2) for which Plaintiffs seek certification is defined as:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in the State of California, including Lucile Salter Packard Children's Hospital at Stanford.

58. **Subclass Definition.** Plaintiffs also propose and seek certification of a subclass (the "LPCH Subclass") under Federal Rule of Civil Procedure 23(b)(2) defined as follows:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at Lucile Salter Packard Children's Hospital at Stanford.

59. **Impracticability of joinder of all Class Members.** The proposed class and subclass are expected to be sufficiently numerous and geographically dispersed that joinder of all members is impracticable. On information and belief, at least ten hospitals in

Case: 26-4388, 08/07/2026, DktEntry: 13.1, (125 of 187)

California, including LPCH, could have received a Grand Jury Subpoena. On information and belief, the number of class members is well over a thousand, and the number of subclass members is in the hundreds. The nature of this action also impacts the ability of claimants to institute individual suits given the confidentiality concerns at its center and putative class members' fears of being targeted by the DOJ Defendants.

60. **Class Representatives.** Plaintiffs Z.A., Z.B., Z.C., Z.D., Z.E., Z.G., by and through their respective parents, and F.F. are members of the proposed class and subclass. Each Plaintiff is willing to serve as a class representative and act on behalf of others similarly situated to themselves. Each has committed to looking out for the interests of all class members and is unaware of any conflict of interest with any proposed class members.

61. **Common Questions of Law and Fact.** This action requires a determination of whether disclosure to the government of the identifying information and PHI sought by the Grand Jury Subpoenas violates the Class's rights under the United States Constitution. Adjudication of these issues will in turn determine whether DOJ may seek the Class members' identifying information and PHI or be enjoined from receiving such information through the Grand Jury Subpoenas, and whether or to what extent LPCH may disclose such information to the government.

62. **Separate suits would create risk of varying conduct requirements.** The prosecution of separate actions by proposed class members against DOJ and/or LPCH would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(1).

63. **Defendants' actions rest on grounds generally applicable to the relevant class and the resulting legal violations can be remedied by unified relief**. By seeking, collecting, and/or disclosing the same identifying and sensitive health information for each class member, Defendants act on grounds generally applicable to the relevant class, rendering declaratory and injunctive relief appropriate respecting the entirety of the class for the particular claim. Certification is therefore proper under Federal Rule of Civil

Procedure 23(b)(2).

64. **Venue.** This action can be most efficiently prosecuted as a class action in the Northern District of California, where Plaintiffs reside, where Plaintiffs and proposed class members received care, where LPCH and, on information and belief, other California healthcare providers that may have received subpoenas, reside and do business, and where the records at issue are kept.

65. **Class Counsel.** Plaintiffs have retained experienced and competent class counsel. Plaintiffs are represented by the National Center for LGBTQ Rights ("NCLR"), GLBTQ Legal Advocates & Defenders ("GLAD Law"), Rosen Bien Galvan & Grunfeld LLP, and Lowell & Associates PLLC. Each of these firms has extensive federal court experience, including as class counsel and putative class counsel in multiple cases. Proposed class counsel includes attorneys with decades of experience litigating on behalf of LGBTQ people, including regarding transgender people's access to healthcare.

## CLAIMS FOR RELIEF

## COUNT I

### United States Constitution, Amendment V

### Denial of Due Process - Right to Informational Privacy

### (By All Plaintiffs and Class Members against DOJ Defendants)

66. Plaintiffs and proposed class members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

67. The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law," U.S. Const., amend. V, which includes a right to privacy.

68. The constitutional right to privacy encompasses the individual interest in avoiding disclosure of personal matters to the government. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977).

69. The Ninth Circuit has expressly recognized that right and has applied it to compelled disclosures of medical information by health-care providers. *See, e.g.*, *Tucson*

*Woman's Clinic v. Eden*, 379 F.3d 531, 551-53 (9th Cir. 2004).

70. By purporting to compel production of documents sufficient to identify Plaintiffs and proposed class members and their PHI, the Grand Jury Subpoenas seek disclosure of information at the core of the interests protected by Plaintiffs' and class members' rights under the Fifth Amendment, including their transgender status, the comprehensive details of their medical and psychological conditions, evaluations, treatments, procedures, family relationships, counseling, diagnoses, and confidential communications with healthcare providers and other professionals.

71. The Grand Jury Subpoenas are not limited to information relevant to any specific transaction, event, or subject matter. They are a categorical demand for years of Plaintiffs' and proposed class members' most sensitive personal records, without disclosure of their purported relevance to any lawful or legitimate grand jury inquiry.

72. Plaintiffs and proposed class members had a well-founded and objectively reasonable expectation that this information would not be disclosed to the government absent judicial process affording them prior notice, an opportunity to be heard, and a particularized showing that the government's need for the specific information sought is sufficient to override their constitutional privacy interest.

73. The DOJ Defendants have no compelling, important, legitimate, or even reasonable basis, for obtaining the requested PHI and information.

74. There is no legitimate governmental interest in the compelled disclosure of Plaintiffs' and proposed class members' private information that is sufficient to override their constitutional right to informational privacy. Indeed, there is no legitimate constitutional or investigative purpose for disclosure of this information whatsoever.

75. The DOJ Defendants issued the Grand Jury Subpoenas for the improper purpose of seeking to end gender-affirming medical care—which states like California have chosen to provide and protect—through intimidation and abuse of the federal criminal process.

76. The DOJ Defendants issued the Grand Jury Subpoenas to prevent

transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

77. The Grand Jury Subpoenas' request for the identifying and sensitive health information of Plaintiffs and proposed class members is so arbitrary that it shocks the conscience.

78. The threatened disclosure of Plaintiffs' and proposed class members' private information constitutes an irreparable injury. Once production occurs, their privacy interest in the disclosed information will be permanently destroyed. No damages award can restore the constitutional rights that will have been extinguished.

79. The collection and nonconsensual disclosure of the Plaintiffs' PHI would erode the provider-patient relationship and discourage Plaintiffs and members of the proposed Class from seeking the healthcare they need, which will negatively impact their health and wellbeing.

80. The potential harm from the collection and nonconsensual disclosure of Plaintiffs' and putative class members' PHI is extraordinary, as the information is the exceedingly sensitive information on the health and wellbeing of children—information discussing healthcare that the government has sworn to end. Their interests in privacy in this information far outweigh any asserted interest by DOJ in receiving this information in a grand jury investigation.

81. There are no safeguards to protect Plaintiffs and the proposed class from the harm of such disclosure, nor would such safeguards prevent the harm to Plaintiffs and the proposed class.

82. The threatened disclosure of Plaintiffs' and proposed class members' private information constitutes an irreparable injury. Once production occurs, their privacy interest in the disclosed information will be permanently destroyed. No damages award can restore the constitutional rights that will have been extinguished.

83. Plaintiffs and proposed class members have no adequate remedy at law. The

injury they seek to prevent is the disclosure itself—an injury that is by its nature incapable of monetary compensation after it has occurred.

84. Plaintiffs and proposed class members are therefore entitled to injunctive and declaratory relief barring disclosure of their identifying information or PHI in response to the Grand Jury Subpoenas or any substantially similar request from the DOJ Defendants.

85. Plaintiffs are entitled to a declaration that Grand Jury Subpoenas' request for their identifying and sensitive health information violates the right to informational privacy under the Due Process Clause of the Fifth Amendment.

**COUNT II**

**United States Constitution, Amendment V**

**Denial of Due Process - Right to Informational Privacy**

**(By LPCH Subclass against LPCH)**

86. Plaintiffs and proposed subclass members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

87. Although LPCH is a private entity, its production of Plaintiffs' and proposed subclass members' information pursuant to the subpoena constitutes action under color of federal law. The subpoena is a legal command issued under the authority of a United States District Court and enforceable through its contempt power. Defendant LPCH faces legal sanctions including criminal contempt, civil contempt, and substantial monetary sanctions if it fails to comply. On information and belief, LPCH has been subject to such extensive coercive power by the United States government that it retains no meaningful discretion to decline production. In addition, or in the alternative, and on information and belief, LPCH knowingly and willingly complied with an unlawful, unenforceable subpoena, knowing that it violated Plaintiffs' constitutional rights to do so. As such, LPCH is a governmental actor for purposes of the claims alleged in this Complaint.

88. Because the constitutional injury to Plaintiffs and proposed subclass members—the involuntary disclosure of constitutionally protected private information to the federal government set forth in paragraphs 67-82—flows directly and proximately

from LPCH's government-compelled act of production, that act is fairly attributable to the United States, and would violate their Fifth Amendment rights.

89. Plaintiffs and proposed subclass members have no adequate remedy at law. The injury they seek to prevent is the disclosure itself—an injury that is by its nature incapable of monetary compensation after it has occurred.

90. Plaintiffs and proposed subclass members are therefore entitled to injunctive and declaratory relief barring LPCH from producing their identifying information or PHI in response to the subpoena, or any future, substantively similar subpoenas.

## COUNT III

### United States Constitution, Amendment IV

### Unreasonable Search and Seizure

### (By All Plaintiffs and Class Members against DOJ Defendants)

91. Plaintiffs and proposed class members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

92. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

93. A grand jury subpoena issued to a third-party custodian of records is a form of government process that compels production of information to the federal government and constitutes a seizure of those records within the meaning of the Fourth Amendment. Although the Supreme Court held in *United States v. Miller*, 425 U.S. 435 (1976), that a person ordinarily lacks a cognizable Fourth Amendment interest in records voluntarily conveyed to a third party, the Court in *Carpenter v. United States*, 585 U.S. 296 (2018), recognized that the third-party doctrine does not apply categorically to all records held by third parties, and that its application must account for the nature, comprehensiveness, and intimacy of the information at issue.

94. *Carpenter* held that when the government compels production of a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," the act of production implicates the Fourth Amendment notwithstanding the fact that the records are held by a third party, because the person neither truly volunteers such information nor can reasonably avoid its collection. 585 U.S. at 315, 320.

95. The identifying information and PHI subject to the subpoenas is precisely the kind of comprehensive, intimate, and involuntarily conveyed information that *Carpenter* places beyond the reach of the third-party doctrine. Plaintiffs' and proposed class members' medical records were not voluntarily disclosed to their California healthcare providers in any meaningful constitutional sense. The provision of medical care requires disclosure of private information of the most intimate sort, and federal and state law impose on providers duties of collection, retention, and documentation that Plaintiffs and class members had no power to refuse or limit. Disclosure to a treating provider is not a free choice to expose one's medical information to the world or to the government.

96. The PHI at issue constitutes a deeply private and comprehensive record of Plaintiffs' and proposed class members' physical and psychological condition, including diagnoses, treatments, prescriptions, mental health history, reproductive health, genetic information, and communications made in confidence to treating physicians and health professionals. This information, taken in aggregate is a "detailed chronicle" of their physical and mental health and medical history. The compelled production of such records to the federal government is constitutionally indistinguishable, in its degree of intrusion, from a physical search of Plaintiffs' and class members' homes or personal records. A person's complete medical history discloses the most private facts of human life—facts that the Constitution, federal and state law, and common understanding have always treated as among the most sensitive and highly protected. Just as the cell phone records in *Carpenter* were distinguished from the bank records in *Miller* by their comprehensiveness, intimacy, and the practical impossibility of avoiding their creation, Plaintiffs' and class members' medical records are distinguished from ordinary third-party business records by

all of the same characteristics. No person can receive necessary medical care without creating such records, and no person can reasonably be said to have assumed the risk of government seizure merely by seeking treatment.

97. Plaintiffs' and proposed class members' healthcare providers hold their identifying information and PHI subject to express statutory and regulatory duties of confidentiality imposed by federal and state law, including the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), and its implementing regulations, 45 C.F.R. Parts 160 and 164. These duties of confidentiality reinforce Plaintiffs' and class members' reasonable expectation of privacy in the information. The government's own statutory framework recognizes that health information of this character is not freely available and is not the kind of information a person is deemed to have surrendered to federal law enforcement officials.

98. At all relevant times, Plaintiffs and proposed class members had and have a subjectively manifested and objectively reasonable expectation of privacy in the identifying information and PHI at issue. Plaintiffs and class members disclosed this information to their healthcare providers solely for the purpose of receiving medical care, under conditions of legally-protected professional confidentiality, and did not thereby assume any risk that the information would be seized and produced to the federal government absent a proper or lawful purpose.

99. The compelled production of Plaintiffs' and proposed class members' identifying information and PHI pursuant to the subpoenas violates their rights under the Fourth Amendment.

100. As a direct and proximate result of this violation, Plaintiffs and proposed class members suffer and will continue to suffer irreparable injury—the permanent and irremediable destruction of their privacy interest in the most intimate details of their physical and mental health and medical history. This injury is not compensable in damages and entitles them to injunctive and declaratory relief.

101. Plaintiffs and proposed class members are therefore entitled to injunctive and

declaratory relief barring disclosure of their identifying information or PHI in response to the grand jury subpoenas or any substantially similar request from the DOJ Defendants.

