Case No. 26-4388

# United States Court of Appeals for the Ninth Circuit

Z.A., A MINOR, BY AND THROUGH THEIR PARENT, A.A., ET AL.,

*Plaintiffs-Appellees,*

v.

TODD BLANCHE, ATTORNEY GENERAL, IN HIS OFFICIAL CAPACITY;
UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

On Appeal from the United States District Court,
Northern District of California,
Case No. 5:26-cv-04998-PCP,
Hon. P. Casey Pitts

## BRIEF FOR APPELLEES

**NATIONAL CENTER FOR LGBTQ RIGHTS**
Shannon P. Minter
*sminter@nclrights.org*
Christopher F. Stoll
*cstoll@nclrights.org*
Rachel Berg
*rberg@nclrights.org*
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257

**LOWELL & ASSOCIATES, PLLC**
Abbe David Lowell
*alowellpublicoutreach@lowellandassociates.com*
Caleb Hayes-Deats
*chayes-deats@lowellandassociates.com*
Schuyler Standley
*sstandley@lowellandassociates.com*
1250 H Street, N.W., Suite 250
Washington, D.C. 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116

*Attorneys for Plaintiffs-Appellees*
*(additional counsel on inside cover)*

**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
Gay Crosthwait Grunfeld
*ggrunfeld@rbgg.com*
Kara J. Janssen
*kjanssen@rbgg.com*
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104

**GLBTQ ADVOCATES AND**
**DEFENDERS (GLAD LAW)**
Joshua Rovenger
*jrovenger@gladlaw.org*
Donovan Bendana
*dbendana@gladlaw.org*
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350

*Attorneys for Plaintiffs-Appellees*

## TABLE OF CONTENTS

INTRODUCTION ....... 1

ISSUES ....... 4

STATEMENT ....... 4

I. The Food, Drug, and Cosmetic Act ....... 4

II. DOJ's Investigation of Transgender Healthcare ....... 7

III. The District Court Enjoins DOJ's Fifth Amendment Violations ....... 14

IV. The District Court Denies DOJ's Request for a Stay ....... 22

SUMMARY OF ARGUMENT ....... 23

STANDARD OF REVIEW ....... 25

ARGUMENT ....... 25

I. Plaintiffs Established a Likelihood of Success on the Merits ....... 27

A. DOJ's Arguments Contradict Longstanding Practice Permitting Plaintiffs to Enjoin Constitutional Violations ....... 28

1. Plaintiffs Have an Equitable Cause of Action ....... 28

2. Congress Has Not Displaced Plaintiffs' Equitable Claim ....... 31

3. DOJ's Remaining Arguments Lack Merit ....... 38

B. DOJ Is Violating Plaintiffs' Fifth Amendment Rights ....... 40

1. The Fifth Amendment Privacy Right Is Well-Established ....... 40

2. Plaintiffs' Privacy Interests Outweigh DOJ's Supposed Need ....... 43

a. DOJ Requests Extremely Sensitive Information ....... 44

b. The Potential Harm Is Tremendous ....... 45

c. Grand Jury Secrecy Provides No Safeguard .......................................45

d. DOJ Has No Need for Patient Information .........................................46

e. No Public Policy Favors Disclosure ..................................................50

3. The Conscience-Shocking Standard Does Not Govern and Would Be Met Regardless ..........................................................................51

C. Plaintiffs Will Likely Succeed on Their First Amendment Claim ........53

II. The District Court Did Not Abuse Its Discretion When Finding That the Remaining Factors Favor a Preliminary Injunction..............................56

A. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief......56

B. The Equities and the Public Interest Favor Plaintiffs ............................58

CONCLUSION ..........................................................................................61

## TABLE OF AUTHORITIES

**Cases**

*Abouammo v. United States*,
146 S. Ct. 1571 (2026) .......... 20, 30, 49

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 25, 26, 52

*Am. Acad. of Pediatrics v. Uthmeier*,
180 F.4th 1022 (7th Cir. 2026) .......... 37

*Arizona v. Hicks*,
480 U.S. 321 (1987) .......... 59

*Armstrong v. Exceptional Child Ctr., Inc.*, 5
75 U.S. 320 (2015) .......... 2, 15-17, 23, 27, 28, 30, 33-36

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 58

*Becker v. Kroll*,
494 F.3d 904 (10th Cir. 2007) .......... 51

*Blair v. United States*,
250 U.S. 273 (1919) .......... 49

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......... 42, 50, 55

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......... 5, 47

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) .......... 56

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 44

*Carroll v. Safford*,
44 U.S. (3 How.) 441 (1845) ........................................................................30

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992)...........................................................................................57

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026)...........................................................................36, 37

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................................................39

*Clear Channel Outdoor, Inc. v. City of L.A.*,
340 F.3d 810 (9th Cir. 2003) .........................................................................26

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998)...............................................................................50, 51

*Coe v. Blanche*,
No. 1:26-cv-4641 (S.D.N.Y. 2026) ..................... 2, 14, 20, 22, 27, 28, 46, 51, 52

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) .........................................................................53

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001).................................................................................28, 37

*De May v. Roberts*,
9 N.W. 146 (Mich. 1881)........................................................................42, 51

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026) ........................................................................59

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)...................................................................................2, 41

*Doe v. Bonta*,
101 F.4th 633 (9th Cir. 2024) .................................................... 23, 40-42

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ........................................................................7

*Douglas Oil Co. v. Petrol Stops Nw.*,
441 U.S. 211 (1979)....................35

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012)....................32

*Escobedo v. Illinois*,
378 U.S. 478 (1964)....................59

*FBI v. Fikre*,
601 U.S. 234 (2024)....................40

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026)....................54

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)....................28

*Gonzales v. Carhart*,
550 U.S. 124 (2007)....................7

*Hale v. Henkel*,
201 U.S. 43 (1906)....................30, 48

*Holland v. Florida*,
560 U.S. 631 (2010)....................31

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025)....................10

*In re Admin. Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025)....................10

*In re Admin. Subpoena 25-1431-032*,
No. 4:26-MC-00006-O (N.D. Tex. May 12, 2026)....................36, 48

*In re Admin. Subpoena 25-1431-032*,
No. 1:26-mc-0007, 2026 WL 1392565 (D.R.I. May 14, 2026)....................10, 27, 53

*In re Children's Nat'l Hosp.*,
No. 1:25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026).... 9-11, 27, 47, 53

*In re Clean Water Act Rulemaking*,
60 F.4th 583 (9th Cir. 2023) ....................29, 59

*In re Copley Press, Inc.*,
518 F.3d 1022 (9th Cir. 2008) ....................56

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
No. 25-mc-00063-SKC-CYC, 2026 WL 33398
(D. Colo. Jan. 5, 2026)....................10, 11, 47

*In re Grand Jury Proceedings*,
801 F.2d 1164 (9th Cir. 1986) ....................43

*In re Grand Jury Subpoena, No. 16-03-217*,
875 F.3d 1179 (9th Cir. 2017) ....................55

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)....................10

*In re Subpoena No. 25-1431-014*,
810 F. Supp. 3d 555 (E.D. Pa. 2025)....................10, 11, 27, 47, 53

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................26, 38, 56, 58

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) ....................41, 51

*Moore v. City of E. Cleveland*,
431 U.S. 494 (1977)....................41

*NASA v. Nelson*,
562 U.S. 134 (2011)....................41

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)....................53

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025)....................39

*Novedades y Servicios, Inc. v. FinCEN*,
181 F.4th 961 (9th Cir. 2026) .......... 24-26, 44

*NRDC v. Haaland*,
102 F.4th 1045 (9th Cir. 2024) .......... 29, 38, 40

*N.Y. Times Co. v. Gonzales*,
459 F.3d 160 (2d Cir. 2006) .......... 17, 34

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998) .......... 30

*Planned Parenthood Great Nw. v. Labrador*,
122 F.4th 825 (9th Cir. 2024) .......... 54

*Preminger v. Principi*,
422 F.3d 815 (9th Cir. 2005) .......... 58

*Proctor v. Vishay Intertechnology Inc.*,
584 F.3d 1208 (9th Cir. 2009) .......... 53

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
807 F. Supp. 3d 1295 (W.D. Wash. 2025) .......... 10, 47

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 55

*Stanley v. Illinois*,
405 U.S. 645 (1972) .......... 59

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 39

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) .......... 2, 18, 27, 36, 38, 40, 41, 43-45, 50-52, 57

*Union Pac. R.R. Co. v. Botsford*,
141 U.S. 250 (1891) .......... 42

*United States v. Calandra*,
414 U.S. 338 (1974) .......... 42, 50

*United States v. Cessa*,
856 F.3d 370 (5th Cir. 2017) ....................................................................30

*United States v. Hubbell*,
530 U.S. 27 (2000)...................................................................................35

*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991)................................................................21, 46, 48, 50

*United States v. Raines*,
362 U.S. 17 (1960)...................................................................................58

*United States v. Skrmetti*,
605 U.S. 495 (2025).....................................................................................7

*Wash. Legal Found. v. Henney*,
202 F.3d 331 (D.C. Cir. 2000)...............................................................5, 6, 47

*Washington v. Glucksberg*,
521 U.S. 702 (1997)...........................................................................41, 42

*Webster v. Doe*,
486 U.S. 592 (1988)...................................................................................32

*Whalen v. Roe*,
429 U.S. 589 (1977)...........................................................................41, 43

*Wilson v. Layne*,
526 U.S. 603 (1999)...................................................................................42

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...............................................................................26, 58

*World Pro'l Ass'n for Transgender Health v. FTC*,
No. 26-532, 2026 WL 1999008 (D.D.C. July 10, 2026) ...................................37

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) ...............................................................22, 58

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)...................................................................................37

**Statutes**

21 U.S.C. § 301 et seq. ........ 4

21 U.S.C. § 352(b)(2) ........ 5

21 U.S.C. § 352(f)(1) ........ 4, 5

21 U.S.C. § 355 ........ 4

28 U.S.C. § 2072(b) ........ 2, 23, 27, 31-33

42 U.S.C. § 1983 ........ 50

Cal. Civ. Code § 1798.301 ........ 8

**Rules**

Fed. R. Crim. P. 6 ........ 17, 24, 35, 36, 45

Fed. R. Crim. P. 6(e) ........ 17, 35, 36, 45

Fed. R. Crim. P. 6(e)(3)(E)(i) ........ 17

Fed. R. Crim. P. 6(e)(3)(G) ........ 17, 35

Fed. R. Crim. P. 17 ........ 16, 17, 21, 31-35, 49

Fed. R. Crim. P. 17(c) ........ 34, 35

Fed. R. Crim. P. 17(c)(2) ........ 34

**Regulations**

21 C.F.R. § 201.1 ........ 5

21 C.F.R. § 201.5 ........ 4, 5

21 C.F.R. §§ 201.55-201.57 ........ 4

21 C.F.R. § 201.100 ........ 4, 5

21 C.F.R. § 201.128 ........ 5

**Other Authorities**

2 Rev. Stat. of N.Y., pt. III, ch. VII, tit. III, § 73 (1st ed. 1828) ... 41

4 William Blackstone,
*Commentaries on the Laws of England* (1769) ... 30, 46

Louis L. Jaffe,
*Suits Against Governments and Officers: Sovereign Immunity*,
77 Harv. L. Rev. 1 (1963) ... 28

Medical Soc'y of N.Y.,
*A System of Medical Ethics* (1823) ... 41

Miles Wilkinson,
*Codification and the Origins of Physician-Patient Privilege*,
32 J. Pol'y Hist. 78 (2020) ... 42

Richard H. Fallon, Jr.,
*Constitutional Remedies: In One Era and Out the Other*,
136 Harv. L. Rev. 1300 (2023) ... 29

# INTRODUCTION

Since summer 2025, Defendants-Appellants (collectively, "DOJ") have attempted to obtain Plaintiffs-Appellees' sensitive, protected healthcare information ("PHI"): records directly identifying them as transgender minors, including detailed descriptions of their diagnoses, treatment histories, and families' consent to care. Initially, DOJ issued an administrative subpoena seeking this PHI for *every* minor who received transgender healthcare at Lucile Salter Packard Children's Hospital ("Packard"). But after district courts around the country quashed similar requests, finding minors' PHI had no bearing on any identified offense, DOJ abruptly withdrew its administrative subpoena and issued an identical grand jury subpoena to Packard from the Northern District of Texas. That tactical shift did not change the nature of DOJ's investigation or the relevance of Plaintiffs' PHI. Instead, the district court reached the "unavoidable conclusion" that DOJ acted with the sole purpose to "avoid another loss and force Packard and its patients to pursue any challenge to DOJ's demands in a forum that DOJ deems friendlier." ER-32.

