No. 26-4388

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Z.A., *et. al.*,
*Plaintiffs - Appellees*,

v.

Todd Blanche, *et al*.,
*Defendants - Appellants*.

**On Appeal from the United States District Court for the Northern District of California**
No. 5:26-cv-4998
Hon. P. Casey Pitts

## BRIEF OF *AMICI CURIAE* FORMER DEPARTMENT OF JUSTICE ATTORNEYS IN SUPPPORT OF THE PETITIONER-APPELLEE AND AFFIRMANCE

Austin P. Anderson
Sean P. O'Neill
ANDERSON & KREIGER LLP
255 State Street, 10th Floor
Boston, MA 02109
T: 617-621-6500
E: aanderson@andersonkreiger.com
E: soneill@andersonkreiger.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 2

ARGUMENT ........ 9

I. DOJ'S IMMENSE POWER MUST BE PROPERLY USED TO ENFORCE FEDERAL LAW. ........ 9

II. DEVIATIONS FROM NORMS AND PROCEDURES IN THIS CASE CREATE AN INFERENCE THAT DOJ IS USING ITS AUTHORITY IMPROPERLY. ........ 15

A. Deviations from normal procedures create an inference of improper purpose. ........ 15

B. This investigation has not been conducted in a manner suggesting its true purpose is enforcing federal law. ........ 17

1. DOJ's mid-course relocation of its investigation suggests an improper purpose. ........ 17

2. The timing of the grand jury subpoena suggests a last-ditch effort to circumvent repeated losses in other courts. ........ 19

3. DOJ's approach to publicizing this investigation and subpoenas violate longstanding norms and policies. ........ 23

III. THE INSTITUTIONAL SAFEGUARDS THAT WOULD ONCE HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED. ........ 26

CONCLUSION ........ 29

CERTIFICATE OF COMPLIANCE ........ 31

CERTIFICATE OF SERVICE ........ 32

## TABLE OF AUTHORITIES

### Cases

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .........6

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*,
No. 1:26-mc-0007-MSM-AEM, 2026 WL 1392565 (D.R.I. May 14, 2026) ..........6

*In re Admin. Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025) ..........6, 25

*In re Children's Nat'l Hosp.*,
No. 1:25-cv-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026) ........6

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
Case No. 25-mc-00063-SKC-CYC, 2026 WL 33398, (D. Colo. Jan. 5, 2026) ..........6

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-mc-00041-JHC, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ..........6

*In re Subpoena No. 25-1431-014*,
810 F. Supp. 3d 555 (E.D. Pa. 2025) ..........6

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
807 F. Supp. 3d 1295 (W.D. Wash. 2025) ..........6, 25

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
No. 25-7384, WL 2359440 (9th Cir. Aug. 14, 2026).............. 7, 8, 15, 16

*R.H. Stearns Co. of Bos., Mass. v. United States*,
291 U.S. 54 (1934) ..........16

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) ..........13

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ..........12

*United States v. Claiborne*,
765 F.2d 784 (9th Cir. 1985) ........................................................21

*United States v. Colo. Supreme Ct.*,
189 F.3d 1281 (10th Cir. 1999) ....................................................11

*United States v. Furrow*,
125 F. Supp. 2d 1170 (C.D. Cal. 2000)..........................................22

*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991) .......................................................................19

*United States v. Skrmetti*,
605 U.S. 495 (2025). .........................................................................3

*United States v. Star*,
470 F.2d 1214 (9th Cir. 1972) ........................................................21

*United States v. Williams*,
504 U.S. 36 (1992) .........................................................................21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......................................................................16

*Wayte v. United States*,
470 U.S. 598 (1985) .........................................................................2

**Statutes**

18 U.S.C. § 3486 .................................................................................5

18 U.S.C. § 3486(a)(1)(A)(i)(I) .......................................................20

Cal Civ. Code § 1798.301..................................................................3

**Rules**

Fed. R. Crim. P. 17(c) ....................................................................21

Federal Rule of Appellate Procedure 29(a)(4)(E)......................................1

## Other Federal Sources

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025). .......... 3

Office of the Inspector General, 66 Fed. Reg. 37903 (July 20, 2001) ..... 26

*Protecting Children From Chemical and Surgical Mutilation,* Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) .......... 4

*Review of State Bar Complaints and Allegations Against Department of Justice Attorneys,* 91 Fed. Reg. 10780 (Mar. 5, 2026) .......... 28

## Other Authorities

ABA Model Rule 3.1 .......... 11

ABA Model Rule 3.8(a) .......... 11

ABA Model Rule 4.4(a) .......... 11

ABA Model Rule 8.4(d) .......... 11

Ben Penn et al., *Justice Department Expands Gender Care Probe as Hospital Fights*, Bloomberg Law (Aug. 20, 2025) .......... 14

Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025) .......... 26

Brief of Amicus Curiae, *Bos. Children's Hosp. Corp. v. U.S. Dep't of Justice*, Case No. 25-2092, filed July 21, 2026 (1st Cir.) .......... 9

Brief of Amicus Curiae, *Child Advocate for R.I. v. United States*, Case No. 26-1568, filed July 24, 2026 (1st Cir.) .......... 8

Brief of Amicus Curiae, *QueerDoc, PLLC v. U.S. Dep't of Just.,* No. 25-7384, filed Jan. 23, 2026 (9th Cir.) .......... 8

Charlie Savage, *Justice Dept.'s Inspector General to Move to the Federal Reserve*, N.Y. Times (June 6, 2025) .......... 27

Complaint, *Coe v. Blanche*, Case No 1:26-cv-04641, ECF No. 1 (S.D.N.Y. June 2, 2026) ........ 8

Dani Schulkin et al., *"Zero Evidence": How Judges and Grand Juries Have Rejected Trump Administration Efforts to Investigate and Prosecute*, Just Security (July 20, 2026) ........ 20, 28

Daniel Wiessner, *Justice Department gets quick win in first bid to enforce subpoena on gender-affirming care*, Reuters (May 1, 2026) ... 18

Declaration of Paula R. Ramer, Esq., *QueerDoc, PLLC v. U.S. Dep't of Justice*, Case No. 2:25-mc-00042-JNW, ECF No. 1, Ex. 2 (W.D. Wash. July 8, 2025) ........ 18

DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Jan. 2025) ........ 24

Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors* (July 9, 2025), ........ 23

Grand Jury Charge 31, Benchbook for the United States District Courts 7th ed., Federal Judicial Center (Feb. 2026) ........ 15

Jonah E. Bromwich, et al., *White House Secretly Swayed Board Meant to Stop Civil Service Politicization,* N.Y. Times, (June 28, 2026) ....... 28

