**No. 26-4388**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

Z.A., *a minor, by and through their parent*, A.A., *et al.*,
*Plaintiffs-Appellees*,

v.

TODD BLANCHE, *Attorney General, in his official capacity*; UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California

**REPLY BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
*Assistant Attorney General*

JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The Injunction Is Indefensible. .......... 3

A. Plaintiffs chose the wrong procedural vehicle and the wrong court. .......... 3

B. The district court ignored precedent and grossly misapplied substantive due process principles. .......... 15

C. Plaintiffs' First Amendment theory cannot save the injunction. .......... 24

II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction. .......... 26

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 4

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 3, 5, 6, 7

*Becker v. Kroll*,
494 F.3d 904 (10th Cir. 2007) .......... 18

*Blair v. United States*,
250 U.S. 273 (1919) .......... 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 13

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) .......... 17, 18, 19

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .......... 15

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) .......... 6, 8

*FBI v. Fikre*,
601 U.S. 234 (2024) .......... 13

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 25

*Great W. Shows, Inc. v. Los Angeles Cnty.*,
42 Fed. Appx. 929 (9th Cir. Aug. 1, 2002) .......... 23

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 10

*Hale v. Henkel*,
201 U.S. 43 (1906) .......... 10

*Haro v. Sebelius*,
747 F.3d 1099 (9th Cir. 2014) .................... 4

*Hilao v. Est. of Marcos*,
95 F.3d 848 (9th Cir. 1996).................... 9

*In re Grand Jury Proceedings*,
801 F.2d 1164 (9th Cir. 1986) .................... 2, 16, 21, 26

*In re Grand Jury Proceedings*,
867 F.2d 562 (9th Cir. 1989) .................... 17

*In re: Matter of Administrative Subpoena 25-1431-032*,
4:26-MC-00006-O (May 12, 2026) .................... 7

*In re Pantojas*,
628 F.2d 701 (1st Cir. 1980) .................... 14

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .................... 26

*Jaffee v. Redmond*,
518 U.S. 1 (1996) .................... 17

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*,
342 U.S. 180 (1952) .................... 20

*Laird v. Tatum*,
408 U.S. 1 (1972) .................... 24

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .................... 15

*Miss. Publ'g Corp. v. Murphree*,
326 U.S. 438 (1946) .................... 10

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .................... 4, 9

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015) .................... 4

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998) .................... 9

*QueerDoc, PLLC v. Dep't of Just.*,
No. 25-7384, 2026 WL 2359440 (9th Cir. Aug. 14, 2026) .................................... 19, 21

*Raich v. Gonzales*,
500 F.3d 850 (9th Cir. 2007) ........................................................................................ 16

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ........................................................................................ 16

*S.D. v. Reese*,
No. 26-4872, 2026 WL 2752350 (9th Cir. Sept. 17, 2026) .................................... 22, 23

*Schweiker v. Chilicky*,
487 U.S. 412 (1988) ........................................................................................................ 6

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) .......................................................................................................... 6

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ................................................................................................. 9, 10

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................................................ 24

*Sibbach v. Wilson & Co.*,
312 U.S. 1 (1941) ............................................................................................................ 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................................................ 13

*Trump v. California*,
2026 WL 2473573 (U.S. Aug. 24, 2026) ......................................................... 13, 24, 25

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............................................................................................ 10, 11, 12

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) ................................................................................... 17, 18

*United States v. (Under Seal)*,
714 F.2d 347 (4th Cir. 1983) ........................................................................................ 11

*United States v. Calandra*,
414 U.S. 338 (1974) ................................................................................ 1, 4, 16, 17, 26

*United States v. Cessa*,
856 F.3d 370 (5th Cir. 2017) ........................................................................ 11

*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991) ........................................................................ 5, 21, 23, 26

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........................................................................ 22, 24

*United States v. Tohono O'Odham Nation*,
563 U.S. 307 (2011) ........................................................................ 9

*Univ. of Pennsylvania v. EEOC*,
493 U.S. 182 (1990) ........................................................................ 24

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ........................................................................ 15

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................................................ 8

*Whalen v. Roe*,
429 U.S. 589 (1977) ........................................................................ 16, 25

*World Prof. Ass'n for Transgender Health v. FTC*,
2026 WL 1999008 (D.D.C. July 10, 2026) ........................................................................ 20

**Statutes**

28 U.S.C. § 2072(b) ........................................................................ 9

Cal. Evid. Code § 998 ........................................................................ 16

**Rules**

Fed. R. Crim. P. 6 ........................................................................ 3

Fed. R. Crim. P. 6(e)(3)(E) ........................................................................ 7

Fed. R. Crim. P. 6(e)(3)(F) ........................................................................ 7

Fed. R. Crim. P. 17 ........................................................................ 3, 11, 21

**Other Authorities**

1 McCormick on Evid. 98 (9th ed.) ........ 16

Miles Wilkinson, *Codification and the Origins of Physician-Patient Privilege*, 32 J. Pol'y Hist. 78 (2020) ........ 16