**COUNT IV**

**United States Constitution, Amendment IV**

**Unreasonable Search and Seizure**

**(By LPCH Subclass against LPCH)**

102. Plaintiffs and proposed subclass members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

103. Although LPCH is a private entity, its production of Plaintiffs' and proposed subclass members' information pursuant to the subpoena constitutes action under color of federal law. The subpoena is a legal command issued under the authority of a United States District Court and enforceable through its contempt power. Defendant LPCH faces legal sanctions including criminal contempt, civil contempt, and substantial monetary sanctions if it fails to comply. It retains no meaningful discretion to decline production. For the same reasons as asserted in paragraph 87, it is a governmental actor for purposes of the claims alleged in this Complaint.

104. In the alternative, LPCH's act of producing Plaintiffs' and proposed subclass members' health records to the federal government, in response to a constitutionally defective subpoena and without interposing any challenge on their behalf, constitutes an unreasonable search and seizure of Plaintiffs' and subclass members' private records and information effected through private hands under government compulsion, in violation of the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) (private party conducting search at government direction is state actor for Fourth Amendment purposes).

105. At all relevant times, Plaintiffs and proposed subclass members had and have a subjectively manifested and objectively reasonable expectation of privacy in the identifying information and PHI at issue. Plaintiffs and subclass members disclosed this information to LPCH solely for the purpose of receiving medical care, under conditions of

Case: 26-4388, 08/07/2026, DktEntry: 13.1, Page 134 of 187

legally-protected professional confidentiality, and did not thereby assume any risk that the information would be seized and produced to the federal government without proper purpose or lawful basis.

106. The compelled production of Plaintiffs' and proposed subclass members' identifying information and PHI pursuant to the subpoena violates their rights under the Fourth Amendment.

107. As a direct and proximate result of this violation, Plaintiffs and proposed subclass members suffer and will continue to suffer irreparable injury—the permanent and irremediable destruction of their privacy interest in the most intimate details of their physical and mental health and medical history. This injury is not compensable in damages and entitles them to injunctive and declaratory relief.

108. Plaintiffs and proposed subclass members are therefore entitled to injunctive and declaratory relief barring LPCH from producing their identifying information or PHI in response to the grand jury subpoena.

## COUNT V

### United States Constitution, Amendment V

### Denial of Equal Protection of the Laws

### (By All Plaintiffs and Class Members against DOJ Defendants)

109. Plaintiffs and proposed class members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

110. The Fifth Amendment's Due Process Clause prohibits the federal government from denying any person the equal protection of the laws. The constitutional guarantee of equal protection applies with full force to federal action, including federal investigative process directed at individuals on the basis of protected characteristics.

111. The identifying information and PHI subject to the subpoenas relate specifically and exclusively to Plaintiffs' and proposed class members' receipt of transgender medical care, including hormone therapy, puberty delaying medications, voice modification, mental health treatment, and any other treatments that are "functionally

integral to, preparatory for, or undertaken in furtherance of" medical care undertaken "for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." The subpoenas do not seek Plaintiffs' and class members' health records generally; they target records pertaining specifically to transgender medical care.

112. The subpoenas thus single out Plaintiffs and proposed class members for compelled government disclosure of private medical information because they are transgender and have lawfully exercised their right to obtain medically necessary care that enables them to live consistently with their transgender identity.

113. Government action that subjects individuals to differential treatment because they are transgender, or because they have obtained medical care associated with transgender identity, is sex-based discrimination subject to heightened scrutiny under the equal protection component of the Fifth Amendment.

114. Additionally, government action that subjects individuals to differential treatment because they are transgender, or because they have obtained medical care associated with transgender identity, constitutes discrimination against a quasi-suspect class that is subject to heightened scrutiny independent of the sex-discrimination framework. *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019).

115. The subpoenas are not a facially neutral instruments of general law enforcement applied without regard to the identity of its targets. They are directed specifically at records of transgender medical care received by Plaintiffs and proposed class members. In targeting this specific category of medical treatment—treatment that is received exclusively or primarily by transgender individuals—the subpoenas classify on the basis of transgender status and thus on the basis of sex.

116. The subpoenas were issued as part of an expressly-declared nationwide policy by the Trump Administration to target individuals who have received, provided, or facilitated access to pediatric transgender medical care. On information and belief, the government has not issued comparable subpoenas broadly seeking the private medical records of non-transgender individuals who have received identical or similar medical

treatments—including hormone therapies, surgeries affecting sex characteristics, or mental health treatment.

117. The government's selective targeting of medical records associated with transgender medical care, while not seeking comparable records associated with analogous medical treatment received by non-transgender individuals, constitutes facial, purposeful discrimination on the basis of sex and transgender status in violation of the equal protection component of the Fifth Amendment.

118. Government action that discriminates based on sex or another quasi-suspect basis is subject to heightened scrutiny; in order to survive such scrutiny, it must be substantially related to an important government interest. *United States v. Virginia*, 518 U.S. 515, 533 (1996). To the extent strict scrutiny applies the government's action must be narrowly tailored to serve a compelling government interest. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

119. The subpoenas cannot survive any level of equal protection scrutiny. The government has articulated no legitimate investigative purpose that is served by compelling disclosure of Plaintiffs' and proposed class members' private records that would not be equally served by means do not require wholesale seizure of their most private medical information. Even if there were a legitimate government interest in the subject matter of the underlying investigation, the targeting of Plaintiffs' and class members' identities and PHI relating to their transgender medical care is not substantially related—let alone narrowly tailored—to that interest, because the government has made no showing that these records are necessary or material to any legitimate investigative purpose.

120. The subpoena's targeting of transgender individuals' records reflects and perpetuates the Administration's repeatedly articulated view that transgender medical care is inherently suspect, immoral, or subject to special government scrutiny. It therefore is explicitly premised on constitutionally impermissible animus against transgender individuals. Government action motivated by animus toward a particular group cannot

survive any level of heightened scrutiny. *United States v. Windsor*, 570 U.S. 744, 769-70 (2013); *Romer v. Evans*, 517 U.S. 620, 632 (1996).

121. The targeting of records of transgender medical care also burdens Plaintiffs' and proposed class members' exercise of constitutionally protected liberty interests—including the right to make intimate medical decisions, the right to bodily autonomy recognized in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), and the right to define one's own identity and intimate life recognized in *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Obergefell v. Hodges*, 576 U.S. 644 (2015)—which independently require that any government burden on those interests be narrowly tailored to a compelling interest.

122. The discriminatory purpose and effect of the subpoena is independently established by the pattern of government action of which it is a part. *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252, 266 (1977) (discriminatory purpose may be established by circumstantial and direct evidence including departures from normal procedural sequences, historical background, and legislative or administrative history). The government's broader pattern of targeting transgender individuals and providers, recipients, and facilitators of transgender medical care through law enforcement and investigative process establishes that the targeting of Plaintiffs' and proposed class members' records is not coincidental or neutral but reflects a deliberate policy of subjecting transgender individuals and their healthcare providers to heightened government surveillance and investigation.

123. Plaintiffs and proposed class members will suffer irreparable injury if their California healthcare providers produce the targeted identifying information and PHI. The compelled disclosure to the federal government of records specifically identified as records of transgender medical care—pursuant to discriminatorily motivated subpoenas and without any lawful justification—inflicts harm on Plaintiffs, chills their exercise of their constitutional rights, and permanently destroys Plaintiffs' privacy interest in information that the government has targeted for disclosure precisely because Plaintiffs are

transgender. These injuries are not compensable in damages.

124. Plaintiffs and proposed class members are therefore entitled to injunctive and declaratory relief barring disclosure of their identifying information or PHI in response to the grand jury subpoenas or any substantially similar request from the DOJ Defendants.

**COUNT VI**

**United States Constitution, Amendment V**

**Denial of Equal Protection of the Laws**

**(By LPCH Subclass against LPCH)**

125. Plaintiffs and proposed subclass members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

126. Although LPCH is a private entity, its production of Plaintiffs' and proposed subclass members' information pursuant to the subpoena constitutes action under color of federal law, as set forth in paragraph 87.

127. For the reasons set forth in paragraphs 110-23, LPCH's production of Plaintiffs' and propose subclass members' information pursuant to the subpoena constitutes a violation of their Fifth Amendment rights to equal protection under the laws.

128. Plaintiffs and proposed subclass members will suffer irreparable injury if LPCH produces the targeted identifying information and PHI. The compelled disclosure to the federal government of records specifically identified as records of transgender medical care—pursuant to a discriminatorily motivated subpoena and without any lawful justification—inflicts harm on Plaintiffs, chills their exercise of their constitutional rights, and permanently destroys Plaintiffs' and proposed subclass members' privacy interest in information that the government has targeted for disclosure precisely because they are transgender. These injuries are not compensable in damages.

129. Plaintiffs and proposed subclass members are therefore entitled to injunctive and declaratory relief barring LPCH from producing their identifying information or PHI in response to the grand jury subpoena.

**COUNT VII**

**United States Constitution, Amendment I**

**Violation of the First Amendment Right to Speech**

**(By All Plaintiffs and Class Members against DOJ Defendants)**

130. Plaintiffs and proposed class members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

131. Free and open communications between medical providers, patients, and their families is protected by the First Amendment. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002).

132. A First Amendment violation exists where "an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

133. The issuance of far-reaching subpoenas, like the Grand Jury Subpoenas, can violate the First Amendment, in part through chilling the speech of their targets. *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, (2026).

134. Plaintiffs have standing to enjoin violations of their First Amendment rights as recipients of protected speech, including the protected speech of doctors and other healthcare professionals. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.").

135. The Grand Jury Subpoenas seek information containing, summarizing, or discussing the verbal communications between doctors and healthcare providers with Plaintiffs and members of the proposed class.

136. These communications embody the candor and honesty that the First Amendment seeks to protect in doctor-patient communications and include highly personal and sensitive information.

137. By requiring disclosure of the communications and the identities of the

speakers and listeners, the Grand Jury Subpoena encourage Plaintiffs, members of the proposed class, and their healthcare providers to cease or modify protected First Amendment communications, both at LPCH and at any other healthcare provider, out of fear of disclosure of those communications, their identities, or their viewpoints, to the government.

138. The issuance of the Grand Jury Subpoenas has chilled and silenced the protected communications of Plaintiffs and proposed class members, in their communications with their medical providers, and would do so for an individual of ordinary firmness.

139. Disclosure of their sensitive information in response to the Grand Jury Subpoenas would chill and silence the protected communications of Plaintiffs and proposed class members, in their communications with their medical providers, and would do so for an individual of ordinary firmness.

140. Moreover, the issuance of the Grand Jury Subpoenas, and any disclosures in response to its requests regarding patient information and communications, on information and belief, have chilled and silenced the protected communications of doctors and healthcare providers that speak to Plaintiffs and proposed class members, and would do the same to doctors and healthcare providers of ordinary firmness.

141. In addition, the Grand Jury Subpoenas are viewpoint discriminatory in violation of the First Amendment. The subpoenas' definition of "Sex Rejecting Procedures" includes medical procedures only when they have the "purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." Whether communications fall within the subpoenas' scope thus depends on whether the minor "assert[s]" a "gender identity" that differs from their "biological sex," or a providers' viewpoint on this issue. The subpoenas are clear that an "intervention is considered a Sex-Rejecting Procedure based on its intended purpose." *Id.* Two identical prescriptions can be treated differently under the subpoena based entirely on the patient's and the doctor's viewpoint about potential differences between gender and sex.

Case: 26-4388, 08/07/2026, DktEntry: 13.1, Page 141 of 187

142. These subpoenas are forms of compulsory process include a "threat of legal sanctions" and "prior restraints," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024), seeking to suppress the viewpoints of doctors, providers, and other healthcare professionals that espouse viewpoints on pediatric transgender healthcare that are contrary to the position of DOJ and the Administration.

143. DOJ Defendants have been clear that their intention is "to achieve the suppression," *id.* at 202, of this viewpoint.

144. Because DOJ's actions constitute viewpoint discrimination, strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015). The Grand Jury Subpoenas fail under this exacting standard, as they are not "narrowly tailored to serve compelling state interests." *Id.* at 163. DOJ cannot have a compelling interest in the suppression of viewpoints with which the government disagrees, nor in issuing a subpoena for an improper purpose.

145. Plaintiffs and proposed class members will suffer irreparable injury if the targeted identifying information, PHI, and communications are disclosed. The compelled disclosure to the federal government of records specifically identified as records of transgender medical care—pursuant to a discriminatorily motivated subpoena and without any lawful justification—inflicts harm on Plaintiffs, chills their exercise of their constitutional rights, and permanently destroys Plaintiffs' privacy interest in information that the government has targeted for disclosure precisely because Plaintiffs are transgender. These injuries are not compensable in damages.