The district court properly enjoined DOJ from carrying out this campaign to violate Plaintiffs-Appellees' Fifth Amendment privacy rights. Its injunction did not quash any specific subpoena. Instead, it addressed "DOJ's ever-shifting tactics" by barring DOJ from obtaining Plaintiffs' PHI in violation of their Fifth Amendment privacy rights. That carefully tailored relief preserves the status quo while leaving

DOJ free to conduct its investigation by seeking other records that do not identify Plaintiffs. A judge in the Southern District of New York issued a similar injunction when confronted with identical facts, *Coe v. Blanche*, No. 1:26-cv-4641, ECF 77 (S.D.N.Y. July 17, 2026), and the Second Circuit recently declined to stay that injunction, No. 26-1886, Dkt. 54.1 (2d Cir. Aug. 26, 2026).

The district court correctly found that Plaintiffs will likely succeed on their Fifth Amendment claims. Plaintiffs' equitable cause of action "reflects a long history of judicial review of illegal executive action, tracing back to England." ER-26 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). DOJ urges that Federal Rules of Criminal Procedure 6 and 17 preclude any equitable claim that would incidentally affect a grand jury subpoena. That argument fails at the threshold. The Rules Enabling Act mandates that Federal Rules "shall not abridge" or "modify any substantive right." 28 U.S.C. § 2072(b). DOJ's interpretation of Rules 6 and 17 would do exactly that. And the district court analyzed those Rules in detail and found no intent to preclude equitable claims.

On the merits, Plaintiffs' Fifth Amendment claim follows directly from this Court's decision in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), *overruled in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Plaintiffs' PHI is "among the most sensitive information that could be collected about a person," and DOJ has not explained *any* need to obtain such

information for an "entire class of people for a six-year period." ER-39; ER-42. Grand jury secrecy does nothing to mitigate the harm of disclosure, because Plaintiffs face a "risk of governmental harassment" from officials with access to the materials who have expressed "clear hostility to 'transgenderism' (*i.e.*, the existence of transgender people)." ER-37; ER-43. Although the district court had no need to reach the issue, this Court may also affirm on the alternative ground that DOJ's pursuit of Plaintiffs' PHI discriminates based on viewpoint and violates the First Amendment.

Plaintiffs also face immediate and irreparable harm that far outweighs any governmental interest. Violation of constitutional rights always constitutes irreparable harm. And DOJ's violation of Plaintiffs' rights threatens a loss of privacy that "cannot be undone." ER-43. DOJ's invocation of a generalized countervailing law enforcement interest rings hollow. DOJ ignores the district court's finding that DOJ did nothing to substantiate any legitimate law enforcement interest in Plaintiffs' identities and private medical records. Instead, DOJ baldly asserts that its unilateral tactical shift to grand jury subpoenas relieved it of a burden multiple courts had previously found it failed to meet.

At bottom, DOJ argues that it can, without judicial oversight or notice to affected individuals, select a single, preferred court to adjudicate the constitutional rights of the entire country. That argument defies the Constitution, statute, and the

basic structure of the federal court system. The district court did not abuse its discretion in rejecting it.

## ISSUES

1. Whether Plaintiffs will likely succeed in showing that the district court had equitable authority to enjoin DOJ's violations of their constitutional rights.

2. Whether Plaintiffs will likely succeed in showing that DOJ's pursuit of extremely sensitive medical information, for which DOJ has never articulated any need and concerning a marginalized group DOJ has vilified, violates the First and Fifth Amendments.

3. Whether the irreparable harm Plaintiffs will suffer from disclosure of their medical information, the balance of equities, and the public interest favor preliminarily enjoining likely violations of their First and Fifth Amendment rights.

## STATEMENT

### I. THE FOOD, DRUG, AND COSMETIC ACT

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, the Food and Drug Administration ("FDA") must approve new drugs as safe and effective for prescribed uses before manufacturers and distributors can sell those drugs in interstate commerce. *See* 21 U.S.C. § 355. Prescription drugs must also bear a label that specifies the FDA-approved uses and directions for those uses. *Id.* § 352(f)(1); *see* 21 C.F.R. §§ 201.5, 201.55-201.57, 201.100. A drug that does not

have "labeling" with "adequate directions for use" is "misbranded." 21 U.S.C. § 352(f)(1). FDA regulations provide that "adequate directions for use" must include directions about the "purposes for which it is intended," or its "intended use." 21 C.F.R. § 201.5. The phrase "intended use" refers to the "objective intent of the persons legally responsible for the labeling," *id.* § 201.128, *i.e.*, the "manufacturer, packer, or distributor," *id.* § 201.1. Prescription drugs, however, are exempt from the "adequate directions for use" labeling requirement if a "practitioner licensed by law to administer such drug" provides directions for use in the prescription. 21 U.S.C. § 352(b)(2); 21 C.F.R. § 201.100. Thus, a drug's label fails to provide "adequate directions for use" only if the drug's label does not specify the use objectively intended by its manufacturer, packer, or distributor. *See, e.g.*, *Wash. Legal Found. v. Henney*, 202 F.3d 331, 332 (D.C. Cir. 2000). Even then, a prescription from a qualified physician can exempt the drug from the requirement entirely.

A doctor "may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA." *See, e.g.*, *id.* at 333. "[N]either Congress nor the FDA has attempted to regulate the off-label use of drugs by doctors and consumers." *Id.*; *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("'off-label' usage" is an "accepted and necessary corollary of the FDA's mission to regulate in this area

without directly interfering with the practice of medicine"). It is "undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties." *Wash. Legal Found.*, 202 F.3d at 333. One such specialty is pediatrics, where "off-label prescribing accounts for some 60% of prescriptions." Br. of Am. Acad. of Pediatrics *et al.* ("AAP Br."), Dkt. 21.1 at 17. The frequency of off-label prescriptions in pediatrics results from the "difficulty and expense" of undertaking separate clinical trials with children, not any doubt among physicians about the drugs' safety or efficacy. *Id.*

Given the commonness of off-label prescriptions, DOJ has historically, including as recently as 2025, taken the position that off-label prescriptions are frequently "eligible for reimbursement under federal healthcare programs." *See, e.g.*, Br. of the United States, *United States ex rel. Penelow v. Janssen Prods., L.P.*, No. 25-1818, Dkt. 56 at 9 (3d Cir. Aug. 27, 2025). Eligibility for reimbursement depends on whether the drug is prescribed for a "medically accepted indication" and is "reasonable and necessary." *Id.* "Off-label prescription of a drug can sometimes be both medically accepted and reasonable and necessary for a given patient." *Id.* Thus, under DOJ's longstanding and recently reaffirmed view, a doctor who writes an "off-label" prescription for a medically accepted and necessary use has not submitted any false claim to a federal healthcare program. Nor is any such

prescription "misbranded," because labeling requirements turn on the intent of the manufacturer, packer, and distributor, not the doctor. *See* p. 5*, supra*.

## II. DOJ'S INVESTIGATION OF TRANSGENDER HEALTHCARE

Many Californians "identify as transgender, meaning that their gender identity does not align with their biological sex." *United States v. Skrmetti*, 605 U.S. 495, 501-02 (2025). "Some transgender individuals suffer from gender dysphoria, a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex." *Id.* at 502-03. "Left untreated, gender dysphoria may result in severe physical and psychological harm." *Id.* "The generally accepted medical practice is to treat people who suffer from gender dysphoria with 'necessary, safe, and effective' gender-affirming medical care." *Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024), *vacated on other grounds sub nom. Petersen v. Doe*, No. 24-449, 2026 WL 1871306 (U.S. June 30, 2026).

In *Skrmetti*, the Supreme Court held that state legislatures properly determine what medical care providers can offer within their States, because the Constitution "afford[s] States 'wide discretion to pass legislation in areas where there is medical . . . uncertainty.'" 605 U.S. at 524 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). California has exercised that discretion by enacting laws that recognize

"gender-affirming health care services" as "rights secured by the Constitution and laws of California." Cal. Civ. Code § 1798.301.

In January 2025, President Trump issued Executive Order 14187, entitled "Protecting Children from Chemical and Surgical Mutilation." That order declared it the "policy of the United States that it will not fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28. 2025). Days later, the White House announced that the order was "already having its intended effect" and listed hospitals that had "downsize[d] or eliminate[d]" their transgender healthcare services for minors.[1]

In April, the Attorney General issued a memorandum entitled "Preventing the Mutilation of American Children," which directed U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warned that DOJ would "hold accountable those who mutilate [our children] under the guise of care."[2] The memorandum directed

---

[1] *President Trump is Delivering on His Commitment to Protect Our Kids*, The White House (Feb. 3, 2025), https://perma.cc/9AKX-57BS.

[2] *Memorandum for Select Component Heads: Preventing the Mutilation of American Children*, U.S. Off. of the Att'y Gen., at 3, 5 (Apr. 22, 2025), https://perma.cc/QAL2-8EF3 ("DOJ April 2025 Memorandum").

DOJ's Civil Division to investigate supposed "violations of the [FDCA] by manufacturers and distributors" and to "pursue investigations under the False Claims Act of false claims submitted to federal healthcare programs for any non-covered services related to radical gender experimentation."[3]

In July, DOJ issued "more than 20 administrative subpoenas to medical centers providing gender-affirming care." ER-7. The press release accompanying the subpoenas announced that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable." ER-7-8. The subpoenas sought "documents that would 'identify each patient'" receiving transgender healthcare, together with documents relating to their "'clinical indications'" and "'diagnoses.'" ER-8. Weeks after DOJ issued the subpoenas, the White House announced "the President's success in 'end[ing] the barbaric, pseudoscientific practice' of gender-affirming care for minors, listing 20 medical centers that had terminated or significantly curtailed their provision of such care based on executive-branch pressure." *Id.*

At least eight district courts quashed DOJ's administrative subpoenas in whole or in part, concluding that "DOJ had failed to articulate any basis for investigating the hospitals" and that it was "'utterly unclear' how such sensitive and identifying patient records related to the hospitals' purportedly unlawful conduct."