Justice Manual § 1-1.100 ........ 10

Justice Manual § 1-4.010 ........ 11

Justice Manual § 1-7.100 ........ 24

Justice Manual § 1-7.210 ........ 10

Justice Manual § 1-7.400(B) ........ 24

Justice Manual § 9-11.010 ........ 11

Justice Manual § 9-11.101 ........ 11

Justice Manual § 9-11.120 .......... 11, 21

Justice Manual § 9-11.121 .......... 12, 17, 19

Justice Manual § 9-11.254 .......... 21

Justice Manual § 9-27.001 .......... 10

Justice Manual § 9-27.220 .......... 11

Memorandum from Brett A. Shumate, Assistant Attorney General, to All Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), .......... 5

Memorandum from Merrick Garland, U.S. Attorney General, to All Department Personnel, *Department of Justice Communications with the White House* (July 21, 2021) .......... 14

Memorandum from Pam Bondi, U.S. Attorney General, to All Department Employees, *General Policy Regarding Zealous Advocacy on Behalf of the United States* (Feb. 5, 2025) .......... 15

Memorandum from Pam Bondi, U.S. Attorney General, to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025) .......... 4, 5

Michael S. Schmidt, et al., *Depleted and Distracted, Justice Dept. Staff Fear Losing Focus on Potential Threats,* N.Y. Times, (Jan. 7, 2026) .. 28

Motion to Enforce, *In re Administrative Subpoena 25-1431-032,* Case No. 4:26-mc-00006-O, ECF No. 1 (N.D. Tex. Apr. 30, 2026). .......... 7

Nancy Kassop, *Contacts Policy Between the White House and the Department of Justice: A Sleeper Issue - or Maybe Not?* (July 01, 2022) .......... 14

NYU Langone Health, *Information for NYU Langone Health Patients,* (last visited Sept. 10, 2026) .......... 7

U.S. Department of Justice, *OPR's Role and Relationship to Other Offices and Congress, Office of Professional Responsibility*, (June 9, 2026) .......... 26

Perry Stein and Jeff Stein, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases*, Washington Post (Feb. 9, 2025) ..... 15

Perry Stein et. al., *Several top career officials ousted at Justice Department*, Washington Post (Mar. 7, 2025) ..... 27

Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Seeks to Enforce Subpoena Against Hospital that Performs Sex-Rejecting Procedures on Minors* (May 1, 2026) ..... 7

Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025) ..... 5

Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Justice Department Secures Agreement with Connecticut Children's to End Pediatric "Gender-Affirming Care" (*Aug. 5, 2026) ..... 6

Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care"* (June 5, 2026) ..... 6

Press Release, U.S. Dep't of Justice, Off. of Public Affairs, *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic* (May 15, 2026) ..... 6

Robert Jackson, U.S. Attorney General, *The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys,* (Apr. 1, 1940) ..... 10

Ryan Goodman et al., *The "Presumption of Regularity" in the Trump Administration Litigation,* Just Security (March 19, 2026) ..... 12

Sarah Lynch, *US Justice Department senior career ethics official removed from post, source says,* Reuters (Jan. 27, 2025) ..... 27

The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025) ..... 4

The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025) ..... 5

Transcript of Motion to Quash Hearing, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-0007-MSM-AEM, ECF No. 54 (D.R.I. May 21, 2026) .......... 18

Transcript of Teleconference Decision, *Coe v. Blanche*, No. 26-cv-04641, ECF No. 89 (S.D.N.Y., June 24, 2026) .......... 22

U.S. Department of Justice, *When Does the Division Announce Investigations?*, Civil Rights Division (Oct. 18, 2018) .......... 24

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former attorneys for the Department of Justice ("DOJ"), serving over seven decades, across administrations of both parties, in Main Justice and United States Attorneys' offices across the country. We have significant experience investigating and prosecuting civil and criminal federal offenses and have deep insight into the institutional norms and procedures that have historically governed DOJ's exercise of law-enforcement authority. We know firsthand how these norms and procedures have supported DOJ's institutional integrity, allowed its attorneys to investigate and prosecute civil and criminal cases ethically and evenhandedly, and helped prevent improper purposes from infecting prosecutorial and civil enforcement decisions.

*Amici* are not medical professionals, and we take no position here on gender-affirming care itself. Nor do we have personal knowledge of how this investigation has been conducted, beyond what the public record discloses. However, what the record appears to show in this case and in related investigations across the country is deeply troubling: the use of DOJ's investigative authority not

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, has contributed money that was intended to fund preparing or submitting this brief. All parties provided consent for *amici* to file this brief. This brief does not purport to convey the position of New York University School of Law.

for a proper purpose, but to compel substantive policy change through intimidation, coercion, and retribution.

That is anathema to the norms, practices, and procedures that governed DOJ's operations for generations up until recently. In our experience and judgment, these striking deviations from procedural norms support the District Court's conclusion that equitable relief is warranted for the class of individuals whose medical records are being sought here.

## INTRODUCTION

In our decades of experience, we have investigated cases, prosecuted crimes in court, and defended the federal government's arguments and conduct. We appreciate DOJ's power, and we know how it can be abused. "[A]lthough prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). It has long been recognized that vindictive prosecutions can be abusive and violate a defendant's rights. *Id*.

No less problematic is the use of coercive investigations to punish disfavored groups or individuals. We understand a coercive investigation to be the use of an investigatory tool—here, a grand jury subpoena—for a purpose unauthorized by law. Such an investigation can be "vindictive" in the classic sense—used as a means of retribution against a perceived enemy—or as a tool for coercion, to achieve a change in conduct that the law would not otherwise

empower the government to compel. Unlike prosecutions, which largely take place in the public eye and with the ultimate backstop of a judge and jury, a coercive investigation can achieve its goal of harming a person or forcing the abandonment of lawful conduct without ever becoming public or being tested in court.

The current Administration has made it the declared policy of the federal government to stamp out gender-affirming care nationwide, notwithstanding the fact that this care is lawful in many states, including California.[2] Indeed, the Supreme Court has recently affirmed that states have "wide discretion to pass legislation," pro or con, in this area. *United States v. Skrmetti*, 605 U.S. 495, 524 (2025). What it cannot achieve under existing law, this Administration seeks to do with a coercive investigation.

On January 20, 2025, President Trump issued EO 14168, stating: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."[3] On January 28, 2025, he issued EO 14187, providing in part: "[I]t is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-

---

[2] Cal Civ. Code § 1798.301.

[3] Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." The EO proclaims that—lawful or not—such treatments "must end."[4] One week later, the White House reiterated that the EO's "intended effect" was "to downsize or eliminate . . . so-called gender affirming care programs."[5]

On April 22, 2025, then-Attorney General Pam Bondi issued a memorandum ("Bondi Mem.") directing DOJ to implement the President's EO.[6] In relevant part, it ordered "all Department of Justice employees to . . . hold accountable those who prey on vulnerable children and their parents." Bondi Mem. at 3.