# INTRODUCTION

The Department of Justice is conducting a nationwide investigation into, among other things, misbranding and billing fraud in the provision of gender-related medical interventions to minors. Last month, a panel of this Court held that a subpoena issued to investigate Food, Drug, and Cosmetic Act offenses in this space was lawful and represented an ordinary exercise of the Department's authority to investigate suspected federal crimes consistent with Presidential priorities. *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25-7384 (9th Cir. Aug. 14, 2026). The Department's investigation has so far resulted in resolutions of criminal liability with six hospital systems. Last week, for example, New York University Langone Hospitals agreed to pay $8.5 million to resolve allegations that they submitted false bills to obtain insurance coverage.[1]

The district court's extraordinary injunction is plainly untenable. It barred the government from seeking or obtaining medical and billing records pertaining to certain procedures through any means (including grand jury process), on the implausible theory that the records could not possibly be relevant to any legitimate federal grand jury investigation. An order of this kind is unknown in our legal tradition. Plaintiffs still cite no remotely comparable order—with the exception of another order issued within a few days of the decision below.

[1] Press Release, U.S. Dep't of Just. (Sept. 18, 2026) (https://perma.cc/F3HV-ARTB)

At the outset, any motions to quash or modify grand jury process are properly entertained only by the court that issued, and has authority to enforce, that process. Plaintiffs do not improve on the district court's reasoning, which would contravene the express terms of Criminal Rule 17 and invite each district court to supervise and interfere with grand jury proceedings operating under the auspices of its sister courts. That is not how the federal judiciary was designed to work. Instead, district courts supervise their own grand juries, and courts of appeals supervise district courts within their jurisdiction.

The district court's order is equally novel on the merits. Plaintiffs do nothing to save the district court's recognition of a new substantive due process right to privacy in medical information sought through grand jury process. Such a right lacks any basis in history or tradition and is flatly inconsistent with this Court's rejection of that theory in materially identical circumstances, *see In re Grand Jury Proceedings*, 801 F.2d 1164, 1167 (9th Cir. 1986)—as well as with a functioning grand jury system.

Even if the Supreme Court allowed "litigious interference with grand jury proceedings," *United States v. Calandra*, 414 U.S. 338, 350 (1974), this Court's recent decision underscores the fundamental errors that infected the district court's order below: It casually assumes impropriety in the normal workings of the Department of Justice, substitutes judicial notions of what should be investigated for the Executive's, and pre-judges enforcement actions that have not yet been brought. The district court's unwarranted intrusion in the Executive Branch's authority to execute the laws,

including through criminal investigation and law enforcement, works irreparable harm each day it remains in effect.

The Court should reverse.

## ARGUMENT

### I. The Injunction Is Indefensible.

Plaintiffs are highly unlikely to succeed on the merits. The injunction circumvents Rule 17, exceeds traditional equitable authority, and rests on an untenable substantive due process theory.

#### A. Plaintiffs chose the wrong procedural vehicle and the wrong court.

As the government has explained, Opening Br. 15-27, Criminal Rule 17 establishes a comprehensive framework governing grand jury subpoenas, including their issuance and supervision and challenges to them. *See* Fed. R. Crim. P. 17; *see also id.* R. 6. That framework evinces an "'intent to foreclose' equitable relief" against identified grand jury process, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015), and Plaintiffs never explain how Congress could have possibly intended for Rule 17's limits to be "circumvent[ed]" through unnecessary and highly disruptive collateral equitable actions, *id.* Nor do Plaintiffs contest the district court's conclusion "that Rule 17 would preclude" them from moving to quash or modify a grand jury subpoena outside the issuing district. ER-27. Their theory thus depends on the implausible notion that Rule 17's limits can be nullified simply by recasting a motion

to quash or modify as a prospective injunction barring the government's receipt of information "in response to the subpoena, or any future, substantively similar subpoenas." ER-130. Courts rightly reject comparable attempts "to evade [a scheme's] restrictions through artful pleading." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 36 (2015); *Mullin v. Doe*, 146 S. Ct. 2121, 2136 (2026) (rejecting attempt to evade limits on judicial review through "creative pleading or clever lawyering"); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661-62 (2025) (Barrett, J., concurring in partial grant of stay) (plaintiff cannot "end-run" jurisdictional scheme "simply by packaging" together "legally distinct" claims); *see also Abbott v. Perez*, 585 U.S. 579, 595 (2018) (functional assessment of remedy to prevent judicial "manipulation"); *cf. Haro v. Sebelius*, 747 F.3d 1099, 1113 (9th Cir. 2014) (invoking the "general rule" that "once federal subject matter jurisdiction is established over the underlying case . . . , the jurisdictional propriety of each additional claim is to be assessed individually").

In the end, a district court has no freewheeling equitable authority to entertain collateral attacks on, or to enjoin in any respect, a coordinate federal court's grand jury process. Plaintiffs still identify no comparable injunction. And for good reason: the procedure embraced below conflicts with basic principles of equity (and comity), the structure and purpose of the Criminal Rules, and the Supreme Court's consistent "disinclination to allow litigious interference with grand jury proceedings." *Calandra*,

414 U.S. at 350. It would also make grand jury investigations unworkable, imperiling the public and eroding the rule of law.