146. Plaintiffs and proposed class members are therefore entitled to injunctive and declaratory relief barring DOJ from requesting or receiving their identifying information or PHI in response to the grand jury subpoena.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant LPCH, and grant the following relief:

1. A temporary restraining order, preliminary injunction, and permanent

injunction enjoining Defendants and all persons acting in concert with it or on their behalf, from requesting, obtaining, receiving, producing, transmitting, disclosing, or otherwise making available to the United States, the Department of Justice, the grand jury sitting in the United States District Court for the Northern District of Texas, or any agent or representative of any of these entities, any records, documents, or information responsive, on information and belief, to specifications 12-14 of the grand jury subpoena issued to LPCH or any substantially similar subpoena issued to any California health care provider, or otherwise providing Plaintiffs' identifying information or protected health information to any of these persons or entities;

2. A temporary restraining order, preliminary injunction, and permanent injunction maintaining the status quo with respect to all records and information responsive to the grand jury subpoena issued to LPCH or any substantially similar subpoena issued to any California health care provider that contain Plaintiffs' identifying information or protected health information, including by requiring LPCH to preserve all such records in their current form and to refrain from altering, destroying, or transferring them to any party.

3. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57:

a. Declaring that Plaintiffs and class members have a constitutionally protected right to informational privacy under the Fifth Amendment in the identifying information and protected health information subject to the Grand Jury Subpoenas, and that compelled disclosure of such information to the federal government violates that right;

b. Declaring that Plaintiffs and class members have a reasonable expectation of privacy protected by the Fourth Amendment in the identifying information and protected health information subject to the Grand Jury Subpoenas;

c. Declaring that the Grand Jury Subpoenas, as issued and as applied to

Case: 26-4388, 08/07/2026, DktEntry: 13.1, Page 143 of 187

Plaintiffs' and class members' identifying information and protected health information relating to transgender medical care, constitutes discrimination on the basis of sex and transgender status in violation of the equal protection component of the Fifth Amendment's Due Process Clause and has no lawful justification that survives constitutional scrutiny;

d. Declaring that compelled disclosure of Plaintiffs' and class members' identifying information and protected health information to the federal government in response to the Grand Jury Subpoenas violates their rights under the First Amendment;

e. Declaring that LPCH's production of Plaintiffs' and the LPCH Subclass's records responsive to the grand jury subpoena, under government compulsion, would constitute action under color of federal law fairly attributable to the United States, and would render LPCH a state actor and participant in the constitutional violations alleged herein; and

f. Declaring that any records or information obtained by the United States through enforcement of the Grand Jury Subpoenas, or through any alternative process issued in furtherance of the same discriminatorily motivated investigative program, may not be used in any criminal, civil, or administrative proceeding against Plaintiffs or class members or any third party who provided or participated in their transgender medical care;

4. Award Plaintiffs and class members reasonable attorneys' fees and litigation costs.

/ / /

/ / /

5. Grant such other and further relief as this Court deems just, equitable, and

proper, including any relief necessary to remedy the constitutional violations alleged herein and to prevent their recurrence.

DATED: June 8, 2026

Respectfully submitted,

NATIONAL CENTER FOR LGBTQ RIGHTS
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
ROSEN BIEN GALVAN & GRUNFELD LLP
LOWELL & ASSOCIATES PLLC

By: */s/ Kara J. Janssen*
Kara J. Janssen

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Z.A., et al.,

Plaintiffs,

v.

LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD,

Defendant.

Case No. 26-cv-04998-PCP

**ORDER CONVERTING MOTION FOR TEMPORARY RESTRAINING ORDER INTO MOTION FOR PRELIMINARY INJUNCTION AND DENYING PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 2, 3

Defendant Lucile Salter Packard Children's Hospital at Stanford (LPCH) provides gender-affirming care to many young patients. In May, the Department of Justice issued a grand jury subpoena to LPCH demanding the production of sensitive medical records about those patients. The subpoena is part of a wider campaign to investigate medical centers across the nation in an effort to chill, if not completely halt, their provision of gender-affirming care to minors.

The plaintiffs in this action either received gender-affirming care at LPCH or are the parents of minors who received such care. They claim that the disclosure of the patient records that DOJ demands would violate their or their children's rights under the Fourth and Fifth Amendments. Rather than sue any government official or move to quash the subpoena in the district where it was issued, however, plaintiffs assert their constitutional claims only against LPCH, a private entity. To protect their private health information, plaintiffs now move for a temporary restraining order enjoining LPCH from producing their medical records to DOJ. Given that plaintiffs' motion has been fully briefed and argued by all parties, it is effectively a motion for a preliminary injunction and the Court treats it as such.

There is no doubt that plaintiffs face a serious risk of harm arising from LPCH's disclosure of private health information that, as plaintiffs note, concerns care that "every major medical

United States District Court
Northern District of California

association recognizes as necessary … for transgender minors when medically indicated." And as numerous district court decisions have suggested when considering similar claims, the Constitution may well protect plaintiffs from the unauthorized disclosure of their medical records pursuant to the subpoena issued to LPCH. But such protections are enforceable only against either the government—which is not a party here—or against private actors whose conduct is fairly attributable to the government. Because the sparse record before the Court does not support a finding that DOJ's effort to compel the disclosure of plaintiffs' medical records (or its broader attack on gender-affirming care) is fairly attributable to LPCH, the Court is unable to grant the preliminary relief plaintiffs seek. Their motion is therefore denied.

**BACKGROUND**

This case concerns the latest in a series of DOJ subpoenas seeking medical records from providers of gender-affirming care for minors as part of the federal government's ongoing efforts to halt such care. The relevant facts are largely undisputed.

On January 28, 2025, the President issued an executive order that expressly aimed to "end" gender-transition-related medical care for minors.[1] The executive order stated that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."[2] Three months later, then-Attorney General Pamela Bondi issued a memorandum announcing various measures to combat the rise in youth "transgenderism" and to abate the provision of gender-affirming medical care to transgender minors, which the memorandum described as "radical gender experimentation."[3] As relevant here, the memorandum directed the Department of Justice's Civil Division to investigate "any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in

---

[1] Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (2025).

[2] *Id.*

[3] Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," at 1, 3–6 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.



United States District Court
Northern District of California

United States District Court
Northern District of California

misbranding by making false claims about … puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition,'" or by "promot[ing] … off-label uses of hormones."[4] The memorandum also instructed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation," including the prescription of puberty blockers for a purportedly "illegitimate reason" like "gender dysphoria."[5]

Over the past year, the DOJ has followed that instruction with gusto. On June 11, 2025, the Civil Division issued a memorandum announcing that it would "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's] directives."[6] Soon thereafter, DOJ issued more than 20 administrative subpoenas to medical centers providing gender-affirming care for minors pursuant to 18 U.S.C. § 3486(a)(1)(A)(i)(I), which authorizes subpoenas in aid of investigations of federal healthcare offenses.[7] The subpoenas sought, among other records, documents that would "identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy," as well as documents relating to such patients' "clinical indications" and "diagnoses."[8] On motions from the hospitals or

---

[4] *Id.* at 4.

[5] *Id.* at 4.

[6] Memorandum from Assistant Attorney General Brett A. Shumate, "Civil Division Enforcement Priorities," at 2 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.

[7] *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 570 (E.D. Pa. 2025); *see also In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007, 2026 WL 1392565, at *1 (D.R.I. May 14, 2026); *In re Children's Nat'l Hosp.*, No. 1:25-CV-03780, 2026 WL 160792, at *3 (D. Md. Jan. 21, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063, 2026 WL 33398, at *1 (D. Colo. Jan. 5, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 233 (D. Mass. 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1298 (W.D. Wash. 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041, 2025 WL 3562151, at *2 (W.D. Wash. Sept. 3, 2025); Declaration of David S. Schumacher, Dkt. No. 31-1 ¶ 2.

[8] *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *4 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 571; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *2; *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Admin. Subpoena 25-1431-032*, 2026 WL 1392565, at *1; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1.

United States District Court
Northern District of California

their patients, district courts across the country quashed many of these subpoenas, finding that DOJ had not established a proper investigative purpose.[9] Several courts also determined that disclosure of the sensitive medical records sought by the subpoenas would violate patients' constitutional right to privacy.[10]

LPCH, which operates a gender-affirming care clinic, was one of the medical centers that received such an administrative subpoena.[11] Like the administrative subpoenas issued to other hospitals, the "[s]ubpoena issued to LPCH included requests for records of all minor patients that received [gender-affirming care]" at the hospital.[12] After receiving the subpoena in July 2025, LPCH produced certain non-patient records to DOJ.[13] LPCH did not, however, produce any patient records after receiving the subpoena. Instead, LPCH spent the next nine months negotiating with DOJ over the possibility of "anonymiz[ing] the patient records" and preparing those anonymized records for possible production.[14] Before LPCH disclosed any anonymized patient records, however, the DOJ informed LPCH on May 6, 2026 that it was withdrawing the administrative subpoena.[15]

The next day, DOJ served a grand jury subpoena similar in scope to the withdrawn administrative subpoena on LPCH.[16] Although it demanded records from an entity based in the

---

[9] *See In re Admin. Subpoena 25-1431-032*, 2026 WL 1392565, at *6; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *6–8 (D. Md. Jan. 21, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 236–39; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1302–04; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 575–87; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *9–13 (W.D. Wash. Sept. 3, 2025); *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2025 WL 3724705, at *1–3 (W.D. Pa. Dec. 24, 2025); *see also In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4–5 (recommending the same).

[10] *See In re Admin. Subpoena 25-1431-032*, 2026 WL 1392565, at *8–10; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 588–606.

[11] Schumacher Declaration, Dkt. No. 31-1 ¶ 2.

[12] *Id.*

[13] *Id.* ¶ 3.

[14] *Id.* ¶ 4.

[15] *Id.* ¶ 6.

[16] *Id.*; Subpoena to Lucile Packard Children's Hospital to Testify Before Grand Jury (May 6, 2026) ("Grand Jury Subpoena"), Dkt. No. 31-2, at 2–8.

Northern District of California, the grand jury subpoena was issued under the seal of the Northern District of Texas.[17] The subpoena requests a wide range of documents from LPCH, including records concerning minor patients who received medical care "for the purpose of … affirming [their] asserted gender identity," i.e., gender-affirming care.[18] (The subpoena refers to this care as "Sex-Rejecting Procedures.") Specifically, the grand jury subpoena demands:

> Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures[;] …
>
> [D]ocuments relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers and hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each [such] patient … from initial consultation to the most recent treatment provided[; and]
>
> All documents relating to informed consent, patient intake, and parent or guardian authorization for [such] minor patients….[19]

The return date on the subpoena is June 10, 2026.[20]

Following service of the grand jury subpoena, counsel for LPCH "met and conferred with … DOJ," and DOJ "indicated that it expected substantial compliance … by [the return date]."[21] DOJ also "indicated that … it would accept anonymized patient records in the first instance" but "reserved the right to request unmasked patient records," subject to challenge in court by LPCH.[22] Based on those representations, LPCH "has been negotiating … to undertake detailed redactions of the patient records commanded by the [g]rand [j]ury [s]ubpoena."[23]

LPCH is not the only hospital outside Texas that DOJ has targeted from within that state. In April, DOJ sought (and received) an order from a court in the Northern District of Texas

[17] Schumacher Declaration, Dkt. No. 31-1 ¶ 6; *see also* Grand Jury Subpoena, Dkt. No. 31-2, at 2.

[18] Grand Jury Subpoena, Dkt. No. 31-2, at 6–8.

[19] *Id.* at 7–8.

[20] *Id.* at 2; Schumacher Declaration, Dkt. No. 31-1 ¶ 6.

[21] Schumacher Declaration, Dkt. No. 31-1 ¶ 7.

[22] *Id.* ¶ 8.

[23] *Id.*

United States District Court
Northern District of California

compelling Rhode Island Hospital to disclose the patient records of transgender minors in response to an administrative subpoena.[24] And on the same day DOJ issued the grand jury subpoena at issue in this case, it issued a nearly identical subpoena to NYU Langone Hospitals in New York.[25]

Hoping to challenge the disclosure of their medical records in the district where both they and the records reside, plaintiffs filed suit against LPCH in this Court on May 27, 2026. Their complaint alleges that the grand jury subpoena is "part of [a] campaign to end pediatric … care" that "every major medical association recognizes as necessary care for transgender minors when medically indicated." According to the complaint, DOJ is attempting to "sidestep" the many district-court orders "condemn[ing] the[] … administrative subpoenas demanding patient identities … by opening a criminal investigation." Plaintiffs claim that LPCH's compliance with the subpoena and release of their private health information would violate their right to informational privacy under the Fifth Amendment, constitute an unreasonable search and seizure under the Fourth Amendment, and deny them the equal protection of the law. The complaint names only LPCH, not any government entity or official, as a defendant.