---

[3] DOJ April 2025 Memorandum at 4.

ER-8-9 (quoting *In re Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3 (D. Md. Jan. 21, 2026)); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025), *rev'd*, No. 25-7384, 2026 WL 2359440 (9th Cir. Aug. 14, 2026) (reversing based on an investigative declaration that DOJ has never offered here, *see* p. 47, *infra*); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 588-607 (E.D. Pa. 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2-3 (W.D. Pa. Dec. 24, 2025); *In re Subpoena*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-mc-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026).

Several of those district courts examined DOJ's request for minor patients' records and found that those records had no plausible relevance to investigations under the FDCA. They addressed only the FDCA because DOJ had made "no argument that the [Administrative] Subpoena was issued . . . for suspected violation of the False Claims Act." *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *7 n.15. The FDCA "regulates the introduction, labeling, and distribution of drugs in interstate commerce; it does not govern how physicians diagnose patients, obtain consent, document treatment, or communicate with them." *In re Subpoena No. 25-*

*1431-014*, 810 F. Supp. 3d at 579. Patient records, in contrast, relate only to "how drugs are used in practice, not how they are labeled, promoted, or distributed in commerce." *Id.*; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8. "Alleged deficiencies in [patient care] may implicate state informed-consent or professional-discipline standards, but they do not establish [an FDCA] violation." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 579. DOJ's requests for minor patients' records thus asserted "sweeping needs for children's identities far removed from those claimed purposes granted by Congress." *Id.* at 583; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4 ("[H]ow clinicians treated individual children and intimate clinical details shed[] no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the [FDCA].").

DOJ's investigation has produced three settlements. DOJ.Br.6 & n.1. Those settlements do not show that patient-identifying records are relevant to any legitimate investigation. Rather, they show that DOJ is using demands for patients' private medical records as the pressure point in a campaign to carry out the President's directive that this care "must end." Texas Children's publicly stated that it "ha[s] been compliant with all laws," but settled "to protect [its] resources from endless and costly litigation." *See* Terri Langford & Colleen DeGuzman, *Texas Children's Hospital Must Create Country's First "Detransition Clinic" Under*

*Legal Settlement with State*, Tex. Trib. (May 15, 2026), https://perma.cc/F4PW-QVDA. The settlement agreement further states that the hospital settled to "protect the privacy of patient records." Texas Children's Hospital Settlement Agreement, U.S. Dep't of Just. 5 (July 27, 2026), https://perma.cc/J3RA-NF84. While the settlement requires the hospital to maintain lists of patients who received transgender healthcare, it provides only that Texas Children's "Chief Compliance Officer shall oversee a comprehensive annual review of the Patient Lists," and does not envision disclosure of those lists to DOJ. *Id.* at 15.

Similarly, Cleveland Clinic's settlement for $308,000 "expressly denies" DOJ's allegations. Cleveland Clinic Foundation Settlement Agreement, U.S. Dep't of Just. 3 (June 5, 2026), https://perma.cc/5QQY-A2SF. Like Texas Children's, Cleveland Clinic also settled "to protect the privacy of patient records," and its settlement agreement provides that "[a]ny patient identifiers will be removed" from document productions to DOJ. *Id.*

Finally, DOJ settled with Connecticut Children's for $500,000 while admitting that "Connecticut Children's has denied all allegations" and "there has been no determination of liability." *See Justice Department Secures Agreement with Connecticut Children's to End Pediatric "Gender-Affirming Care,"* U.S. Dep't of Just. (Aug. 5, 2026), https://perma.cc/QJ3M-3CJ5. The hospital emphasized that it settled "without disclosing any protected patient information to the US government."

Jennifer Lambert, Connecticut Children's Reaches Agreement with DOJ to End Gender-Affirming Care, NBC Connecticut (Aug. 6, 2026), https://perma.cc/8GUM-DZFD. Public statements about each settlement thus confirm that DOJ's concerns about potential FDCA and False Claims Act violations do not require production of patient records if the hospital will agree to cease offering transgender healthcare. *See also* ER-118 (noting that when settling claims relating to the administrative subpoena served on Children's Hospital of Los Angeles, "DOJ withdrew requests seeking patient identifying information, patient medical records, and records related to parental authorization and consent.").

One of the administrative subpoenas DOJ issued in July 2025 was served on Packard. SER-55.[4] Between July 2025 and May 2026, Packard negotiated with DOJ over the scope of any production. *Id.* Packard did not produce any patient records to DOJ during those ten months. *Id.* And DOJ "indicated that it would accept anonymized patient records in the first instance." *Id.* In May 2026, after courts had repeatedly quashed identical administrative subpoenas served on other hospitals, DOJ "out of the blue" withdrew the administrative subpoena to Packard. *Id.* The next day, DOJ issued a grand jury subpoena from the Northern District of Texas that had "substantially similar" requests to the withdrawn administrative subpoena. *Id.* The grand jury subpoena seeks records concerning what it defines as "Sex-Rejecting

[4] Citations to "SER" refer to Plaintiffs' Supplemental Excerpts of Record.

Procedures"—interventions undertaken for "the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." ER-102. Following service of the grand jury subpoena, Packard and DOJ continued to negotiate, and DOJ again confirmed that it would "accept anonymized patient records in the first instance." *Id.*

DOJ also issued a grand jury subpoena to NYU Langone Hospital that was "nearly identical" to the grand jury subpoena served on Packard. ER-11. A judge in the Southern District of New York enjoined DOJ's pursuit of minor patient information from NYU Langone, finding that DOJ sought to "'recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.'" *Id.* (quoting *Coe*, No. 26-cv-4641, ECF 77 at 8).

### III. The District Court Enjoins DOJ's Fifth Amendment Violations

Plaintiffs-Appellees are patients who received transgender healthcare at Packard, and their parents. ER-4. Their amended complaint sought to bar DOJ from obtaining their PHI and that of other similarly situated patients in violation of the First and Fifth Amendments. ER-12.

On July 2, 2026, the Court certified a provisional class of minor patients who received transgender healthcare at Packard and entered a preliminary injunction that barred DOJ from "obtaining" four categories of information: (1) records that would

"identify members of the provisional class as having sought or received gender-affirming care"; (2) records that "disclose the clinical indications, diagnoses, assessments or other sensitive health information underlying the provision of such care to members of the provisional class"; (3) records that "describe the gender-affirming care . . . provided to members of the provisional class"; or (4) records that "relate to the provision of informed consent and parent or guardian authorization for provisional class members' receipt of gender-affirming care." ER-45.

The district court considered the factors set forth in Federal Rule of Civil Procedure 23(a) & (b)(2) and found that Plaintiffs had met each with respect to the class of patients who received transgender healthcare at Packard. ER-13-24. "DOJ's demand for Packard's patient records" raised common questions for all members of the proposed class, allowing them to seek relief applicable to the "whole" class. ER-17-24.

A. The district court next considered the four-factor test for injunctive relief. ER-24-45. With respect to the likelihood of success, the court first considered DOJ's arguments that Plaintiffs' assertion of constitutional claims in the Northern District of California would be "improper" and found that Plaintiffs had established the availability of injunctive relief in that district. ER-26-33. Plaintiffs had an equitable cause of action for constitutional claims, because the Supreme Court has

"long held" that federal courts may enjoin "violations of federal law by federal officials." ER-26 (quoting *Armstrong*, 575 U.S. at 326).

The district court rejected DOJ's contention that "any equitable cause of action available to plaintiffs has been displaced by Federal Rule of Criminal Procedure 17." ER-27. It first explained that Plaintiffs "do not seek to quash a particular grand jury subpoena," but instead "challenge DOJ's broader campaign to procure provisional class members' private health information, which began a year ago when DOJ issued an administrative subpoena to Packard." *Id.* The district court considered whether "Rule 17's quashal provision embodies an intent to foreclose equitable remedies in one district that would incidentally prevent DOJ's enforcement of a grand jury subpoena in another district," applying the two-factor test articulated by the Supreme Court in *Armstrong*, 575 U.S. at 326. ER-28.

Under the first *Armstrong* factor, the district court asked whether Congress created a "sole remedy" for constitutional violations in connection with grand jury subpoenas. ER-28. It found that "Rule 17 is far less tailored to a specific violation of federal law than the statutory remedy at issue in *Armstrong*," because it applied to "any federal criminal subpoena—whether issued in aid of a grand jury investigation or trial"—and permitted a range of non-constitutional challenges. ER-29. It thus concluded that "Rule 17 lacks a close relationship to any particular substantive rule of federal law." *Id.*

Turning to the second *Armstrong* factor, the district court found that, even if "Rule 17's quashal mechanism were analogous to" the statutory provision considered in *Armstrong*, it still would not displace Plaintiffs' equitable claims because Rule 17 "contains no other indicia of an intent to foreclose constitutional claims." ER-29-30. DOJ had pointed to a "provision in Rule 6 requiring grand jury secrecy." ER-30. But Rule 6(e)(3)(E)(i) "undercut" that argument by "allowing DOJ to petition to disclose 'a grand jury matter . . . in connection with a judicial proceeding.'" *Id.* (quoting Fed. R. Crim. P. 6(e)(3)(E)(i)). Far from expressing congressional intent to foreclose proceedings in other districts, Rule 6 "expressly contemplates" disclosures in a "judicial proceeding in another district." *Id.* (quoting Fed. R. Crim. P. 6(e)(3)(G)). The district court's conclusion, moreover, was "bolstered" by the Second Circuit's decision in *New York Times v. Gonzales*, which permitted "a declaratory action in one district to collaterally challenge DOJ's attempt to obtain the plaintiff's confidential information" by issuing a grand jury subpoena in another district. *Id.* (citing 459 F.3d 160, 165-67 (2d Cir. 2006).

The district court next considered DOJ's argument that it should decline to review Plaintiffs' equitable claims "based on comity and separation-of-powers concerns," finding neither rationale "convincing." ER-31. Comity concerns did not apply because a "grand jury subpoena issues without judicial review," and "nothing in the record suggests that any court in Texas has reviewed or approved the scope of

the grand jury subpoena issued to Packard." *Id.* Nor did Plaintiffs' claims raise "separation-of-powers concerns." *Id.* The requested injunction did not "invalidate, quash, or otherwise operate on a particular subpoena," but instead "narrowly prevents DOJ from obtaining private health information" that has "no apparent relevance to any crime indictable in Texas." *Id.* The requested injunction did not restrain "'lawful' conduct," because "DOJ's challenged conduct is likely *not* lawful," bringing the injunction within courts "well settled" power to "enjoin likely unconstitutional actions by executive-branch actors." ER-31-32.