Specifically, the Attorney General directed "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of [medications] used to facilitate a child's so-called 'gender transition.'" *Id.* at 4. And she directed "the Civil Division's Fraud Section to pursue investigations

---

[4] *Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[5] The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025), https://tinyurl.com/mrxvewkc.

[6] Memorandum from Pam Bondi, U.S. Attorney General, to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025), https://tinyurl.com/yzyx4akh.

under the False Claims Act (FCA) of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation." *Id.*

On June 11, 2025, Brett Shumate was sworn in as Assistant Attorney General for DOJ's Civil Division and issued his own directive to pursue investigations of "manufacturers and distributors" of drugs used in gender-affirming care for illegal promotion in violation of the FDCA, and investigations of "false claims submitted to federal health care programs" in violation of the FCA.[7] Mr. Shumate executed on this directive by signing at least twenty materially identical subpoenas under the authority of 18 U.S.C. § 3486 (collectively, the "HIPAA Subpoenas").[8] The Administration boasted a month later that, as a result of its actions, a dozen or so hospitals had "stopped," "ended," "halted," or "suspended" gender-affirming care for minors.[9] The Department's public

---

[7] Memorandum from Brett A. Shumate, Assistant Attorney General, to All Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://tinyurl.com/3vrdw8ed.

[8] Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://tinyurl.com/yzjpurhy ("DOJ July 2025 Subpoena").

[9] The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025), https://tinyurl.com/7eppf39d (emphasis in original).

settlements with three hospitals tout that it has forced these health care providers to stop providing gender-affirming care and provide "restorative care for detransitioners," remedies which are not provided for under federal law.[10]

Some health care providers challenged the validity of HIPAA Subpoenas and DOJ ran into legal obstacles when District Courts reviewed its investigation. Between September 2025 and May 2026, at least eight district courts concluded that the HIPAA Subpoenas had been issued for an improper purpose, quashing them at the request of the providers of gender affirming care or the representatives of the patients they serve.[11] Only one court, a Ninth Circuit Court of Appeals

[10] Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Justice Department Secures Agreement with Connecticut Children's to End Pediatric "Gender-Affirming Care"* (Aug. 5, 2026), https://perma.cc/D4MX-8TD8; Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care"* (June 5, 2026), https://perma.cc/7MPN-4AQK; Press Release, U.S. Dep't of Justice, Off. of Public Affairs, *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic* (May 15, 2026), https://perma.cc/S4NQ-X6FN.

[11] *See In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-0007-MSM-AEM, 2026 WL 1392565, at *6–8 (D.R.I. May 14, 2026); *In re Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792, at *6–8 (D. Md. Jan. 21, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1302–04 (W.D. Wash. 2025); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578–87 (E.D. Pa. 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *9–13 (W.D. Wash. Sept. 3, 2025); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *1–3 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, Case No. 25-mc-00063-SKC-CYC, 2026 WL 33398, at *3–7 (D. Colo. Jan. 5, 2026).

panel in *QueerDoc, PLLC v. U.S. Dep't of Justice*, has concluded that a HIPAA Subpoena was not improper on its face, but nevertheless remanded the case for further proceedings to assess whether specific records requests were unduly burdensome or overbroad. *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25-7384, 2026 WL 2359440, at *19 (9th Cir. Aug. 14, 2026) ("*QueerDoc*").

As successful district court challenges to the HIPAA Subpoenas mounted, evidence came to light that DOJ had shifted tactics. First, it moved to enforce a HIPAA Subpoena against a Rhode Island provider of gender-affirming care in the Northern District of Texas, a district to which the investigation and the subpoena recipient had no apparent connection.[12] The Department announced its enforcement petition in a press release.[13] Second, NYU Langone Hospitals, a New York provider of gender-affirming care, announced that it had been served with a grand jury subpoena for patient records.[14] Recent grand jury subpoenas from the Northern District of Texas to other providers of pediatric health care have subsequently come to light. Patients whose records are being sought have

---

[12] *In re Administrative Subpoena 25-1431-032*, Case No. 4:26-mc-00006-O, Motion to Enforce, ECF No. 1 (N.D. Tex. Apr. 30, 2026).

[13] Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Seeks to Enforce Subpoena Against Hospital that Performs Sex-Rejecting Procedures on Minors* (May 1, 2026), https://tinyurl.com/4b33fumf.

[14] NYU Langone Health, *Information for NYU Langone Health Patients*, https://tinyurl.com/mw5zzwza (last visited Sept. 10, 2026).

challenged at least two of the grand jury subpoenas, including the subpoena to Stanford's Packard Children's Hospital that is the subject of this case ("Packard Subpoena").[15]

In *amici*'s view, the record appears to indicate that the Packard Subpoena is just the latest suspect step in an investigation initiated for an improper purpose. In addition to the growing public record that supports that assessment, DOJ's shift to grand jury subpoenas is another irregular step in this investigation, and one that distinguishes this case from *QueerDoc*. The deviations from longstanding DOJ norms and procedures that we discuss below reinforce the District Court's conclusion that "[b]ecause the sensitive patient information demanded by DOJ has no obvious relevance to an indictment in the Northern District of Texas, DOJ likely lacks a meaningful need for access to such information." District Court Opinion ("Op.") at 37.

Many *amici* here are already on the record with our belief that the use of administrative subpoenas for these purposes is dangerous and wrong, and that failing to stop it could encourage more vindictive or coercive investigations in the future.[16] *Amici* here hold the same view about DOJ's misuse of the grand jury in a

---

[15] Complaint, *Coe v. Blanche*, Case No. 1:26-cv-04641, ECF No. 1 (S.D.N.Y. June 2, 2026).

[16] *See, e.g.*, *QueerDoc*, Brief of Amici Curiae, *filed* Jan. 23, 2026; *Child Advocate for R.I. v. United States*, Case No. 26-1568, Brief of Amici Curiae, *filed* July 24,

judicial district with no apparent ties to the federal offenses DOJ claims it is investigating. This Court has an important role to play in preventing such abuses.

## ARGUMENT

### I. DOJ'S IMMENSE POWER MUST BE PROPERLY USED TO ENFORCE FEDERAL LAW.

Federal prosecutors enforce laws passed by Congress. Those laws define illegal conduct and provide prosecutors with the tools they need to investigate that illegal conduct and prove their cases in court. No member of the executive branch has license to decide what conduct they believe is illegal; nor do they have unfettered authority to obtain evidence or testimony from targets or others.

The responsibility of a federal prosecutor was most famously set forth by Justice Robert Jackson in a speech that still appears on DOJ's website:

> With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.
>
> ***It is in this realm – in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of***

---

2026 (1st Cir); *Bos. Children's Hosp. Corp. v. U.S. Dep't of Justice*, Case No. 25-2092, Brief of Amici Curiae, *filed* July 21, 2026 (1st Cir.).