**1.** Two background premises frame the dispute. First, Plaintiffs can obtain meaningful judicial review of their constitutional objections to the asserted grand jury subpoena by following Rule 17's procedures—they are not left without any recourse in court. They may seek relief from the court identified on the subpoena, *see* Fed. R. Crim. P. 17(c)(2)—the court that "will be able to craft appropriate procedures that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays," *United States v. R. Enters., Inc.*, 498 U.S. 292, 302 (1991). Second, the government does not argue that the Criminal Rules displace an equitable cause of action for constitutional claims for which judicial review is *not* available under Rule 17. For example, the government does not contend that Rule 17 channels a claim against unidentified future process—that claim simply fails for other reasons, as explained. *See* Opening Br. 26-27.

The relevant dispute is thus whether a litigant may challenge an identified grand jury subpoena in a collateral equitable action *even though* he could have obtained judicial review and meaningful relief (from the issuing court) under Rule 17. As we explained, the Criminal Rules "establish Congress's 'intent to foreclose' equitable relief" against extant, identified grand jury process. *Armstrong*, 575 U.S. at 328.

Plaintiffs repeat the district court's error by arguing that *Armstrong* permits evasion of Rule 17 because a motion to quash or modify "lacks a close relationship to any particular substantive rule of federal law." Br. 34 (quoting ER-29). That observation is immaterial. The point is that Rule 17 "express[ly] provi[des]," *Armstrong*, 575 U.S. at 328, a mechanism for obtaining relief from extant grand jury process. Indeed, unlike in *Armstrong*, the prescribed procedure gives private parties (including unregulated third parties, such as Plaintiffs) an immediate opportunity to seek full relief from a federal court. As the district court recognized, Rule 17 is a "broad mechanism" under which Plaintiffs could object based on "statutory or common-law privileges, or the Constitution." ER-29. Plaintiffs and the district court thus have it exactly backwards. That Rule 17 is a "comprehensive" mechanism, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012), confirms that Congress could not have intended for it to be sidestepped through inefficient and highly disruptive collateral equitable actions. *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional . . . remedies."). And Plaintiffs' effort to confine alternative-remedy principles to damages actions cannot be squared with *Armstrong* itself, nor the cases on which it relied. *See, e.g.*, *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 74 (1996) ("the same general principle applies" to

whether "the Eleventh Amendment bar should be lifted . . . in order to allow a suit against a state officer" for prospective injunctive relief).

Even if Rule 17's remedy were not alone sufficient, the defining features of grand jury investigations—including secrecy, centralized supervision, and nationwide process—make collateral adjudication "judicially unadministrable." *Armstrong*, 575 U.S. at 328. Plaintiffs nonetheless insist that allowing collateral attacks on grand jury process would not lead to any "practical difficulties," Br. 35, faulting the Department for "not even try[ing]" to obtain any necessary Rule 6(e) authorization, Br. 36. Given that the district court entered an ex parte injunction within hours of Plaintiffs' strategically timed motion, this argument rings hollow. The intolerable and unjustified disruption to the asserted grand jury proceedings began before the government had a chance to appear.

Plaintiffs' claim that collateral attacks will not create "practical difficulties" also ignores that even if Rule 6(e) authorization is sought, it will not necessary be granted. The supervising court—not the Department—is responsible for determining whether to authorize the disclosure of any information about a grand jury's proceedings, to what extent such disclosure may occur, and whether any conditions should be attached to that disclosure. *See* Fed. R. Crim. P. 6(e)(3)(E), (F). And there is no reason to think that a supervising court would freely grant such permission in connection with an improper collateral attack. *See In re: Matter of Administrative Subpoena 25-1431-032*, 4:26-MC-00006-O, ECF No. 17 (May 12, 2026) (denying

government's 6(e) request in part because it was not "clear why, if it is entitled to it, [the subpoenaed entity] has not sought disclosure of the subject information in this Court").

Worse, Plaintiffs all but ignore the district court's recognition that grand jury secrecy "restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief." ER-39. They instead rely on the court's post-injunction "invit[ation]" for the government to try again. Br. 36 (quoting SER-5-6). That enjoin-first, decide-later approach relieves Plaintiffs of their burden and converts grand jury secrecy rules into license to indefinitely obstruct an alleged grand jury investigation. And Plaintiffs do not contest that even *if* any needed Rule 6(e) authorization were granted on terms that would permit the Department to collaterally litigate the validity of any subpoena, in the meantime, there would be extended interruption of the grand jury's investigation—without any informed determination about the consequences or appropriateness of such delay.