Counsel for LPCH has attested that, after plaintiffs filed their complaint, he "updated the DOJ regarding the lawsuit."[26] In response, DOJ stated that if LPCH failed to produce anonymized records by the return date on the grand jury subpoena due to an injunction from this Court, it would "move to compel full compliance with the subpoena in the Northern District of Texas, to include patient-identifying information."[27]

Concurrent with their complaint, plaintiffs filed a motion for a temporary restraining order

---

[24] *See In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026), Dkt. No. 2.

[25] *See* Subpoena to NYU Langone Hospitals to Testify Before Grand Jury (May 6, 2026), Dkt. No. 1, at 25–36.

[26] Schumacher Declaration, Dkt. No. 31-1 ¶ 9.

[27] *Id.* As the Texas judge presiding over matters relating to DOJ's subpoenas has explained, DOJ is "a frequent forum shopper." THE FEDERALIST SOCIETY, *Opening Remarks from Judge Reed O'Connor [2024 TX Chapters Conference]*, at 7:46–7:53 (YouTube, Oct. 22, 2024), https://www.youtube.com/watch?v=HMTt9pxWBhA [https://perma.cc/GR7A-H6N8].

(TRO) asking the Court to enjoin LPCH from producing their identifying information and medical records to DOJ. LPCH received notice of that motion, which has since been fully briefed. The Court heard argument from all parties on June 5, 2026.

**LEGAL STANDARDS**

The standard for issuing a temporary restraining order is largely identical to the standard for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Plaintiffs seeking either form of relief must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a [temporary restraining order or] preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

Although the substantive standards for both motions are similar, the timeframe for a temporary restraining order is different. While a preliminary injunction remains in effect pending final resolution of the litigation, "a TRO 'should be restricted to ... preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)). The procedural requirements also differ. While a "court may issue a preliminary injunction only on notice to the adverse party," a court "may issue a temporary restraining order without written or oral notice to the adverse party" if the movant satisfies certain requirements. *See* Fed. R. Civ. P. 65(a)(1), (b)(1). "Ordinarily, temporary restraining orders, in contrast to preliminary injunctions, are not appealable." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002).

Although plaintiffs originally moved for a temporary restraining order, LPCH received



United States District Court
Northern District of California

notice and an opportunity to respond to the motion, both in writing and orally at the hearing. "[G]iven the nature of the relief [denied] by this [o]rder and so as to appropriately permit [plaintiffs] the ability to appeal should they choose to do so, the Court converts" plaintiffs' motion to one for a preliminary injunction. *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1090 (E.D. Cal. 2025).

## ANALYSIS

### I. The Court grants plaintiffs' unopposed motion to proceed pseudonymously.

Plaintiffs have moved to proceed in this action via pseudonym. "In this circuit, [courts] allow parties to use pseudonyms in the unusual case when nondisclosure of the party's identity is necessary to protect a person from harassment, injury, ridicule or personal embarrassment." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000) (citation modified). "Because there is a presumption that parties' identities are public information, anonymity is only proper under 'special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity.'" *Doe v. UNUM Life Ins. Co. of Am.*, 164 F. Supp. 3d 1140, 1144 (N.D. Cal. 2016) (quoting *Advanced Textile*, 214 F.3d at 1068).

This case involves such special circumstances. Plaintiff F.F. requests to proceed under a pseudonym because she is transgender. Plaintiffs A.A., B.B., C.C., D.D., and E.E. wish to proceed under pseudonyms because they are the parents of transgender children, and because "their identities track their children's identities, … their children's identities can be readily surmised." *Int'l Partners for Ethical Care Inc. v. Inslee*, No. 3:23-CV-05736, 2023 WL 7017765, at *1 (W.D. Wash. Oct. 25, 2023). Plaintiffs fear that the public disclosure of their identities will result in discrimination and harassment based on their or their children's transgender status and receipt of gender-affirming medical care. Courts in this circuit have frequently found that individuals reasonably feared harm from the disclosure of their transgender identity, *see, e.g.*, *Doe v. Progressive Cas. Ins. Co.*, No. 21-CV-02602, 2023 WL 5960772, at *1 (N.D. Cal. Aug. 21, 2023); *Karnoski v. Trump*, No. C17-01297, 2017 WL 11431253, at *1 (W.D. Wash. Oct. 10, 2017), particularly in cases involving transgender minors, *see, e.g.*, *Int'l Partners for Ethical Care*, 2023 WL 7017765, at *1; *D.T. v. Christ*, 552 F. Supp. 3d 888, 892 n.5 (D. Ariz. 2021). Because an

Case: 26-4388, 08/07/2026, DktEntry: 13.1, Page 153 of 187

individual's gender identity and medical history are "matter[s] of sensitive and highly personal nature," *Advanced Textile Corp.*, 214 F.3d at 1068 (citation omitted), and because plaintiffs reasonably fear discrimination or harassment if those matters are publicly disclosed, the Court concludes that they have established a strong need for anonymity.

LPCH does not oppose the motion, so no "prejudice to the opposing party" outweighs that need for anonymity. *Id.* Nor does "the public's interest in knowing [plaintiffs'] identit[ies]." *Id.* Allowing plaintiffs to proceed via pseudonym in this action will not "obstruct public scrutiny of the important issues," i.e., whether LPCH is a government actor whose disclosure of plaintiffs' and their children's medical records to DOJ would violate the Constitution. *Id.* at 1072. Further, the public has an interest in allowing claims to proceed to resolution on the merits without chilling effects. *See Doe v. Valley Ctr.-Pauma Unified Sch. Dist.*, No. 3:25-CV-03686, 2026 WL 622689, at *2 (S.D. Cal. Mar. 5, 2026). Plaintiffs' reasonable fears of discrimination and harassment may "chill [their] willingness to challenge … violations of their rights," so "permitting plaintiffs to use pseudonyms will serve the public's interest in this lawsuit by enabling it to go forward." *Advanced Textile Corp.*, 214 F.3d at 1073.

Accordingly, plaintiffs' motion to proceed pseudonymously is granted.

## II. The Court denies plaintiffs' motion for preliminary relief.

As noted above, a plaintiff seeking preliminary relief must satisfy each of the four *Winter* factors. Here, however, the Court need only consider "the most important … factor": plaintiffs' likelihood of success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Because plaintiffs have not demonstrated a likelihood of success or raised "serious questions going to the merits," the Court "need not consider the other factors." *Id.* (citation modified).

The dispositive issue is not the "what"—that is, the existence of potential constitutional violations—but the "who." "The Constitution's protections … apply in general only to action by the government." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). As plaintiffs acknowledge, LPCH is a private nonprofit corporation, not a government entity. That fact alone "does not quite end [the] inquiry because, in certain 'exceptional cases,' a private party 'will be



United States District Court
Northern District of California

treated as a [government] actor for constitutional purposes.'" *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 754 (9th Cir. 2024) (quoting *O'Handley v. Weber*, 62 F.4th 1145, 1155–56 (9th Cir. 2023)), *cert. denied*, 145 S. Ct. 2846 (2025). But the scant record before the Court does not create a serious question as to whether LPCH should be treated as such.

A private party may be considered a government actor only if it "meet[s] two distinct requirements[.]" *Id.* First, the party's alleged deprivation of plaintiffs' constitutional rights "must result from the exercise of some right or privilege created by the [government] or a rule of conduct imposed by the [government] or by a person for whom the [government] is responsible." *Id.* (citation modified). This "governmental policy" requirement is easily satisfied here. All parties agree that LPCH's challenged conduct is the result of a government-imposed mandate: DOJ's grand jury subpoena.

Second, the private party "must fairly be said to be a [government] actor, which requires that it meet one of four tests: (1) the private actor performs a traditionally public function; (2) the private actor is a willful participant in joint activity with the government; (3) the government compels or encourages the private actor to take a particular action; or (4) there is a sufficiently close nexus between the government and the challenged action." *Id.* (citation modified).

Plaintiffs rely on the coercion test.[28] Under that test, "the government must have 'exercised coercive power or provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government].'" *Id.* at 759 (citation modified) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). But not all uses of government authority to compel a private party's action convert the party into a government actor. As the Ninth Circuit held in *Sutton v. Providence St. Joseph Medical Center*, "the mere fact that the government compel[s] a result does not suggest that the government's action is 'fairly attributable' to the private defendant." 192 F.3d 826, 838 (9th Cir. 1999). Were it otherwise, a private corporation

---

[28] Plaintiffs style their motion as relying on both the coercion *and* nexus tests because the Ninth Circuit has sometimes described the nexus test as encompassing the coercion test. *See O'Handley*, 62 F.4th at 1157 (reciting the standard quoted above as a "second version" of the nexus test, rather than as a separate coercion test). The label does not matter. By whatever name, the substance of the test plaintiffs invoke concerns DOJ's exercise of coercive power.

would be treated as a government actor "every time it complies with a presumptively valid, generally applicable law." *Id.* For that reason, the Ninth Circuit has distinguished "governmental compulsion in the form of a generally applicable law" or other "generally applicable requirement[s]" from compulsion involving "particularized" threats "directed [at] a specific entity" to compel "a specific (allegedly unconstitutional) action against a specific person." *Id.* at 841, 843 (quoting *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1295 (9th Cir. 1987)). The former is not "sufficient to deem a truly private entity a governmental actor" without "something more." *Id.* at 840, 843. Evidence of the latter form of compulsion, however, may sometimes suffice to convert a private defendant into a government actor. *See id.* at 843.

Cases involving coercion of the second category are, at least in this circuit, rare. Plaintiffs cite only one published opinion in which the Ninth Circuit has held that coercive threats alone were sufficient to make a private defendant a state actor for constitutional purposes. *See Carlin*, 827 F.2d at 1295. In *Carlin*, the Ninth Circuit held that the coercion test was satisfied "when a deputy county attorney threatened to prosecute a regional telephone company if it continued to carry a third party's dial-a-message service." *O'Handley*, 62 F.4th at 1158 (characterizing *Carlin*). Even then, the Ninth Circuit ultimately denied relief based on the telephone company's insistence that its later policy change to exclude the message service represented the company's "independent business judgment." *Id.* at 1297. On that basis, the Ninth Circuit vacated the district court's injunction against the private-defendant telephone company. *Id.* When asked at the hearing, plaintiffs could not identify any in-circuit authority affirming injunctive relief solely against a private defendant alleged to be a government actor based on threats or coercion alone. That is likely because "[t]he compulsion analysis originated in cases in which the government itself, not a private entity, was the defendant." *Sutton*, 192 F.3d at 836. Thus, while "*the government* cannot escape liability when it compels a result," *id.* at 838, "there is reason to doubt that a purely private actor …, which was the *victim* of the alleged coercion, would be the appropriate defendant" in most constitutional cases, *Children's Health Defense*, 112 F.4th at 759.

Plaintiffs nevertheless argue that this case involves "particularized" threats "directed [at] a specific entity" to compel "a specific (allegedly unconstitutional) action against a specific person"

that render LPCH a government actor. *Sutton*, 192 F.3d at 841, 843. They argue that DOJ's issuance of the grand jury subpoena, its subsequent statement that it would move to enforce the subpoena in Texas absent the production of anonymized records by the return date, and its broader efforts to investigate providers of gender-affirming care constitute such threats. The Court disagrees that this conduct creates a serious question as to LPCH's status as a government actor.

As an initial matter, the issuance of a subpoena is a "generally applicable" form of compulsion. While a subpoena is necessarily directed to a particular recipient, the coercive force at work is the general requirement that a recipient must comply with a subpoena absent quashal. Other courts to have considered the issue have reached the same conclusion. In *Abordo v. Mobi PCS*, for example, a plaintiff asserted claims against a private mobile-communications company and its employees under 42 U.S.C. § 1983, which requires a showing of government action, for allegedly disclosing his privileged communications to state authorities in response to several subpoenas. No. 15-CV-00279, 2016 WL 777921, at *2 (D. Haw. Feb. 25, 2016). The district court concluded that the plaintiff's complaint "fail[ed] to allege *any* material facts showing that [d]efendants, in responding to the [State]'s subpoenas, … acted under color of state law." *Id.* at *5 (emphasis added). In other words, the bare fact that the State had issued subpoenas to the private defendants did not constitute coercion sufficient to render the defendants' responsive productions government action. On appeal, a panel of the Ninth Circuit affirmed, similarly reasoning that the plaintiff "failed to raise a genuine dispute of material fact as to whether any defendant was acting under color of state law in responding to subpoenas issued by the State…." *Abordo v. Mobi PCS*, 684 F. App'x 631, 632 (9th Cir. 2017). While not binding, the Court finds these decisions persuasive. And even plaintiffs concede in their motion that "not … *every* recipient of a grand jury subpoena becomes a [government] actor" simply by virtue of complying with the subpoena. Accordingly, all parties agree that the coercive effect of the grand jury subpoena, standing alone, is insufficient to render LPCH a government actor here.[29]

---

[29] The appendage of a notice listing the generally applicable federal statutes that DOJ believes might compel compliance with its criminal investigatory efforts does not, in the Court's view, change the analysis.