The district court rejected "DOJ's protestations about comity and separation-of-powers principles" for the additional reason that any risk had been "manufactured by DOJ." ER-32. DOJ's administrative subpoena to Packard was "never quashed," and Packard was "'explor[ing] the possibility' of producing 'anonymized patient records,' which 'DOJ had indicated it would accept . . . in the first instance.'" *Id.* (quoting SER-55). DOJ was thus "poised to get everything it could reasonably need" when it "abruptly withdrew the administrative subpoena" and replaced it with a "nearly identical" grand jury subpoena. *Id.* Because that decision came in the "wake of a series of court losses," the "unavoidable conclusion" was that DOJ sought to "avoid another loss" and route challenges to a "forum that DOJ deems friendlier." *Id.* "DOJ cannot reasonably invoke comity and the separation of powers as cover for its forum shopping." *Id.*

B. The district court next found Plaintiffs "likely to succeed" on their Fifth Amendment privacy claim under this Court's five-factor balancing test from *Tucson Woman's Clinic*, 379 F.3d at 551. ER-33-42. First, the type of information requested was "highly sensitive" medical information about "care subject to intense political controversy, that the federal government has professed a desire to 'end.'" ER-34. Packard's privacy notice did not alter that conclusion because it specified that records would not be disclosed, even under a grand jury subpoena, "absent a showing of possible relevance to the purported law-enforcement purpose." ER-35. Nor could DOJ rely on precedent finding "no general right to privacy before the grand jury," because Plaintiffs invoked a "narrow due-process right to the privacy of information of a particularly sensitive nature," which applied even before a grand jury. ER-35-36 (internal quotation marks omitted).

Second, disclosure of Plaintiffs' sensitive information would cause significant harm, which no safeguards would prevent. ER-36-38. Disclosure would render highly sensitive information "accessible to the drivers of what courts around the country have found to be a bad-faith campaign to intimidate hospitals into halting the lawful provision of gender-affirming care." ER-37. The "requirements of grand jury secrecy" did not reduce the "potential harm," because it is "little solace to transgender minors that the only officials with access to their medical records are

those working to terminate gender-affirming care based on clear hostility to transgenderism." ER-36-37 (quotation marks omitted).

Third, DOJ had no "legitimate need" for the information. ER-38-42. DOJ did not "meaningfully defend the propriety of its demand." ER-4. Instead, it insisted that "grand jury secrecy requirements prevent [it] from explaining the nature of its investigation." ER-39. The district court found that was "not quite true," because DOJ could "petition the Texas court for authorization" to disclose information "*in camera* as needed to preserve grand jury secrecy." *Id.* Regardless, the record was "clear enough." *Id.* First, the district court found it "difficult to conceive of a potential criminal offense for which an investigation 'would require . . . identifying and sensitive medical information for an entire class of people for a six-year period.'" *Id.* (quoting *Coe*, No. 1:26-cv-4641, ECF 77 at 25). Second, the district court found it "hardly a logical leap to conclude that the subpoenas" concern the same FDCA investigation as the substantively identical administrative subpoenas. ER-39-40. Other courts had "ably explained" that sensitive patient information had "no discernible relevance to any federal healthcare offense or other fraudulent billing or insurance-claim practices." ER-40.

The district court determined that DOJ's forum shopping created an additional hurdle to any claim of relevance. ER-40-41. DOJ's own guidance instructs that a "case should not be presented to a grand jury in a district unless venue for the offense

lies in that district." ER-40 (quoting U.S. Dep't of Justice Manual § 9-11.121). Under the Supreme Court's decision in *Abouammo v. United States*, any charges must be brought "'where the crime was committed.'" ER-41. "Yet the patient records demanded by the grand jury subpoena issued to Packard have no apparent nexus to the Northern District of Texas," or even to a "potential multi-district offense that might allow prosecution in Texas." *Id.* That Rule 17(e) permits nationwide service did not alter the analysis, because such service "relates primarily" to trial subpoenas and still requires that records sought elsewhere will have "relevance to crimes chargeable in the district where the grand jury sits." *Id.*

Finally, no public policy weighed against Plaintiffs' privacy interest. ER-42. While DOJ "gesture[d] to the general public policy against unduly burdening grand jury investigations," the "Supreme Court has made clear that this policy does not authorize 'fishing expeditions' or demands for records for which there is not a reasonable possibility of relevance to the existence of an indictable offense." *Id.* (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 298 (1991)).

C. The district court concluded Plaintiffs "will likely suffer immediate and irreparable harm without preliminary injunctive relief." ER-42. Such harm resulted from not only deprivation of a constitutional right, but also disclosure of the "'most sensitive information that could be collected about a person.'" *Id.* Such disclosure would deter provisional class members from seeking healthcare and could "out"

them to federal officials who "sought to identify, demonize, and ultimately to eradicate an entire population of transgender people." ER-43.

D. DOJ identified no offsetting harm to the public interest. DOJ's own "conduct" suggested that any need it has for class members' information is "not urgent," because it "took no action to compel disclosure of such information for nine months after first serving Packard with its administrative subpoena." ER-44. Moreover, DOJ "'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" *Id.* (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)). Finally, the preliminary injunction does "nothing to prevent DOJ from seeking other records that might actually be relevant" to any criminal investigation. *Id.*

## IV. THE DISTRICT COURT DENIES DOJ'S REQUEST FOR A STAY

The district court denied DOJ's motion for a stay. The district court had invited DOJ to seek authorization to present information about its investigation to the district court *in camera*. SER-5-6. "More than four weeks later," DOJ had "taken no action," leading the district court to conclude DOJ "lacks evidence to support its claimed interest or to demonstrate irreparable harm to that interest." SER-6. DOJ then moved for a stay from this Court. Dkt. 12.1. This Court deferred the stay motion to the merits panel, Dkt. 27.1, and that motion remains pending.

Most recently, the Second Circuit denied DOJ's materially identical stay request in *Coe v. Blanche*. *See* No. 26-1886, Dkt. 54.1 (2d Cir. Aug. 26, 2026).

## SUMMARY OF ARGUMENT

I.A. Plaintiffs can file equitable claims to challenge DOJ's ever-shifting campaign to obtain their PHI in violation of the Constitution. The Supreme Court has repeatedly permitted equitable claims targeting constitutional violations, which have a historical pedigree that traces back to England. *Armstrong*, 575 U.S. at 327. Plaintiffs' equitable claims do not target any specific subpoena and instead address DOJ's broader course of unconstitutional action. Rules 6 and 17 do not preclude such claims. Only Congress can preclude constitutional claims. But Congress expressed the opposite intention in the Rules Enabling Act, stating that Federal Rules cannot "abridge" or "modify" any substantive right. 28 U.S.C. § 2072(b). Regardless, the district court carefully reviewed Rules 6 and 17 and determined that neither reflects any intention to preclude constitutional claims for equitable relief.

I.B. Plaintiffs will likely succeed on their Fifth Amendment privacy claims. This Court recognizes a Fifth Amendment right "stemming from an individual's interest in avoiding disclosure of personal matters." *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024). That right applies with special force to medical records identifying transgender minors and disclosing diagnoses, treatment histories, and family consent to care. Plaintiffs have a profound interest in protecting the privacy

of their medical information, which could "out" them to DOJ officials who have expressed "clear hostility to 'transgenderism.'" ER-37. DOJ, in contrast, has provided no evidence of any legitimate law enforcement interest in Plaintiffs' PHI. While DOJ claimed that Rule 6 prevented it from offering evidence, the district court correctly found that claim pretextual: DOJ could have sought authorization from the Texas court to make an *in camera* submission, but never did.

I.C. DOJ's requests for Plaintiffs' PHI also discriminate based on viewpoint and chill protected doctor-patient communications. DOJ requests patient information only if the patient has "asserted" a "gender identity" that differs from their "biological sex." ER-102. That request treats identical prescriptions differently based on the gender identity the patient has asserted and deters patients from expressing that viewpoint. Such viewpoint discrimination violates the very core of the First Amendment.

II. Plaintiffs face a severe risk of irreparable harm absent an injunction, and no countervailing government interest outweighs that risk. Violations of constitutional rights always inflict irreparable harm, and the specific harm Plaintiffs face, disclosure of their personal healthcare information, "cannot be undone." ER-43. The government's supposed investigative interest, in contrast, is unsubstantiated.

## **STANDARD OF REVIEW**

This Court reviews a district court's grant of a preliminary injunction for abuse of discretion. *Novedades y Servicios, Inc. v. FinCEN*, 181 F.4th 961, 970 (9th Cir. 2026). It reviews "conclusions of law de novo and findings of fact for clear error." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quotation marks omitted). "A factual finding is clearly erroneous if it is illogical, implausible, or without support in inferences that may be drawn from the record." *Novedades*, 181 F.4th at 970 (quotation marks omitted). This Court "will not reverse the district court where it 'got the law right,' even if [this Court] 'would have arrived at a different result,' so long as the district court did not clearly err in its factual determinations." *All. for the Wild Rockies*, 632 F.3d at 1131 (quotation marks omitted).

## **ARGUMENT**

Under binding precedent, Plaintiffs can assert an equitable claim to prohibit DOJ from violating their Fifth Amendment privacy rights. The district court applied this Court's balancing test and determined that transgender minors' privacy interest in highly-sensitive, patient-identifying healthcare information vastly outweighs any claimed investigative need for that information. Plaintiffs face a risk of harassment from government officials who have described healthcare that California deems a right as "barbaric." DOJ April 2025 Memorandum at 1. DOJ has never offered

evidence that Plaintiffs' PHI is relevant to any investigation, not even *in camera* in response to the district court's invitation. Every court to balance transgender minors' privacy interests against DOJ's supposed need for their PHI has held that those privacy interests prevail. The district court's agreement with that consensus was not an abuse of discretion.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors operate on a sliding scale; interim relief may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor.'" *All. for the Wild Rockies*, 632 F.3d at 1131 (quoting *Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)). The threatened deprivation of constitutional rights constitutes irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Novedades*, 181 F.4th at 980.

## I. PLAINTIFFS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

The district court correctly found that Plaintiffs will likely succeed on their Fifth Amendment claim. DOJ focuses its arguments entirely on a single grand jury subpoena, completely ignoring that the subpoena is simply one piece of a "campaign" that "began a year ago when DOJ issued an administrative subpoena to Packard." ER-27. Plaintiffs' claims, and the resulting injunction, did not seek to "quash a particular grand jury subpoena," but instead addressed "DOJ's broader campaign to procure provisional class members' [PHI]." *Id.* Such constitutional claims "reflect[ ] a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327.

Federal Rules of Criminal Procedure 6 and 17 do not preclude Plaintiffs' equitable claims. Nor could they. Supreme Court precedent makes clear that only Congress can preclude a constitutional cause of action. Congress expressed its intent not to preclude causes of action in the Rules Enabling Act, which provides that Federal Rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). And the district court correctly found that, even if Federal Rules could preclude constitutional claims, Rules 6 and 17 reflect no such intent.