> ***unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.***[17]

Crucially, it is improper to "pick[] the man and then . . . put[] investigators to work . . . to pin some offense on him," even if the government is motivated not by animus, but by the desire to achieve substantive policy goals. *Id.* The key point of Justice Jackson's teaching is that investigation and prosecution should flow from a reasonable, concrete suspicion that someone has violated the law.

Federal prosecutors' adherence to Justice Jackson's admonition does not rely upon tradition alone. DOJ procedures and ethical rules have worked together to constrain this power toward authorized ends. The Justice Manual[18] includes hundreds of pages of guidance on everything from contacts with the media to the necessary consultations before proceeding with different types of charges. *See*, *e.g.*, JM § 1-7.210. Criminal prosecutors also operate with the Principles of Federal Prosecution in the background of their decision-making, which "promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the federal criminal laws," *Id.* § 9-27.001. These Principles instruct a prosecutor to "commence or recommend federal prosecution

---

[17] Robert Jackson, U.S. Attorney General, The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys, pp. 4-5 (Apr. 1, 1940), https://tinyurl.com/bdfbwhkw (emphasis and line breaks added).

[18] The Justice Manual "publicly sets forth internal DOJ policies and procedures." Justice Manual § 1-1.100 (hereafter "JM").

*only if* he/she believes that the person will more likely than not be found guilty beyond a reasonable doubt by an unbiased trier of fact and that the conviction will be upheld on appeal." *Id.* at 9-27.220 comment (emphasis added). This is consistent with the requirements of their professional licensure and role as officers of the court.[19] *Id.* § 1-4.010. Even initial steps of a federal criminal prosecution entail the use of legal process covered by rules of professional ethics. *See, e.g.*, *United States v. Colo. Supreme Ct.*, 189 F.3d 1281, 1288-89 (10th Cir. 1999).

These duties are further reflected in the Justice Manual's guidance on the use of grand juries, which recognizes at the outset that the grand jury is an "independent body whose functions include not only the investigation of crime and the initiation of criminal prosecution but also the protection of the citizenry from unfounded criminal charges." JM § 9-11.010. Grand juries may be used only for the "possible return of an indictment," JM § 9-11.120, where there is probable cause to believe a person has "committed a certain Federal offense within the venue of the district court." JM § 9-11.101. Venue considerations necessarily take

---

[19] *See, e.g.*, ABA Model Rule 3.1 (prohibiting a lawyer from bringing a proceeding "unless there is a basis in law and fact for doing so that is not frivolous"); ABA Model Rule 3.8(a) (requiring a lawyer to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause"); ABA Model Rule 4.4(a) ("a lawyer shall not [take actions] that have no substantial purpose other than to embarrass, delay, or burden a third person"); ABA Model Rule 8.4(d) ("professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice").

place early in the development of a case, reflecting the vicinage requirement of the Sixth Amendment. U.S. Const. amend. VI ("…the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed…"); JM § 9-11.121 ("A case should not be presented to a grand jury in a district unless venue for the offense lies in that district.").

Each of us has practiced under these precedents, principles, and ethical rules. We may not have agreed with what each one of the precedents, principles, and ethical rules required of us in every situation, but we recognized, and continue to recognize, the invaluable role they play in constraining the awesome power of federal prosecutors and safeguarding against its abuse. Decades of adherence to these principles have earned a judicial "presumption of regularity" that federal prosecutors generally act in good faith. In case after case around the country, courts have found that due to the current administration's actions, that presumption of regularity should no longer apply.[20]

---

[20] Ryan Goodman et al., *The "Presumption of Regularity" in the Trump Administration Litigation*, Just Security (March 19, 2026) (tracking cases in which court have questioned the presumption of regularity for actions taken by this administration); *accord Trump v. Cook*, 146 S. Ct. 2234, 2240 (2026) (assessing whether the "good cause" asserted for the removal of a Federal Reserve governor implied an unfitness for office or was instead an effort to secure a more congenial replacement).

The District Court in this case, like many others across the country, carefully reviewed DOJ's conduct before granting equitable relief. The government complains the court overstepped its authority and that "[o]rders like the one entered here have no historical precedent." Gov't Br. at 2. If that is true, it is only because DOJ's use of a grand jury subpoena to obtain the same information it has been barred from obtaining through administrative subpoenas is itself unprecedented. The public record reflects an investigation driven by the Administration's "unadulterated expression of animus and reflective of a bare desire to harm a politically unpopular group." *Talbott v. United States*, 176 F.4th 720, 728 (D.C. Cir. 2026) (affirming in part a district court injunction of a policy prohibiting military service by anyone with history of gender dysphoria) (internal citations omitted). We are hard-pressed to identify an analogous DOJ investigation, where multiple courts prevented DOJ from using subpoenas in an investigation tainted by animus, only to have the Department shift venue and investigative tools. It is not surprising that there is little caselaw addressing the propriety of a grand jury subpoena under these circumstances.

Further, the use of a criminal investigation, directed by the highest levels of the executive branch, to target legally-protected medical care provided to a class of individuals puts this matter well outside the norms of White House involvement in law enforcement priorities. While there may be some reasonable debate about how

much direction DOJ should receive from the White House, here the White House and DOJ's political leadership have directed DOJ to "hold accountable" an entire field or industry engaged in lawful conduct by seeking out criminal violations perpetrated by its members. They are not hiding their goals: each of the three settlements DOJ has announced as part of this investigation include commitments by health care providers to stop providing medical care, even though the medical care at issue is not barred under federal law.

Longstanding conventions and internal guidelines would historically have prevented this sort of direction, and our ethical obligations would have obliged us to reject that direction if received.[21] Since the 1990s, written policies limited contacts between the White House and DOJ on specific matters.[22] Those policies protected prosecutors' ability to independently assess the merits of any case and take steps consistent with their ethical responsibilities.

---

[21] It has been reported that Mr. Shumate's predecessor, Amanda Liskamm, "declined to sign" the Subpoenas opining "that investigating providers and doctors for prescribing [gender-affirming therapy] would be unlikely to lead to a successful criminal prosecution." Liskamm and her deputy subsequently resigned. Ben Penn et al., *Justice Department Expands Gender Care Probe as Hospital Fights*, Bloomberg Law (Aug. 20, 2025), https://tinyurl.com/yn8p8rxf.

[22] *See* Memorandum from Merrick Garland, U.S. Attorney General, to All Department Personnel, *Department of Justice Communications with the White House* (July 21, 2021), https://tinyurl.com/2s488wtn; *see also* Nancy Kassop, *Contacts Policy Between the White House and the Department of Justice: A Sleeper Issue - or Maybe Not?* (July 01, 2022), available at https://tinyurl.com/bzsyk928; see also JM § 1-8.600.