Plaintiffs' other responses are no more persuasive. They invoke *Webster v. Doe*, 486 U.S. 592 (1988), but the question there was whether a scheme should be "construed to deny *any judicial forum* for a colorable constitutional claim." *Webster*, 486 U.S. at 603 (emphasis added). The Supreme Court explained that it would require a clear demonstration of congressional intent before interpreting a statute to bar the door of *every* court to a plaintiff challenging agency action on colorable constitutional grounds. *See id.* But as the Supreme Court later explained in *Elgin*, "*Webster*'s standard

does not apply where Congress simply channels judicial review of a constitutional claim to a particular" forum. 567 U.S. at 9. It was therefore of no constitutional concern that the remedial scheme there required covered employees nationwide to seek review before the Merits Systems Protection Board and then the Federal Circuit—"even [for] constitutional claims for equitable relief." *Id.* at 8. The same is true here: nothing about *Webster* guarantees Plaintiffs a particular venue or a single forum for all of their challenges, and everything about the grand jury process necessarily channels claims against identified grand jury subpoenas to the supervising court. Indeed, respecting a scheme's remedial limits "often requires . . . plaintiffs to file two actions in different courts to obtain complete relief in connection with one set of facts." *Am. Pub. Health Ass'n*, 145 S. Ct. at 2662 (Barrett, J., concurring in partial grant of stay) (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 323 (2011) (Sotomayor, J., concurring)).

Plaintiffs' new[2] Rules Enabling Act argument fails for similar reasons. Because Plaintiffs cannot contest that the "Federal Rules have the force of statute," *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996), they pivot to arguing that Defendants'

[2] The government does not attempt to invoke forfeiture or waiver principles because the issues are "purely [legal] . . . and . . . do[] not depend on [any] factual record developed below." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998). Nor would such a blinkered analysis be in the interest of justice, even though the highly compressed briefing schedule below was necessitated by Plaintiffs' decision to wait to seek emergency relief until "just hours before the original return date on the [asserted] grand jury subpoena." ER-12. For similar reasons, Plaintiffs' halfhearted forfeiture arguments, *see* Br. 30, 39, 41, should be rejected out of hand.

interpretation of Rule 17 is inconsistent with the Act's requirement that the Federal Rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). But "[t]he test is not whether the rule affects a litigant's substantive rights; most procedural rules do." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010). Rather, this limitation merely means "that the Rule must 'really regulat[e] procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'" *Id.* (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)). Rule 17 does exactly that. Requiring Plaintiffs to present objections to the supervising court merely changes how and where their asserted rights are enforced; it does not "erase" or alter any claim. Br. 32. Again, Plaintiffs may raise any constitutional objections to the asserted grand jury subpoena before the supervising court. "What matters is" that the channeling required by the Criminal Rules "governs only 'the manner and the means' by which the [Plaintiffs'] rights are 'enforced.'" *Shady Grove*, 559 U.S. at 407 (quoting *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 445 (1946)).

**2.** Nor have Plaintiffs shown that the district court had equitable authority to interfere with a coordinate federal court's grand jury process. Plaintiffs still identify no example of one federal court entering a coercive injunction against another court's

grand jury process.[3] They instead spend pages defending the general principle that courts may enjoin unconstitutional action. Br. 28-30. But that does not come close to answering whether the truly novel injunction here is the "sort[] of equitable remed[y] 'traditionally accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). After all, the universal injunction in *CASA* likewise sought to remedy allegedly unconstitutional executive action. *See id.* at 838-39. Much more is required to justify an even more novel equitable remedy that interferes with "[t]he power to quash a subpoena" that "exists in the district court of the district where the grand jury sits by reason of its inherent authority to prevent misuse of its own process." *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir. 1983).

That Plaintiffs cannot identify a single analogous injunction (before this year) is dispositive. The "absence" of any comparable remedy "settles the question of judicial authority." *CASA*, 606 U.S. at 845. Citing a case that concerned where a grand jury indictment could be returned, Plaintiffs protest that "historically, a grand jury could

[3] Plaintiffs cite *Hale v. Henkel*, 201 U.S. 43, 77 (1906), for the proposition that "[g]rand jury subpoenas had no exemption from courts' equitable powers." Br. 30. *Hale*, which affirmed a contempt finding against a noncompliant grand jury witness, has literally nothing to do with one federal court's equity power over a coordinate court's process. Indeed, if anything, *Hale*'s passing acknowledgement that "were [any] abuses" of the grand jury process "called to the attention of *the* court,"—that is, the *issuing* court—"it would doubtless be alert to repress them," 201 U.S. at 65 (emphasis added), supports the government's arguments here.

not 'regularly enquire of a fact done out of that county for which they [we]re sworn,'" Br. 30 (quoting *United States v. Cessa*, 856 F.3d 370, 372 (5th Cir. 2017), in turn quoting 4 William Blackstone, Commentaries on the Laws of England *300). Whatever the accuracy of that statement for pre-Revolution English grand juries, it is clear that American statutes have "overridden" any such common-law rule from the very beginning. *Cessa*, 856 F.3d at 372. Nationwide compulsory process for witnesses in federal criminal investigations—including grand jury witnesses—has existed *since 1793*, *see Blair v. United States*, 250 U.S. 273, 280 (1919), and Rule 17 has carried that authority forward since its enactment in 1946. *See* Fed. R. Crim. P. 17 advisory committee's note to subdivision (e)(1) (1944) ("This rule continues existing law" allowing subpoenas to "run into another district"). And because Plaintiffs' apparent theory would allow any interested person or subpoenaed entity to challenge any grand jury subpoena outside the issuing district (because quashal can always be reframed as a "broader" prospective injunction against the government's receipt of evidence), it is all the more striking that Plaintiffs cannot point to a single historical analogue supporting the district court's injunction. *Cf. CASA*, 606 U.S. at 845 & n.8 ("That this Court had no occasion to reject the universal injunction as inconsistent with traditional equity practice merely demonstrates that no party even bothered to ask for such a sweeping remedy—because no court would have entertained the request.").