For similar reasons, DOJ's statement that it intends to move to compel full compliance with the subpoena if LPCH does not produce records by the return date—e.g., if this Court enjoins such production—also does not create a serious question as to plaintiffs' satisfaction of the coercion test. Moving to compel compliance with a subpoena is an ordinary step when a recipient does not disclose the requested records by the return date. If a subpoena cannot transform a private party into a government actor, neither can the government's pursuit of the available means of enforcing the subpoena.

Finally, plaintiffs point to DOJ's broader efforts to criminally investigate and prosecute providers of gender-affirming care. To be sure, DOJ has threatened providers of gender-affirming care with criminal investigations.[30] And the Ninth Circuit held in *Carlin* that a private defendant operates as a government actor where it takes the specific (and allegedly unconstitutional) action directed by the government in response to an express threat of prosecution. *See* 827 F.2d at 1295; *Sutton*, 192 F.3d at 843. But there is a disjunct here between DOJ's threats against hospitals and the specific action plaintiffs challenge as unconstitutional. The evidence plaintiffs have submitted demonstrates that DOJ's specific statements threatening criminal investigations and prosecutions are attached to demands for providers to stop offering gender-affirming care for minors, not to DOJ's demands for the disclosure of patient records.[31] Of course, those background threats have an indirect coercive effect on LPCH's response to DOJ's subpoenas—the Court is not blind to that reality, nor does it countenance indirect coercion. DOJ's extreme hostility to providers of gender-affirming care is not, however, a sufficient basis to make *LPCH* a government actor without evidence of a more direct tie between DOJ's threats of prosecution and LPCH's disclosure of patient records.

The limited record before the Court establishes DOJ's direct coercion of LPCH's

---

[30] *See, e.g.*, Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," at 3–6 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[31] *See, e.g.*, "Justice Department Secures Landmark Resolution to End Pediatric 'Gender-Affirming Care' and Create Detransition Clinic," Department of Justice (May 15, 2026), https://perma.cc/52UQ-RRWS (threatening to "use every weapon at [DOJ's] disposal to end the destructive and discredited practice of so-called 'gender-affirming care' for children").

production of patient records only through generally applicable means. As a result, "something more" is needed to establish that LPCH might be a government actor. In *Sutton*, the Ninth Circuit noted that "more" will "[t]ypically … consist[] of some willful participation in a joint activity by the private entity and the government." 192 F.3d at 843.

That is what plaintiffs claim occurred here. In essence, plaintiffs argue that LPCH has willfully participated in DOJ's allegedly unconstitutional activity by failing to fight the grand jury subpoena with sufficient vigor. They lament that LPCH has never moved to quash either of DOJ's subpoenas despite the success of other medical providers in doing so and LPCH's acknowledgement of potentially meritorious grounds in its briefing to this Court. They castigate LPCH for instead choosing to negotiate with DOJ to limit the scope of its production to anonymized records. But they cite no authority suggesting that a private defendant's less-than-total opposition to government overreach provides the "something more" that *Sutton* requires. *Sutton* itself does not stand for that proposition. There, summarizing prior Supreme Court opinions, the Ninth Circuit provided examples of joint activity supplying "something more" that included a defendant's initiation of a state attachment proceeding, a request for state authorities' help in enforcing a defendant's own discriminatory by-laws, and a defendant's conspiracy with local authorities to discriminatorily deny a plaintiff service or to cause her arrest. *See* 192 F.3d at 839–41. All of these examples involve affirmative conduct by private defendants that actively sought to enable the government's unconstitutional ends.

Here, by contrast, the record does not show that LPCH acted in concert with DOJ to abet its alleged constitutional violations. There is no evidence, for example, that LPCH conspired with DOJ to procure withdrawal of the administrative subpoena and issuance of a grand jury subpoena from the Northern District of Texas in order to prevent plaintiffs from moving to quash in their home district. Nor did LPCH simply roll over in the face of DOJ's demands. Rather than "willful[ly] participat[e]" in DOJ's efforts to procure plaintiffs' private medical records, *id.* at 843, the sparse record before the Court suggests that LPCH made a strategic choice to pursue more limited forms of opposition (i.e., negotiating to limit its disclosure to anonymized records) in lieu of providing the kind of full-throated resistance engaged in by other medical providers (e.g.,

moving to quash the subpoenas in full). Were that enough to render LPCH a government actor, every recipient of a grand jury subpoena for third-party information would be forced to file a motion to quash or risk being sued for constitutional violations. That cannot be the law. *See Sconiers v. Cal. Dep't of Soc. Servs.*, No. 07-CV-00972, 2008 WL 4196599, at *4 (E.D. Cal. Sept. 11, 2008) (concluding that defendants' "voluntary" disclosure of plaintiff's medical information to a district attorney constituted state action but suggesting that the result would differ if defendants "were presented with a subpoena … to produce [the] records, and obliged").

"It is ... a truism by now that there is no rigid formula for measuring [government] action for purposes of [constitutional] liability. Rather, it is a process of 'sifting facts and weighing circumstances' which must lead [the Court] to a correct determination." *Ouzts v. Maryland Nat'l Ins. Co.,* 505 F.2d 547, 550 (9th Cir. 1974) (quoting *Reitman v. Mulkey*, 387 U.S. 369, 378 (1967)). "At bottom," the Court must "evaluate whether the nature of the relationship between [LPCH] and the government is such that the alleged infringement of federal rights is fairly attributable to the government." *Children's Health Def.*, 112 F.4th at 754 (citation modified). The record as a whole, at least at this early stage, suggests that it is not. For almost a year, LPCH has refrained from producing the patient records DOJ demands and continues to resist disclosing non-anonymized records. It certainly could have taken—or could now take—more robust actions to vindicate the patient privacy rights it purports to value. But however inadvisable, LPCH's choice not to do so is LPCH's alone, not the government's.

The Court does not doubt the strength of plaintiffs' constitutional interest in the preservation of their privacy or the gravity of harm that might result from the unauthorized disclosure of their medical information (or their inability to access medically indicated care going forward). On the record before the Court, however, plaintiffs have not raised serious questions going to the merits of their argument that LPCH is a government actor. Because all of their claims depend on such a finding, they cannot satisfy the threshold *Winter* factor, precluding preliminary injunctive relief.[32]

---

[32] The Court need not address LPCH's arguments that enjoining disclosures in response to a grand jury subpoena issued from the Northern District of Texas would raise comity concerns. The Court

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court grants plaintiffs' motion to proceed via pseudonym (Dkt. No. 2) and denies their motion for preliminary relief (Dkt. No. 3). The denial is without prejudice to the filing of a renewed motion for a preliminary injunction in the event of materially changed facts or further development of the record.

**IT IS SO ORDERED.**

Dated: June 6, 2026

P. Casey Pitts
United States District Judge

---

notes, however, that there is some authority suggesting that a plaintiff may challenge a grand jury subpoena in the plaintiff's home district instead of moving to quash the subpoena in the district where it was issued (although that case involved a threatened subpoena rather than an already-issued one). *See New York Times Co. v. Gonzales*, 459 F.3d 160, 166–67 (2d Cir. 2006) (holding that a plaintiff's ability to move to quash a federal grand jury subpoena in the issuing district "does not preclude *per se* a declaratory judgment" action against DOJ in another district); *but see IO Grp. v. J.W.*, No. 10-cv-05821, 2011 WL 237673, at *1 (N.D. Cal. Jan. 24, 2011) ("[O]nly the issuing court has the power to act on its subpoenas." (quoting *In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998)).

Case: 26-4398, 08/07/2026, DktEntry: 13.1, (161 of 187)

BRETT A. SHUMATE
ASSISTANT ATTORNEY GENERAL
JORDAN CAMPBELL
DEPUTY ASSISTANT ATTORNEY GENERAL
SARAH WELCH
SENIOR COUNSEL TO THE ASSISTANT ATTORNEY GENERAL
JOHN BAILEY
BRANTLEY MAYERS
COUNSEL TO THE ASSISTANT ATTORNEY GENERAL
LISA K. HSIAO
ACTING DIRECTOR

LUKE MILLER
EUGENE O'HALLORAN
SHIMENG ZHANG
Trial Attorneys

U.S. Department of Justice
Civil Division
950 Constitution Ave. NW
Washington, D.C. 20005
Telephone: (202) 514-3180
E-mail: Sarah.E.Welch@usdoj.gov

Attorneys for Federal Defendants

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

Z.A., a minor, by and through their parent, A.A., et al.

Plaintiffs,

v.

TODD BLANCHE, et al.,

Defendants,

Case No. 5:26-cv-04998-PCP

**DEFENDANTS' NOTICE OF APPEAL**

HON. P. CASEY PITTS
UNITED STATES DISTRICT JUDGE

**PLEASE TAKE NOTICE** that Todd Blanche and the Department of Justice hereby appeal to the United States Court of Appeals for the Ninth Circuit from the district court's order granting the motion for preliminary injunction, Dkt. 93.

RESPECTFULLY SUBMITTED, this 9th day of July, 2026.

BRETT A. SHUMATE
Assistant Attorney General

Case: 26-4398, 08/07/2026, DktEntry: 13.1, Page 162 of 187

JORDAN CAMPBELL
Deputy Assistant Attorney General

*/s/ Sarah Welch*_____
SARAH WELCH
Senior Counsel to the Assistant Attorney General
950 Pennsylvania Ave. NW Washington, DC 20530
202-514-3180
sarah.e.welch@usdoj.gov

JOHN BAILEY
BRANTLEY MAYERS
Counsel to the Assistant Attorney General

LISA K. HSIAO
Acting Director

LUKE MILLER
EUGENE O'HALLORAN
SHIMENG ZHANG
Trial Attorneys

U.S. Department of Justice
Civil Division

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I certify that, on July 9, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Northern District of California on the following:

SHANNON P. MINTER
CHRISTOPHER F. STOLL
AMY WHELAN
RACHEL BERG
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
Email:
sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD
KARA J. JANSSEN
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:
ggrunfeld@rbgg.com
kjanssen@rbgg.com

Jordan Richea Clark Kearney
Hooper, Lundy & Bookman, P.C.
44 Montgomery Street
Suite 3500
San Francisco, CA 94104
415-875-8497
Email: jkearney@hooperlundy.com

CALEB HAYES-DEATS
ABBE DAVID LOWELL
SCHUYLER STANDLEY
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
CHayes-Deats@lowellandassociates.com
ALowellpublicoutreach@lowellandassociates.com
SStandley@lowellandassociates.com

JOSHUA ROVENGER
DONOVAN BENDANA
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
Email:
jrovenger@gladlaw.org
dbendana@gladlaw.org

Alicia Warren Macklin
Hooper, Lundy & Bookman, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067
310-551-8161
Email: amacklin@hooperlundy.com

David S. Schumacher
Hooper, Lundy & Bookman, P.C.
470 Atlantic Avenue
Suite 1201
Boston, MA 02210
617-532-2704

Case: 26-4398, 08/07/2026, DktEntry: 13.1, Page 164 of 187

Katrina Angela Pagonis
Hooper Lundy & Bookman
44 Montgomery Street
Suite 3500
San Francisco, CA 94104
415-875-8515
Fax: 415-986-2157
Email: kpagonis@hooperlundy.com

Fax: 618-345-3927
Email: dschumacher@hooperlundy.com

Dated this 9th day of July, 2026.