Finally, the district court correctly determined that, under this Court's test in *Tucson Woman's Clinic*, transgender minors' privacy interests far outweigh whatever unexplained need DOJ claims to have for their sensitive healthcare

information. Every other court to balance those interests has agreed. *Coe*, No. 1:26-cv-4641, ECF 77 at 20; *In re Admin. Subpoena 25-1431-032*, 2026 WL 1392565, at *8-10; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 588-606.

### A. DOJ's Arguments Contradict Longstanding Practice Permitting Plaintiffs to Enjoin Constitutional Violations

#### *1. Plaintiffs Have an Equitable Cause of Action*

The district court correctly concluded that Plaintiffs have an equitable cause of action to prohibit DOJ's campaign to violate their constitutional rights. "[I]njunctive relief has long been recognized as the proper means for preventing [agencies] from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases). DOJ mischaracterizes Plaintiffs' claim as an attempt to "disable grand jury process issued by a sister federal court." DOJ.Br.16; *see also id.* at 2. Plaintiffs sued DOJ and the Acting Attorney General, not any court. ER-26. Their equitable cause of action is not a "mere proxy for a motion to quash," and instead seeks to enjoin an executive agency and its officers from violating their rights—something DOJ has now attempted to do for more than a year using multiple tools. ER-28. Plaintiffs require such relief against DOJ to "avoid playing 'a game of whack-a-mole' in which they must constantly uncover and counter DOJ's ever-shifting tactics." *Id.* (quoting *Coe*, No. 1:26-cv-4641, ECF 77 at 7).

Plaintiffs' claims follow a "long history of judicial review of illegal executive action." *Armstrong*, 575 U.S. at 327; *Free Enter. Fund*, 561 U.S. at 491 n.2. Sir Edward Coke recognized an action for "mandamus" as early as 1615. Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 16 (1963). Such an action "command[ed] an officer not as an individual but as a functionary" and sought to "prevent disorder from a failure of justice, and defect of police." *Id.* at 16-17. Early American courts followed their English forebears in holding that a "suit against an officer was not forbidden simply because it raised a question as to the legality of his action as an agent of government or because it required him, as in mandamus, to perform an official duty." *Id.* at 20; *see* Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and Out the Other*, 136 Harv. L. Rev. 1300, 1311 (2023) ("Founding generation presupposed a background scheme of common law and equitable remedies through which the Constitution could be enforced and rights vindicated."). This history renders it "well settled that federal courts have equitable authority to 'enjoin unconstitutional actions by state and federal officers.'" *In re Clean Water Act Rulemaking*, 60 F.4th 583, 594 (9th Cir. 2023).

DOJ invokes a supposed lack of "equitable history or tradition recognizing freestanding constitutional causes of action to enjoin grand jury process." DOJ.Br.24. DOJ forfeited that "argument by failing to develop it before the district

court." *NRDC v. Haaland*, 102 F.4th 1045, 1077 (9th Cir. 2024). It cannot fault the district court for failing to conduct a historical analysis DOJ never proposed. SER-17-21.[5]

Regardless, history decisively rebuts DOJ's argument. The tradition of officer suits permitted relief " 'in a court of equity . . . to prevent an injurious act by a public officer,' " whatever form that act may have taken. *Armstrong*, 575 U.S. at 327 (quoting *Carroll v. Safford*, 3 How. 441, 463 (1845)). Grand jury subpoenas had no exemption from courts' equitable powers. *See Hale v. Henkel*, 201 U.S. 43, 77 (1906) ("A general subpoena of this description is equally indefensible as a search warrant would be if couched in similar terms.").

DOJ's argument that courts did not enjoin subpoenas served from another jurisdiction, DOJ.Br.24-25, incorrectly assumes that such subpoenas have historical precedent. But historically, a grand jury could not " 'regularly enquire of a fact done out of that county for which they [we]re sworn.' " *United States v. Cessa*, 856 F.3d 370, 372 (5th Cir. 2017) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 303 (1769)); *see* 4 Blackstone, *supra*, at 305 ("[I]n general, all offences

[5] In reply on its stay motion, DOJ contended that "claims are deemed waived or forfeited, not arguments." Dkt. 22.1 at 9 n.1. But this Court has long applied "a 'general rule' against entertaining *arguments* on appeal that were not presented or developed before the district court." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998) (emphasis added). Allowing DOJ to raise new arguments in support of its general "claim" that the injunction is invalid would require this Court to resolve issues never presented to the district court.

must be enquired into as well as tried in the county where the fact is committed.”).[6] DOJ gains nothing from observing that courts did not historically enjoin a form of subpoena that never issued. That DOJ has undertaken a novel *abuse* of the grand jury process does not deprive courts of equitable power to address a pattern of conduct that includes such abuse. “The flexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices.” *Holland v. Florida*, 560 U.S. 631, 650 (2010).

*2. Congress Has Not Displaced Plaintiffs' Equitable Claim*

As the district court recognized, DOJ bears the burden of showing that Rule 17 has “displaced” Plaintiffs' well-recognized equitable right of action. ER-27. DOJ cannot do so for several different reasons. First, while DOJ urges that Federal Rules “have the force of statute,” DOJ.Br.22 (internal quotation marks omitted), the Rules Enabling Act that authorizes those Rules explicitly cabins their effect, 28 U.S.C. § 2072(b). Federal Rules “shall not abridge, enlarge or modify any substantive right.” *Id.* Interpreting Rule 17 to displace Plaintiffs' equitable cause of action would “abridge” and “modify” Plaintiffs' Fifth Amendment rights, *id.*, simply

[6] Even today, precedent and DOJ policy impose limitations on the territorial scope of grand jury investigations. *See Abouammo v. United States*, 146 S. Ct. 1571, 1576 (2026) (venue lies where “proscribed conduct” occurs); U.S. Dep't of Justice, *Justice Manual* § 9-11.121 (“A case should not be presented to a grand jury in a district unless venue for the offense lies in that district.”); *see* pp. 49-50, *infra*.

because their assertion would "incidentally" impact a grand jury subpoena. ER-28. Such an interpretation of Rule 17 would permit Plaintiffs to pursue their claim when aware of only the administrative subpoena, but would erase that same claim the moment DOJ recast its demand through grand-jury process. Section 2072(b) prohibits that result.

While § 2072(b) alone disposes of this issue, DOJ's argument would also raise a "serious constitutional question" by "deny[ing] any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Plaintiffs' claim is broader than a motion to quash, as the district court explained. ER-28. A "motion to quash could not enjoin" the full scope of DOJ's efforts to violate Plaintiffs' Fifth Amendment rights; "equitable relief can." *Id.* Courts will not infer an intention to "preclude judicial review" of Plaintiffs' broader constitutional claim unless *Congress's* "intent to do so … is clear." *Webster*, 486 U.S. at 603. But the Rules Enabling Act shows Congress's intent that no Federal Rule would "abridge" or "modify any substantive right," *id.* § 2072(b), much less create the "serious constitutional question" that would arise here, *Webster*, 486 U.S. at 603.

Nor can DOJ assert that Rule 17 channels Plaintiffs' constitutional claims to the district where DOJ issued the grand jury subpoena. Dkt. 22.1 at 6. Plaintiffs' claim is not a "mere proxy for a motion to quash," and is instead broader. ER-28. Regardless, claim channeling schemes turn on "Congress' intent" to commit claims

to a certain tribunal. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). Rule 17 says nothing about Congress's intent. To the contrary, the Supreme Court's insistence that Congress alone can alter the forum that hears constitutional claims underscores that DOJ's interpretation of Rule 17 would "abridge" and "modify" Plaintiffs' substantive rights in violation of § 2072(b).[7]

For the same reasons, the test the Supreme Court applied in *Armstrong* does not support a conclusion that Rules 6 and 17 displace Plaintiffs' constitutional claims. The Supreme Court deemed courts' equitable powers subject only to "express and implied statutory limitations." *Armstrong*, 575 U.S. at 328. The Rules Enabling Act does not express or imply any such limitations. Quite the opposite, it explicitly forbids imposing any such limitations here. 28 U.S.C. § 2072(b).

Even if *Armstrong* could apply, the district court persuasively explained at length why Rule 17 does not reflect any "intent to preclude" the equitable relief Plaintiffs seek. ER-27-30 (quoting *Armstrong*, 575 U.S. at 327). *Armstrong* inferred such an intent from "[t]wo aspects of § 30(A)" of the Medicaid Act. 575 U.S. at 328. First, § 30(A) created a "sole remedy" for State violations of the Medicaid Act. *Id.* The creation of a sole remedy, "by itself," did not "preclude the availability of equitable relief." *Id.* But it did so "when combined with the judicially

[7] Nor would channeling claims to Texas make sense, because Plaintiffs "received care in California from an institution that is located in California and has no documented connection to Texas." ER-41.

unadministrable nature of § 30(A)'s text," which imposed a "judgment-laden standard" appropriate only for agency decision-making. *Id.*

The district court examined both considerations identified in *Armstrong* and concluded that neither supported preclusion of equitable relief here. ER-28-29. First, Rule 17 "lacks a close relationship to any particular substantive rule of federal law," and thus is "less suggestive of a congressional intent to preclude equitable relief for violations thereof than the narrowly tailored remedy" in § 30(A). ER-29. Second, the Rule "contains no other indicia of an intent to foreclose constitutional claims for equitable relief that would incidentally affect enforcement of a subpoena." ER-29-30. That conclusion was "bolstered" by *N.Y. Times*, ER-30, where the Second Circuit held that Rule 17 does not bar an action for a declaratory judgment seeking to protect information sought by a grand jury subpoena in another district, 459 F.3d at 165-67.

DOJ identifies no error in the district court's decision. It urges that Rules 6 and 17 "establish a unified and comprehensive framework governing the issuance, enforcement, and challenge of grand jury subpoenas." DOJ.Br.15-16. Even putting aside that Plaintiffs' challenge is not limited to grand jury subpoenas, *see* pp. 27-28, *supra*, Rule 17 is not a "comprehensive framework" for challenging such subpoenas. It is not even specific to grand jury subpoenas, and instead "provides a broad mechanism to challenge any federal criminal subpoena" as "'unreasonable or

oppressive.'" ER-27 (quoting Fed. R. Crim. P. 17(c)(2)). Nor is Rule 17 the "sole remedy" for protecting Fifth Amendment rights, even in connection with grand jury subpoenas. *Armstrong*, 575 U.S. at 328. Subpoena recipients need not move to quash a grand jury subpoena under Rule 17(c) to assert their Fifth Amendment rights, and can instead refuse to testify or produce requested documents. *E.g.*, *United States v. Hubbell*, 530 U.S. 27, 36 (2000). If DOJ persists in violating those individuals' Fifth Amendment rights, then courts must dismiss any indictments the grand jury returns. *See id.* at 45-46. Treating Rule 17 as a "sole remedy" for constitutional violations by grand jury subpoenas would upend binding precedent and unsettle criminal practice.