But the firewall between the White House and DOJ prosecutors on most specific matters has been eliminated by this Administration.[23] On the day she was sworn in as Attorney General, Bondi effectively described DOJ attorneys as the President's lawyers.[24] DOJ lawyers today face the unprecedented threat of termination if they do not "zealously" prosecute the President's ideological agenda.[25] Extreme cases like this show what can happen when prosecutorial independence is compromised and the safeguards that have historically addressed the improper influences on Department investigations are removed.

## II. DEVIATIONS FROM NORMS AND PROCEDURES IN THIS CASE CREATE AN INFERENCE THAT DOJ IS USING ITS AUTHORITY IMPROPERLY.

### A. Deviations from normal procedures create an inference of improper purpose.

*Amici* agree that under prior administrations, which followed the principles and practices set forth above, DOJ was appropriately afforded a presumption that it acted in good faith. *See QueerDoc*, 2026 WL 2359440, at *13; *see also* Grand Jury Charge 31, Benchbook for the United States District Courts 7th ed., Federal

---

[23] Perry Stein and Jeff Stein, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases*, Washington Post (Feb. 9, 2025), https://tinyurl.com/47b2xkeu.

[24] Memorandum from Pam Bondi, U.S. Attorney General, to All Department Employees, *General Policy Regarding Zealous Advocacy on Behalf of the United States* (Feb. 5, 2025), https://tinyurl.com/3sw29mt5.

[25] *Id.*

Judicial Center (Feb. 2026) ("If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys."). As documented in this brief, however, the current administration and the political leadership of DOJ has dismantled those safeguards and now boasts of its use of the judicial process to achieve goals not authorized under law. Accordingly, as several courts have found, this DOJ is no longer entitled to a presumption of regularity.[26] Moreover, even when it is in place there is "[n]o doubt" that this "presumption of regularity is subject to be rebutted." *R.H. Stearns Co. of Bos., Mass. v. United States*, 291 U.S. 54, 63 (1934).

Deviations from procedures and norms can be compelling evidence that a presumption of good faith and regularity is unwarranted. *QueerDoc*, 2026 WL 2359440, at *30-31 (Paez, J., dissenting). As the Supreme Court has recognized, "[t]he specific sequence of events leading up to the challenged decision," and any "[d]epartures from the normal procedural sequence," can be strong "circumstantial . . . evidence" of improper "intent." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977). The sequence of events leading up to this grand jury subpoena, viewed in the context of the many departures from DOJ norms and procedures that have characterized this investigation, support the

[26] See *supra* note 20.

District Court's decision to grant equitable relief "to fully remedy the alleged constitutional harms." Op. at 28. As discussed below, DOJ's use of grand jury subpoenas—conduct not at issue in *QueerDoc* —and other procedural irregularities further show why it should not receive the benefit of the presumption of regularity or good faith in this case.

### B. This investigation has not been conducted in a manner suggesting its true purpose is enforcing federal law.

#### 1. DOJ's mid-course relocation of its investigation suggests an improper purpose.

The District Court was correct to question whether venue for this investigation is proper in the Northern District of Texas. Op. at 38-39. Consistent with the Constitution and precedent, DOJ procedures instruct that "a case should not be presented to a grand jury in a district unless venue for the offense lies in that district." JM § 9-11.121. The public record does not include any suggestion that venue for the "offense"—*i.e.*, potential FDCA or FCA claims—"lies in" the Northern District of Texas. As the District Court recognized, this casts serious doubt on DOJ's asserted need for the information sought by the Packard Subpoena. Op. at 39-40. But it also indicates to *amici* that the purpose of this investigation is something other than the legitimate enforcement of federal law.

The public record shows that DOJ conducted this investigation for nearly a year in jurisdictions and courts across the country using administrative subpoenas.

There was no apparent connection between that investigation and the Northern District of Texas. Instead, until recently, all evidence suggested DOJ's investigation was headquartered at Main Justice in Washington, D.C. The HIPAA subpoenas were signed by DOJ attorneys based in Washington D.C.[27] Counsel for targets of these subpoenas interacted with attorneys located in Washington D.C.[28] Even after DOJ has begun using a grand jury in the Northern District of Texas, Department attorneys from Washington D.C., not the Northern District of Texas, continue to litigate these cases across the country.[29]

The fact pattern here is therefore unusual in at least two ways. First, as a general matter, it is not normal practice to relocate a nationwide investigation to a United States Attorney's office. More unusual still is that the decision to relocate appears to have been made after nearly a year's worth of work had been completed

[27] Daniel Wiessner, *Justice Department gets quick win in first bid to enforce subpoena on gender-affirming care*, Reuters (May 1, 2026), https://tinyurl.com/35ctr6jk ("The subpoena, was signed by Shumate, who is based in the District of Columbia, and refers to three other Washington-based department lawyers.").

[28] *QueerDoc, PLLC v. U.S. Dep't of Justice*, Case No. 2:25-mc-00042-JNW, Declaration of Paula R. Ramer, Esq., ECF No. 1, Ex. 2, at 2:5-8 (W.D. Wash. July 8, 2025).

[29] *See, e.g.*, Transcript of Motion to Quash Hearing at 68-69, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-0007-MSM-AEM, ECF No. 54 (D.R.I. May 21, 2026); *Coe v. Blanche*, Case No 1:26-cv-04641 (S.D.N.Y.) (involving a challenge by a New York hospital to a grand jury subpoena issued by N.D. Tex. and defended by DOJ attorneys out of Washington, D.C.).

by Main Justice attorneys. There can be valid reasons for relocating an investigation as it progresses, like the need for additional resources or expertise, but those reasons counsel moving an investigation to, not away from, Main Justice in Washington.

Second, a grand jury should be used to investigate potential illegal conduct *in the district* where the grand jury sits. *See* Op. at 39 (citing *United States v. R. Enters., Inc.*, 498 U.S. 292, 295 (1991)). The record here and in similar cases in New York and Rhode Island instead shows that DOJ is continuing the exact same investigation for which it initially issued administrative subpoenas. Op. at 38 ("it is hardly a logical leap to conclude that the subpoenas concern the same potential FDCA violations"). But there is no indication that that investigation concerns a potential crime committed in the Northern District of Texas. DOJ instead switched to using the grand jury simply as a different mechanism to obtain the same information. This use of a grand jury is contrary to the Justice Manual, *see* JM § 9-11.121, and suggests an improper purpose.

### 2. The timing of the grand jury subpoena suggests a last-ditch effort to circumvent repeated losses in other courts.

The record of this case shows DOJ obtained a grand jury subpoena only after DOJ's legal basis for the HIPAA Subpoenas was questioned by multiple district courts. The possibility that DOJ used a grand jury subpoena to circumvent these

unfavorable precedents is another irregular act, which further distinguishes this case from *QueerDoc*.[30]

After the Attorney General directed investigations into gender affirming care, Packard Hospital received one of the HIPAA Subpoenas, produced some responsive documents, and was engaged in negotiations over others. Op. at 7. As these negotiations were ongoing, courts across the country were concluding that the HIPAA Subpoenas were issued for an improper purpose. Instead of continuing negotiations with Packard Hospital, or moving to enforce the HIPAA Subpoena as it had done in another case, DOJ withdrew its HIPAA Subpoena and issued a grand jury subpoena that was "similar in scope to the withdrawn administrative subpoena." *Id.* at 8.