**3.** Plaintiffs resist the settled rule that a litigant cannot evade a remedial scheme by packaging impermissible relief together with other relief. They emphasize

that the district court here did not "take the further step of quashing the grand jury subpoena." Br. 39. But that misses the point entirely. Plaintiffs sought an injunction barring Defendants "from requesting or receiving" information "in response to the grand jury subpoena," ER-141, and the order they obtained functions just like "quash[al] or modif[ication]" under Rule 17. Even if Defendants could somehow seek to enforce other parts of the asserted subpoena without risking contempt, the asserted subpoena has at the least been modified by the district court's injunction—as Plaintiffs put it, the asserted subpoena can now be enforced only "as to information outside the injunction's scope." Br. 39.

Plaintiffs alleged an imminent injury because the asserted subpoena required compliance "no later than June 10." ER-113. That allegation confirms that this action arose from the identified subpoena, not from any withdrawn or unknown future process. In any event, pseudonymous assertions of irreparable harm from unknown process cannot suffice for standing, much less salvage the injunction here insofar as it purports to reach grand jury process emanating from another district court. Plaintiffs still have not shown that any "hypothetical future harm that [they] fear" from anything other than the identified subpoena is "certainly impending." *Trump v. California*, 2026 WL 2473573, at *3 (U.S. Aug. 24, 2026) (per curiam) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And they further err by arguing that they need only show a "credible threat" of future injury. Br. 39 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014)). That test applies when a

plaintiff intends to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159. Plaintiffs do not contend that they face prosecution for engaging in constitutionally protected conduct; rather, their Fifth Amendment claim challenges merely the government's receipt of information from a third party. Nor does *FBI v. Fikre*, 601 U.S. 234 (2024), supply standing for unidentified future process. *Fikre* concerns mootness after voluntary cessation; it does not relax the requirement that each form of prospective relief address a certainly impending injury.

Moreover, Plaintiffs do not even try to explain how every conceivable future attempt by the government to obtain Packard's patient records would be unlawful on the merits. That is understandable, because the privacy balancing Plaintiffs invoke is inherently fact-specific and cannot be applied to unknown investigations or forms of process, which also may be governed by their own remedial frameworks. Without standing or any workable merits theory to justify the "broader" injunction Plaintiffs obtained, it becomes ever clearer that this case has always been about whether the Northern District of California "may adjudicate Plaintiffs' constitutional challenge to compliance with an out-of-district grand jury subpoena." ER-75 (capitalization altered).

**4.** Last, Plaintiffs assert that "[t]he district court found that DOJ was abusing grand jury process." Br. 38. Even if that were true, it would not justify

ignoring Rule 17 nor support equitable interference with another court's process. Again, the "responsibility for controlling grand jury excesses lies with the district court, on which the grand jury must rely for subpoena and contempt procedures," *In re Pantojas*, 628 F.2d 701, 705 (1st Cir. 1980), and Plaintiffs are free to pursue their challenges before that court. In any event, the district court here made no such finding, and could not have: as a nonsupervising court, it lacked any information about the asserted grand jury investigation, and Plaintiffs themselves attested that "the nature of any alleged criminal conduct under investigation is unknown." ER-119; ER-72. Were it otherwise, the court would have had no occasion to "invite[]" the Department to come back with secret grand jury information. Br. 59 (quoting SER-5-6). A district court lacking the most basic information about the existence of a grand jury in another district or the contours of any investigation could not make any such determination.

### B. The district court ignored precedent and grossly misapplied substantive due process principles.

**1.** Plaintiffs' apparent theory is that the "right to informational privacy" is an established fundamental right that applies in a variety of circumstances, Br. 40, and, therefore, they are not required to carefully define their proposed right or show that such a right is deeply rooted in the Nation's history and tradition. That is inconsistent with *Washington v. Glucksberg*, 521 U.S. 702 (1997); *Dobbs v. Jackson Women's Health Org.*,

597 U.S. 215 (2022); and this Court's own cases, all of which recognize that a purported substantive due process right must be carefully defined.

Plaintiffs' reliance on *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc), misses the point. The government does not ask this panel to overrule *Bonta* or *Tucson Woman's Clinic*. Neither case involved the Fifth Amendment or a grand jury subpoena, nor held that a general informational privacy balance applies in every setting. Applying *Regino* and *Raich* to define the asserted right in context follows Supreme Court and circuit precedent.

Apparently recognizing this, Plaintiffs now attempt to establish "a right to the privacy of medical information specifically." Br. 41. But that framing is still wrong. Again, to "formulate the asserted fundamental right," the Court "must consult both the scope of the challenged [government action] and the nature of [the plaintiff's] allegations." *Regino v. Staley*, 133 F.4th 951, 964 (9th Cir. 2025) (citation omitted). And still "[c]onspicuously missing from" Plaintiffs' new characterization of the asserted right "is its centerpiece," *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007): that Plaintiffs seek a right to privacy of medical information as *against grand jury process directed to a third party*.