*/s/ Sarah Welch*
Sarah Welch

ADRMOP,APPEAL,REFDIS

# U.S. District Court
# California Northern District (San Jose)
# CIVIL DOCKET FOR CASE #: 5:26-cv-04998-PCP

Z.A. et al v. Lucile Salter Packard Children's Hospital at Stanford
Assigned to: Judge P. Casey Pitts
Referred to: Magistrate Judge Nathanael M. Cousins
Case in other court: Ninth Circuit, 26-04388
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/27/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Z.A.**
*a minor, by and through their parent, A.A.*

represented by

**Amy Whelan**
National Center for Lesbian Rights
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-365-1338
Email: awhelan@nclrights.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
National Center for Lesbian Rights
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-365-1320
Email: cstoll@nclrights.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
Rosen Bien Galvan & Grunfeld, LLP
101 Mission St., Sixth Floor
San Francisco, CA 94105
415-433-6830
Fax: 415-433-7104
Email: ggrunfeld@rbgg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
National Center for Lesbian Rights
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-365-1310

Email: sminter@nclrights.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abbe David Lowell**
Lowell & Associates, PLLC
1250 H St NW
Suite 250
Washington, DC 20005
202-508-4450
Fax: 202-964-6116
Email:
alowellpublicoutreach@lowellandassociates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
Lowell & Associates, PLLC
1250 H Street NW
Suite 250
Washington, DC 20005
202-964-6110
Fax: 202-964-6116
Email: chayes-deats@lowellandassociates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
18 Tremont Street
Boston, MA 02108
504-343-5070
Email: dbendana@gladlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
GLBTQ Legal Advocates & Defenders
18 Tremont St Ste 950
Boston, MA 02108
617-426-1350
Email: jrovenger@gladlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
National Center For Lgbtq Rights
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-343-7679
Fax: 415-392-8442
Email: rberg@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Schuyler Standley**
Lowell & Associates, PLLC
1250 H Street NW
Suite 250
Washington, DC 20005
202-964-6110
Email: sstandley@lowellandassociates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
Rosen Bien Galvan & Grunfeld
101 Mission Street
Sixth Floor
San Francisco, CA 94105-1738
United Sta
(415) 433-6830
Fax: (415) 433-7104
Email: KJanssen@rbgg.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Z.B.**
*a minor, by and through their parent, B.B.*

represented by

**Amy Whelan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Z.C.**
*a minor, by and through their parent, C.C.*

represented by

**Amy Whelan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Z.D.**
*a minor, by and through their parent, D.D.*

represented by **Amy Whelan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Z.E.**
*a minor, by and through their parent, E.E.*

represented by **Amy Whelan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**F.F.** represented by **Amy Whelan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Minter**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donovan Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua David Rovenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel H. Berg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Z.G.**
*a minor, by and through their parents, G.G. and A.G.*

represented by **Caleb M Hayes-Deats**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Francis Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gay Crosthwait Grunfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lucile Salter Packard Children's Hospital at Stanford**
*a California nonprofit public benefit corporation*

represented by **Alicia Warren Macklin**
Hooper, Lundy & Bookman, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067
310-551-8161
Email: amacklin@hooperlundy.com

*ATTORNEY TO BE NOTICED*

**David S. Schumacher**
Hooper, Lundy & Bookman, P.C.
470 Atlantic Avenue
Suite 1201
Boston, MA 02210
617-532-2704
Fax: 618-345-3927
Email: dschumacher@hooperlundy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan Richea Clark Kearney**
Hooper, Lundy & Bookman, P.C.
44 Montgomery Street
Suite 3500
San Francisco, CA 94104
415-875-8497
Email: jkearney@hooperlundy.com
*ATTORNEY TO BE NOTICED*

**Katrina Angela Pagonis**
Hooper Lundy & Bookman
44 Montgomery Street
Suite 3500
San Francisco, CA 94104
415-875-8515
Fax: 415-986-2157
Email: kpagonis@hooperlundy.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Acting Attorney Gene Todd Blanche** represented by **John Bailey**
DOJ-Civ
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave NW
Ste 3618
Washington, DC 20530
202-514-6993
Email: john.bailey@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eugene O'Halloran**
DOJ-Civ
Enforcement and Affirmative
450 5th Street NW
Washington DC, DC 20001
202-598-7976
Email: eugene.o'halloran2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sarah Welch**

DOJ-Civ
Civil Division
950 Pennsylvania Ave.
Ste 3612
Washington, DC 22202
202-514-3180
Email: sarah.e.welch@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Scott B Dahlquist**
DOJ-Civ
Enforcement & Affirmative Litigation Branch
450 5th St NW
Washington, DC 20001
202-598-3915
Email: scott.b.dahlquist@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Steven R Scott**
DOJ-Crm
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
202-286-5293
Email: steven.r.scott@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Justice** represented by **John Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eugene O'Halloran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott B Dahlquist**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven R Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of California**
*State of California* represented by **Crystal M. Adams**
Office of The Attorney General
1515 Clay St., 20th Floor
Oakland, CA 94612
510-879-3098

Email: crystal.adams@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Academy of Pediatrics** represented by **Michael Ceja Martinez**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-894-6582
Email: mmartinez@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alethea Anne Swift**
Democracy Forward Foundation
1445 New York Ave. NW
Washington, DC 20005
202-899-9065
Fax: 202-701-1775
Email: aswift@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joel L McElvain**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-935-1082
Email: jmcelvain@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**
Democracy Forward
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: pmoraga@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/27/2026 | 1 | COMPLAINT against Lucile Salter Packard Children's Hospital at Stanford ( Filing fee $ 405, receipt number ACANDC-22029832.). Filed by F.F., Z.D., Z.A., Z.C., Z.B., Z.E.. (Janssen, Kara) (Filed on 5/27/2026) (Entered: 05/27/2026) |
| 05/27/2026 | 2 | ADMINISTRATIVE MOTION To Proceed Via Pseudonym *Plaintiffs' Application to Proceed Via Pseudonym* filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. Responses due by 6/1/2026. (Attachments: # 1 Proposed Order Stipulation and [Proposed] Order)(Janssen, Kara) (Filed on 5/27/2026) (Entered: 05/27/2026) |
| 05/27/2026 | 3 | MOTION for Temporary Restraining Order filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Attachments: # 1 Complaint, # 2 Motion and Memorandum of Points and Authorities, # |

| | | |
|---|---|---|
| | | 3 Declaration of Kara Janssen, # 4 Declaration of A.A., # 5 Declaration of B.B., # 6 Declaration of C.C., # 7 Declaration of D.D., # 8 Declaration of E.E., # 9 Declaration of F.F., # 10 Proposed Order re Temporary Restraining Order & Order to Show Cause, # 11 Proposed Order to Show Cause)(Janssen, Kara) (Filed on 5/27/2026) (Entered: 05/27/2026) |
| 05/28/2026 | 4 | Case assigned to Magistrate Judge Virginia K. DeMarchi.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 6/11/2026. (mbc, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 5 | NOTICE of Appearance filed by Jordan Richea Clark Kearney on behalf of Lucile Salter Packard Children's Hospital at Stanford (Kearney, Jordan) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 6 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22032288.) filed by Lucile Salter Packard Children's Hospital at Stanford. (Schumacher, David) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 7 | NOTICE of Appearance filed by Alicia Warren Macklin on behalf of Lucile Salter Packard Children's Hospital at Stanford (Macklin, Alicia) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 8 | **ORDER Granting 6 Application for Admission of Attorney Pro Hac Vice for David Schumacher. Signed by Magistrate Judge Virginia K. DeMarchi on 5/28/2026. (smc, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026)** |
| 05/28/2026 | 9 | NOTICE of Appearance filed by Christopher Francis Stoll on behalf of F.F., Z.A., Z.B., Z.C., Z.D., Z.E. (Stoll, Christopher) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 10 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by F.F., Z.A., Z.B., Z.C., Z.D., Z.E... (Stoll, Christopher) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 11 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 8/22/2026. Initial Case Management Conference set for 9/1/2026 01:30 PM in San Jose, - Videoconference Only. (anj, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026)** |
| 05/28/2026 | 12 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. |

| | | |
|---|---|---|
| | | *This is a text only docket entry; there is no document associated with this notice.* (smc, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 13 | **ORDER REASSIGNING CASE**<br><br>IT IS ORDERED that this case is reassigned using a proportionate, random and blind system pursuant to General Order No. 44 to Judge P. Casey Pitts. Magistrate Judge Virginia K. DeMarchi no longer assigned to the case.<br><br>Counsel are instructed that all future filings shall bear the updated judicial initials immediately after the case number. Counsel are reminded to verify the location of the judge on the court website. All hearing and trial dates presently scheduled are vacated. However, existing briefing schedules for motions remain unchanged. Motions must be renoticed for hearing before the judge to whom the case has been reassigned, but the renoticing of the hearing does not affect the prior briefing schedule. Other deadlines such as those for ADR compliance and discovery cutoff also remain unchanged.<br><br>Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and cand.uscourts.gov/cameras.<br><br>Mark B. Busby<br>Clerk, United States District Court<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br><br>(smc, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | | CASE REFERRED to Magistrate Judge Nathanael M. Cousins for Discovery. (smc, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 14 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22033851.) filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Berg, Rachel) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 15 | **TEXT-ONLY ORDER.**<br><br>**The parties are ordered to appear for a remote status conference at 12:00pm on May 29, 2026 using the Zoom link on the Court's public website. By no later than 10:00am on May 29, 2026, the parties shall file a joint statement proposing a schedule for briefing and hearing plaintiffs' 3 motion for a temporary restraining order.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026)** |
| 05/28/2026 | 16 | **CLERK'S NOTICE SETTING ZOOM HEARING AND REQUIRING REGISTRATION.** Status Conference set for 5/29/2026 at 12:00 PM before Judge P. Casey Pitts. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/pcp<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at pcpcrd@cand.uscourts.gov no later than 5/29/2026 at 10:00AM PDT. |

| | | |
|---|---|---|
| | | **Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://cand.uscourts.gov/zoom.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 17 | **ORDER Granting 14 Motion for Pro Hac Vice as to attorney Rachel Berg. Signed by Judge P. Casey Pitts. (lrt, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026)** |
| 05/29/2026 | 18 | JOINT CASE MANAGEMENT STATEMENT *re Briefing and Hearing Schedule* filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Stoll, Christopher) (Filed on 5/29/2026) (Entered: 05/29/2026) |
| 05/29/2026 | 19 | Proposed Summons. (Janssen, Kara) (Filed on 5/29/2026) (Entered: 05/29/2026) |
| 05/29/2026 | 20 | Summons Issued as to Lucile Salter Packard Children's Hospital at Stanford. (anj, COURT STAFF) (Filed on 5/29/2026) (Entered: 05/29/2026) |
| 05/29/2026 | 21 | **Minute Entry for proceedings held before Judge P. Casey Pitts: Status Conference held on 5/29/2026 by Zoom webinar. Briefing schedule for TRO addressed. Order to issue.**<br><br>**Plaintiff Attorney: Chris Stoll, Rachel Berg.**<br>**Defendant Attorney: David Schumacher, Jordan Kearney, Alicia Macklin.**<br><br>**Total Time in Court: 7 minutes.**<br>**Court Reporter: Summer Fisher. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Date Filed: 5/29/2026) (Entered: 05/29/2026)** |
| 05/29/2026 | 22 | **TEXT-ONLY ORDER.**<br><br>**The parties' 18 proposed briefing and hearing schedule is approved. Defendant shall file any opposition to plaintiffs' motion for a temporary restraining order by no later than June 3, 2026. The government may also file a response to the motion by no later than June 3, 2026. Plaintiffs shall file any reply by no later than June 4, 2026. The parties are ordered to appear for a hearing on the motion over Zoom at 10:00am on June 5, 2026.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 5/29/2026) (Entered: 05/29/2026)** |
| 05/29/2026 | 23 | **CLERK'S NOTICE SETTING ZOOM HEARING.** Temporary Restraining Order Hearing set for 6/5/2026 at 10:00 AM. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/pcp<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at pcpcrd@cand.uscourts.gov no later than 6/3/2026 at 3:00 PM PDT. |

| | | |
|---|---|---|
| | | **Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://cand.uscourts.gov/zoom.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*(lrt, COURT STAFF) (Filed on 5/29/2026) (Entered: 05/29/2026) |
| 06/02/2026 | 24 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number BCANDC-22051570.) filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Bendana, Donovan) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/02/2026 | 25 | **ORDER GRANTING 24 Application for Admission of Attorney *Donovan C. Bendana* Pro Hac Vice representing Plaintiffs. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/03/2026 | 26 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22055913.) filed by Z.A.. (Lowell, Abbe) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/03/2026 | 27 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22055923.) filed by Z.A.. (Hayes-Deats, Caleb) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/03/2026 | 28 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22057863.) filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Rovenger, Joshua) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/03/2026 | 29 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22058220.) filed by Z.A.. (Standley, Schuyler) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/03/2026 | 30 | NOTICE of Appearance filed by Katrina Angela Pagonis on behalf of Lucile Salter Packard Children's Hospital at Stanford (Pagonis, Katrina) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/03/2026 | 31 | OPPOSITION/RESPONSE (re 3 MOTION for Temporary Restraining Order ) filed byLucile Salter Packard Children's Hospital at Stanford. (Attachments: # 1 Exhibit A - Declaration of David A. Schumacher, # 2 Exhibit B - N.D. Tex. Subpoena to Testify Before Grand Jury (LPCH))(Kearney, Jordan) (Filed on 6/3/2026) (Entered: 06/03/2026) |
| 06/04/2026 | 32 | WAIVER OF SERVICE Returned Executed filed by F.F., Z.D., Z.A., Z.C., Z.B., Z.E.. Service waived by Lucile Salter Packard Children's Hospital at Stanford waiver sent on 6/1/2026, answer due 7/31/2026. (Janssen, Kara) (Filed on 6/4/2026) (Entered: 06/04/2026) |
| 06/04/2026 | 33 | **ORDER GRANTING 26 Application for Admission of Attorney *Abbe David Lowell* Pro Hac Vice representing Plaintiffs. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/4/2026) (Entered: 06/04/2026) |
| 06/04/2026 | 34 | **ORDER GRANTING 27 Application for Admission of Attorney *Caleb Hayes-Deats* Pro Hac Vice representing Plaintiffs. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/4/2026) (Entered: 06/04/2026) |
| 06/04/2026 | 35 | **ORDER GRANTING 28 Application for Admission of Attorney *Joshua D. Rovenger* Pro Hac Vice representing Plaintiffs. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/4/2026) (Entered: 06/04/2026) |