Nor does Rule 6(e) enhance DOJ's argument. DOJ does not even attempt to argue that Rule 6(e) reflects congressional intent to limit equitable remedies. The supposed practical difficulties DOJ invokes do not withstand scrutiny. DOJ.Br.19-20. While DOJ urges that "Rule 6(e) generally prohibits government attorneys from disclosing matters occurring before the grand jury," it admits that it can do so with "authorization from the supervising court." DOJ.Br.19. That admission is fatal. Far from displaying an intention to preclude proceedings in other districts, Rule 6(e) specifically envisions disclosure in a "judicial proceeding in another district." Fed. R. Crim. P. 6(e)(3)(G). That is the opposite of what DOJ must show.

*Douglas Oil Co. v. Petrol Stops Northwest* is not contrary. 441 U.S. 211, 225 (1979). The Supreme Court held only that the "supervisory court" should "participate in reviewing" requests for disclosure. *Id.* That the "supervisory court" should "participate" does not exclude any other district court from doing so. The district court here recognized the role of the supervisory court, ER-39, and "invited" DOJ to seek permission to disclose information about its investigation *in camera*, SER-5-6. The Northern District of Texas had previously granted such permission. *In re Admin. Subpoena 25-1431-032*, 4:26-MC-00006-O, ECF 17 at 2 (N.D. Tex. May 12, 2026) (describing prior grant of permission "to disclose to the Rhode Island court that there is a legitimate investigation pending in this district, and responsive documents are due."). But DOJ did not even try. SER-6. DOJ cannot transform its own refusal to use Rule 6(e)'s disclosure mechanism into proof that Plaintiffs' constitutional claims are categorically unavailable.

DOJ's invocation of a "judicially unadministrable" standard fares no better. DOJ.Br.23. In *Armstrong*, the concern about administrability related to a "judgment-laden standard" that required the "expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking." 575 U.S. at 328-29. There can be no serious dispute that federal courts, not administrative agencies, routinely resolve Fifth Amendment claims under well-established standards. *E.g.*, *Tucson Woman's Clinic*, 379 F.3d at 551.

DOJ urges that, "if Congress has created 'an alternative remedial structure,' then '*that alone*' precludes the creation of a cause of action." DOJ.Br.23 (quoting *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1891 (2026)). That fails twice over. First, DOJ continues to miss the fundamental point that *Congress* did not create the alternative remedial structure it attempts to invoke. *See* pp. 31-33, *supra*. Second, *Cisco* and the precedent on which it relied dealt with *damages* actions, not equitable actions. *See* 146 S. Ct. at 1891 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)). The Supreme Court explicitly distinguishes between the "*Bivens* remedy" for damages, and "injunctive relief," which "has long been recognized as the proper means for preventing [agencies] from acting unconstitutionally." *Malesko*, 534 U.S. at 74. The district court did not need to "creat[e]" an equitable cause of action, DOJ.Br.23, where one has "long been recognized," *Malesko*, 534 U.S. at 74.

DOJ's remaining citations involve antisuit injunctions barring a lawsuit in another state. *See Am. Acad. of Pediatrics v. Uthmeier*, 180 F.4th 1022 (7th Cir. 2026); *World Pro'l Ass'n for Transgender Health v. FTC*, No. 26-532, 2026 WL 1999008 (D.D.C. July 10, 2026). Those cases are far afield. Neither considered whether Rules 6 and 17 preclude an equitable cause of action asserting Fifth Amendment privacy rights. Nor is the injunction here comparable to an antisuit injunction. It "narrowly prevents DOJ from obtaining" Plaintiffs' PHI, leaving DOJ "otherwise free to proceed with its investigation, including by obtaining other

records from Packard that did not disclose individual patients' private information." ER-31.

*3. DOJ's Remaining Arguments Lack Merit*

DOJ's other attacks on Plaintiffs' equitable claim fail. It argues that Plaintiffs' claims will "impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." DOJ.Br.20-21. But that is an argument about the *merits* of Plaintiffs' Fifth Amendment claim, not an argument that Congress intended to preclude such claims. *See Tucson Woman's Clinic*, 379 F.3d at 551 (considering DOJ's "need for access" to information and whether a "recognizable public interest" favors access). DOJ's argument fails on the merits, *see* pp. 46-50, *infra*, and it has no interest in investigative actions that violate constitutional rights, *see Melendres*, 695 F.3d at 1002. The district court found that DOJ was abusing grand jury process, as the "record before the Court evinces virtually no chance that the information [sought] is relevant to an offense chargeable in the Northern District of Texas." ER-40. It is no response to argue that DOJ must have the flexibility to act quickly in carrying out the very tactics the district court found likely unconstitutional. That response has even less merit where DOJ's own "conduct suggests that [its] need is not urgent." ER-44.

Similarly unavailing is DOJ's accusation that Plaintiffs are "packaging an impermissible request for relief from grand jury process together with a request from

other hypothetical process." DOJ.Br.26. This argument is also forfeited. SER-17-21; *NRDC*, 102 F.4th at 1077. But on the merits, the district court simply enjoined "DOJ from 'obtaining'" specific information. ER-28. Its injunction does "not invalidate the subpoena," which remains in place and can be enforced as to information outside the injunction's scope. *Id.* That fact distinguishes Justice Barrett's concurrence in *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). There, a district court had jurisdiction to vacate agency guidance under the APA, but lacked jurisdiction to reinstate grants terminated under that guidance. *Id.* at 2661 (Barrett, J., concurring). Here, in contrast, the district court had jurisdiction to declare and enforce Plaintiffs' rights. It had no need to take the further step of quashing the grand jury subpoena and explicitly did not do so. ER-28.

Finally, Plaintiffs have standing to challenge DOJ's "campaign to procure" their PHI. ER-27. That campaign "began a year ago when DOJ issued an administrative subpoena to Packard," not in May when DOJ issued the grand jury subpoena. *Id.* Plaintiffs' injury is not speculative: DOJ sought their records once through administrative process, withdrew that subpoena after courts rejected materially similar demands, and immediately sought the same information through grand-jury process. That sequence establishes a "credible threat" to Plaintiffs' Fifth Amendment privacy rights that long predated the grand jury subpoena. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014). That threat results from DOJ's

actions regarding Plaintiffs, not a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). DOJ's withdrawal of the administrative subpoena is irrelevant, because a defendant's "voluntary cessation of a challenged practice" does not defeat jurisdiction. *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Plaintiffs have standing to challenge each of DOJ's "ever-shifting tactics" to obtain their PHI in violation of their Fifth Amendment privacy rights. ER-28.

### B. DOJ Is Violating Plaintiffs' Fifth Amendment Rights

DOJ's arguments regarding the merits of Plaintiffs' Fifth Amendment privacy claim are even weaker. This Court has "recognized a right to informational privacy" under the Fifth Amendment "stemming from an individual's interest in avoiding disclosure of personal matters." *Bonta*, 101 F.4th at 637; *Tucson Woman's Clinic*, 379 F.3d at 553. The district court carefully applied this Court's balancing test from *Tucson Woman's Clinic* and concluded that Plaintiffs' interest in keeping private the "most sensitive information that could be collected about a person" far outweighed any legitimate interest DOJ might have. ER-33-42.

#### *1. The Fifth Amendment Privacy Right Is Well-Established*

DOJ does not dispute that *Tucson Woman's Clinic* recognized a Fifth Amendment "interest in avoiding certain unauthorized disclosures of highly personal information." DOJ.Br.30. But it urges that applying that right here would "break new ground," because any privacy right must be " 'objectively, deeply rooted

in the Nation's history and tradition.'" *Id.* at 31. That argument is forfeited. *NRDC*, 102 F.4th at 1077. DOJ again faults the district court for not conducting a historical inquiry DOJ never proposed.

Regardless, DOJ bears the burden of showing that *Bonta* and *Tucson Woman's Clinic* are "clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). It does not come close. As the district court recognized, the Supreme Court has "for decades assumed, without conclusively deciding, that [a right to informational privacy] exists." ER-33 (citing *NASA v. Nelson*, 562 U.S. 134, 147 (2011); *Whalen v. Roe*, 429 U.S. 589, 599 (1977)). Even *Dobbs* distinguished between "the right to shield information from disclosure" and "the right to make and implement important personal decisions without governmental interference," addressing only the latter. 597 U.S. at 273. This Court is thus "bound by . . . prior circuit law." *Miller*, 335 F.3d at 900.

Even examined anew, the right to privacy is "'objectively, deeply rooted in the Nation's history and tradition.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)). Early American law reflects a right to the privacy of medical information specifically. In 1828, New York evidence law forbade any doctor from "disclos[ing] any information which he may have acquired in attending any patient." 2 Rev. Stat. of

N.Y., pt. III, ch. VII, tit. III, § 73 (1st ed. 1828). Contemporary medical guides compared doctors' confidentiality obligations to priests', "which admit[] of no disclosures except in cases of treason or murder." Medical Soc'y of N.Y., *A System of Medical Ethics* 21 (1823). "Between 1828 and 1870, seventeen states or territories enacted statutory guarantees of medical confidentiality." Miles Wilkinson, *Codification and the Origins of Physician-Patient Privilege*, 32 J. Pol'y Hist. 78, 92 (2020); *Glucksberg*, 521 U.S. at 715-16 (reviewing 19th-century state statutes to identify "deeply rooted" legal tradition). And case law declared it "shocking to our sense of right, justice and propriety" to not provide an "ample remedy" for third-party intrusions into medical care. *De May v. Roberts*, 9 N.W. 146, 148-49 (Mich. 1881); *see also Union Pac. R.R. Co. v. Botsford*, 141 U.S. 250, 257 (1891) (court could not order "plaintiff's person to examination by a surgeon, without her consent and in advance of the trial").[8]

That history amply supports this Court's recognition of a "right to informational privacy" under the Fifth Amendment. *Bonta*, 101 F.4th at 637. DOJ urges that the Fifth Amendment privacy right provides no protection against grand jury subpoenas. But that makes no sense. The Fifth Amendment constrains all government action, including the "grand jury's subpoena power." *United States v.*

[8] For their part, English courts recognized the "centuries-old principle of respect for the privacy of the home." *Wilson v. Layne*, 526 U.S. 603, 609-610 (1999).

*Calandra*, 414 U.S. 338, 346 (1974). The Supreme Court has repeatedly recognized that "grand juries must operate within the limits of the First Amendment *as well as the Fifth*." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972) (emphasis added).

*In re Grand Jury Proceedings*, 801 F.2d 1164 (9th Cir. 1986), is not contrary. That case acknowledged that *Whalen* balanced "the right to privacy" and asked whether the "State's interest in prohibiting illegal drug activity outweighed the limited invasion of privacy." *Id.* at 1169. That balancing inquiry is consistent with this Court's later decision in *Tucson Woman's Clinic*, 379 F.3d at 551. That *In re Grand Jury Proceedings* found the "State's interest" to outweigh the "invasion of privacy" resulted from the case's specific facts, where a doctor had prescribed "large quantities" of "illegal" steroids to "many professional athletes" in violation of federal and state law. 801 F.2d at 1166. As the district court recognized, the balancing of the "State's interest" against "privacy" leads to the opposite conclusion here. ER-33-42.