This history undermines any presumption of regularity and good faith that would typically apply to DOJ's use of a grand jury. Of course, a grand jury has a broad remit, and its subpoenas are not limited, like HIPAA Subpoenas, to the investigation of "a Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I).

---

[30] Unfortunately, this would not be the first time this Department of Justice has abused the grand jury process. Despite the vast legal and procedural advantages prosecutors have before the grand jury, judges and grand juries have rejected DOJ investigations and indictments brought by this Administration at an unprecedented rate. *See* Dani Schulkin et al., *"Zero Evidence": How Judges and Grand Juries Have Rejected Trump Administration Efforts to Investigate and Prosecute*, Just Security (July 20, 2026) https://tinyurl.com/mt7hsb33.

It may issue subpoenas to "investigate merely on suspicion that the law is being violated, or even because it wants assurance that it is not." *United States v. Williams*, 504 U.S. 36, 48 (1992).

But even though a grand jury may investigate based on the "mere suspicion" that a federal law has been broken, there are recognized limits. *See United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985) ("[D]efendants may overcome the presumption of regularity which attaches to grand jury proceedings … on a proper showing of grand jury abuse.") An issuing court "may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c). For example, grand jury subpoenas cannot be used to obtain post-indictment discovery for trial preparation because the purpose of the grand jury is the possible return of an indictment. *See, e.g.*, *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972). Similarly, the Justice Manual protects against serial misuse of a grand jury, requiring a prosecutor to seek special approval before resubmitting a matter to a grand jury after it has "return[ed] a no-bill or otherwise acts on the merits in declining to return an indictment…." JM § 9-11.120; *see also* JM § 9-11.254 ("Before issuing a grand jury subpoena, prosecutors should consider what evidence has already been collected…and whether…other compulsory process is available to obtain the information sought."). When assessing whether the grand jury process is being abused, "[t]he timing of the subpoena casts significant light

on its purposes." *United States v. Furrow*, 125 F. Supp. 2d 1170, 1177 (C.D. Cal. 2000).

The timing of this grand jury subpoena is telling. Only after having limited success under HIPAA did the government turn to a grand jury in a district with no apparent relationship to Packard Hospital to obtain "similar" evidence. And that was also after "other compulsory process"—the HIPAA Subpoenas—was used to obtain evidence from at least 20 entities, including Packard.

*Amici* do not claim to know what other evidence the Government may have, or whether there are some other facts or legal theory that may justify its actions. But if the government's motive in using a grand jury was to avoid adverse judicial opinions, *amici* would consider this conduct to be a paradigmatic example of Justice Jackson's warning about "picking the man and then searching the law books, or putting investigators to work, to pin some offense on him." That irregular conduct provided the District Court ample justification to probe the Government's basis for its investigation to assess whether injunctive relief for the class of patients before it is warranted. [31]

---

[31] The other district court reviewing DOJ's use of a grand jury subpoena reached the same conclusion. *See Coe v. Blanche,* No. 26-cv-04641, Transcript of Teleconference Decision, ECF No. 89 at 11:6-11(S.D.N.Y., June 24, 2026) ("[T]his Court will not blind itself to reality. And, in this case, reality is the timeline of DOJ's efforts and, in particular, its efforts to recast discredited civil

### 3. DOJ's approach to publicizing this investigation and subpoenas violate longstanding norms and policies.

DOJ's efforts to publicize its investigation are contrary to prosecutorial best practices, Department rules, and attorney ethical responsibilities. These deviations from DOJ norms and practices further support the District Court's finding that the Plaintiffs are entitled to equitable relief.

DOJ has publicized this investigation from the outset. On the day Mr. Shumate signed over 20 HIPAA subpoenas marking the beginning of DOJ's investigation, Department officials publicly discussed it at a Federal Trade Commission conference entitled "The Dangers of 'Gender-Affirming Care' for Minors." There, moments after mentioning the subpoenas, DOJ Chief of Staff Chad Mizelle openly stated that DOJ's goal was to "*take down this ... industry*" (*i.e.*, gender-affirming care), and that "[w]e are using all of the tools at the Department of Justice to address this issue."[32] Similarly, when DOJ first moved to enforce one of these subpoenas, it announced the filing in a press release.

It is not just the content of these remarks that is extraordinary; it is extraordinary that the Government said anything at all. The Department "generally

---

administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.").

[32] Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors*, Tr. at 49 (July 9, 2025), https://tinyurl.com/4a9rc7bx (emphasis added).

will not confirm the existence of or otherwise comment about ongoing investigation."[33] JM § 1-7.400(B). DOJ attorneys are counseled that "disclosure of [non-public, sensitive information] to anyone . . . is prohibited and could lead to disciplinary action," including "criminal prosecution or administrative action." *Id.* § 1-7.100.[34]

Administrative subpoenas pursuant to HIPAA do not expressly *require* confidentiality. But as a matter of common sense and longstanding DOJ practice, *amici* fail to see what law-enforcement purpose is served by announcing a wide-ranging criminal investigation well before an indictment has been filed or any obviously criminal conduct has been identified. A prosecutor's job is harder, not easier, when investigations become public in their early stages, putting potential targets and witnesses on notice and risking the destruction or alteration of necessary evidence.

---

[33] DOJ has articulated a limited exception to that rule, not relevant here, that has applied to civil rights investigations of law enforcement agencies, prisons and jails. U.S. Department of Justice, *When Does the Division Announce Investigations?*, Civil Rights Division (Oct. 18, 2018), https://tinyurl.com/3dynfjtw.

[34] DOJ's Office of Inspector General concluded that the Department violated its own rules by issuing a press release announcing information requests related to nursing-home care during the COVID pandemic. DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Jan. 2025) at 42-44, https://tinyurl.com/nhzr94kj.

DOJ also opposed hospital efforts to seal court proceedings as they sought to challenge the HIPAA subpoenas. *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 234-35. Once again, in our experience it is highly unusual for DOJ to seek publicity of a sensitive criminal investigation in its early fact-gathering stage—and to be so insistent on doing so that it would oppose a sealing motion, at the risk of having its own nascent investigation dissected in open court.[35]

The content of DOJ's unusual publicity is also revealing of its improper motives. Amidst hospital efforts to seal court proceedings in connection with DOJ's investigation, DOJ issued what one district court rightly called an "inflammatory" press release "attempting to sway public sentiment against healthcare providers." *QueerDoc*, 807 F. Supp. 3d at 1301. The press release said *explicitly* that DOJ was seeking to hold hospitals "accountable" for purportedly "mutilat[ing] children in the service of a warped ideology"—*i.e.*, for providing gender-affirming care *per se*.[36] There was not a word in the press release about unlawful promotion of pharmaceuticals in violation of the FDCA—the ostensible focus of the investigation.