Plaintiffs have not shown that such a right is deeply rooted. They emphasize that "[b]etween 1828 and 1870, seventeen states or territories enacted statutory guarantees of medical confidentiality." Br. 42 (quoting Miles Wilkinson, *Codification and the Origins of Physician-Patient Privilege*, 32 J. Pol'y Hist. 78, 92 (2020)). But "[t]he

physician-patient evidentiary privilege is unknown to the common law." *Whalen v. Roe*, 429 U.S. 589, 602 & n.28 (1977). And even "[i]n States where it exists by legislative enactment, it is subject to many exceptions." *Id.* California's "widely copied" 1872 privilege applied only in civil proceedings. 1 McCormick on Evid. 98 (9th ed.). That remains true today. *See* Cal. Evid. Code § 998. And given that federal courts refuse to recognize any general physician-patient privilege, *see, e.g.*, *In re Grand Jury Proceedings*, 801 F.2d at 1169, Plaintiffs' argument that such a privilege is implicitly required by the Constitution cannot possibly be right.

Plaintiffs add that "[t]he Fifth Amendment constrains" a "grand jury's subpoena power." Br. 42 (quoting *Calandra*, 414 U.S. at 346). True, but not in the manner they suggest. Their cases address the Fifth Amendment's textual guarantee against self-incrimination, which is irrelevant here. A patient cannot invoke that privilege "to prevent [a] doctor [or] hospitals from producing her [medical] records" because such records "are voluntarily kept business records and thus without the scope of the fifth amendment privilege." *In re Grand Jury Proceedings*, 867 F.2d 562, 565 (9th Cir. 1989), *abrogated on other grounds*, *Jaffee v. Redmond*, 518 U.S. 1 (1996). And Plaintiffs still identify no case even suggesting that grand jury subpoenas are constrained by free-floating Fifth Amendment substantive due process principles—even though any such right in the grand jury context would necessarily have emerged long ago in order to be deeply rooted in history and tradition. Nor can Plaintiffs excuse the lack of precedent by arguing the situation is novel. Grand juries have long

conducted inquiries that involve "embarrassing" topics and require "an unwelcome disclosure of . . . personal affairs." *Calandra*, 414 U.S. at 353.

**2.** Even if Plaintiffs had established a right to privacy of medical information against grand jury process issued to third parties, they have not shown that the asserted subpoena amounts to an abuse of power that "shocks the conscience" so as to support a substantive due process claim. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Plaintiffs now protest that this standard does not apply to informational privacy claims, Br. 51; *cf.* ER-128 (alleging this standard is met), citing this Court's decision in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004). Plaintiffs misunderstand. As *Lewis* explained, "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." 523 U.S. at 846. Plaintiffs here challenge a discrete action, rather than legislation, and in those circumstances "the substantive component of the Due Process Clause is violated" only when the action "'can properly be characterized as arbitrary or conscience shocking, in a constitutional sense.'" *Id.* at 847. *Tucson*, by contrast, involved constitutional challenges to "a statutory and regulatory scheme," 379 F.3d at 536, rather than to a discrete government action.

*Lewis* forecloses Plaintiffs' claims for another reason: they cannot possibly show that the district court performed the "exact analysis" that it requires. *Lewis*, 523 U.S. at 850. Plaintiffs' only response on this score is to say that the district court thought

the record was "clear enough" for it to assess the subpoena's relevance. Br. 52. But Plaintiffs fail to explain how the district court could have "apprais[ed] . . . the totality of facts in [this] case," *Lewis*, 523 U.S. at 850, when Plaintiffs themselves asserted that "the nature of any alleged criminal conduct under investigation is unknown," ER-72, and the court acknowledged that grand jury secrecy rules "restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief," ER-39. That Plaintiffs have no answer alone requires vacatur.

Moreover, Plaintiffs' attempt to equate the asserted subpoena to "conduct intended to injure in some way unjustifiable by any government interest," *Lewis*, 523 U.S. at 849, is implausible. *See also Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007) (such "extreme circumstances" "typically involv[e] some violation of physical liberty or personal physical integrity"). To the contrary—not only is the asserted subpoena not "intended to injure" anyone, it is also plainly justifiable by the government's law-enforcement interests in protecting vulnerable recipients of sensitive medical procedures and in ensuring lawful participation in government healthcare programs. And Plaintiffs' contention is especially untenable in light of recent caselaw from this Circuit. Parroting the district court, Plaintiffs say that the asserted subpoena is part of "what courts around the country have found to be a bad-faith campaign." Br. 51 (quoting ER-37). And Plaintiffs somehow continue to insist that patient records have "no discernable relevance to any federal healthcare offense." Br. 51-52 (quoting ER-

40). A panel of this Court just rejected similar arguments in reversing the quashal of an administrative subpoena that Plaintiffs assert concerns the same or a similar investigation. ER-120. As the panel explained, the administrative subpoena at issue was not issued in "bad faith" or for an "improper purpose," as "[t]he President may direct DOJ to exercise its statutory authority in a manner that aligns with his broader policy goal." *QueerDoc, PLLC v. Dep't of Just.,* No. 25-7384, 2026 WL 2359440, at *2 (9th Cir. Aug. 14, 2026). It also held that patient records could be relevant to the government's investigation, including because such "records[] may produce evidence about the scale of any misconduct and about whether [the subpoenaed entity] or another party concealed the risks or failed to warn about the potential adverse effects of 'gender-affirming care.'" *Id.* at *10. It is difficult to see how an asserted grand jury subpoena issued (as Plaintiffs assert) as part of the same broader "campaign" could amount to "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849.