| | | |
|---|---|---|
| 06/04/2026 | 36 | **ORDER GRANTING 29 Application for Admission of Attorney *Schuyler Standley* Pro Hac Vice representing Plaintiffs. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/4/2026) (Entered: 06/04/2026) |
| 06/04/2026 | 37 | REPLY (re 3 MOTION for Temporary Restraining Order ) *Plaintiffs' Reply in Support of Motion for Temporary Restraining Order and Order to Show Cause* filed byF.F., Z.A., Z.B., Z.C., Z.D., Z.E.. (Janssen, Kara) (Filed on 6/4/2026) (Entered: 06/04/2026) |
| 06/05/2026 | 38 | **Minute Entry for proceedings held before Judge P. Casey Pitts:<br>Hearing on Motion for Temporary Restraining Order held on 6/5/2026. Argument of counsel heard. Court takes matters under submission. Order to issue.<br><br>Plaintiffs' Attorneys: Caleb Hayes-Deats, Christopher Stoll, Kara Janssen.<br>Defendant's Attorneys: David Schumacher, Jordan Kearney, Alicia Macklin.<br><br>Total Time in Court: 1:00.<br>Court Reporter: April Brott. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Date Filed: 6/5/2026) (Entered: 06/05/2026)** |
| 06/05/2026 | 39 | TRANSCRIPT ORDER for proceedings held on 6/5/2026 before Judge P. Casey Pitts by Z.A., for Court Reporter April Brott. (Lowell, Abbe) (Filed on 6/5/2026) (Entered: 06/05/2026) |
| 06/06/2026 | 40 | **ORDER GRANTING 2 MOTION TO PROCEED PSEUDONYMOUSLY AND DENYING 3 MOTION FOR PRELIMINARY RELIEF. Signed by Judge P. Casey Pitts on 6/6/2026. (pcplc3, COURT STAFF) (Filed on 6/6/2026) (Entered: 06/06/2026)** |
| 06/08/2026 | 41 | AMENDED COMPLAINT *First Amended Complaint* against Lucile Salter Packard Children's Hospital at Stanford, Todd Blanche, U.S. Department of Justice. Filed by F.F., Z.C., Z.B., Z.A., Z.D., Z.E., Z.G.. (Attachments: # 1 Exhibit Redlined Complaint) (Janssen, Kara) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 42 | ADMINISTRATIVE MOTION To Proceed Via Pseudonym *Plaintiffs' Application to Proceed Via Pseudonym* filed by Z.G.. Responses due by 6/12/2026. (Attachments: # 1 Declaration of Kara Janssen, # 2 Proposed Order)(Janssen, Kara) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 43 | Proposed Summons. (Janssen, Kara) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 44 | ERRATA re 41 Amended Complaint, *Notice of Errata to Plaintiffs' First Amended Complaint* by F.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Janssen, Kara) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 45 | MOTION to Certify Class filed by Z.A.. Responses due by 6/22/2026. Replies due by 6/29/2026. (Attachments: # 1 Memorandum in Support, # 2 Declaration of C. Hayes-Deats, # 3 Declaration of J. Rovenger, # 4 Declaration of K. Janssen, # 5 Declaration S. Minter, # 6 Declaration of A.G., # 7 Declaration of B.B., # 8 Declaration of G.G., # 9 Proposed Order Granting Provisional Class Cert)(Hayes-Deats, Caleb) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 46 | Ex Parte MOTION for Temporary Restraining Order filed by Z.A.. (Attachments: # 1 Amended Complaint, # 2 Memorandum in Support, # 3 Declaration of C. Hayes-Deats, # 4 Declaration of A.G., # 5 Declaration of B.B., # 6 Declaration of G.G., # 7 Proposed Order Granting TRO)(Hayes-Deats, Caleb) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/08/2026 | 47 | **TEXT-ONLY ORDER.** |

| | | |
|---|---|---|
| | | **The parties are ordered to appear for a remote status conference at 10:00am on June 9, 2026 using the Zoom link on the Court's public website.**<br><br>**Absent a further order from this Court, Lucile Packard Children's Hospital (LPCH) shall not produce additional records to the government in response to specifications 12 to 14 of the May 6, 2026 grand jury subpoena issued to LPCH under the seal of the Northern District of Texas. *See FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) (holding that a court has "express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction"); *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014) (explaining that disclosure of information moots an action that seeks to prevent such disclosure).**<br><br>**For the same reasons, absent a further order from this Court, the government shall not take further action to enforce any grand jury subpoena seeking the private health information or patient records of any member of the putative class or subclass.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 6/8/2026) (Entered: 06/08/2026)** |
| 06/09/2026 | 48 | **TEXT-ONLY ORDER.**<br><br>**Plaintiffs are ordered, by no later than 9am, to send notice of this Court's prior order 47 to Pamela Johann, Chief of the Civil Division of the U.S. Attorney's Office for the Northern District of California, by electronic mail to <pamela.johann@usdoj.gov>. The notice shall include copies of plaintiffs' amended complaint 41 , motion for provisional class certification 45 , and motion for a temporary restraining order 46 .**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 6/9/2026) (Entered: 06/09/2026)** |
| 06/09/2026 | 49 | Summons Issued as to Todd Blanche, U.S. Department of Justice, U.S. Attorney and U.S. Attorney General (kxo, COURT STAFF) (Filed on 6/9/2026) (Entered: 06/09/2026) |
| 06/09/2026 | 50 | CLERKS NOTICE SETTING ZOOM HEARING. Status Conference set for 6/9/2026, at 10:00 AM in San Jose, Courtroom 8, 4th Floor before Judge P. Casey Pitts. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/pcp<br><br>**Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://cand.uscourts.gov/zoom.<br><br>Status Conference set for 6/9/2026 10:00 AM in San Jose, Courtroom 8, 4th Floor before Judge P. Casey Pitts. (Related documents(s) 47 ) *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (erm, COURT STAFF) (Filed on 6/9/2026) (Entered: 06/09/2026) |
| 06/09/2026 | 51 | **Minute Entry for proceedings held before Judge P. Casey Pitts:** |

| | | |
|---|---|---|
| | | **Status Conference held on 6/9/2026 re 46 Ex Parte MOTION for Temporary Restraining Order filed by Z.A.**<br><br>**Government to file its response to the motion for preliminary injunction by June 17, 2026.**<br>**Plaintiff to file its reply to the governments response by June 22, 2026.**<br>**Return on extension of subpoena by June 25, 2026.**<br>**Court will set hearing if necessary.**<br><br>Total Time in Court: 18 minutes.<br>Court Reporter: Irene Rodriguez.<br><br>Plaintiff Attorney: Caleb Hayes-Deats.<br>Defendant Attorney: David Schumacher, Jordan Kearney, Alicia Macklin.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (erm, COURT STAFF) (Date Filed: 6/9/2026). (Entered: 06/09/2026) |
| 06/11/2026 | 52 | **TEXT-ONLY ORDER.**<br><br>**On June 8, 2026, the Court issued an order 47 intended solely to "protect its jurisdiction" pending consultation with the parties as to the timeline for the Court's resolution of plaintiffs' motion 46 for a temporary restraining order. At the June 9, 2026 status conference, all parties agreed that the Court should await full briefing before ruling on the motion. To that end, the parties represented that they would file a joint stipulation setting forth a schedule for briefing and hearing the motion and setting forth the terms of their agreement to maintain the status quo pending resolution of plaintiffs' motion. The parties have yet to do so. The parties are therefore ordered to appear for a status conference at 2:00pm on June 12, 2026.**<br><br>**Absent a stipulation setting forth a briefing and hearing schedule, defendants are ordered to file any response to plaintiffs' 46 motion for a temporary restraining order by no later than 11:59pm on June 12, 2026. No reply shall be filed.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 6/11/2026) (Entered: 06/11/2026)** |
| 06/12/2026 | 53 | STIPULATION WITH PROPOSED ORDER *(Joint)* filed by Z.A.. (Hayes-Deats, Caleb) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/12/2026 | 54 | **TEXT-ONLY ORDER.**<br><br>**The parties' 53 stipulation proposes a briefing schedule but is ambiguous as to any "terms of their agreement to maintain the status quo pending resolution of plaintiffs' motion" for a temporary restraining order. *See* Dkt. No. 52 . It therefore does not obviate the need for a status conference. The 2pm conference will be conducted via Zoom.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 6/12/2026) (Entered: 06/12/2026)** |
| 06/12/2026 | 55 | **CLERK'S NOTICE SETTING ZOOM HEARING.** Status Conference set for 6/12/2026 at 02:00 PM in San Jose, - Videoconference Only before Judge P. Casey Pitts. This proceeding will be held via a Zoom webinar. |

| | | |
|---|---|---|
| | | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/pcp<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at pcpcrd@cand.uscourts.gov no later than 6/12/2026 at 12:00 PM.<br><br>**Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://cand.uscourts.gov/zoom.<br><br>Status Conference set for 6/12/2026 02:00 PM in San Jose, - Videoconference Only before Judge P. Casey Pitts. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/12/2026 | 56 | NOTICE of Appearance filed by Scott B Dahlquist on behalf of U.S. Department of Justice (Dahlquist, Scott) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/12/2026 | 57 | NOTICE of Appearance filed by Steven R Scott on behalf of U.S. Department of Justice (Scott, Steven) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/12/2026 | 58 | **Minute Entry for proceedings held before Judge P. Casey Pitts:<br>Status Conference held on 6/12/2026.**<br><br>**Plaintiffs' Attorney: Caleb Hayes-Deats.<br>Defendants' Attorneys: David Schumacher, Jordan Kearney, Scott Dahlquist, Steven Scott.**<br><br>**Total Time in Court: 11 minutes.<br>Court Reporter: Summer Fisher. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Date Filed: 6/12/2026) (Entered: 06/12/2026)** |
| 06/12/2026 | 59 | STIPULATION WITH PROPOSED ORDER filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Hayes-Deats, Caleb) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/12/2026 | 60 | **ORDER Granting AS MODIFIED 59 Joint Stipulation. Signed by Judge P. Casey Pitts on 6/12/2026.**<br><br>**RE: 42 Administrative Motion To Proceed Via Pseudonym, 45 Motion to Certify Class, 46 Ex Parte Motion for Temporary Restraining Order: Responses due by 6/17/2026. Replies due by 6/22/2026. Motion Hearing set for 6/24/2026 at 02:00 PM in San Jose, Courtroom 8, 4th Floor before Judge P. Casey Pitts. (lrt, COURT STAFF) (Filed on 6/12/2026) (Entered: 06/12/2026)** |
| 06/15/2026 | 61 | MOTION for Leave to File *Amicus Curiae Brief* filed by State of California. (Attachments: # 1 Proposed Amicus Curiae Brief in Support of Plaintiffs' Motion for Temporary Restraining Order, # 2 Proposed Order Granting Motion for Leave to File Amicus Curiae Brief)(Adams, Crystal) (Filed on 6/15/2026) (Entered: 06/15/2026) |
| 06/15/2026 | 62 | Transcript of Proceedings held on June 5, 2026, before Judge P. Casey Pitts. Court Reporter/Transcriber April Wood Brott, telephone number 510-225-8350, april_brott@uscourts.cand.gov. Per General Order No. 59 and Judicial Conference policy, |

| | | |
|---|---|---|
| | | this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 39 Transcript Order ) Release of Transcript Restriction set for 9/14/2026. (Related documents(s) 39 ) (Brott, April) (Filed on 6/15/2026) (Entered: 06/15/2026) |
| 06/16/2026 | 63 | NOTICE of Appearance filed by Michael Ceja Martinez on behalf of American Academy of Pediatrics (Martinez, Michael) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 64 | NOTICE of Appearance filed by Crystal M. Adams on behalf of State of California (Adams, Crystal) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 65 | MOTION for Leave to File *Amicus Curiae Brief* filed by American Academy of Pediatrics. (Attachments: # 1 Proposed Amicus Curiae Brief in Support of Plaintiffs' Motion for Temporary Restraining Order, # 2 Proposed Order, # 3 Certification) (Martinez, Michael) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 66 | ADMINISTRATIVE MOTION Waiver of In-State Requirement for Sponsoring Co-Counsel filed by American Academy of Pediatrics. Responses due by 6/22/2026. (Attachments: # 1 Proposed Order)(Martinez, Michael) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 67 | **ORDER GRANTING 61 Unopposed Motion for Leave to File Brief of Amici Curiae States in Support of Plaintiffs' Motion for a Temporary Restraining Order. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 68 | **ORDER GRANTING 65 Unopposed Motion for Leave to File Brief Amicus Curiae American Academy of Pediatrics in Support of Plaintiffs' Motion for a Temporary Restraining Order. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 69 | **ORDER GRANTING 66 Unopposed Administrative Motion for American Academy of Pediatrics to Waive In-State Requirement for Sponsoring Counsel. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 70 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22108209.) filed by American Academy of Pediatrics. (McElvain, Joel) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 71 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22108123.) filed by American Academy of Pediatrics. (Moraga, Pablo) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 72 | Brief *of Amici Curiae States in Support of Plaintiffs' Motion for Temporary Restraining Order* filed byState of California. (Adams, Crystal) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/16/2026 | 73 | Brief *OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS MOTION FOR A TEMPORARY RESTRAINING ORDER* filed byAmerican Academy of Pediatrics. (Martinez, Michael) (Filed on 6/16/2026) (Entered: 06/16/2026) |
| 06/17/2026 | 74 | NOTICE of Appearance filed by Sarah Welch on behalf of Todd Blanche, U.S. Department of Justice (Welch, Sarah) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/17/2026 | 75 | Certificate of Interested Entities by Lucile Salter Packard Children's Hospital at Stanford identifying Other Affiliate Leland Stanford Junior University for Lucile Salter Packard |