*2. Plaintiffs' Privacy Interests Outweigh DOJ's Supposed Need*

Under *Tucson Woman's Clinic*, this Court balances five factors "to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest":

> (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access,

> and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

379 F.3d at 551. The district court considered each and held that the balance weighs heavily in Plaintiffs' favor. ER-33-42.

a. <u>DOJ Requests Extremely Sensitive Information</u>

The information at issue is precisely what this Court found sensitive in *Tucson Woman's Clinic*: "unredacted medical records" concerning politically controversial care. 379 F.3d at 552. DOJ urges that "LPCH's own privacy notice makes clear" that medical information is "routinely disclosed." DOJ.Br.37. But the district court specifically considered that notice and found that Plaintiffs maintained a "reasonable . . . expectation of privacy," because the notice discloses that "certain conditions" must be met, including that PHI "will not be disclosed absent a showing of possible relevance to the purported law-enforcement purpose and an attendant government interest in the information." ER-34-35; SER-50; SER-46; SER-43. DOJ identifies no clear error in that factual finding. *Novedades*, 181 F.4th at 970. The Supreme Court "has never held that the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Carpenter v. United States*, 585 U.S. 296, 317 (2018). A hospital privacy notice is not a blank check for the federal government to obtain minor patients' most intimate medical records without any demonstrated, legitimate need.

b. The Potential Harm Is Tremendous

The "potential for harm in any subsequent non-consensual disclosure" of sensitive medical information is "obviously tremendous." *Tucson Woman's Clinic*, 379 F.3d at 552. As the district court recognized, the "disclosure of children's [PHI] to officials who expressly intend to deprive them of medical care that their families, doctors, and the California legislature deem necessary and appropriate is an obvious harm." ER-37. DOJ urges that the Court "baselessly assumed" that DOJ has expressed hostility to transgender healthcare. DOJ.Br.38. But the district court did not assume anything. It chronicled the evidence of hostility it considered and listed the many district courts who made the same finding based on that evidence. ER-6-11. DOJ cannot show "clear error" by ignoring the evidence before the district court.

c. Grand Jury Secrecy Provides No Safeguard

Grand jury secrecy does nothing to protect Plaintiffs' Fifth Amendment privacy rights. *Tucson Woman's Clinic* recognizes that supposed protections do not prevent a violation of "informational privacy rights" if a "large number of government employees have access to the information." 379 F.3d at 551-52. Rule 6(e) would permit disclosure of Plaintiffs' sensitive information to the "drivers of what courts around the country have found to be a bad-faith campaign to intimidate hospitals into halting the lawful provision of gender-affirming care." ER-36-37. It is "of little solace to transgender minors that the only officials with access to their

medical records are those working to terminate gender-affirming care based on clear hostility to 'transgenderism.'" *Id.* DOJ's response again fails to confront the evidence before the district court. DOJ.Br.38-39.

#### d. DOJ Has No Need for Patient Information

DOJ has not even attempted to demonstrate a need for the large quantities of patient information it seeks. It instead urges that it has a "'compelling interest in the grand jury's investigation into possible violations of federal law.'" DOJ.Br.39.[9] But that begs the question of whether DOJ is investigating "violations of federal law." DOJ cannot use grand jury subpoenas to "engage in arbitrary fishing expeditions" or "select targets of investigation out of malice or an intent to harass." *R. Enters.*, 498 U.S. at 298.

The district court found it "difficult to conceive of a potential criminal offense for which an investigation 'would require . . . identifying and sensitive medical information for an entire class of people for a six-year period." ER-39 (quoting *Coe*, No. 1:26-cv-4641, ECF 77 at 25). Given that DOJ "issued the grand jury subpoena the day after it withdrew the substantively identical administrative subpoena," the district court found it "hardly a logical leap to conclude that the subpoenas concern

[9] Historically, the grand jury protected the "liberties of the people" against the "prerogatives of the crown." 4 Blackstone, *supra*, at 343. DOJ thus cannot equate its "prerogatives" with the grand jury's. As the district court recognized, DOJ acted unilaterally when issuing its grand jury subpoena to Packard. ER-31.

the same potential FDCA violations." ER-39-40. DOJ's brief appears to confirm as much. DOJ.Br.5. But Plaintiffs' sensitive medical information has "no discernable relevance" to FDCA claims or any other "federal healthcare offense." ER-40. DOJ agrees that FDCA violations depend on the intentions of "drug manufacturers and distributors" when they ship "drugs in interstate commerce." DOJ.Br.5. That has nothing to do with "how physicians diagnose patients, obtain consent, document treatment, or communicate with them." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 579; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4. To the contrary, doctors are explicitly permitted to prescribe drugs for off-label purposes and commonly do so. *Wash. Legal Found.*, 202 F.3d at 333; *see Buckman*, 531 U.S. at 350.

DOJ's own conduct confirms the lack of need for patient-identifying information. It twice told Packard it would accept "anonymized" information. ER-32; SER-54-56. And it has repeatedly withdrawn requests for patient-identifying information or settled claims without receiving it. ER-118; *see* pp. 11-13, *supra*.

This Court's decision in *QueerDoc* does not change the analysis. No. 25-7384, 2026 WL 2359440 (9th Cir. Aug. 14, 2026). In *QueerDoc*, DOJ provided a declaration explaining its "reasons for believing that QueerDoc may be engaged in the 'misbranding' of puberty blockers and cross-sex hormones through false or

misleading labeling." *Id.* at *5. DOJ provided no such declaration here. And even after this Court found a legitimate investigative rationale in *QueerDoc*, it did not consider whether that rationale outweighed patients' privacy concerns, but instead remanded to the district court to address "concerns about patient privacy" relating to "DOJ's requests for patient medical records." *Id.* at *20. *QueerDoc* thus says nothing at all about the central issue here: whether DOJ may obtain minor patients' identifying PHI without any substantiated need. If anything, it recognizes that courts must consider patients' strong interest in protecting that information.

Rather than substantiate any investigative rationale, DOJ argued that "grand jury secrecy requirements prevent [it] from explaining the nature of [its] investigation." ER-39. But as the district court explained, that is "not quite true," because DOJ can petition for authorization to disclose information *in camera*. *Id.* DOJ never even tried. SER-6. DOJ asks this Court to excuse that failure because the Texas court *might* have withheld permission, *but see In re Admin. Subpoena 25-1431-032*, 4:26-MC-00006-O, ECF No. 17 at 2 (N.D. Tex. May 12, 2026) (discussing a prior grant of such permission), and because DOJ should not have to "collaterally litigate." DOJ.Br.24. But such arguments simply request a blank check for grand jury subpoenas that no court has ever granted. *R. Enters.*, 498 U.S. at 298; *Hale*, 201 U.S. at 77. This case should not be the first. Having engaged in what "courts around the country have found to be a bad-faith campaign to intimidate

hospitals," ER-36-37, DOJ should not be spared from making even a minimal showing that it needs the identities and medical histories of minor patients.

Even if DOJ had shown that the records at issue related to possible violations of federal law, the district court identified a further barrier to any legitimate need for those records in the Northern District of Texas. "A case should not be presented to a grand jury in a district unless venue for the offense lies in that district." U.S. Dep't of Justice, *Justice Manual* § 9-11.121. The Constitution "twice safeguards" defendants' venue rights, requiring prosecution in the district where an offense's "essential conduct elements" occurred. *Abouammo*, 146 S. Ct. at 1576. "Even if the sensitive patient information DOJ demands is possibly relevant to the existence of some chargeable offense," the district court found that the "record" before it "evinces virtually no chance that the information is relevant to an offense chargeable in the Northern District of Texas." ER-40.

DOJ comes nowhere close to showing that this finding was clearly erroneous. It urges that "Rule 17 authorizes nationwide service." DOJ.Br.36. But it does so because "individuals outside a particular district may nevertheless possess evidence of potential relevance to criminal conduct within the district." ER-41. That is precisely what DOJ failed to show, any "possibility of relevance to crimes chargeable in the district where the grand jury sits." *Id.* DOJ next urges that it can seek "out-of-district evidence to determine 'whether the facts show a case within

the[ ] jurisdiction.' " DOJ.Br.36 (quoting *Blair v. United States*, 250 U.S. 273, 283 (1919)). But DOJ cannot credibly contend that "identifying and sensitive medical information for an entire class of people for a six-year period" is jurisdictional discovery, ER-39, much less where patient information has "no discernable relevance" to the only criminal statute DOJ has identified, ER-40.

e. No Public Policy Favors Disclosure

Finally, no "public policy" or "public interest" favors allowing DOJ to access Plaintiffs' sensitive medical information. *Tucson Woman's Clinic*, 379 F.3d at 551. DOJ repeatedly invokes the need to avoid "litigious interference with grand jury proceedings." DOJ.Br.20 (quoting *Calandra*, 414 U.S. at 350). But *Calandra* and other Supreme Court precedent agree that grand jury subpoenas must yield to any "recognized privilege of confidentiality," including individuals' constitutional rights. 414 U.S. at 353; *Branzburg*, 408 U.S. at 708. DOJ cannot dismiss Plaintiffs' assertion of recognized constitutional rights as mere "litigious interference." Nor can DOJ invoke any prohibition against "[r]equiring the Government to explain in too much detail," DOJ.Br.20 (quoting *R. Enters.*, 498 U.S. at 299), when it has refused to explain its investigative rationale at all, *see R. Enters.*, 498 U.S. at 299 (refusing to permit "arbitrary fishing expeditions" and "harass[ment]").

#### 3. *The Conscience-Shocking Standard Does Not Govern and Would Be Met Regardless*

Finally, DOJ contends that only conduct that "shocks the conscience" can violate substantive due process. DOJ.Br.33 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). But the cases on which DOJ relies involved damages claims under 42 U.S.C. § 1983 for generalized "abuse of executive power." *E.g.*, *Lewis*, 523 U.S. at 840; *Becker v. Kroll*, 494 F.3d 904, 922-23 (10th Cir. 2007). This Court's precedent addressing Fifth Amendment privacy rights does not require a showing that conduct shocks the conscience. *Tucson Woman's Clinic*, 379 F.3d at 551-54. DOJ cannot add a requirement this Court's decisions do not impose, *Miller*, 335 F.3d at 900, particularly when doing so could place proven constitutional violations beyond judicial reach.

Regardless, the record amply demonstrates conscience-shocking misconduct that satisfies even DOJ's proposed standard. "[H]istorical examples" recognize the privacy "interest of the sort claimed" by Plaintiffs. *Lewis*, 523 U.S. at 847 n.8; *see* pp. 41-42, *supra*; *De May*, 9 N.W. at 149 (failure to remedy intrusions into medical privacy "shocking to our sense of right"). DOJ has engaged in "what courts around the country have found to be a bad-faith campaign." ER-37. It is "expressly targeting members of a particular and uniquely vulnerable group," *Coe*, No. 1:26-cv-4641, ECF 77 at 23, even though multiple courts have "ably explained" that group's information has "no discernable relevance to any federal healthcare

offense," ER-40. Worse still, it has engaged in "forum shopping" in an effort to "avoid" enforcement of the very constitutional rights the district court found DOJ likely to violate. ER-28.