[35] One court concluded "this troubling behavior by DOJ actually strengthens the case for transparency, not secrecy." *QueerDoc,* 807 F. Supp. 3d at 1301.

[36] *See* DOJ July 2025 Subpoena.

## III. THE INSTITUTIONAL SAFEGUARDS THAT WOULD ONCE HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED.

Over many decades, numerous institutional safeguards have protected the Department's decisions from improper influence and supported a presumption of regularity in DOJ's work. Today, the courts cannot rely on these safeguards.

The Department's Office of Professional Responsibility ("OPR") investigates allegations of professional misconduct by DOJ attorneys in court and related to litigation.[37] The Office of Inspector General is an independent, nonpartisan office housed within the Department charged with detecting and preventing waste, fraud, and abuse.[38] These offices once provided an independent assessment of cases and conduct outside the chain of command, conducting fact-finding and setting precedents that deterred improper actions and guided the conduct of all DOJ attorneys. This Administration has undermined the work of these offices through terminations, demotions, and reassignments.[39] In the first weeks of this Administration, DOJ's political appointees ousted several key senior

---

[37] *OPR's Role and Relationship to Other Offices and Congress*, Office of Professional Responsibility, U.S. Department of Justice (June 9, 2026), https://tinyurl.com/4yzzk7cc.

[38] Office of the Inspector General, 66 Fed. Reg. 37903 (July 20, 2001), https://tinyurl.com/vcxa465w.

[39] Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025), https://tinyurl.com/3p6twp9t.

career officials, including the head of the Office of Professional Responsibility,[40] and the Associate Deputy Attorney General who was responsible for making ethics determinations involving high-level DOJ officials, including those relating to partiality and improper political influence.[41] DOJ's Inspector General left his role in June 2025, after 13 years of service, following the firing or demotion of 20 inspectors general across the federal government.[42]

Meanwhile, this Administration has eroded civil-service and whistleblower protections enforced by agencies outside the Department. Independent agencies like the Merit Systems Protection Board and the Office of Special Counsel have historically protected career DOJ attorneys from prohibited employment practices, such as whistleblower retaliation, discrimination based on political affiliation, and politicized employment decisions. Terminations of the prior leadership of these agencies and efforts to limit their jurisdiction cast serious doubt on whether DOJ

---

[40] Perry Stein et. al., *Several top career officials ousted at Justice Department*, Washington Post (Mar. 7, 2025), https://tinyurl.com/d4cydx4y.

[41] Sarah Lynch, *US Justice Department senior career ethics official removed from post, source says*, Reuters (Jan. 27, 2025), https://tinyurl.com/nhkxh9t4.

[42] Charlie Savage, *Justice Dept.'s Inspector General to Move to the Federal Reserve*, N.Y. Times (June 6, 2025), https://tinyurl.com/3tj2eps3. The Senate confirmed a new Inspector General for DOJ in July 2026, over a year after the last Senate-confirmed IG departed. https://tinyurl.com/5ebrs92z. DOJ's website does not list a new head of OPR. Office of Pro. Resp., https://www.justice.gov/opr (last visited Sept. 10, 2026).

attorneys can rely upon them if they resist improper influences or become whistleblowers.[43]

In addition to these formal guardrails, career DOJ prosecutors bring decades of experience and judgment to any new investigation. The exodus of career attorneys from DOJ in the past year has devastated the Department's institutional judgment and removed perhaps the most important checks against abuse in cases like this one.[44] And if there were any doubt that DOJ is seeking to protect its attorneys from any institutional or independent accountability for their actions, it has proposed a rule that would give it the ability to indefinitely block a state bar association from investigating any DOJ attorney accused of misconduct.[45] The consequences of these policies are being seen in courts, and grand juries, across the country.[46]

---

[43] See generally Jonah E. Bromwich, et al., *White House Secretly Swayed Board Meant to Stop Civil Service Politicization*, N.Y. Times, (June 28, 2026), https://tinyurl.com/32bk3ca4; Nick Bednar, *The Merit System Protection Board's Independence Is Dead*, Lawfare, (Jan. 20, 2026), https://tinyurl.com/36fecj2m.

[44] Michael S. Schmidt, et al., *Depleted and Distracted, Justice Dept. Staff Fear Losing Focus on Potential Threats*, N.Y. Times, (Jan. 7, 2026), https://tinyurl.com/5ff5keyy.

[45] Review of State Bar Complaints and Allegations Against Department of Justice Attorneys, 91 Fed. Reg. 10780 (Mar. 5, 2026) (to be codified at 28 C.F.R. Part 77) (https://www.federalregister.gov/documents/2026/03/05/2026-04390/review-of-state-bar-complaints-and-allegations-against-department-of-justice-attorneys).

[46] Schulkin et al., *supra* note 30 (observing that "anyone who moves to quash faces the onerous burden of proving there is "no reasonable possibility" that the

The Packard Subpoena has been issued at a time when DOJ offices and other oversight agencies responsible for policing the Department are unlikely or unwilling to do so. For that reason, judicial review of the Department's intent and purpose has never been more necessary.

## CONCLUSION

In *amici*'s view, the record in this case is sufficient to overcome any presumption of regularity that might otherwise attach to DOJ's actions, and to support the District Court's conclusion that equitable relief from the grand jury subpoena may be warranted. *Amici* urge the Court to affirm.

September 11, 2026

materials subpoenaed are relevant to an investigation [which] is why the publicly-known amount of grand jury subpoenas quashed under the second Trump administration — at least 16 — is so striking.").

Respectfully submitted,

*/s/ Austin P. Anderson*

Austin P. Anderson
Sean P. O'Neill
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
(617) 621-6500
aanderson@andersonkreiger.com
soneill@andersonkreiger.com

Miriam Rosenbaum
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, New York 10271
(646) 292-8310
rosenbaumm@brennan.law.nyu.edu

Joseph Gaeta
410 Cole Avenue
Providence, Rhode Island 02906
(646) 292-8310
joe@jgaetaconsulting.com

September 11, 2026

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because the brief contains 6,938 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

September 11, 2026

*<u>/s/ Austin P. Anderson</u>*
Austin P. Anderson

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on September 11, 2026.