Last, Plaintiffs' accusations of "forum shopping" are unfounded and, in any event, would not come close to showing the extreme official misconduct necessary to establish a substantive due process violation. Br. 52 (quoting ER-28). This assertion turns on the false premise that evidence located in one district cannot be relevant to a crime chargeable in another district. They never answer the government's basic point that conspiracies and other multijurisdictional crimes frequently support venue in several districts. Instead, they simply assume that Packard's records cannot relate to

any investigation a grand jury could conduct in the Northern District of Texas. But that fares no better than the district court's uninformed speculation, particularly where Plaintiffs have expressly alleged and argued that "the nature of" the asserted grand jury investigation "is unknown." ER-72; ER-119.

Relatedly, Plaintiffs badly err by characterizing the government's position as a request for "a blank check for grand jury subpoenas." Br. 48. It is the opposite. Given that government has consistently maintained that Plaintiffs may pursue their constitutional objections before the issuing court, Plaintiffs' argument assumes that the Northern District of Texas will be unwilling or unable to faithfully apply the Constitution. There is no basis for this unsupported—and invidious—suggestion. *Cf. Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 185 (1952) ("If in a rare instance a district judge abuses [his or her] authority . . . there is always the opportunity for corrective review by a Court of Appeals and ultimately by [the Supreme Court]."); *see also, e.g.*, *World Prof. Ass'n for Transgender Health v. FTC*, 2026 WL 1999008, at *2 (D.D.C. July 10, 2026) (denying TRO) ("[a] truly compelling showing" is "needed to warrant . . . disrupting proceedings in a coordinate district and doing so on an emergency basis with truncated briefing and consideration").

**3.** Nor have Plaintiffs salvaged the district court's botched application of the balancing framework this Court has applied outside the grand jury process. On the first factor, they cannot deny that medical records are routinely disclosed, including for law-enforcement purposes, as Packard's privacy notice states. That the

district court found Plaintiffs nonetheless "maintained a reasonable [] expectation of privacy" in their medical records held by third parties is just another legal error requiring vacatur. Br. 44 (citing ER-34-35). "[A] person possesses no reasonable expectation that his medical history will remain completely confidential." *In re Grand Jury Proceedings*, 801 F.2d at 1169.

On potential harm and adequacy of safeguards, Plaintiffs do not attempt to defend much of the district court's erroneous reasoning, such as its baseless speculation that compliance would trigger investigations of Plaintiffs' families by Texas officials. *See* ER-37-38. They instead discount the settled rule that "grand jury secrecy affords substantial protection for the [individual's] privacy and dignity interests." Fed. R. Crim. P. 17 advisory committee's note to 2008 amendment. Their answer again "improperly disregard[s] the presumption of regularity," *QueerDoc*, 2026 WL 2359440, at *13, in asserting—without factual support—that the investigation is being conducted in "bad faith," Br. 45. *See also R. Enters.*, 498 U.S. at 300-01 ("a grand jury subpoena issued through normal channels is presumed to be reasonable" because "the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority"). Plaintiffs' assertion that the Department's investigation might "deprive them of medical care," Br. 45, is speculative and, regardless, unpersuasive given the "fierce scientific and policy debates about the safety, efficacy, and propriety of" such interventions in children. *United States v. Skrmetti*, 605 U.S. 495, 525 (2025). And Plaintiffs' forecasts of harm are

particularly difficult to credit given their simultaneous assertion that the injunction's "limitation on [the Department's] investigation is overstated." Br. 59.

On the last two factors (need for access and public policy), nearly all of Plaintiffs' arguments pivot back to assertions that *QueerDoc* rejected: that there is a genuine "question of whether DOJ is investigating violations of federal law"; that the Department's investigation amounts to an "arbitrary fishing expedition[]"; and that the asserted subpoena must be "out of malice or an intent to harass." Br. 46 (citations omitted). But as even Plaintiffs must acknowledge, "this Court found a legitimate investigative rationale in *QueerDoc*," Br. 48—including as to the Department's request for (non-anonymized) patient records. Plaintiffs' only answer to *QueerDoc*—that Defendants here "provided no . . . declaration" to "substantiate any investigative rationale," Br. 48—simply illustrates the district court's fundamental error. That "rationale is legally flawed because it ignores the burden of proof." *S.D. v. Reese*, No. 26-4872, 2026 WL 2752350, at *4 (9th Cir. Sept. 17, 2026). The district court repeatedly faulted the government because (consistent with Rule 6(e)) "[n]othing in the record" proved the relevance of Packard's' records to a "prosecution in Texas." ER-41. But Plaintiffs bore the burden of proof, and "any gaps in the evidence therefore counted against them rather than (as the district court would have it) in their favor." *Reese*, 2026 WL 2752350, at *4. And in addition to flipping the burden, the district court impermissibly raised it by requiring the government to establish specific facts establishing venue. Unlike a trial or administrative subpoena, where a "[grand

jury] subpoena is challenged on relevancy grounds," the subpoena recipient—not the government—must "show that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the *general subject of the grand jury's investigation*." *R. Enters.*, 498 U.S. at 301 (emphasis added).