| | | |
|---|---|---|
| | | Children's Hospital at Stanford. (Kearney, Jordan) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/17/2026 | 76 | OPPOSITION/RESPONSE (re 46 Ex Parte MOTION for Temporary Restraining Order , 42 ADMINISTRATIVE MOTION To Proceed Via Pseudonym *Plaintiffs' Application to Proceed Via Pseudonym*, 45 MOTION to Certify Class ) filed byLucile Salter Packard Children's Hospital at Stanford. (Kearney, Jordan) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/17/2026 | 77 | **ORDER GRANTING 70 Application for Admission of Attorney *Joel McElvain* Pro Hac Vice representing American Academy of Pediatrics. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/17/2026 | 78 | **ORDER GRANTING 71 Application for Admission of Attorney *Pablo Moraga* Pro Hac Vice representing American Academy of Pediatrics. Signed by Judge P. Casey Pitts.** (lmh, COURT STAFF) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/17/2026 | 79 | OPPOSITION/RESPONSE (re 46 Ex Parte MOTION for Temporary Restraining Order , 45 MOTION to Certify Class ) filed byTodd Blanche, U.S. Department of Justice. (Attachments: # 1 Exhibit A (LPCH Privacy Notice))(Welch, Sarah) (Filed on 6/17/2026) (Entered: 06/17/2026) |
| 06/22/2026 | 80 | REPLY (re 46 Ex Parte MOTION for Temporary Restraining Order , 45 MOTION to Certify Class ) *Plaintiffs' Reply in Support of Ex Parte Motion for a Temporary Restraining Order and Order to Show Cause and Motion for Provisional Class Certification* filed byF.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Stoll, Christopher) (Filed on 6/22/2026) (Entered: 06/22/2026) |
| 06/23/2026 | 81 | NOTICE of Appearance filed by John Bailey on behalf of Todd Blanche, U.S. Department of Justice (Bailey, John) (Filed on 6/23/2026) (Entered: 06/23/2026) |
| 06/23/2026 | 82 | NOTICE of Appearance filed by Eugene O'Halloran on behalf of Todd Blanche, U.S. Department of Justice (O'Halloran, Eugene) (Filed on 6/23/2026) (Entered: 06/23/2026) |
| 06/24/2026 | 83 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byF.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Related document(s) 46 , 45 ) (Grunfeld, Gay) (Filed on 6/24/2026) (Entered: 06/24/2026) |
| 06/24/2026 | 84 | **Minute Entry for proceedings held before Judge P. Casey Pitts:**<br><br>Motion Hearing held on 6/24/2026. Oral argument held on 46 Ex Parte MOTION for Temporary Restraining Order filed by Z.A., 42 ADMINISTRATIVE MOTION To Proceed Via Pseudonym *Plaintiffs' Application to Proceed Via Pseudonym* filed by Z.G., 45 MOTION to Certify Class filed by Z.A., Temporary Restraining Order Hearing - Non-evidentiary held on 6/24/2026. Motions have been taken under submission with written order to follow.<br><br>**The parties are ordered to update the existing stipulation and notify the Court by 9:00 a.m. PST on June 25, 2026, of any agreement to further extend the status quo for seven (7) days to allow the Court time to issue a decision on a preliminary injunction.**<br><br>Total Time in Court: 1 hr 15 minutes.<br>Court Reporter: Summer Fisher.<br><br>Plaintiff Attorney: Christopher Stoll, Donvan Bendana, Shannon Minter.<br>Defendant Attorney: David Schumacher, Alicia Macklin.<br>U.S. DOJ: John Bailey |

| | | |
|---|---|---|
| | | *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (erm, COURT STAFF)(Date Filed: 6/24/2026) (Entered: 06/24/2026) |
| 06/25/2026 | 85 | STIPULATION WITH PROPOSED ORDER filed by F.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Hayes-Deats, Caleb) (Filed on 6/25/2026) (Entered: 06/25/2026) |
| 06/25/2026 | 86 | **ORDER GRANTING 85 STIPULATION** *signed by Judge P. Casey Pitts on 6/25/2026. (This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 6/25/2026) (Entered: 06/25/2026) |
| 06/26/2026 | 87 | TRANSCRIPT ORDER for proceedings held on 06/24/2026 before Judge P. Casey Pitts by Todd Blanche, U.S. Department of Justice, for Court Reporter Summer Fisher. (O'Halloran, Eugene) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/26/2026 | 88 | TRANSCRIPT ORDER for proceedings held on 06/24/2026 before Judge P. Casey Pitts by Z.A., for Court Reporter Summer Fisher. (Hayes-Deats, Caleb) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/26/2026 | 89 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byF.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Related document(s) 46 , 45 ) (Stoll, Christopher) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/26/2026 | 90 | Transcript of Proceedings held on 06/24/2026, before Judge P. Casey Pitts. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov 408-763-0563. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 87 Transcript Order ) Redaction Request due 7/17/2026. Redacted Transcript Deadline set for 7/27/2026. Release of Transcript Restriction set for 9/24/2026. (Related documents(s) 87 ) (Fisher, Summer) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/30/2026 | 91 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22160684.) filed by American Academy of Pediatrics. (Swift, Alethea) (Filed on 6/30/2026) (Entered: 06/30/2026) |
| 07/01/2026 | 92 | **ORDER Granting 91 Motion for Pro Hac Vice as to Alethea Anne Swift. Signed by Judge P. Casey Pitts on 7/1/2026. (crr, COURT STAFF) (Filed on 7/1/2026) (Entered: 07/01/2026)** |
| 07/02/2026 | 93 | **ORDER RE: MOTIONS FOR 42 PSEUDONYMITY, 45 PROVISIONAL CLASS CERTIFICATION, AND 46 PRELIMINARY INJUNCTION. Signed by Judge P. Casey Pitts on 7/2/2026. (pcplc3, COURT STAFF) (Filed on 7/2/2026) (Entered: 07/02/2026)** |
| 07/09/2026 | 94 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Todd Blanche, U.S. Department of Justice. Appeal of Order on Administrative Motion per Civil Local Rule 7-11, Order on Motion to Certify Class, Order on Motion for TRO 93 (Appeal fee FEE WAIVED.) (O'Halloran, Eugene) (Filed on 7/9/2026) (Entered: 07/09/2026) |
| 07/10/2026 | 95 | USCA Case Number 26-4388 for Ninth Circuit for 94 Notice of Appeal to the Ninth Circuit, filed by U.S. Department of Justice, Todd Blanche. (jnk, COURT STAFF) (Filed on 7/10/2026) (Entered: 07/13/2026) |
| 07/14/2026 | 96 | SUMMONS Returned Executed by F.F., Z.C., Z.B., Z.G., Z.A., Z.D., Z.E.. Todd Blanche served on 6/9/2026, answer due 8/10/2026; U.S. Department of Justice served on |

| | | |
|---|---|---|
| | | 6/9/2026, answer due 8/10/2026. *Proof of Service on Todd Blanche, Acting Attorney General of the United States and United States Department of Justice* (Janssen, Kara) (Filed on 7/14/2026) (Entered: 07/14/2026) |
| 07/14/2026 | 97 | MOTION to Stay re 93 Order on Administrative Motion per Civil Local Rule 7-11, Order on Motion to Certify Class, Order on Motion for TRO *Pending Appeal* filed by Todd Blanche, U.S. Department of Justice. Motion Hearing set for 8/20/2026 02:00 PM in San Jose, Courtroom 8, 4th Floor before Judge P. Casey Pitts. Responses due by 7/28/2026. Replies due by 8/4/2026. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order)(Bailey, John) (Filed on 7/14/2026) (Entered: 07/14/2026) |
| 07/14/2026 | 98 | MOTION to Shorten Time *re: Federal Defendants' Motion to Stay Pending Appeal* filed by Todd Blanche, U.S. Department of Justice. (Attachments: # 1 Declaration of John Bailey)(Bailey, John) (Filed on 7/14/2026) (Entered: 07/14/2026) |
| 07/14/2026 | 99 | **TEXT-ONLY ORDER.**<br><br>**Plaintiffs are ordered to file any opposition to defendants' 98 motion to shorten time by no later than 5:00 PM on July 16, 2026.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 7/14/2026) (Entered: 07/14/2026)** |
| 07/16/2026 | 100 | OPPOSITION/RESPONSE (re 98 MOTION to Shorten Time *re: Federal Defendants' Motion to Stay Pending Appeal* ) filed byZ.A.. (Attachments: # 1 Declaration of C. Hayes-Deats)(Hayes-Deats, Caleb) (Filed on 7/16/2026) (Entered: 07/16/2026) |
| 07/16/2026 | 101 | **TEXT-ONLY ORDER.**<br><br>**Defendants' 98 motion to shorten time is denied. Because defendants' 97 motion for a stay pending appeal is suitable for resolution without oral argument, the Court vacates the August 20, 2026 hearing. *See* Civ. L.R. 7-1(b). The motion shall be taken under submission upon the filing of defendants' reply (i.e., by no later than August 4, 2026).**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pcplc3, COURT STAFF) (Filed on 7/16/2026) (Entered: 07/16/2026)** |
| 07/20/2026 | 102 | STIPULATION *to Extend Time to Respond to Amended Complaint* filed by Lucile Salter Packard Children's Hospital at Stanford. (Kearney, Jordan) (Filed on 7/20/2026) (Entered: 07/20/2026) |
| 07/21/2026 | 103 | TRANSCRIPT ORDER for proceedings held on 06/05/2026 before Judge P. Casey Pitts by Lucile Salter Packard Children's Hospital at Stanford, for Court Reporter April Brott. (Macklin, Alicia) (Filed on 7/21/2026) (Entered: 07/21/2026) |
| 07/21/2026 | 104 | TRANSCRIPT ORDER for proceedings held on 06/24/2026 before Judge P. Casey Pitts by Lucile Salter Packard Children's Hospital at Stanford, for Court Reporter Summer Fisher. (Macklin, Alicia) (Filed on 7/21/2026) (Entered: 07/21/2026) |
| 07/27/2026 | 105 | OPPOSITION/RESPONSE (re 97 MOTION to Stay re 93 Order on Administrative Motion per Civil Local Rule 7-11, Order on Motion to Certify Class, Order on Motion for TRO *Pending Appeal* ) filed byLucile Salter Packard Children's Hospital at Stanford. (Kearney, Jordan) (Filed on 7/27/2026) (Entered: 07/27/2026) |
| 07/28/2026 | 106 | OPPOSITION/RESPONSE (re 97 MOTION to Stay re 93 Order on Administrative Motion per Civil Local Rule 7-11, Order on Motion to Certify Class, Order on Motion for |

| | | |
|---|---|---|
| | | TRO *Pending Appeal* ) filed byF.F., Z.A., Z.B., Z.C., Z.D., Z.E., Z.G.. (Hayes-Deats, Caleb) (Filed on 7/28/2026) (Entered: 07/28/2026) |
| 07/29/2026 | 107 | NOTICE of Waiver of Reply and Request for Prompt Ruling by Todd Blanche, U.S. Department of Justice re 97 MOTION to Stay re 93 Order on Administrative Motion per Civil Local Rule 7-11, Order on Motion to Certify Class, Order on Motion for TRO *Pending Appeal - Waiver of Reply and Request for Prompt Ruling* (Bailey, John) (Filed on 7/29/2026) Modified on 7/29/2026 (amf, COURT STAFF). (Entered: 07/29/2026) |
| 07/31/2026 | 108 | **ORDER Denying 97 Motion to Stay Pending Appeal. Signed by Judge P. Casey Pitts on 7/31/2026. (nmc, COURT STAFF) (Filed on 7/31/2026) (Entered: 07/31/2026)** |
| 08/04/2026 | 109 | STIPULATION *to Extend Time to Respond to Amended Complaint* filed by Todd Blanche, U.S. Department of Justice. (Bailey, John) (Filed on 8/4/2026) (Entered: 08/04/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/04/2026 10:05:25 | | | |
| **PACER Login:** | crussell5 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:26-cv-04998-PCP |
| **Billable Pages:** | 21 | **Cost:** | 2.10 |

ER-187