DOJ's counterarguments fail. It asserts that the district court could not engage in the "exact analysis of circumstances" required by *Lewis*. DOJ.Br.34. But the district court explained that the "record is clear enough." ER-39. DOJ's grand jury subpoena relates to the "substantively identical administrative subpoena" it withdrew one day earlier. ER-39-40. DOJ insists that it often seeks "large quantities" of "billing records." DOJ.Br.35. But that is no response. The injunction leaves DOJ free to obtain anonymized billing records, and court after court has found DOJ has no legitimate need for the patient-identifying information it seeks. Rather than prove its case in the district where Plaintiffs received care, DOJ sought to "avoid another loss" by attempting to move any dispute to a "forum that DOJ deems friendlier." ER-32. It responded to repeated findings of misconduct with forum shopping rather than a defense. Such egregious efforts to violate the Fifth Amendment rights of a vulnerable group of minor patients, "based on clear hostility to 'transgenderism,'" shock the conscience. ER-37; *Coe*, No. 1:26-cv-4641, ECF 77 at 22-23.

* * *

The district court "'got the law right,'" *All. for the Wild Rockies*, 632 F.3d at 1131, applying the balancing test set forth in this Court's leading precedent, *Tucson Woman's Clinic*, 379 F.3d at 551. Because the district court "did not clearly err in its factual determinations," this Court should affirm. *All. for the Wild Rockies*, 632 F.3d at 1131. The unanimous agreement of every district court to balance those same interests underscores that the district court appropriately exercised its discretion. *Coe*, No. 1:26-cv-4641, ECF 77 at 20; *In re Admin. Subpoena 25-1431-032*, 2026 WL 1392565, at *8-10; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 588-606.

### C. Plaintiffs Will Likely Succeed on Their First Amendment Claim

Because the district court found a likelihood of success on Plaintiffs' Fifth Amendment claims, it had no need to "address plaintiffs' First Amendment claims." ER-26. But this Court can affirm "on any ground raised below and fairly supported by the record," including issues the district court declined to consider. *Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009).

DOJ's campaign to obtain Plaintiffs' PHI discriminates based on viewpoint and thus violates Plaintiffs' First Amendment rights. "Throughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018) (quotations omitted). Free and open

communication between medical providers, patients, and their families is protected by the First Amendment. *Id.* "Physicians must be able to speak frankly and openly to patients." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) (upholding a permanent injunction of government investigations into doctors recommending medical marijuana). For this reason, this Court has long recognized the First Amendment's protection of communications between doctors and providers and their patients, particularly where the government discriminates based on viewpoint. *See id.* at 673; *see also Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024).

The Supreme Court has recently held that subpoenas can injure First Amendment rights. *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). In *Davenport*, the New Jersey Attorney General subpoenaed information about a nonprofit's donors to investigate whether the organization had "misled" them. *Id.* at 1120. The Supreme Court held that the issuance of the subpoena "established a present injury to [the recipient's] First Amendment associational rights" for purposes of Article III standing. *Id.* at 1124. Because the recipient's "prospective partners would be hesitant to risk the revelation of their personal information through government investigation," the subpoena discouraged "people from associating with groups" and also encouraged "groups

and individuals to cease or modify protected First Amendment advocacy the government disfavors." *Id.* at 1125.

DOJ's pursuit of Plaintiffs' PHI discriminates based on viewpoint and chills doctor-patient communications. The definition of "Sex-Rejecting Procedures" includes medical procedures only when they have the "purpose of aligning with or affirming a minor's *asserted* gender identity rather than the minor's biological sex." ER-102 (emphasis added). Whether communications fall within the subpoena's scope thus depends on whether the minor "assert[s]" a "gender identity" that differs from their "biological sex." The subpoena is clear that an "intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose." *Id.* Two identical prescriptions can be treated differently under the subpoena based entirely on the patient's and the doctor's viewpoint about potential differences between gender and sex. Such discrimination will deter patients from communicating with their doctors about differences between their sexes and gender identities, as Plaintiffs set forth in declarations before the district court, SER-46; SER-58, and as the district court found, ER-43. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Before the district court, DOJ argued that the Supreme Court's decision in *Branzburg* precludes any assertion of First Amendment rights in response to a grand jury subpoena. SER-28. But *Branzburg* recognized that even "grand juries must operate within the limits of the First Amendment." 408 U.S. at 708. This Court has held that the First Amendment does not permit grand jury investigations " 'instituted or conducted other than in good faith.' " *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1190 (9th Cir. 2017) (quoting *Branzburg*, 408 U.S. at 707-08). It has prohibited grand jury investigations that "engaged in a fishing expedition designed to gather as much background information as possible about the activities of a dissident group." *Id.* at 1188 (discussing *Bursey v. United States*, 466 F.2d 1059, 1065 (9th Cir. 1972)). The Court can thus affirm the injunction based on Plaintiffs' likelihood of success on their First Amendment claims.

## II. The District Court Did Not Abuse Its Discretion When Finding That the Remaining Factors Favor a Preliminary Injunction

The district court correctly found that Plaintiffs face a severe risk of irreparable harm and that the balance of equities and public interest favor a preliminary injunction.

### A. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

The district court found that Plaintiffs will suffer two forms of "immediate and irreparable harm without preliminary injunctive relief." ER-42-43. First, the

"deprivation" of Plaintiffs' "constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002 (internal citation omitted). DOJ's campaign to obtain Plaintiffs' PHI violates both their Fifth Amendment privacy rights, *see* pp. 40-52, *supra*, and the First Amendment, *see* pp. 53-56, *supra*.

Second, without an injunction, Plaintiffs would suffer "near-certain disclosure of their personal medical information, which is among the most sensitive information that could be collected about a person." ER-42 (internal quotation marks omitted). "Secrecy is a one-way street." *In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008). Disclosure of Plaintiffs' PHI will cause "loss of privacy, chilling of doctor-patient communications, and risk of governmental harassment," all of which "cannot be undone." ER-43.

DOJ again urges that "grand jury secrecy provides substantial protection." DOJ.Br.41-42. But Plaintiffs are harmed by disclosure of their information to *DOJ*, not just further disclosure of their information by DOJ. *See Tucson Woman's Clinic*, 379 F.3d at 551-52. DOJ asserts that transgender people "deny biological reality" and that healthcare that California deems a right is "barbaric." *See* DOJ April 2025 Memorandum at 1-2. As the district court found, disclosing Plaintiffs' PHI would "'out' provisional class members as transgender to a federal government that for more than a year has 'sought to identify, to demonize, and ultimately to eradicate an entire population of transgender people." ER-43.

DOJ's suggestion that it can cure any injury by returning records, DOJ.Br.42, is wrong. *Church of Scientology of California v. United States* addressed whether a third party's compliance with a subpoena rendered a dispute moot; it did not hold that disclosure of constitutionally protected information to the government causes no irreparable injury. 506 U.S. 9, 13-15 (1992). In fact, the Supreme Court held the exact opposite. It explained that, following disclosure, "it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred." *Id.* at 13. The district court did not abuse its discretion in reaching the same conclusion.

### B. The Equities and the Public Interest Favor Plaintiffs

Because the injunction binds the government, "the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). The district court correctly found that these factors "tip sharply in plaintiffs' favor," because "DOJ has not established that preliminary injunctive relief would injure it in any meaningful way." ER-44. The public *always* has an interest in "prevent[ing] the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("[A]ll citizens have a stake in upholding the Constitution."). "[T]he government 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" ER-

44 (quoting *Zepeda*, 753 F.2d at 727; *United States v. Raines*, 362 U.S. 17, 27 (1960)).

The government urges that the injunction prohibits it from "obtaining relevant evidence through any grand jury process (or any other process)," "no matter how strong the evidence of wrongdoing." DOJ.Br.40. But the district court specifically found "little to no possibility that the patient information DOJ demands will be of any relevance to the grand jury investigation." ER-41. It "invited" DOJ to submit contrary proof. SER-5-6. DOJ refused, leading the district court to conclude that it "lacks evidence." *Id.* DOJ cannot ask this Court to assume the very thing the district court found DOJ had done nothing to prove. And any limitation on its investigation is overstated, because "DOJ remains otherwise free to proceed[,] . . . including by obtaining other records from Packard." ER-31.

Even if DOJ could show that the requested information had any relevance to a criminal investigation, that still would not entitle it to violate Plaintiffs' constitutional rights. The First, Fourth, and Fifth Amendments routinely constrain DOJ's ability to obtain even relevant evidence, "to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987). "If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Escobedo v. Illinois*, 378 U.S. 478, 490 (1964); *see*

*also Stanley v. Illinois*, 405 U.S. 645, 656 (1972) ("[T]he Constitution recognizes higher values than speed and efficiency.").

None of DOJ's remaining arguments tip the scales in its favor. DOJ invokes separation-of-powers principles. But courts' "equitable authority to 'enjoin unconstitutional actions'" by federal officers is "well settled." *In re Clean Water Act Rulemaking*, 60 F.4th at 594. *Dickinson v. Trump* is not to the contrary. 174 F.4th 634 (9th Cir. 2026). There, the district court entered a "grossly overbroad and unworkable" preliminary injunction that impeded ICE officers' ability to "protect themselves and the Portland ICE facility from attack and disruption." *Id.* at 646, 648. The injunction was thus "extremely dangerous to both federal officers and the public." *Id.* at 644, 649. Here, in contrast, the preliminary injunction bars DOJ from seeking a specific, limited category of patient information in California that the district court found had "virtually no chance" of proving "relevant to an offense chargeable in the Northern District of Texas," ER-40, a finding DOJ continues to make no effort to rebut.

DOJ also briefly invokes the "principle of comity" between federal courts. DOJ.Br.41. But as the district court found, any risk to comity has been "manufactured by DOJ" as it sought to "avoid another loss" and route challenges to a "forum that DOJ deems friendlier." ER-32. "DOJ cannot reasonably invoke comity . . . as cover for its forum shopping." *Id.*

DOJ's abstract interests do not outweigh the Plaintiffs' irreparable harms, or the public's fundamental interest in protecting constitutional rights. The district court did not abuse its discretion in concluding that the balance of equities and public interest tip sharply in favor of injunctive relief.

## CONCLUSION

This Court should affirm the district court's preliminary injunction.

DATED: September 4, 2026

Respectfully submitted,

*/s/ Caleb Hayes-Deats*

ABBE DAVID LOWELL
CALEB HAYES-DEATS
SCHUYLER STANDLEY
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
chayes-deats@lowellandassociates.com
sstandley@lowellandassociates.com

SHANNON P. MINTER
CHRISTOPHER F. STOLL
AMY WHELAN
RACHEL BERG
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California 94102
Telephone: (415) 392-6257
sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

JOSHUA ROVENGER
DONOVAN BENDANA*
GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts 02108
Telephone: (617) 426-1350
jrovenger@gladlaw.org
dbendana@gladlaw.org

GAY C. GRUNFELD
KARA J. JANSSEN
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
kjanssen@rbgg.com

Attorneys for Plaintiffs-Appellees

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*/s/ Caleb Hayes-Deats*
CALEB HAYES-DEATS

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,877 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Caleb Hayes-Deats*
CALEB HAYES-DEATS