I hereby certify that participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

September 11, 2026

*/s/ Austin P. Anderson*
Austin P. Anderson

## APPENDIX

1.) Carmen Ortiz, United States Attorney for the District of Massachusetts (2009-17)

2.) John Vaudreuil, United States Attorney (2010-17), Assistant United States Attorney (1980-2010), U.S. Attorney's Office for the Western District of Wisconsin

3.) Jim Lewis, United States Attorney for the Central District of Illinois (2010-16)

4.) Anne Tompkins, United States Attorney for the Western District of North Carolina (2010-25)

5.) Lon Povich, Assistant U.S. Attorney (1990-93), U.S. Attorney's Office for the District of Massachusetts

6.) David Mackey, Assistant U.S. Attorney (1994-2001), U.S. Attorney's Office for the District of Massachusetts

7.) Sara Winslow, Chief of the Civil Division (2016-21), Civil Health Care Fraud Coordinator (2002-16), Assistant U.S. Attorney (2002-16), Affirmative Civil Enforcement Coordinator, U.S. Attorney's Office for the Northern District of California; Trial Attorney, U.S. Department of Justice, Civil Fraud Section (1996–2001)

8.) Mildred Methvin, U. S. Magistrate Judge (1983-2009), Assistant U. S. Attorney (1979-1981), Western District of Louisiana

9.) Brendan Ballou, Special Counsel (2023-25) and Trial Attorney (2020-23), Antitrust Division

10.) Roland Riopelle, Assistant U.S. Attorney, U.S. Attorney's Office for the Southern District of New York (1991-98)

11.) Joyce Branda, Acting Assistant Attorney General (Sept. 2015-Feb. 2016) and Deputy Assistant Attorney General (2012-2017), Civil Division; Trial Attorney, Assistant Director, Deputy Director, and Director (1982-2012) Fraud Section, Commercial Litigation Branch, Civil Division; Trial Attorney (1980-82), Land and Natural Resources Division

12.) Ellyn Lindsay, Assistant U.S. Attorney (1987–2015) and DOJ Honors Program Graduate (1985–87), U.S. Attorney's Office for the Central District of California

13.) John Warshawsky, Senior Trial Counsel and Trial Attorney (1990-2008 and 2010-2014), Civil Division

14.) Ty Cobb, Special White House Counsel (2017-18); Senior Trial Counsel, Office of the Independent Counsel, HUD (1992-93); Assistant U.S. Attorney (1980-86), Chief of the Criminal Division (1983-86), Mid-Atlantic Regional Coordinator President's Organized Crime Drug Enforcement Task Force (1983-86), U.S. Attorney's Office for the District of Maryland

15.) Ira Belkin, Assistant U.S. Attorney (1990-2002), U.S. Attorney's Office for the District of Rhode Island

16.) Ben Clements, Assistant U.S. Attorney (1994-2001), U.S. Attorney's Office for the District of Massachusetts

17.) David Schwendiman, Interim U.S. Attorney (1998), First Assistant U.S. Attorney, (1993-1998), and Assistant U.S. Attorney (Senior Litigation Counsel) (1987-1998), U.S. Attorney's Office for the District of Utah

18.) James Becker, Chief, Major Crimes Section (1987) and Assistant U.S. Attorney (1981-87), U.S. Attorney's Office for the Eastern District of Pennsylvania

19.) Krishna "Kris" Dighe, Senior Counsel (2012-25), Assistant Chief (2006-12), Senior Trial Attorney (2004-06), Environmental Crimes Section, Environment and Natural Resources Division; Assistant U.S. Attorney (1994-2004), U.S. Attorney's Office for the Eastern District of Michigan

20.) Robert Steinberg, Senior Assistant U.S. Attorney (1968-78), U.S. Attorney's Office for the Southern District of Ohio

21.) Michael Tuteur, Assistant US Attorney (1991-1994), U.S. Attorney's Office for the District of Massachusetts

22.) A. Carley Palmer, General Crimes Section Deputy Chief (2021-23) and Assistant U.S. Attorney (2016-24), U.S. Attorney's Office for the Central District of California

23.) Brian Legghio, Assistant United States Attorney (1982-88), U.S. Attorney's Office for the Eastern District of Michigan

24.) Sonia W. Murphy, Trial Attorney, Civil Division, Commercial Litigation Branch, National Courts Section (2018-24); Senior Trial Counsel (2024-25), Special Assistant United States Attorney (2023-25), U.S. Attorney's Office for the District of Columbia

25.) Samuel Bagenstos, General Counsel, U.S. Department of Health and Human Services (2022-24); General Counsel, Office of Management and Budget (2021-22); Principal Deputy Assistant Attorney General (2010-11), Deputy

Assistant Attorney General (2009) and Trial Attorney (1994-97), Civil Rights Division

26.) Daniel Schwe, Deputy Director, Fraud Section of the Civil Division; Trial Attorney, Senior Counsel, Assistant Director Health Care Fraud (1996-2019)

27.) Ann Powers, Trial Attorney, Land and Natural Resources Division (1979-84); Assistant U.S. Attorney (1975-79), U.S. Attorney's Office for the District of Columbia

28.) Elizabeth Langer, Trial Attorney, Civil Division, U.S. Department of Justice (1976-98)

29.) Subodh Chandra, Assistant U.S. Attorney (1999-2002), U.S. Attorney's Office for the Northern District of Ohio

30.) Steven Gold, Assistant U.S. Attorney (1985-1990), Deputy Criminal Chief (1989-90), U.S. Attorney's Office for the Eastern District of New York

31.) Steven Kazan, Assistant U.S. Attorney (1969-71), U.S. Attorney's Office for the Northern District of California

32.) Harriett Galvin, Assistant U.S. Attorney, Appellate Division, (1987-2015), U.S. Attorney's Office for the Southern District of Florida

33.) Celeste Miller, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Idaho; Special Assistant U.S. Attorney, U.S. Attorney's Offices for the Districts of Western Washington, Oregon, Central District California, Utah, and Idaho (1987-2012)

34.) Mark Berthiaume, Assistant U.S. Attorney (1983-86), U.S. Attorney's Office for the District of Maryland

35.) Peter K. Vigeland, Chief, Major Crimes (1994 - 1996) and Assistant United States Attorney (1989 - 1994), United States Attorney's Office for the Southern District of New York

36.) Sheila Sawyer, Assistant U.S. Attorney (1992-2001, 2014-2025), U.S. Attorney's Office for the Districts of Massachusetts and Maine

37.) Elizabeth Trosman, Assistant U.S. Attorney and Chief of the Appellate Division, (2012-21), U.S. Attorney's Office for the District of Columbia

38.) Harry Benner, Assistant U.S. Attorney (1972-2000), U.S. Attorney's Office for the District of Columbia

39.) Mary McGowan Davis, Assistant U.S. Attorney (1978-86) and Chief of Appeals Division (1983-86), U.S. Attorney's Office for the Eastern District of New York

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4388

I am the attorney or self-represented party.

**This brief contains** 6,938 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ________.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Austin Anderson **Date** September 11, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*