Finally, as to public policy, as it stands now the government is certainly *not* "free to obtain anonymized billing records" from Packard, as Plaintiffs claim. Br. 52. The district court's sweeping injunction will not allow even that. Anonymized records would still "disclose the clinical indications [or] diagnoses . . . underlying the provision of" care to class members. ER-45.

### C. Plaintiffs' First Amendment theory cannot save the injunction.

As a fallback, Plaintiffs assert an implausible claim that the district court did not reach: that the asserted subpoena amounts to "discriminat[ion] based on viewpoint" in violation of the First Amendment. Br. 53. This untested argument does not present an alternative basis for affirmance, and there is no good reason for this Court to reach it in the first instance. *See, e.g.*, *Great W. Shows, Inc. v. Los Angeles Cnty.*, 42 Fed. Appx. 929, 930 (9th Cir. Aug. 1, 2002) (reversing preliminary injunction and remanding; declining to affirm on First Amendment arguments not ruled on below); *see also Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011).

Plaintiffs first lack Article III standing for this claim. The subpoena does not subject them, now or prospectively, to any "regulation[], proscription[], or

compulsion[]." *Laird v. Tatum,* 408 U.S. 1, 11-12 (1972). In these circumstances, "allegations of a subjective 'chill'" cannot "substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Id.* at 14; *cf. Trump v. California*, 2026 WL 2473573, at *2-3 (plaintiffs lack standing to challenge executive order that "imposes no obligations on," and "does nothing to," them). The theory fails on the merits for the same reason: any effect on Plaintiffs' speech is too "remote and attenuated" to "infringe any First Amendment right enjoyed by" them. *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 200-01 (1990). Plaintiffs' cases (at Br. 53-54) involved government restrictions on speech or advice; the asserted subpoena imposes none on Plaintiffs or their providers.

Moreover, a grand jury subpoena is not viewpoint-based merely because it uses conduct-based definitions that may turn on the purpose of a medical intervention. Otherwise, any subpoena seeking records about conduct with an expressive component would become an impermissible content- or viewpoint-based speech restriction. For good reason, that is not the law. *Cf. Skrmetti*, 605 U.S. at 512 (because "[s]ome medical treatments and procedures are uniquely bound up in sex," "[i]n the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny"). Nor do the Supreme Court's expressive association cases support Plaintiffs' sweeping theory. Br. 54 (citing *First Choice Women's Res. Ctrs., Inc. v. Davenport,* 146 S. Ct. 1114, 1125 (2026)). Plaintiffs are not the recipients of any subpoena, and medical treatment is not expressive association. The

Supreme Court long ago rejected an attempt by patients to "derive a right to individual anonymity" (*i.e.*, privacy) "from [the Court's] freedom of association cases." *Whalen*, 429 U.S. at 604 & n.32. Those precedents "protect freedom of association for the purpose of advancing ideas and airing grievances"—"not anonymity in the course of medical treatment." *Id.* Moreover, "in those cases there was an uncontroverted showing of past harm through disclosure." *Id.* That is "absent here." *Id.*

## II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction.

The injunction irreparably harms the federal government and the public by indefinitely immunizing relevant evidence from any process, including grand jury process. Moreover, the Northern District of California's baseless interference with an asserted grand jury investigation supervised by the Northern District of Texas would intolerably delay any such investigation. There can be no dispute that such an injunction—one that "meddles in 'the workings of' the Executive Branch" by "preventing it from even trying to lawfully implement" its policies—irreparably harms the government and the public. *California*, 2026 WL 2473573, at *4 (staying injunction that, among other things, interfered with the Attorney General's "implement[ation] [of] the President's [criminal] enforcement priorities").

On the other side of the balance, Plaintiffs' asserted privacy interests do not outweigh the government's compelling and legitimate interests in enforcing federal

law—interests that "outweigh[] the privacy rights of those whose [medical] records" are sought to further those interests. *In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000); *In re Grand Jury Proceedings*, 801 F.2d at 1169. A grand jury is entitled to conduct its investigation and receive even evidence that amounts to "an unwelcome disclosure of … personal affairs." *Calandra*, 414 U.S. at 353. "[P]rocedural delays and detours" that interfere with that process are impermissible. *R. Enters.*, 498 U.S. at 298. And lacking a workable merits theory, no irreparable harm to Plaintiffs can suffice to sustain the district court's preliminary injunction. That novel, far-reaching order must be vacated.

## CONCLUSION

For these reasons and those stated in the government's opening brief, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH

*/S/ JOHN BAILEY*
JOHN BAILEY
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
(202) 514-6993
*john.bailey@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(1)(d) and 32-3 because it contains 6,738 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ JOHN BAILEY*
JOHN BAILEY